## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 2022-23945-CIV-MARTINEZ/Becerra

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

      Plaintiff,

v.

SMARTBIZ TELECOM LLC
A Florida limited liability company,

      Defendant.

_____/

## DEFENDANT SMARTBIZ TELECOM LLC'S
## MOTION TO DISMISS AND MOTION TO JOIN REQUIRED PARTIES

Defendant **Smartbiz Telecom LLC ("SBT")**, through counsel and pursuant to Rules 12(b)(1), (6), and (7) Fed. R. Civ. P., hereby moves for dismissal without prejudice of Plaintiff **Office of the Attorney General ("Attorney General")**'s Complaint, and for required joinder:

I.      THE ALLEGATIONS DO NOT INVOKE ARTICLE III STANDING

II.     THE TRACED ACT REGULATIONS CONTROL;

III.    SBT DOES NOT "MAKE" OR "INITIATE" CALLS;

IV.    THE ATTORNEY GENERAL HAS NOT JOINED REQUIRED PARTIES;

V.     COUNT III CONTAINS A PLEADING DEFECT;

VI.    SBT DID NOT PROVIDE SUBSTANTIAL ASSISTANCE UNDER THE PERTINENT REGULATION 16 C.F.R. § 310.3(B); AND

VII.   COUNT V CANNOT SURVIVE ABSENT THE OTHERS

### Introduction

Timeline

In 1991, Congress enacted the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, to address the growing number of telephone marketing calls.[1] On December 30, 2019, the

---

[1] https://www.fcc.gov/general/telemarketing-and-robocalls

Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, or the Pallone-Thune TRACED Act, became law.[2] The TRACED Act's provisions amended various provisions of the TCPA as applied to voice service providers.[3]  Over the following years, the Federal Communications Commission ("FCC") would implement the TRACED act, stating it "worked hard to meet the TRACED Act's deadlines and quickly provide Americans with new protections against unwanted robocalls."[4] The FCC's TRACED Act Implementation website links to more than 40 Public Notices, Reports and Orders, Announcements, and Notices of Proposed Rulemaking it has issued since the TRACED Act became law.[5]

Following the events of January 6, 2021, it was revealed Florida Attorney General Ashley Moody served on the Executive Committee of the association responsible for sending robocalls urging "patriots" to come to Washington and "fight" the certification of Joe Biden's victory in the presidential election.[6] On December 27, 2021, General Moody informed Floridians that robotexts had surpassed robocalls as the most common spam message to Americans.[7] On May 20, 2022, General Moody announced that Florida entered into a new investigative partnership with the FCC to look into illegal caller ID spoofing and robocalls.[8]

On August 2, 2022, General Moody announced the formation of the "Anti-Robocall Litigation Task Force," which she said would investigate *international* scammers who target Americans.[9] "Ahead of today's announcement, the task force issued 20 investigative demands to 20 gateway providers and other entities that are allegedly responsible for a majority of foreign robocall traffic. Gateway providers that bring foreign traffic into the U.S. telephone network are

---

[2] https://www.congress.gov/bill/116th-congress/senate-bill/151
[3] https://www.congress.gov/bill/116th-congress/senate-bill/151/text
[4] https://www.fcc.gov/TRACEDAct
[5] Id.
[6] https://floridapolitics.com/archives/394103-ashley-moody-needs-to-answer-for-robocalls-urging-protesters-to-the-capitol/
[7] https://www.wfla.com/news/florida/florida-ag-robotexts-surpass-robocalls-as-biggest-spam-messages-to-americans/
[8] https://www.tallahassee.com/story/news/local/state/2022/05/20/florida-joins-federal-communications-commission-fight-against-robocalls-illegal-caller-id-spoofing/9845879002/
[9] https://www.wtsp.com/article/money/consumer/ashley-moody-robocall-task-force-scam/67-fd017934-8d5e-4ad9-8ca2-6c3a814b0f29

responsible for ensuring the traffic is legal, but the task force believes these providers are not taking sufficient action to stop illegal robocall traffic," Moody's office wrote in an email.[10]

On September 19, 2022, General Moody called on the FCC to "require telephone providers to implement stronger measures that prevent illegal and fraudulent robocalls from inundating Americans."[11] On November 1, 2022, days before the election, General Moody announced the investigation of two alleged illegal robocallers, neither of which were SBT.[12] On November 8, 2022, General Moody was reelected as Attorney General of the State of Florida.[13]

On November 18, 2022, the FCC filed notice in the Federal Register that the Office of Management and Budget ("OMB") had approved of a TRACED Act Rule that requires gateway providers to block calls based on a "reasonable Do Not Originate (DNO) list."[14] The notice plainly states "*Compliance date:* Compliance with 47 CFR 64.1200(o), published at 87 FR 42916, July 18, 2022, is required on December 19, 2022."[15] On December 5, 2022, General Moody issued a press release announcing this lawsuit.[16]

General Moody then issued a press release on December 12, 2022, again urging the FCC to adopt measures to cut down on illegal robotexting.[17] On December 27, 2022, the FCC issued an "Order on Reconsideration and Declaratory Ruling."[18] The FCC's website announced the Order as "FCC Affirms Three-Call Limit for Robocalls to Residential Lines."[19]

---

[10] Id.

[11] https://www.wftv.com/news/local/florida-ag-ashley-moody-calls-fcc-provide-more-protections-against-robocalls/6OHFHGWRDJAM3IOLPOBWXUJ2TA/

[12] http://www.myfloridalegal.com/newsrel.nsf/newsreleases/4F50E8F9842FB739852588ED005797AF

[13] https://www.wesh.com/article/moody-ayala-florida-attorney-general/41858557

[14] https://www.federalregister.gov/documents/2022/11/18/2022-25148/advanced-methods-to-target-and-eliminate-unlawful-robocalls-call-authentication-trust-anchor

[15] Id.

[16] http://www.myfloridalegal.com/newsrel.nsf/newsreleases/DE8589ADA8B9DB738525890F0055D5DA

[17] http://www.myfloridalegal.com/newsrel.nsf/newsreleases/8632248541F2ED9485258916005F2D8F

[18] https://docs.fcc.gov/public/attachments/FCC-22-100A1.pdf

[19] Id.

<u>**MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT**</u>

<u>**Jurisdiction and Summary of the Attorney General's Arguments**</u>

The Complaint cites the Telephone Consumer Protection Act ("TCPA"), the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarking Act"), and Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA"). The Attorney General cites the TCPA for jurisdiction, 47 U.S.C. § 227(e)(6) and (g)(2). <u>See</u> Complaint at ¶ 9. The Complaint also cites 15 U.S.C. § 6103(a) of the Telemarketing Act. <u>See</u> Complaint at ¶ 15. Although one might assume the FCC has jurisdiction over the conduct of telemarketers, it's the Federal Trade Commission ("FTC") being referred to as the "Commission" in these statutes. <u>See</u> 15 U.S.C. § 6106(2). The Attorney General also seeks to apply FDUTPA. To summarize, the first three counts of the lawsuit pertain to the Attorney General's efforts to bring a civil action as *parens patriae* of residents of Florida and to step into the shoes of the FCC and enforce its power under the Communications Act of 1934, as amended. The fourth count is an attempt to bring a civil action as *parens patriae* of residents of Florida to enforce the FTC's telemarketing rules. The fifth count is a state law claim dependent upon the first four.

As a preliminary matter, SBT vehemently disputes all factual allegations in this matter and intends to show the numerous fundamental flaws with the Attorney General's reasoning and understanding of its services. However, SBT understand that for purposes of this motion it must accept all factual allegations as true at this stage of the litigation. Stating SBT's argument simply, the Attorney General is trying to water seeds that haven't been planted yet.

**I.      THE OAG LACKS ARTICLE III STANDING**

"Standing is a threshold jurisdiction question which must be addressed prior to and independent of the merits of a party's claims." <u>Bochese v. Town of Ponce Inlet</u>, 405 F.3d 964, 974 (11th Cir. 2005).

Despite SBT being in the "ninety-eighth percentile for transmitting illegal robocalls," Complaint at ¶ 4, "one of the most prolific transmitters of illegal robocalls in the United States," <u>Id</u>. at ¶ 3, "flooding the United States with phone scams," <u>Id</u>. at ¶ 8, and "causing vast numbers of robocalls to reach US consumers," the Complaint fails to mention a single victim's name, or allege a single instance of actual concrete harm that befell anyone. The Attorney General analyzed SBT's records. <u>Id</u>. at ¶ 66-81. The Attorney General is also in possession of the "at least 255" tracebacks that SBT has received. <u>Id</u>. at ¶ 3. This is noteworthy because "tracebacks always begin with the call recipient's voice service provider." <u>Id</u>. at footnote 6. Therefore, the Attorney General has all the

information about the persons who received these alleged robocalls, but still has not alleged a single instance of concrete injury to anyone or produced the name of a single alleged victim.

The lack of concrete injury is further evidenced by the Attorney General's own allegations. For example, the Complaint relies heavily on a commercial call blocking software service called YouMail, citing links to the media.youmail.com domain in footnotes 1, 2, and 3, and 15, and relying upon YouMail transcriptions in footnotes 13 and 14. The Attorney General notes, for example, "the **call blocking service** YouMail captured a transcription of one of these calls." Complaint at ¶ 71. The argument is simple and obvious; If the calls were blocked by YouMail's intended purpose, then no person as a called party could have been harmed because no person received them. These recordings, intercepted and forwarded away from a called party, cannot be used to confer standing. As will be shown below, *receipt* of more than one unwanted call is required to confer standing.

The case of Salcedo v. Hanna, 936 F.3d 1162 (11th Cir. 2019) was recently applied by this Court in a persuasive order dismissing TCPA allegations for lack of Article III standing. The Order of Dismissal ("Order") was entered in the case of Muccio v. Global Motivation, Inc. and Jordan R. Belfort, Case No. 22-81004-CIV-CANNON/Reinhart at Doc. 40 (Dec. 27, 2022). The case involved allegations that Global Motivation, Inc., owned by the "Wolf of Wall Street" Jordan R. Belfort, had sent five unsolicited text messages to the Plaintiff Stephen Muccio. The complaint alleged violations of the TCPA in Counts III and V. Order at 2-3. The Court quoted Salcedo, "[s]imply sending one text message to a private cell phone is not closely related to the severe kinds of actively intermeddling intrusions that the traditional tort [of intrusion upon seclusion] contemplates." Order at *4. Likewise, the Court noted that the recent case of Drazen v. Pinto, 41 F.4th (11th Cir. 2022) affirmatively cited Salcedo for the same proposition, "[A] plaintiff has not suffered a concrete injury for Article III standing purposes when she has received a single unwanted text message." Id. at 4-5.

The plaintiff in Muccio argued that he had received five text messages and not one single text message like in Salcedo. However, the Court squarely rejected this argument, again quoting Salcedo and noting "[t]here is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be." Order at *6. In other words, the question is "how concrete and real the alleged harm is, i.e. not on the mere number of unwanted communications." Id.

The fact that these cases dealt with text messages and not pre-recorded messages is immaterial. As the Court noted in footnote 2 of the Order, Congress cannot enact an injury into existence:

> Plaintiff urges this Court to treat the standing analysis differently for his FTSA claims (Counts I and II) because the FTSA identifies unauthorized text messages in the statutory text, whereas the TCPA at issue in Salcedo does not [ECF No. 27 pp. 6–8]. The Court declines the invitation. Article III standing requires a concrete injury even in the context of a statutory violation; "'Congress may not simply enact an injury into existence [sufficient to satisfy Article III],'" Hunstein, 48 F.4th at 1243 (quoting TransUnion, 141 S. Ct. at 2205); and Plaintiff must assert a concrete harm, "independent of a new statutory cause of action," id. at 1245. The Court sees no basis to relax the requirements of Article III simply because certain counts in this case allege violations of the FTSA as opposed to the TCPA.

Order at footnote 2.

On page 6 of the Order, the Court cited three other cases, all in this district, which have applied the same analysis. In fact, in Mittenthal v. Fla. Panthers Hockey Club, Ltd., 472 F.Supp. 3d 1211, 1225 (S.D. Fla. 2020), the Court found a lack of standing where the plaintiff alleged to have received 30 text messages over a four-month period. Id.

In another similar case, Harris v. Travel Resorts of Am., Inc., Case No. 20-14368-CIV-CANNON/Maynard, 2021 U.S. Dist. LEXIS 257303* (S.D. Fla. March 31, 2021), the Court found that Plaintiff lacked standing when she alleged "she received at least twenty unsolicited cellphone calls and voicemails from Defendant between January 29, 2020 and March 26, 2020." Order at 1, 3. The Court rejected the Plaintiff's arguments regarding spent time, wear and tear, and increased electricity expenses, finding she did not "allege how much time was expended, how much electricity expense was incurred, what tangible damage her phone suffered from the receipt of these voicemails, or what lost opportunity she suffered as a result of the unauthorized communications." Id. at 3.

This is further evidenced by Glasser v. Hilton Grand Vacations Co., LLC, 948 F.3d 1301 (11th Cir. 2020). In that case, the plaintiffs alleged they received "over a dozen unsolicited phone calls, some about repaying a debt, others about buying vacation properties." Glasser, 948 F.3d at 1304. The Court conducted a brief analysis about Article III standing. The significant portion being that Article III standing requires "[t]he *receipt* of more than one unwanted telemarketing call:"

> A brief word or two about jurisdiction is in order before we turn to the merits of these consolidated appeals. The U.S. Constitution empowers the federal courts to decide "Cases" or "Controversies." To ensure that a plaintiff has standing to bring

such a claim, we ask whether the plaintiff (1) alleged a concrete injury (2) that's traceable to the defendant's conduct and (3) that the courts can redress. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 559-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

The only tricky issue is whether these unwanted phone calls amount to concrete injuries. That Congress called them injuries and awarded damages for them does not end the inquiry. Congress "cannot erase Article III's standing requirements" by granting a plaintiff "who would not otherwise have standing" the right to sue via statute. <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547-48, 194 L. Ed. 2d 635 (2016) (quotation omitted). A real injury remains necessary. But a recent decision, as it happens, resolves the point for the plaintiffs. "The receipt of more than one unwanted telemarketing call," the court concluded, "is a concrete injury that meets the minimum requirements of Article III standing." <u>Cordoba v. DIRECTV, LLC</u>, 942 F.3d 1259, 1270 (11th Cir. 2019). We appreciate that the point is close, as another decision of the court suggests. See <u>Salcedo v. Hanna</u>, 936 F.3d 1162, 1168 (11th Cir. 2019). But <u>Cordoba</u> resolves it, establishing an Article III injury and giving plaintiffs standing to bring these claims.

<u>Glasser</u> 948 F.3d at 1305-1306.

The Instant Case

Turning to the instant case, the Attorney General has not alleged sufficient injury to invoke the Court's Article III jurisdiction. General allegations of statutory damages are not enough, neither are generalized claims that "robocalls" are the most common contact method for scams, lead to catastrophic loss "for many," and that generally "consumers reported losing over $692 million to fraudulent robocalls in 2021 alone." That's informative, but not enough for Article III purposes. The Complaint doesn't contain any reference to damages Floridians have suffered, instead citing a nationwide figure of $692 million. As this Court has ruled, and the Eleventh Circuit has held repeatedly, Article III standing requires sufficient detail and not conclusory allegations. The Complaint does not name a single person or allege a single person received more than one robocall. Nor could it, considering the Attorney General's case relies upon evidence captured by a service that prevented the call from ever being received by the intended recipient. There was no "receipt" of any alleged telemarketing calls, let alone receipt of more than one. Even then though, the Attorney General is in receipt of the tracebacks and all the records evidencing the alleged millions of robocalls, but has yet to allege a single instance of harm or produce one victim.

## II.     THE TRACED ACT REGULATIONS CONTROL

The Complaint ignores the TRACED Act to create novel and new theories of liability, but those theories are preempted, or simply do not apply. To allow the Attorney General to create new

regulatory liability for conduct the FCC otherwise deems permissible under the TRACED Act, without federally mandated notice and rulemaking provisions, is a violation of procedural due process. The Attorney General's authority to enforce the FCC's rules does not allow it to make new rules the FCC itself has not made or impose penalties for conduct that the FCC does not consider illegal. The conduct complained of in the Complaint, i.e., the blocking or not blocking of alleged robocalls, is already regulated by the TRACED Act and there are no allegations the TRACED Act has been violated. There are regulations governing what providers like SBT are required to do when they receive traceback requests from the ITG, or notices from the FCC. None of those regulations have been alleged to have been violated. Further, the FCC's adoption of new robocall regulations, two weeks after this lawsuit was filed, evidences the need to allow the federal administrative process to play out, or the seeds to be planted so to speak.

## SBT Is an Intermediate Provider

Despite the Complaint stating that SBT "purports to be an intermediate VoIP provider," Complaint at ¶ 21, SBT is an intermediate voice provider and has an active registration with the FCC.[20] Although the Complaint cites many statutes and regulations, it conspicuously omitted the most pertinent law to these proceedings – the TRACED Act and its regulations. Under 47 C.F.R. § 64.1200, entitled "Delivery restrictions," it provides the rules for how and when providers may block call traffic. It's found within 47 C.F.R Subpart L – "Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising" containing 5 regulations - 64.1200 – Delivery restrictions; 64.1201 – Restrictions on billing name and address disclosure; 64.1202 – Public safety answering point do-not-call registry; 64.1203 – Consortium registration process; and 64.1204 – Private entity submissions of robocall violations.

## Current Regulations Govern Call Blocking by Providers

The Complaint cites 47 C.F.R. § 64.1203 on page 3, footnote 5, to note that the Industry Traceback Group ("ITG") is registered under that rule. However, there is not a single citation to any of the other TRACED Act regulations mentioned above. These existing rules provide when different types of providers may block calls. See e.g., 47 C.F.R. § 64.1200(k)(1)-(11). The rule defines the term "gateway provider" which incorporates the definition of "intermediate provider" found in 47 CFR § 64.1600. Gateway provider is defined as:

---

[20] https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=831853

(19) The term gateway provider means a U.S.-based intermediate provider that receives a call directly from a foreign originating provider or foreign intermediate provider at its U.S.-based facilities before transmitting the call downstream to another U.S.-based provider. For purposes of this paragraph (f)(19):

(i) U.S.-based means that the provider has facilities located in the United States, including a point of presence capable of processing the call; and

(ii) Receives a call directly from a provider means the foreign provider directly upstream of the gateway provider in the call path sent the call to the gateway provider, with no providers in-between.

47 C.F.R. § 1200(f)(19).

The term "intermediate provider" means "any entity that carries or processes traffic that traverses or will traverse the public switched telephone network (PSTN) at any point *insofar as that entity neither originates nor terminates that traffic*." 47 C.F.R. § 64.1600(i) (emphasis supplied). Gateway providers are a subset of intermediate providers.

These regulations provide the circumstances in which an intermediate provider like SBT may block calls without liability, or cease accepting traffic under special conditions, one of which is being notified by the Commission:

(4) A provider may block voice calls or cease to accept traffic from an originating or intermediate provider without liability under the Communications Act or the Commission's rules where the originating or intermediate provider, when notified by the Commission, fails to effectively mitigate illegal traffic within 48 hours or fails to implement effective measures to prevent new and renewing customers from using its network to originate illegal calls. Prior to initiating blocking, the provider shall provide the Commission with notice and a brief summary of the basis for its determination that the originating or intermediate provider meets one or more of these two conditions for blocking.

47 C.F.R. § 64.1200(k)(4).

The Complaint alleges SBT accepts and connects call traffic which purports to be 911, but the regulations simply do not give discretion otherwise.

(5) A provider may not block a voice call under paragraphs (k)(1) through (4), paragraph (k)(11), paragraphs (n)(5) and (6), or paragraph (o) of this section if the call is an emergency call placed to 911.

(6) When blocking consistent with paragraphs (k)(1) through (4), paragraph (k)(11), paragraphs (n)(5) and (6), or paragraph (o) of this section, a provider must

make all reasonable efforts to ensure that calls from public safety answering points and government emergency numbers are not blocked.

(7) For purposes of this section, a provider may rely on Caller ID information to determine the purported originating number without regard to whether the call, in fact originated from that number.

47 C.F.R. § 64.1200(k)(5)-(7).

As an intermediate voice provider, and in compliance with the TRACED Act, SBT *may* block calls only under the limited circumstances prescribed in 47 C.F.R. 64.1200(k)(1), (2), and (4). Subsection (5) provides a call may *not* be blocked if it is an emergency call placed to 911, subsection (6) requires providers to make reasonable efforts to ensure calls from public safety and government numbers are not blocked, and subsection (7) states a provider may rely on Caller ID information to determine the purported originating number *without regard to whether the call, in fact originated from that number*. This undermines the Attorney General's arguments that SBT is liable for routing "spoofed" calls, Complaint at ¶ 42, and that "[m]ore egregiously," it transmits calls where the purported calling number matches a US Government Agency. Id. at ¶ 33.

<u>Current Regulations Govern Mitigation Efforts and Responding to Tracebacks</u>

The Attorney General's entire claim is premised upon "tracebacks" from the ITG. <u>See</u> Complaint at ¶ 3-4. Footnote 5 is the only place in the Complaint that the Attorney General cites the TRACED Act regulations. However, 47 C.F.R. § 16.1200(n)(1)-(6) regulates what voice service providers *must* do regarding tracebacks and mitigation. Subsection (n)(1) is clear in what is required from a provider when it receives a traceback request from the ITG. This regulation requires the provider to respond, "fully and in a timely manner," with timely manner being within 24 hours of the request, with some limitations surrounding business hours, holidays, and weekends. There are no allegations that SBT failed to comply with this requirement, despite the Attorney General alleging over 255 tracebacks.

Subsection (n)(2) requires a provider "to take steps to effectively mitigate illegal traffic when it receives actual written notice of such traffic *from the Commission through its Enforcement Bureau*." There are no allegations that SBT failed to comply with this provision or that the Commission ever provided it or any other provider notice. The Attorney General is attempting to impose a new mitigation requirement on SBT that does not exist within the current federal

regulatory framework. The Attorney General is essentially trying to make the case that a provider has an obligation to mitigate despite not having received notice from the Commission.

If the FCC intended for mitigation following tracebacks alone from the ITG, the FCC would codify those changes within the TRACED Act regulations. The Attorney General cannot substitute a "but for" analysis theory of "initiating" or "making" calls as some workaround to create liability for otherwise lawful conduct. SBT cannot be held liable for refusing to block calls that it is not authorized to block under controlling regulations or refusing to take mitigation measures when there are no allegations it received notice from the Commission. The TRACED Act controls and holding SBT liable for conduct that is permissible under those rules, without contrary notice from the FCC, and rulemaking, would deprive it of procedural due process.

Procedural Due Process

It is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it. Fleetwood Trucking Co. v. Dir., OWCP, 586 Fed. App'x 518, 520 (11th Cir. 2014). When the Attorney General sues to enforce the laws delegated to the FCC, it cannot create liability that the FCC itself could not enforce for lack of following its own regulations. Doing so would deprive SBT of notice and the opportunity to be heard, which is the point of the federal rulemaking process. SBT is entitled to notice that its conduct, which is not alleged to have violated the TRACED Act, is now somehow illegal and subjects it to liability. SBT is entitled to be heard, as are all intermediate voice providers, and that should occur through the FCC's rulemaking process. The Attorney General cannot hold SBT liable for failing to block call traffic that it is not allowed to block under applicable regulations without first receiving notice from the FCC, *not* the ITG.

The ITG Is Not The FCC

On July 17, 2020, the FCC adopted the Call Blocking Safe Harbor Report and Order, which authorized voice service providers to block illegal robocalls. *Call Blocking Safe Harbor Report and Order,*[21] 35 FCC Rcd 7614; see also 47 C.F.R § 64.1200(k)(3)-(4). On page 15, ¶ 37 and ¶ 39, the FCC makes it clear that the *FCC* must first notify a provider before it can block calls, and that Tracebacks/ITG are not the same thing as the FCC:

> 37. *Permitting Provider-Based Blocking.* Until very recently, we have only authorized call blocking for particular calls, not based on the provider. In April of

---

[21] https://docs.fcc.gov/public/attachments/FCC-20-96A1.pdf

this year, the Commission's Enforcement Bureau and the FTC jointly issued letters making clear that, in some instances, provider-based blocking is appropriate. [footnote omitted] Today, we clarify that voice service providers are permitted to block calls from "bad-actor" upstream voice service providers. Specifically, we make clear that a voice service provider may block calls from an upstream voice service provider that, **when notified that it is carrying bad traffic by the Commission**, fails to effectively mitigate such traffic or fails to implement effective measures to prevent new and renewing customers from using its network to originate illegal calls. **The notification from the Commission will be based on information obtained through traceback, likely in coordination with the Traceback Consortium**. Failure of the bad-actor provider to sign calls may be an additional factor in this notification. The safe harbor thus provides protection to a voice service provider that blocks all calls from a bad-actor voice service provider. [footnote omitted]

39. *Notification and Effective Mitigation Measures*. If the **Commission** identifies illegal traffic on the network, it **may notify** the voice service provider that it is passing identified bad traffic and that specific calls are illegal. **Upon receipt of this notification**, the voice service provider should promptly investigate and, if necessary, prevent the illegal caller from continuing to use the network to place illegal calls. **If the upstream voice service provider fails to take effective mitigation measures within 48 hours, a voice service provider may then, after notifying the Commission as discussed below, block calls from this bad-actor provider**. Similarly, if the upstream voice service provider fails to implement effective measures to prevent new and renewing customers from using its network to originate illegal calls, a voice service provider may also block calls from this bad-actor provider.

Analyzing the language in paragraph 39, it's obvious that a provider is not allowed to block upstream traffic until the upstream provider has been notified by the FCC and fails to take effective mitigation measures within 48 hours. After the upstream provider fails to mitigate, the provider *may then*, after notifying the FCC, block calls from the bad-actor provider. There have been no allegations that any of the upstream providers named in paragraphs 55-81 of the Complaint were ever given notice by the FCC. Even if they had been, and failed to take mitigation measures within 48 hours, then SBT *may* block their traffic. SBT cannot be held liable in this case for failing to block traffic it is not legally required to block.

<u>Conclusion</u>

To conclude, the TRACED Act and its regulations control and govern the conduct of SBT. There are no allegations the TRACED Act has been violated by SBT or any of the alleged bad actor upstream providers, or that they ever received notice from the FCC. To impose additional

mitigation requirements, without the required notice from the FCC, would run contrary to existing regulations that provide when a provider must take steps to mitigate illegal traffic. As will be further developed in the next section, SBT does not "make" or "initiate" calls, and it would be improper to impose liability based on this "but for" standard because it would penalize SBT it for engaging in conduct the FCC deems lawful as an intermediate provider.

### III.   SBT DOES NOT "MAKE" OR "INITIATE" CALLS

Even assuming the TRACED Act regulations did not control, Counts I and II accuse SBT of engaging in a pattern or practice of "making telephone calls . . .," Complaint at ¶ 85, and "initiating telephone calls . . .," Complaint at ¶ 93. The Complaint acknowledges that SBT accepts calls from "upstream" voice providers, even claiming it structures its contracts to appeal to upstream providers who transmit robocalls. See Complaint at ¶ 21-22. If there is an "upstream" provider, then SBT cannot be the entity "making," "initiating," or "originating" the calls. TRACED Act regulations make this obvious, making numerous references to "originating providers," distinguished from "intermediate providers," and "terminating providers." Further, the definition of "intermediate provider" necessarily means it does not "make" or "initiate" calls. See 47 C.F.R. § 64.1600(i). This is bolstered by the definition of gateway provider which contemplates the gateway provider (intermediate provider) receiving a call from a "foreign originating provider" and then "transmitting the call downstream" to another US-based provider. "Making" and "initiating" are different than "receiving" and "transmitting." The Attorney General applies a "but for" test, Complaint at ¶¶ 87 and 95, to allege that SBT is initiating or making the call because "but for" the call transiting its network, it would not have reached the end user. This test does not exist in statute, does not comport with the rules, and if true, would require the joining of other required parties[22] because every single voice service provider in the chain of the call path from call origin to answer would likewise have "initiated" the call, including the terminating provider because "but for" them connecting the call, the phone would not ring. Likewise, as alleged in the

---

[22] The Attorney General acknowledges that calls originate "upstream," and that a company named Red Telecom, "nominally headquartered in Miami, sent Defendant 3,220,367 call attempts over the two days for which the Attorney General subpoenaed records," and that the calls featured "obvious neighbor spoofing." See Complaint at ¶ 72. Yet, Red Telecom is not a named Defendant. Important here, though, is that the Attorney General acknowledges they were Red Telecom's calls, and not SBT's. Id. at ¶ 73, 74 ("Red Telecom's calls featured obvious neighbor spoofing."); ("Red Telecom's traffic contained illegal robocalls."); see generally ¶ 55-81 (identifying the sources of the alleged illegal robocalls as other than SBT).

Complaint, SBT's contracts are at issue and the Attorney General appears to be asking this Court to invalidate them via injunction.

The TRACED Act regulations make it clear that SBT does not "make" or "initiate" pre-recorded calls, a prerequisite to liability under the TCPA provisions relied upon in the Complaint. Although the Attorney General attempts to utilize a "but for" test, the FCC regulations differentiate between "originating" providers that "make" or "initiate" calls, "intermediate providers," such as SBT, that "receive" and "transmit" calls, and "terminating providers," which connect the call to your cell phone so it rings. SBT is an intermediate provider that transmits calls it receives from "upstream." Therefore, considering there is an "upstream" party, SBT cannot be the one "making" or "initiating" the calls. Even if the Attorney General's "but for" theory was true, it would render every provider in the chain equally liable for "making" or "initiating" the call and would require the addition of those required parties.

## IV. THE ATTORNEY GENERAL HAS NOT JOINED REQUIRED PARTIES

### Contract Rights Are Being Determined and Joinder is Required

In a recent decision of this Court, it was found that all parties to a contract have an interest in the outcome of proceedings determining those contract rights, and parties to a contract are required when a suit concerns the rights and obligations afforded by the contract. Cuhaci v. Echemendia, 2021 U.S. Dist. LEXIS 205729, Case No. 20-cv-23950-BLOOM/Louis (S.D. Fla. Oct. 25, 2021). In that case, the Court succinctly laid out the appropriate test:

> Federal Rule of Civil Procedure 19 sets forth a two-step inquiry to determine whether Kouri Group is an indispensable party to this action. First, the court must decide "whether an absent party is required in the case under Rule 19." Int'l Importers, Inc. v. Int'l Spirits & Wines, LLC, No. 10-61856-CIV, 2012 U.S. Dist. LEXIS 64929, 2011 WL 7807548, at *2 (S.D. Fla. July 26, 2011) (citing Molinos Valle del Cibao v. Lama, 633 F.3d 1330, 1344 (11th Cir. 2011)). An absent party is considered necessary (i) if, in its absence, the court cannot accord complete relief among the existing parties to the action; (ii) if the nonparty's absence would have a prejudicial effect on that party's ability to protect its interest relating to the subject of the action; or (iii) if, due to the absent party's related interest, the nonparty's absence would leave the existing parties at a substantial risk of incurring inconsistent obligations upon the court's disposition of the current action. See Fed. R. Civ. P. 19(a)(1); see also City of Marietta v. CSX Transp. Inc., 196 F.3d 1300, 1305 (11th Cir. 1999) (Per Rule 19(a), the first question is "whether complete relief can be afforded in the present procedural posture, or whether the nonparty's absence will impede either the nonparty's protection of an interest at stake or subject parties to a risk of inconsistent obligations.").

Id. at *7-8.

More importantly, the Court found that absent parties to a contract have a legally protected interest in the outcome of litigation wherein the rights of that contract are being determined:

> As a threshold matter, the Court finds that each of the Rule 19(a)(1) factors weigh in favor of finding that Kouri Group is a "required party" to this action. Fed. R. Civ. P. 19(a)(1)(A)-(B). "In cases challenging the enforceability or validity of a contract, joinder of all parties to that contract will typically be required." Raimbeault v. Accurate Mach. & Tool, LLC, 302 F.R.D. 675, 684 (S.D. Fla. 2014) (citing Dawavendewa v. Salt River Project Agr. Imp. and Power Dist., 276 F.3d 1150, 1156-57 (9th Cir. 2002)). "This is true primarily because the absent contract party has a legally protected interest in the outcome of the litigation." Id. Additionally, "non-joinder of a contract-party would undermine the court's ability to render complete relief among existing parties, since the absent party would not be bound by the court's judgment on the challenged contract. Id. (citing Fireman v. Travelers Cas. & Sur. Co. of Am., No. 10-81564-CIV, 2011 U.S. Dist. LEXIS 18426, 2011 WL 743069, at *4 (S.D. Fla. Feb. 24, 2011)). Thus, "[p]arties to a contract are indispensable when a suit concerns the rights and obligations afforded by the contract." HDR Eng'g, Inc. v. R.C.T. Eng'g, Inc., No. 08-81040-CIV, 2010 U.S. Dist. LEXIS 67690, 2010 WL 2402908, at *2 (S.D. Fla. June 15, 2010) (collecting cases); see also McCray v. Adams, 529 So. 2d 1131, 1136 (Fla. 1st DCA 1998).

Id. at *9.

The Instant Case

The Complaint alleges that SBT has contracts with upstream providers. See Complaint at ¶ 7, 22. It also goes into detail about the identities of those providers. Id. at ¶ 55-81. The Complaint seeks injunctive relief. Id. at p. 1, ¶ 13, ¶ 125. Although nondescript, the injunctive relief sought seems to pertain to stopping the traffic SBT carries pursuant to its contracts with upstream providers by forcing SBT to terminate the contracts or asking the Court to invalidate them. If the Attorney General were to succeed in this action and this Court were to order SBT to cease all traffic under those contracts, or invalidate the contracts, it could result in contractual liability for SBT. Likewise, it would also amount to a determination that the substance of the contracts was illegal, which would mean those other parties would likewise be liable to the Attorney General. If call traffic SBT receives from upstream providers under its contracts is deemed illegal and subjects it to liability, the upstream and downstream providers who touch the same traffic would be equally liable under the Attorney General's "but for" test. Thus, the substantial interests of those contract holders are being determined in this proceeding. This presents the exact situation quoted directly above "non-joinder of a contract-party would undermine the court's ability to render complete

relief among existing parties, since the absent party would not be bound by the court's judgment on the challenged contract."

## V.      COUNT III CONTAINS A PLEADING DEFECT

The Complaint properly cites the wording of 47 U.S.C. § 227(e). <u>See</u> Complaint at ¶ 99. However, in paragraph 101, the word "knowingly" has been moved to create liability. The statute makes it unlawful for certain people to "<u>cause any caller identification service to knowingly transmit</u> misleading or inaccurate caller identification information . . ." However, paragraph 101 of the Complaint accuses SBT of "<u>knowingly causing the caller identification services</u> of the recipients of their call traffic <u>to transmit</u> misleading or inaccurate caller identification information . . ." This is not the standard. The entire Complaint is premised upon the notion that SBT is causing caller ID services to *unknowingly* transmit illegal robocalls. There is not a single allegation in the Complaint that any caller ID servicer has knowingly transmitted misleading or inaccurate caller ID information, or that SBT caused them to do it. Therefore, this Count must be dismissed to correct the defect, and so sufficient allegations can be made to support the claim.

## VI.     SBT DID NOT PROVIDE SUBSTANTIAL ASSISTANCE UNDER THE PERTINENT REGULATION 16 C.F.R. § 310.3(B)

The Attorney General alleges that SBT violated 16 C.F.R. § 310.3(b) by providing substantial assistance or support through its VoIP services to one or more sellers or telemarketers that SBT knew or consciously avoided knowing were engaging in abusive and deceptive telemarketing practices. This claim fails for the same reasons that Counts I-III fail. SBT's conduct as an intermediate provider, as it pertains to the functions of an intermediate provider, is appropriately regulated by the FCC, and not the FTC. The Attorney General alleges no violation of the controlling regulations. Further, although the Attorney General is empowered to bring a suit on behalf of the residents of Florida under 15 U.S.C. § 6103(a), SBT contends that this grant of authority to represent private citizens does not override the jurisdictional damages requirement for private persons in 15 U.S.C. § 6104(a).

The FCC Has Jurisdiction

The Attorney General seeks to "enjoin [SBT]'s violations of the TSR," which it allegedly accomplishes by "providing substantial assistance or support through its VoIP services." <u>See</u> Complaint at ¶ 111, 109. This is a roundabout way to try and force SBT to block traffic on its network. The problem is the FCC regulates the blocking of call traffic, as described in Sections II and III above. The Complaint does not contain a single allegation that SBT was ever put on notice

of illegal call traffic on its network by the FCC. This notice is a condition precedent to SBT being authorized to block call traffic. See *Call Blocking Safe Harbor Report and Order,*[23] 35 FCC Rcd 7614 at ¶ 39. The Attorney General now asks this Court to step into the shoes of the FCC and order SBT to block call traffic that even the FCC has not declared is illegal, despite the alleged "255 tracebacks."

The Attorney General Has Not Alleged Sufficient Damages

The Attorney General also has a jurisdictional problem with failure to allege sufficient damages. Under 15 U.S.C. § 6104(a), a private person, or an authorized person acting on such person's behalf, who is adversely affected by any pattern or practice of telemarketing which violates any FTC rule may bring suit. However, there is a qualification, "if the amount in controversy exceeds the sum or value of $50,000 in actual damages for each person adversely affected by such telemarketing." (emphasis supplied). Here, the Attorney General is an "authorized person" acting on behalf of the private citizens of Florida. The grant of authority to bring the action in 6103(a) does not relieve the Attorney General of the jurisdictional threshold requirement that at least one person be adversely affected in an amount exceeding $50,000. There are no allegations in the Complaint naming a single person, let alone alleging one person suffered actual damages more than $50,000.

The undersigned could not locate any cases in this Circuit that addressed the $50,000 threshold and a claim under 16 C.F.R. § 310.3(b). Outside this Circuit, a recent case identified was McDermet v. DirecTV, LLC, Case No. 19-11322-FDS, 2021 U.S. Dist. LEXIS 11123 (D. Mass. Jan 21, 2021). There, the Court granted summary judgment to defendant against plaintiff's TCPA claims. As part of the analysis, the Court noted the plaintiff was trying to proceed under a theory of liability premised on 16 C.F.R. § 310.3(b). The Court noted the $50,000 threshold in a footnote:

> But that standard is part of the Federal Trade Commission's Telemarketing Sales Rule ("TSR"), which is different from the TCPA. See 16 C.F.R. § 310.3(b). A private right of action exists for violations of the TSR, 15 U.S.C. § 6104, but McDermet has not pursued any such claims here.[FN 7]
>
> * * *
>
> [FN 7] Indeed, it appears unlikely that he could sue under the TSR for the calls at issue. Federal law provides a private right of action for TSR violations only where the plaintiff alleges "actual damages of $50,000 or more." Shostack v. Diller, 2016

---

[23] https://docs.fcc.gov/public/attachments/FCC-20-96A1.pdf

U.S. Dist. LEXIS 30354, 2016 WL 958687, at *6 (S.D.N.Y. Mar. 8, 2016). Here, McDermet has not alleged any actual damages. (Defs. Mem., Ex. 9 at 6; McDermet Dep. at 36).

McDermet, 2021 U.S. Dist. LEXIS 11123 at *18.

In the case of Callier v. Multiplan, Inc., Case No. EP-20-CV-00318-FM, 2021 U.S. Dist LEXIS 256747 (W.D. Tex. Aug. 26, 2021), the Court dismissed a plaintiff's claims under the Telemarketing Sales Rule ("TSR") due to insufficient allegations of actual harm. The Court noted that a private cause of action for violation of the TSR only is only available if the aggrieved individual claims at least $50,000 in actual damages. Id. at *41. "Statutory and punitive damages cannot satisfy this requirement." Id. On that basis, the Court dismissed plaintiff's claim without prejudice. Id.

The language of the statute is important because it provides a private cause of action "if the amount in controversy exceeds the sum or value of $50,000 in actual damages for each person adversely affected by such telemarketing." 15 U.S.C. § 6104(a). SBT anticipates that the Attorney General will argue it has alleged over $50,000 in damages. SBT would respond that the $50,000 threshold is for actual damages to each person, and that the Attorney General's claims of generalized aggregate damages across an unknown number of potential plaintiffs does not satisfy this specific requirement.

### The Complaint Fails to Allege Sufficient Substantial Assistance congruent with §§ 310.3(a), (c), (d), or § 310.4 of FTC's Telemarketing Sales Rule ("TSR")

A person provides substantial assistance when "that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule." See Fed. Trade Comm'n v. WV Universal Mgmt., LLC, 877 F.3d 1234, 1239 (11th Cir. 2017). The operative words are "knows or consciously avoids knowing" the conduct of the telemarketer. Relief under such a claim resides in theories of tort and securities law. Id. Particular to such a cause for relief is an articulatable and identifiable connection of the third-party, due to its proximity to the offender, to give rise to the inference of foreseeable knowledge or disregard to a particular seller's conduct. See FTC v. WV Universal Mgmt., LLC, 877 F.3d 1234, 1239 (11th Cir. 2017) (finding Merchant Service provider was liable for substantial assistance when it provided two merchant accounts to known direct customer, the offending seller and telemarketer, despite a slew of red flags indicating that same customer was engaged in a

fraudulent telemarketing scheme."). An identifiable connection under § 310 requires more than a "casual or incidental" provision of service or procurement of goods to the offending seller to trigger relief under the statute. "The FTC must identify something more than 'casual or incidental' help to the telemarketer, but does not have to show a 'direct connection' between the assistance and the misrepresentation for an entity to be liable under § 310.3(b)." Fed. Trade Comm'n v. Partners in Health Care Ass'n, Inc., 189 F.Supp. 3d 1356, 1369 (S.D. Fla. 2016) (citing FTC v. HES Merch. Servs. Co., No. 12–cv–1618, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014)).

      In the instance of Interconnected VoIP providers supplying services to TSR offenders, the FTC has asserted jurisdiction under TSR violations when the VoIP provider supplies call origination in combination with calling facilities or other services. See FTC v Alcazar Networks, Inc. et. al., Case No.: 6:20-cv-02200-PGB-DCI, Doc-1 ¶ 22 (M.D. Fla. Dec. 3, 2020) (finding FTC sufficiently alleged VoIP provider who provided origination services directly to seller liable under theories of § 310.3(b) – not casual or incidental support of the telemarketer.); see also FTC v VOIP Terminator, Inc. et. al., Case No.: 6:22-cv-00798, Doc-1 ¶ 28-29, (S.D. Fla Apr. 26, 2022) (finding FTC sufficiently alleged VoIP provider who provided origination, inter-exchange and termination services directly to seller liable under theories of § 310.3(b)); and FTC v Education Centre Services, Inc. et. al. Case No.: 3:19-cv-00196-KC, Doc 81 at ¶ 16, (W.D. Tex. Dec. 3, 2019) (finding FTC sufficiently alleged VoIP providers who provided Interconnected Voice over Internet Protocol communication services and facilities directly to TSR offender, a common business enterprise, liable under theories of § 310.3(b)). Common to all instances where the FTC has properly exercised jurisdiction under § 310 over a third-party VoIP Providers is direct service of outbound and inbound calls. This is congruent with theories in tort liability. The third-party knew and held business dealings or privity of contract with the offender as a direct customer beyond any incidental connection, was alerted to the particular fraud or malfeasance in violation of the TSR by that customer, and had direct ability to cut the seller off-from all call services inbound and outbound.

      The Attorney General avers no such identifiable connection and pleads to the contrary. First, the Attorney General alleges that SBT is an intermediate provider under the TRACED Act and neither originates nor terminates the potentially offensive calls to end-user seller. See Complaint at ¶¶ 21, 22, 25, 31, 32, 36(e), 36(f), 55. 56, 57, 58, 67, 75 and 81(identifying SBT as Florida intermediate voice service provider allegedly sending violative traffic under TRACED Act

to other providers with closer connection to any potential seller). Second, the Complaint is devoid of any fact of direct dealing with any one seller definable under §§ 310.3(a), (c) or (d), or § 310.4 of the FTC's Rule. No allegation is made that SBT had knowledge of any particular calling party seller by contract or otherwise.  Third, and even more troublesome for the Attorney General, Count IV lacks any particular representative victim identifying a seller. Instead, the Complaint cites transcripts of blocked prerecorded messages that *could* be the by-product of a TSR violation if the call was answered by the called party. See Complaint at ¶¶ 1, 58, 71, 74, 78, 86, and 94 (averring that the body of calls routed by Defendant failed to terminate or were otherwise blocked by Youmail preventing call completion and capturing a transcript instead). This is insufficient for purposes of §§ 310.3(a), (c) or (d), or § 310.4 of the FTC's Rule. There is nothing within the four corners of the Complaint to identify that the Defendant did anything more that provide *incidental support* at the wholesale/resale level of VoIP call routing to layers of providers and eventually a potential unidentified violative telemarketer or fraudulent seller who allegedly committed violations against callers who never pick up the call.

Count IV must be therefore dismissed because it is incongruent with theories of liability under §§ 310.3(a), (c) or (d), or § 310.4 of TSR Rule. Fed. Trade Comm'n v. WV Universal Mgmt., LLC, 877 F.3d 1234, 1239 (11th Cir. 2017). At best, the Attorney General avers that Defendant could have provided incidental support by means of its services as an intermediate provider under the TRACED Act. Offenders and victims are unnamed and the alleged harm pleads no concrete harm to a called party. Count IV simply fails to plead a proper cause of action under 15 U.S.C. § 6102(a)(1) and 16 C.F.R. §§ 310.1-310.9 or ancillary theories based thereupon to which this Court could grant relief. Count IV must be dismissed.

## VII.   COUNT V CANNOT SURVIVE ABSENT THE OTHERS

The FDUTPA claims cannot survive dismissal of all other claims due to lack of federal question jurisdiction. Further, conduct the FCC considers lawful cannot sustain FDUTPA liability due to the Supremacy clause. "Federal regulations have no less pre-emptive effect than federal statutes." Marrache v. Bacardi U.S.A., Inc., 17 F.4th 1084, 1094 (11th Cir. 2021).

**WHEREFORE**, SBT requests that this Court dismiss the Attorney General's Complaint with leave to amend, and/or also order the joinder of required parties named in the Complaint whose interests are affected if the traffic is deemed illegal.

## <u>CERTIFICATE OF NON-CONFERRAL</u>

Pursuant S.D. Fla. L.R. 7.1(a)(3), SBT is not required to confer with the Attorney General prior to filing this motion.

Respectfully submitted,

SMARTBIZ TELECOM LLC

/s/ Sean W. Gellis
SEAN W. GELLIS
Florida Bar No. 105924
Gellis Law, PLLC
300 W. Pensacola St.
Tallahassee, Florida 32301
Telephone: (561) 371-2848
sean@gellislaw.com
*Counsel for Defendant SBT*

and

/s/ Edward A. Maldonado
EDWARD A. MALDONADO
Florida Bar No. 129781
The Law Office of Edward A. Maldonado, P.A.
2850 S Douglas Rd, Suite 303
Coral Gables, Florida 33134-6903
Telephone: (305) 477-7580
eam@maldonado-group.com
*Counsel for Defendant SBT*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed electronically through the Court's CM/ECF portal and served via the same on all parties of record on this January 20, 2023.

/s/ Sean W. Gellis
SEAN W. GELLIS