**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

    Plaintiff,

    v.                                          CASE NO.: 1:22-cv-23945-JEM

SMARTBIZ TELECOM LLC,
A Florida limited liability company,

    Defendant.

_____/

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs (the "Attorney General"), submits the following Statement of Material Facts in support of Plaintiff's Motion for Summary Judgment, against Smartbiz Telecom LLC ("Smartbiz" or "Defendant") and further states as follows.

**I.    Defendant's Structure and Operations**

1.    Defendant is a Florida Limited Liability Company formed in 2016 with a principal address in Miami, Florida. Exhibit 1, Smartbiz Corporate Records.

2.    Defendant is registered in the Federal Communications Commission's ("FCC") Form 499 Filer database with a Miami, Florida address. Exhibit 2, Smartbiz Form 499 Database Entry.

3.    Defendant is registered in the FCC's Robocall Mitigation Database with a Miami, Florida address. Exhibit 3, Smartbiz Robocall Mitigation Database Entry.

4.    Since 2023, Defendant has maintained office space owned by the company Regus at 6303 Blue Lagoon Drive, Suite 400, Miami, Florida. Exhibit 4, Deposition of Eduardo Borrero ("Borrero Deposition") at 14:25-15:9.[1]

5.    From its founding to 2023, Defendant listed its address as an apartment belonging to a relative of one of Defendant's corporate officers, 14230 Southwest 57th Lane, Suite 106B, Miami, Florida. Exhibit 4, Borrero Deposition at 13:9-14:1.

---

[1] Citations to deposition transcripts are formatted as [page number]:[line number].

1

6. As a part of its business, Defendant provides domestic Voice over Internet Protocol ("VoIP") communications services, meaning that it receives telephone calls from its customers in the form of packets of information sent over the internet, and routes those telephone calls through its suppliers so that the calls can "terminate", meaning connect, to recipients in the United States. Exhibit 4, Borrero Deposition at 26:15-27:24.

7. Defendant's customers and suppliers also offer VoIP communications services and Defendant negotiates individual contracts, titled "Reciprocal Service Agreements" or similar names, governing the buying and selling of "minutes" of connected telephone calls pursuant to rates which are periodically provided by Defendant to its customers and provided to Defendant from its suppliers. Exhibit 5, Reciprocal Service Agreements, at e.g., pg. 1 (Agreement titled "Reciprocal Voice Services Agreement" and setting forth "obligation to purchase and supply" at rates set by "a Usage Charge Schedule" based on "locale where calls may be terminated."); pg. 12 (Agreement tilted "SMARTBIZ TELECOM LLC Carrier Services Agreement" providing that the "Parties hereby agree to provide and to purchase from each other . . . services described in the Schedules attached hereto."); pg. 104 ("Invoices shall include at a minimum; number of completed calls, chargeable minutes, rate per minute and total cost for each individual route.").

8. Defendant uses SIPNav, an online platform called a "softswitch," to route phone calls from its customers through its suppliers in order to connect the calls to recipients in the United States. Exhibit 6, Deposition of Jose Olivar ("Olivar Deposition"), at 14:8-15:15; 21:3-6; Exhibit 4, Borrero Deposition, at 25:15-26:5.

9. Defendant connects with its customers and suppliers over the internet through "trunks," which are pathways for transmitting call traffic that are configured to receive calls from the users' Internet Protocol ("IP") address. Exhibit 6, Olivar Deposition, at 29:4-16.

10. Defendant bills its customers for completed calls that Defendant routed through its softswitch, and Defendant's profits are based on the difference between the rate it charges its customers and the rate it pays its suppliers for transmitting completed phone calls. Exhibit 7, Response to Plaintiff's First Request for Admissions, at pg. 1, No. 3.

11. Defendant does not require that its customers maintain on premises equipment, nor does Defendant maintain any equipment at its own office. Exhibit 4, Borrero Deposition, at 15:10-21, and 28:15-18.

12.     Defendant employs sales, accounting, and technical staff in Latin America to conduct its business operations in conjunction with its Chief Financial Officer, Eduardo Borrero who resides in South Florida, and its Chief Executive Officer, Jose Olivar, who resides in Texas. Defendant's technical support staff are referred to as its network operations center or "NOC." Exhibit 8, Organizational Chart; Exhibit 4, Borrero Deposition, at 36:7-13, 38:18-40:20, and 41:6-42:9; Exhibit 6, Olivar Deposition, at 52:5-8.

13.     Defendant's softswitch captures information about each call it routes, including the date and time of the call, the calling phone number, the called phone number and the billed duration of the call. This information can be exported in the form of a Call Detail Record ("CDR"). Exhibit 9, Example CDR spreadsheet.[2]

14.     Defendant's softswitch also lists a three-digit integer code, called a SIP Code, which denotes the result of each attempted phone call that reaches the softswitch. Exhibit 6, Olivar Deposition, at 60:17-22. These codes include SIP code 200 denoting that the call connected (*Id.* at 54:16-19), code 404 denoting that the call failed because the caller attempted to call an invalid telephone number (*Id.* at 57:2-5), and code 487 denoting the call failed because the caller terminated the call before it had a chance to connect (*Id.* at 58:17-20).

15.     Defendant produced CDR files for call attempts to area codes assigned to the United States that were transmitted to its softswitch between November 6, 2020, and June 1, 2023,[3] comprising approximately 3.4 billion unique call records. Exhibit 10, Expert Report and Summary of Findings of Michael Rudolph ("Expert Report"), at pgs. AG MSJ 008, AG MSJ 021.

## II.     The Industry Traceback Group and the Traceback Process

16.     The Industry Traceback Group ("ITG") is a neutral consortium of telecommunications companies appointed by the FCC pursuant to 47 C.F.R. 64.1203 who attempt to trace suspected illegal calls to their source. Exhibit 11, Deposition of Josh Bercu as

---

[2] Exhibit 9 is a spreadsheet which cannot be filed through the Court's CM/ECF system. Plaintiff has contemporaneously submitted exhibits which cannot be filed though CM/ECF to the Court on digital media. [ECF No. 46].

[3] Defendant produced records spanning only four days of 2020 and 2021, specifically: 2020-11-06, 2020-12-11, 2021-01-14 and 2021-02-02. Exhibit 10, Expert Report, at pg. AG MSJ 048 (finding No. 60), AG MSJ 053-54 (Appendix III, showing dates of first and last call in each dataset produced).

corporate representative for Industry Traceback Group, LLC ("ITG Deposition"), at 11:6-12:7; 148:10-151:2.

17. Tracebacks are a process run by the ITG that attempts to identify the source of a suspected illegal call by contacting each communications service provider who carried the call sequentially starting with the call recipient's provider to uncover the provider who originated[4] the call being traced and who the caller is. Exhibit 11, ITG Deposition, at 13:10-17; 19:2-11.

18. The ITG conducts tracebacks by sending an email notification to a communications provider, starting with the call recipient's provider, asking them to sign into the ITG's online portal to respond to the traceback request. Exhibit 11, ITG Deposition, at 18:7-12; 26:3-10.

19. The ITG's email notice and online portal allow traceback notification recipients to listen to recorded audio of the traced call. Exhibit 11, ITG Deposition, at 25:21-26:2.

20. Each traceback is labeled with a unique identification number in the ITG's records and this identification number is included in the notification emails providers are sent, and copies of the notification emails are also maintained by the ITG. Exhibit 11, ITG Deposition, at 13:18-21; 17:2-8. Composite Exhibit 11, ITG Email Notifications to Smartbiz, at, e.g., pg. 2 (Incident #2640), pg. 15 (Traceback #2930), pg. 444 (Traceback #12079).

21. ITG records indicate that Smartbiz received at least 265 traceback notifications between June 26, 2020, and January 30, 2023. Exhibit 11, ITG Deposition, at 27:9-14; 33:24-35:4; 34:5-35-:1; 174:23-176:3. Exhibit 12, ITG Email Notifications to Smartbiz.[5]

22. Traceback notices apprise Smartbiz that a suspected illegal call reportedly traversed its network, provide a recording and description of the call as well as a statement as to

---

[4] The "originating provider" is the entity that identifies itself as putting the call on the phone network and having a relationship with the end user who made the call. Exhibit 11, ITG Deposition, at 19:18-22.

[5] Exhibit 12 contains each email notification sent by the ITG to Smartbiz. Traceback notification emails make up the bulk of Exhibit 12, but as they span hundreds of pages pinpoint citation to each email is unfeasible. The Attorney General has bookmarked each traceback notification for ease of access. The ITG also sent Defendant reminder emails about un-responded to tracebacks as well as other traceback related communications, such as notifications about the number of tracebacks received in the preceding month. *See e.g.*, Exhibit 12 at pg. 310-312. These email notifications were not included in the count of 265 total traceback notifications received by Defendant but are included in Exhibit 12. Three traceback notifications, Traceback Numbers 2644, 9820, and 9823, were likely sent to Defendant but were not captured in ITG records. Additionally, Defendant was unable to locate one traced call in its CDRs. *Infra* at ¶ 27.

why the call was suspected to be illegal, and provide the phone number information, call time, and date, for Defendant to locate the call in its CDRs and respond to the traceback with the identity of the customer who sent the call to Defendant. Exhibit 11, ITG Deposition, at 30:15-32:22. Exhibit 12, ITG Email Notifications, at *e.g.* pgs. 1-2 (Traceback Notice for #2640), 4-5 (Traceback Notice for #2659), 444 (Traceback Notice for #12079).

23. The ITG records each provider's response to traceback notifications and compiles these responses into records representing the call path – the route that a suspected illegal call takes to reach the recipient. The ITG refers to the provider responding to the traceback the "Hop Provider." The provider who sent the Hop Provider the traced call is referred to as the "Upstream Provider" and the provider who the Hop Provider transmits the call to is referred to as the "Downstream Provider." Exhibit 13, ITG Spreadsheet of Traceback Responses at "Hops" tab. Exhibit 11, ITG Deposition, at 17:2-27:24 (describing the meaning of each column of information in Exhibit 13).

24. Defendant received tracebacks regarding at least 21 of its Upstream Provider customers. Exhibit 14, Smartbiz TB History 6-26-2020 to 1-30-2023, at Column C.[6]

25. Defendant received repeated tracebacks for different calls sent by the same Upstream Provider customers, including more than ten tracebacks for each of the following: AlkaIP Telecom LLC (23 tracebacks); Chock Telecom (24); Etelix.com USA, LLC (11); Family Communications Pte. Ltd. (18); Lata 1 Communications Inc. (16); Opextel, LLC (18); OXNP Telecom Limited (31); and Whisl (83). Exhibit 14, TB History at Column C; Exhibit 10, Expert Report, at AG MSJ 041, Finding 53.

26. The ITG sent at least one traceback notification to Defendant every month from June 2020 to January 2023. Exhibit 14, Smartbiz TB History 6-26-2020 to 1-30-2023, at Column E.

27. ITG records indicate Defendant responded to 261 traceback notifications and identified illegal calls that had transited its network. Exhibit 14, Smartbiz TB History (showing

---

[6] Exhibit 14 is an excerpt of the information compiled in Exhibit 13 for 262 tracebacks. The Columns have the same meaning as in Exhibit 13, but information about traceback responses from entities other than the Defendant has been omitted to make the document easier to read. Exhibit 14 omits information on three traceback notices, numbers 2644, 9820, and 9823, which were sent to Defendant, but not recorded on Exhibit 13. See Exhibit 11, ITG Deposition at 34:5-35:1; 175:24-176:2.

261 rows recording Defendant's responses to traceback notifications). Three traceback notifications were sent but any response by Defendant was not recorded by the ITG. Exhibit 11, ITG Deposition, at 174:23-176:3. In one instance, Traceback Number 9934, Defendant was unable to locate the subject call in its CDRs. Exhibit 13, ITG Spreadsheet of Traceback Responses, at Row 1452, Column M ("We don't have a completed call to that number in our Records").

28. Defendant would frequently leave comments informing the ITG of the action they purported to take in response to the traceback. The most common comment recorded by the ITG states: "In addition to notified [sic] immediately our customers, they are identified as the account sending us FRAUD calls into the US territory (as we are currently doing). We will required [sic] them to take immediate action and stop these calls while giving information regarding the upstream carrier originating those calls. If we don?t [sic] receive a formal response and actions taken as requested within 24hrs, Their account will be blocked temporarily until they comply with our requirements." Defendant responded to traceback notifications with this assertion over 100 times. Exhibit 14, Smartbiz TB History 6-26-2020 to 1-30-2023, at Column N.

### III. Complaints from Defendant's Suppliers

29. Directo is a Mexico based VoIP service provider which Defendant used as a supplier of VoIP services to complete calls to the United States. Exhibit 6, Olivar Deposition, at 257:25-258:2; 267:8-21; 268:22-270:9.

30. From December 2020 to April 2022, Defendant received at least fifteen complaints from Directo about call traffic Defendant sent to Directo to complete to recipients in the United States. These complaints informed Defendant that it was sending Directo traffic which included calls where the ANI[7] had been spoofed so that an invalid phone number appeared in the caller ID, calls that were associated with attempted fraud, calls characterized as scams and robocalls, and Amazon imposter scam calls. Exhibit 15, Directo Complaint Emails, at pgs. 2 (invalid ANIs), 4-5 (fraud), 8 (spoofing), 13 (spoofing), 17 (characterized as suspicious and potentially illegal), 19 (invalid ANIs), 22 (scams and robocalls), 26 (impersonation calls spoofing into the State of Michigan Unemployment Insurance Customer Service Line[8]), 32

---

[7] ANI is used synonymously with the calling number or caller ID for a VoIP phone call. Exhibit 6, Olivar Deposition, at 34:16-17, 35:14-17.
[8] https://www.michigan.gov/leo/bureaus-agencies/uia/contact

(characterized as suspicious and potentially illegal), 36-37 (characterized as suspicious and potentially illegal), 39 (scam call), 43 (scams and robocalls), 46 (neighborhood spoofed[9] call characterized as suspicious and potentially illegal), 50 (scam call), 54 (identified as a scam call impersonating Amazon).

31.     On December 22, 2020, Defendant sent a complaint it had received from a supplier to its customer AlkaIP regarding a call attempt AlkaIP sent to Defendant's network and Defendant transmitted. The complaint stated: "We received this report: AT&T received complaint from our business customer: CITY OF FLORIDA PD telephone number: 305-247-8223 is being spoofed, receiving return calls complaining the [sic] their number is on their caller ID. If you are receiving this e-mail you have been identified as the carrier(s) sending this traffic. Please contact your customer(s) and request they cease and desist this activity." Exhibit 16, Complaint re Spoofing Law Enforcement Number, at p. 1.[10] Defendant's only attempt to eliminate further illegal traffic from its customer was to escalate the complaint to AlkaIP and accept AlkaIP's representation that: "hemos escado esto con el cliente y confirman que este caso ya no debería repetirse." [We have discussed this with the client and they confirm that this case should not be repeated]. Exhibit 17, Smartbiz Skype Account Transcription, at Tab AlkaIP, Row 971.

32.     In June and October of 2020, Defendant escalated complaints from suppliers about traffic Defendant received from their customers Chock Telecom and Family Communications, regarding government impersonation calls and fraudulent caller ID spoofing where a phone number called itself. Exhibit 18, Complaint Escalation to Chock Telecom, at p. 1-2; Exhibit 19, Complaint Escalation to Family Communications, at p. 2.

### IV.     Defendant's Robocall Mitigation Procedures

33.     Defendant uploaded "Robocall Mitigation Procedures" to the FCC's Robocall Mitigation Database and purportedly implemented them at some point in approximately 2021. Exhibit 6, Olivar Deposition, at 45:11-46:9. Exhibit 20, Robocall Mitigation Procedures.

---

[9] Neighborhood spoofing refers to the practice of simulating a caller ID so that it matches three to nine digits of the called number to create the perception that it is a local call. Exhibit 10, Expert Report, at AG MSJ 019. In this specific instance, the calling number matched the first six digits of the called number.

[10] The phone number purportedly making the call at issue, 305-247-8223, is publicized as the contact number for the Chief of Police for the Florida City Police Department. https://www.floridacityfl.gov/police/

34.     The ITG sent Defendant an email with subject: "URGENT: PERSISTENT TRACEBACKS ESCALATION NOTICE" on December 14, 2020. The email stated that the ITG had identified Defendant as carrying fraudulent robocalls directed to United States Telephone subscribers, informed Defendant that responding to a traceback by blocking a particular source number or even refusing service to the offending customer is not sufficient action and provided a link to a webinar on Best Practices for Mitigating Robocalls. Exhibit 21, ITG Escalation Letter to Smartbiz Tel 12.14.2020, at pg. 1.

35.     ITG Best Practices for Mitigating Robocalls emphasize the importance of vetting customers and traffic including knowing the expected call volumes, call durations, and nature of calls, as well as checking that caller IDs used are assigned to the caller, and monitoring traffic patterns to trigger an investigation of suspicious traffic.  Exhibit 22, Mitigating Robocalls Best Practices, at pgs. 8-11.

36.     After January 2021, Defendant purported to implement a policy where it would monitor its customers' call traffic and commence an investigation if the percentage of calls with a duration of less than six seconds, referred to as the short duration percentage ("SDP"), exceeded forty-five percent of the total number of calls for three consecutive days, the percentage of connected calls, referred to as the Answer Seizure Ratio ("ASR") fell below 25%, or if the traffic exceeded 20% and 58% metrics based on SIP codes denoting that calls failed to connect because they were attempting to reach invalid phone numbers, SIP Code 404, or the caller ended the call before it connected, SIP Code 487, respectively.  Exhibit 23, Template Traffic Monitoring Emails, at pg. 1; Exhibit 6, Olivar Deposition, at 51:20-57:23, 63:9-12.

37.     Defendant did not follow its policy. It seldom sent emails notifying customers that their metrics had exceeded Defendant's tolerances despite the fact that several customers routinely sent traffic that triggered the policy. Exhibit 6, Olivar Deposition, at 63:3-8; Exhibit 10, Expert Report, at pg. AG MSJ 014 (e.g., Red Telecom sent 892,906,874 calls over 342 days between January 27, 2022 and March 7, 2023 with an ASR of only 8% and an average call duration of only 11 seconds, Global Net Holdings ("GNH") sent 47,297,730 calls over 84 days with an ASR of only 4% and an average call duration of only 14 seconds, Whisl sent 8,684,329 calls through one trunk over 206 days with an ASR of 21% and an average call duration of only 14 seconds).

38.     In the few instances Defendant sent emails per its policy, it didn't investigate the underlying traffic. For instance, despite almost a year of non-compliant traffic from Red Telecom, Defendant only sent a single email. Red did not respond to this email and Defendant did not send any follow-up. Exhibit 24, Email re Red Telecom Metrics, at pg. 1.

39.     On December 8, 2021, Defendant represented to the ITG that it had terminated its customer GNH in response to Traceback Number 7249, stating in pertinent part: "We have also proceeded to close the client from now on. This action is taken by our organization and applied to all accounts that send Fraudulent Calls consistently and violate the law established on this matter, to protect the US network from illegal automated robocalls." Exhibit 14, Smartbiz Traceback History, Row 151, Column N. However, Defendant did not actually terminate GNH. On February 2, 2022, Defendant contacted GNH about traffic that exceeded its metrics and took no further action when GNH stated that it would "work on this issue today." Exhibit 25, Email re GNH Metrics, at pgs. 1-2. On September 9, 2022, Defendant contacted GNH about suspicious traffic to Puerto Rico, but took no action even though GNH explicitly told Defendant it had no way to address the traffic. Exhibit 26, Email re GNH Puerto Rico Traffic, at pgs. 1-2.

40.     On October 21, 2021, Defendant contacted its customer Axkan Consultores about short duration call traffic. Defendant closed its investigation even though Axkan indicated its intention to program its equipment to delay sending the SIP bye signal that ends a call to artificially increase the length of its calls thereby circumventing Defendant's policy. Exhibit 6, Olivar Deposition, at 246:18-249:13; Exhibit 27, Email re Axkan High SDP Traffic, at pg. 1.

41.     David Frankel, a contractor with the ITG, contacted Defendants in January 2021 and suggested steps Defendant could take to reduce illegal traffic on its network, including monitoring call traffic and insisting on an explanation when customers send calls where 20% or more of total calls are short duration, and monitoring how many different caller ID's appear in customer's traffic. Exhibit 28, Email Correspondence with David Frankel, at pg. 3; Exhibit 11, ITG Deposition, at 14:13-15.

42.     Defendant's contracts with its customers contain the only terms and conditions for the use of its services. Exhibit 29, Response to Plaintiff's Second Request for Production, at pgs. 1-2, Response No. 4.

43.     Defendant's Know-Your-Customer ("KYC") forms request information about whether the customer intends to send "call center" traffic, commonly abbreviated as "CC

traffic," which refers to short duration traffic that is not conversational in nature. However, Defendant does not vet this traffic to ensure that it is legal. Exhibit 30, Template KYC Form and KYC Forms for Seven Customers,[11] at pg. 2. Exhibit 6, Olivar Deposition, 37:9-17, 308:17-309:19. Exhibit 31, Email Chain re Matchcom-SBT Interconnection, at pg. 7.

44. Defendant adjusts the routing of call traffic in its network to "mix" short duration traffic with longer duration traffic. Exhibit 6, Olivar Deposition, at 313:4-314:15; Exhibit 31, Email Chain re Matchcom-SBT Interconnection, at pg. 3.

45. Carriers that provide cellular and residential phone service to individual consumers, such as Verizon and T-Mobile, monitor call traffic and scrutinize traffic profiles that suggest the presence of illegal calls, such as high percentages of short duration calls. Exhibit 6, Olivar Deposition at 53:7-23; Exhibit 11, ITG Deposition, at 142:7-143:11.

46. Defendant offers "1/1" billing for calls to the United States, meaning it bills call durations per second instead of rounding up to a longer interval such as six seconds. Exhibit 5, Reciprocal Service Agreements, at pg. 31; Exhibit 6, Olivar Deposition, at 284:9-285:10. Many of Defendant's invoices are even more generous, as they calculate the billable duration to a hundredth of a minute, so that call lengths are rounded to .6 second intervals. Exhibit 32, Invoice Examples, at pgs. 2-3 (billing Whisl for call lengths in minutes rounded to 2-decimal places), 8 (Same for Computer Tel Inc.), 10 (Family Communication), 15 (Lata 1), 18 (Opextel).

V. The Content of Defendant's Call Traffic

47. YouMail provides call answering service to nearly 12 million registered U.S. consumer accounts, it does not provide service to non-cellular business phones, so each subscriber's telephone line is either cellular or residential. Exhibit 10, Expert Report, at AG MSJ 006.

48. Michael Rudolph ("Rudolph"), Chief Technology Officer of YouMail and the Attorney Generals' expert witness, identified least 166,628 calls to YouMail subscribers that transited Defendant's network and left a prerecorded or artificially voiced message in the

---

[11] Exhibit 30 consists of a template KYC form Defendant produced to the Attorney General in discovery as well as seven KYC forms Defendant actually collected from its customers. The Attorney General requested the KYC information Defendant collected from twenty-one of its customers who had sent Defendant calls that were subject to tracebacks. Defendant produced only the seven KYC forms included in Exhibit 29.

YouMail subscriber's voicemail. Exhibit 33, YouMail Recorded Evidence Count, at Rows 2-166,629.

49.     Rudolph transcribed and matched 165,979 of the 166,628 prerecorded or artificially voiced messages to known robocall campaigns, and 98,368 of those calls were made to phone numbers on the National Do-Not-Call Registry. Exhibit 10, Expert Report at AG MSJ 083.

50.     Only 1,624 calls, fewer than 1% of calls mapped to Youmail records, were identified as wanted robocalls such as appointment reminders or school notices. Exhibit 10, Expert Report, at AG MSJ 024, Finding 31.

51.     Over 294 thousand calls impersonated law enforcement, financial institutions, or other well-known brands using Do-Not-Originate[12] numbers, at one point exceeding 63 thousand calls a week. Exhibit 10, Expert Report, at AG MSJ 020, Finding No. 24.

52.     Defendant's revenue from transmitting calls to the United States increased substantially as its number of tracebacks increased, going from approximately $570,000 in 2019, to $1,009,000 in 2021, and then $1,910,000 in 2022. Exhibit 34, Answers to First Interrogatories, at pg. 5, Interrogatory No. 8.

Dated: October 16, 2023

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General of the State of Florida**

*/s/ Patrick Crotty*
Patrick Crotty
Florida Bar # 108541
Senior Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Patrick.Crotty@myfloridalegal.com

---

[12] Do-Not-Originate numbers are numbers that belong to organizations or enterprises that have indicated that they never make outbound calls from these numbers – that is, those numbers are only called and never used as the calling number for outbound calls.

>Miles Vaughn
>Florida Bar # 1032235
>Assistant Attorney General
>Office of the Attorney General
>Consumer Protection Division
>3507 E. Frontage Road, Suite 325
>Tampa, FL 33607
>Phone: 813-287-7950
>Fax: 813-281-5515
>Miles.vaughn@myfloridalegal.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 16, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system and thereby served the other parties of record.

>*/s/ Patrick Crotty*
>Patrick Crotty
>Senior Assistant Attorney General

12