## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

      Plaintiff,

      v.                                CASE NO.: 1:22-cv-23945-JEM

SMARTBIZ TELECOM LLC,
A Florida limited liability company,

      Defendant.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# Contents

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

STANDARD OF REVIEW ............................................................................................. 3

ARGUMENT .................................................................................................................. 5

   I.  Defendant Violated the TCPA ................................................................................ 6

     A.  Defendant and the Recipients of Defendant's Calls are Within the United States .......... 6

     B.  Defendant Made or Initiated Calls ................................................................... 6

       1.  Transmission Facilities ............................................................................ 7

       2.  Actual Notice of Illegal Transmissions ..................................................... 7

       3.  Failure to Prevent Illegal Use ................................................................. 10

     C.  Defendant was Involved in Placing Calls ........................................................ 16

     D.  Defendant Transmitted Prerecorded or Artificially Voiced Calls ........................ 18

   II.  Defendant Violated the Truth in Caller ID Act ...................................................... 19

     A.  Defendant Knowingly Transmitted Spoofed Calls Attempting to Harm and Steal ....... 20

     B.  Civil Penalties Under the Truth in Caller ID Act ............................................. 21

   III.  Defendant Violated the TSR and FDUTPA ......................................................... 23

     A.  Defendant Transmitted Calls that Violated the TSR ........................................ 23

     B.  Knowingly Transmitting Scam Calls Constitutes Substantial Assistance or Support ... 25

     C.  Knowledge or Conscious Avoidance .............................................................. 26

     D.  Transmitting Scam Calls is a Deceptive Trade Practice .................................... 27

     E.  Injunction and Civil Penalties Under 15 U.S.C. § 6103 and FDUTPA ................. 28

CONCLUSION ............................................................................................................... 28

# TABLE OF AUTHORITIES

*Page(s)*

### *Cases*

*Alea London Ltd. v. Am. Home Servs., Inc.*,
    638 F.3d 768 (11th Cir. 2011) ............................................................................. 18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................... 4

*Asher & Simons, P.A. v. j2 Glob. Canada, Inc.*,
    977 F. Supp. 2d 544 (D. Md. 2013) ...................................................................... 6

*Blackston v. Shook & Fletcher Insulation Co.*,
    764 F.2d 1480 (11th Cir.1985) .............................................................................. 4

*Breslow v. Wells Fargo Bank, N.A.*,
    857 F. Supp. 2d 1316 (S.D. Fla. 2012) ............................................................... 18

*Carriuolo v. Gen. Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ............................................................................. 27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................... 4

*Chapman v. Am. Cyanamid Co.*,
    861 F.2d 1515 (11th Cir. 1988) ............................................................................ 4

*Clark v. Coats & Clark, Inc.*,
    929 F.2d 604 (11th Cir. 1991) .............................................................................. 4

*Coleman v. CubeSmart*,
    328 F. Supp. 3d 1349 (S.D. Fla. 2018) ............................................................... 27

*Consumer Fin. Prot. Bureau v. Daniel A. Rosen, Inc.*,
    2022 WL 1514439 (C.D. Cal. Apr. 5, 2022) ....................................................... 27

*Cordoba v. Dillard's, Inc.*,
    419 F.3d 1169 (11th Cir. 2005) ............................................................................ 4

*Couser v. Pre-paid Legal Servs., Inc.*,
    994 F. Supp. 2d 1100 (S.D. Cal. 2014) ................................................................ 6

*Cunningham v. Montes*,
    378 F. Supp. 3d 741 (W.D. Wis. 2019) .............................................................. 16

*Fax.com, Inc.*,
   19 F.C.C. Rcd. 748 (2004) ........................................................................................... 8

*FTC v. Chapman*,
   714 F.3d 1211 (10th Cir. 2013) ........................................................................... 26, 27

*FTC v. Consumer Health Benefits Ass'n*,
   No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242 (E.D.N.Y. May 23, 2012) ....................... 26

*FTC v. Day Pacer LLC*,
   No. 19 CV 1984, 2023 WL 5671618 (N.D. Ill. Sept. 1, 2023) ................................. 24

*FTC v. Fleetcor Techs., Inc.*,
   620 F. Supp. 3d 1268 (N.D. Ga. 2022) ..................................................................... 10

*FTC v. HES Merch. Servs. Co.*,
   No. 6:12-CV-1618-ORL-22, 2014 WL 6863506 (M.D. Fla. Nov. 18, 2014)......................... 26

*FTC v. Lake*,
   181 F. Supp. 3d 692 (C.D. Cal. 2016)........................................................................ 26

*FTC v. Lalonde*,
   545 F. App'x 825 (11th Cir. 2013) ............................................................................ 23

*FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*,
   350 F. Supp. 3d 1246 (M.D. Fla. 2018) .................................................................... 23

*FTC v. Partners In Health Care Ass'n, Inc.*,
   189 F. Supp. 3d 1356 (S.D. Fla. 2016)....................................................... 10, 25, 26

*FTC v. Walmart Inc.*,
   No. 22 CV 3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023).............................27

*Glob. Mktg. Grp., Inc.*,
   594 F. Supp. 2d 1281 (M.D. Fla. 2008) .................................................................... 23

*Hurley v. Messer*, No. CV,
   3:16-9949, 2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018) ...................................... 16

*In the Matter of Advanced Methods to Target & Eliminate Unlawful Robocalls*,
   34 F.C.C. Rcd. 4876 (2019) ...................................................................................... 17

*In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the
Transmission of Obscene Materials*,
   2 F.C.C.R. 2819 (1987)............................................................................................. 6

*In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*,
   7 F.C.C. Rcd. 8752 (1992) ........................................................................................ 6

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
  140 S. Ct. 768 (2020) ............................................................................................ 7

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
  326 U.S. 310 (1945) .............................................................................................. 6

*Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Cont. No. B0621MAS*RSWV15BND,
  766 F. App'x 795 (11th Cir. 2019) ....................................................................... 4

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
  780 F.3d 1101 (11th Cir. 2015)........................................................................... 18

*Lee v. Celotex*,
  764 F.2d 1489 (11th Cir.1985)............................................................................. 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .............................................................................................. 4

*Mey v. All Access Telecom, Inc.*,
  No. 5:19-CV-00237-JPB, 2021 WL 8892199 (N.D.W. Va. Apr. 23, 2021)........................ 6, 16

*Millennium Commc'ns & Fulfillment, Inc. v. State of Fla.*,
  761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000) ............................................. 28

*Off. of Att'y Gen. v. Bilotti*,
  267 So. 3d 1, 3 (Fla. Dist. Ct. App. 2019)......................................................... 27

*Off. of the Att'y Gen. v. Smartbiz Telecom LLC*,
  No. 1:22-CV-23945-JEM, 2023 WL 5491835 (S.D. Fla. Aug. 23, 2023).............................. 16

*Penzer v. Transportation Ins. Co.*,
  545 F.3d 1303 (11th Cir. 2008)........................................................................... 18

*Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
  30 FCC Red. 7961 (2015) ..................................................................................... 16

*Sprint Commc'ns, Inc. v. Calabrese*,
  2022 WL 457829 (S.D. Fla. Jan. 10, 2022) ..................................................... 3, 4

*Sunshine Children's Learning Ctr., LLC v. Waste Connections of Fla., Inc.*,
  No. 21-CV-62123, 2023 WL 3057995 (S.D. Fla. Apr. 24, 2023) ........................ 7

*Texas v. Am. Blastfax, Inc.*,
  164 F. Supp. 2d 892 (W.D. Tex. 2001).................................................................. 8

*United States v. Corps. for Character, L.C.*,
  116 F. Supp. 3d 1258 (D. Utah 2015) .............................................................. 25

*United States v. Dish Network L.L.C.*,
   954 F.3d 970 (7th Cir. 2020)........................................................................... 19

*United States v. Dish Network, L.L.C.*,
   75 F. Supp. 3d 942 (C.D. Ill. 2014).................................................................. 5

*United States v. Dish Network, L.L.C.*,
   667 F.Supp.2d 952 (C.D.Ill.2009).................................................................... 26

*United States v. Rhodes*,
   No. CV 21-110-M-DLC, 2022 WL 17484847 (D. Mont. Dec. 7, 2022)................ 20

**_Statutes_**

15 U.S.C. § 6102(c)(1)...................................................................................... 5

15 U.S.C. § 6103.............................................................................................. 27

15 U.S.C. § 6103(a).......................................................................................... 27

47 U.S.C. 227(g)(1).......................................................................................... 18

47 U.S.C. § 227(b)(1)(A)(iii)............................................................................. 5

47 U.S.C. § 227(e)............................................................................................ 19

47 U.S.C. § 227(e)(1)........................................................................................ 5, 20

47 U.S.C. § 227(e)(5)(A)................................................................................... 22

47 U.S.C. § 227(e)(5)(A)(i)............................................................................... 21

47 U.S.C. § 227(e)(6)(A)................................................................................... 21

47 U.S.C. § 227(e)(8)(E)(i)............................................................................... 20

47 U.S.C. § 227(g)............................................................................................ 19

§ 501.203(3), Florida Statutes.......................................................................... 5

§ 501.2075, Florida Statutes............................................................................ 28

§§ 501.207(1)(b) and 501.207(3), Florida Statutes.......................................... 27

**_Regulations_**

16 C.F.R. 310.3(b) ........................................................................................... 5, 23, 25, 27

16 C.F.R. § 310.2(gg) ...................................................................................... 24

16 C.F.R. § 310.3(a)(2)(iii) ................................................................................................ 23

16 C.F.R.§ 310.3(a)(2)(vii) ................................................................................................ 23

16 C.F.R.§ 310.3(a)(4) ........................................................................................................ 23

16 C.F.R.§ 310.4(a)(8) .................................................................................................. 24, 25

16 C.F.R. § 310.4(b)(1)(iii)(B) ........................................................................................... 24

16 C.F.R. § 310.4(d)(1) ....................................................................................................... 24

16 C.F.R. §§ 310.3(a), (c) or (d), or § 310.4 ..................................................................... 23

16 C.F.R. §§ 310.3-310.4 ...................................................................................................... 5

16 C.F.R. §§ 310.3(a) or 310.4 ........................................................................................... 23

16 C.F.R. §§ 310.3(c) and (d) ............................................................................................. 23

16 C.F.R. §§ 310.4(b)(1)(iii)(B) and § 310.4(d)(1) ........................................................... 24

16 C.F.R. § 310.3(a)(2)(iii), § 310.3(a)(2)(vii), and § 310.3(a)(4) ................................... 25

47 C.F.R. 64.1604(b) and (c) ................................................................................................ 5

47 C.F.R. § 64.1604(a) ........................................................................................................ 20

47 C.F.R. § 64.6302(a)-(b) .................................................................................................. 13

47 C.F.R. § 64.6302(c) ........................................................................................................ 13

47 C.F.R. § 64.6305 ............................................................................................................. 10

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General"), moves for summary judgment against Smartbiz Telecom LLC ("Defendant") and further states as follows.

## INTRODUCTION

Defendant transmits scam phone calls that it knows are illegal. Hundreds of complaints have not deterred Defendant. When Defendant's suppliers, which are downstream voice service providers that accept call traffic from Defendant, implement policies to detect and reduce the number of illegal calls on their networks, Defendant circumvents these measures by manipulating the way it routes calls to hide the nature of its call traffic. Defendant further enables phone scams by making misleading or outright false claims about what it does to stop illegal calls. Instead of eliminating scam calls from its network, Defendant chooses to profit from them in violation of state and federal law. The Attorney General respectfully requests that this Court enter summary judgement on all counts alleged in the Complaint, [ECF No. 1], enter an injunction prohibiting Defendant from transmitting calls to phone numbers with area codes assigned to the United States, and award statutory damages and civil penalties.

## BACKGROUND

Defendant is a Florida Limited Liability Company that lists a Miami, Florida address in filings with the Florida Secretary of State and the Federal Communications Commission ("FCC").[1] Defendant is a provider of Voice over Internet Protocol ("VoIP") communication services, meaning that it receives telephone calls from its customers in the form of packets of information sent over the internet, and routes those telephone calls through its suppliers to be connected to recipients in the United States.[2] Both Defendant's customers and suppliers are also VoIP communication companies from which Defendant buys and sells minutes of completed phone calls to different locations, through individual contracts, and pursuant to schedules of periodically adjusted per minute rates.[3] Although Defendant maintains an office address in Florida,[4] the

---

[1] Statement of Material Facts ("SoMF") at ¶¶ 1-3.
[2] SoMF. at ¶ 6.
[3] SoMF at ¶ 7
[4] In 2023, Defendant rented commercial space owned by Regus, a provider of virtual office space. SoMF at ¶ 4. Previously Defendant's office was an apartment owed by a relative of one of Defendant's corporate officers. SoMF at ¶5.

1

majority of its staff are located in Latin America and Defendant does not maintain any equipment or physically conduct business from its Florida address.[5]

Defendant provides its customers with trunks, which are digital pathways for transmitting VoIP phone calls.[6] Customers send calls through trunks to Defendant's softswitch, which is an online platform owned by the company SIPNav LLC, that routes the calls to Defendant's suppliers.[7] The softswitch captures information about each call it routes including the date and time of the call, the calling phone number, the called phone number, and the billed duration of the call.[8] Records that Defendant's softswitch creates about calls transiting Defendant's network[9] are referred to as Call Detail Records ("CDRs").[10] Defendant's softswitch also records a three-digit integer code denoting the call result, called a "SIP code," for each call.[11] A SIP code 200 denotes that a call was successfully completed to a recipient, while other codes denote a reason that the call failed to connect.[12] Defendant bills its customers for each minute of a completed call that it routed through its network, pays its suppliers for each minute of a completed call that the supplier accepted, and Defendant's profits are based on the difference between the rate it charges its customers and the rate it pays its suppliers for transmitting completed phone calls.[13]

In addition to maintaining CDRs for billing purposes, Defendant also uses these records to respond to tracebacks initiated by the Industry Traceback Group ("ITG"), a neutral consortium of telecommunications companies appointed by the FCC to trace suspected illegal calls to their origin.[14] Tracebacks are a process run by the ITG that attempts to identify the source of a suspected illegal call by sequentially contacting each communications service provider who was involved in connecting the call, starting with the call recipient's voice service provider, to uncover the provider

---

[5] SoMF at ¶¶ 4-5, 10-11.
[6] SoMF at ¶ 9.
[7] SoMF at ¶ 8.
[8] SoMF at ¶ 13.
[9] "Network" as used in the instant Motion, refers to Defendant's softswich and the downstream suppliers who accept calls Defendant transmits.
[10] SoMF at ¶ 13.
[11] SoMF at ¶ 14.
[12] *Id.*
[13] SoMF at ¶ 10.
[14] SoMF at ¶ 16.

who originated[15] the call being traced and the identity of the caller.[16] The ITG assigns a unique number to each traceback and maintains records of each traceback notification sent.[17] ITG records indicate that Defendant received at least 261 traceback notifications between June 26, 2020 and January 30, 2023.[18] Each notice apprised Defendant that a suspected illegal call had reportedly traversed Defendant's network, provided a recording and description of the call as well as a statement as to why the call was suspected to be illegal, and provided the called and calling phone numbers, the call time, and the call date, which is sufficient information to allow Defendant to locate the call in its CDRs and respond to the traceback with the identity of the customer who sent it the call.[19] The ITG recorded Defendant's responses to traceback notifications as well as the responses of every other provider who routed the traced call over its network. [20] ITG records show the call path, which is the route that a traced call took to reach the recipient.[21] Defendant's customers appear in the call path as upstream providers, meaning the provider that sent Defendant the traced call, while Defendant's suppliers appear in the call path as downstream providers, meaning the provider to which Defendant sent a traced call.[22] Defendant's CDRs and responses to traceback notifications demonstrate that Defendant knowingly transmitted scam phone calls to recipients in the United States, profited from the calls, and systematically lied to protect those profits.

**STANDARD OF REVIEW**

Fed. R. Civ. P. 56(a) allows a party to "move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Here, the Attorney General seeks summary judgment on all claims alleged in the Complaint, [ECF No. 1]. Courts grant summary judgment where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., or other materials ... show[] ... that there is no genuine dispute as to

---

[15] The "originating provider" is the entity that identifies itself as putting the call on the phone network and having a relationship with the end user who made the call. SoMF at fn. 2.
[16] SoMF at ¶ 17.
[17] SoMF at ¶ 20.
[18] SoMF at ¶ 27.
[19] SoMF at ¶ 22.
[20] SoMF at ¶ 23.
[21] *Id.*
[22] *Id.*

any material fact and the movant is entitled to judgment as a matter of law." [23] The Attorney General, as the moving party, "bears the initial burden to show, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." [24] "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." [25] When the Attorney General has carried her burden, the Defendant must do more than show that there is "metaphysical doubt" as to any material fact. [26] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." [27]  Fed. R. Civ. P. 56 "requires the nonmoving party to go beyond the pleadings and, by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." [28]

Courts are required to view the evidence and draw inferences in the light most favorable to the non-movant. [29] "However, an inference based on speculation and conjecture is not reasonable." [30] "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." [31] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." [32]

---

[23] Fed. R. Civ. P. 56(a), (c); *Sprint Commc'ns, Inc. v. Calabrese*, 2022 WL 457829, at *2 (S.D. Fla. Jan. 10, 2022).

[24] *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *accord Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Cont. No. B0621MASRSWV15BND*, 766 F. App'x 795, 798 (11th Cir. 2019).

[25] *Clark*, 929 F.2d at 608.

[26] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[28] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted).

[29] *Sprint Commc'ns*, 2022 WL 457829, at *2.

[30] *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988) (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir.1985); *Lee v. Celotex*, 764 F.2d 1489 (11th Cir.1985)).

[31] *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original).

[32] *Matsushita Elec. Indus.*, 475 U.S. 574 at 587 (internal quotation omitted).

## ARGUMENT

The Attorney General moves for summary judgment on the five counts pled in the Complaint.[33] Specifically, Counts I and II state claims for violation of the Telephone Consumer Protection Act ("TCPA"), which prohibits "any person within the United States, or any person outside the United States if the recipient is within the United States [from making] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice to any telephone number assigned to a . . . cellular telephone service," and "[from initiating] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." [34] As these Counts prohibit substantially the same activity, the Attorney General addresses them together.

Next, Count III states a claim for violation of a provision of the Truth in Caller ID Act prohibiting "any person within the United States, or any person outside the United States if the recipient is within the United States, in connection with any voice service or text messaging service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value," [35] subject to certain exemptions set forth by regulation which do not apply on the facts of this case.[36] Count III shares the same requirement that Defendant or the recipients of Defendant's calls be within the United States, and the Attorney General will address that element in conjunction with Count I and II, but addresses the remaining elements of Count III separately.

Finally, Counts IV and V state claims for violations of the Telemarketing Sales Rule ("TSR")[37] and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").[38] Defendant violated the TSR by providing substantial assistance or support to sellers or telemarketers that it

---

[33] [ECF No. 1, Pgs. 21-31].
[34] 47 U.S.C. § 227(b)(1)(A)(iii).
[35] 47 U.S.C. § 227(e)(1).
[36] 47 C.F.R. 64.1604(b) and (c).
[37] 16 C.F.R. §§ 310.3-310.4.
[38] Chapter 501, Part II, Florida Statutes.

knew were engaged in abusive and deceptive acts or practices that violate the TSR.[39] This conduct also constitutes a violation of FDUTPA.[40]

## I.     Defendant Violated the TCPA

### A.   Defendant and the Recipients of Defendant's Calls are Within the United States

The first element of the Attorney General's TCPA claim is that Defendant or the recipients of Defendant's calls are within the United States. Both are true. Defendant is within the United States because Defendant is incorporated in Florida and has maintained at least a nominal address in Florida since 2016.[41] Additionally, Defendant's CFO makes business decisions for the company "[f]rom anyplace where [he is] physically working" and he spends most of his time in South Florida.[42] Also, Defendant's CEO has resided in Texas since 2015.[43] These connections to the United States establish Defendant's presence.[44] Also, the calls at issue in this case were all transmitted to phone numbers with United States area codes.[45] Thus, Defendant was within the United States at the time the relevant calls were made or initiated, and the calls themselves were directed to recipients in the United States.

### B.   Defendant Made or Initiated Calls

The next element of the Attorney General's TCPA claims is whether Defendant made or initiated the calls at issue. The TCPA does not define what it means to make or initiate calls; however, in 1992 shortly after the enactment of the TCPA, the FCC analyzed whether entities that provide transmission facilities can be liable for transmissions which violate the statute.[46] The FCC

---

[39] 16 C.F.R. 310.3(b).

[40] See § 501.203(3), Florida Statutes (defining "violation of this part" to include violations of "[a]ny rules promulgated pursuant to the Federal Trade Commission Act"). The TSR is treated as a rule promulgated under the Federal Trade Commission Act.  15 U.S.C. § 6102(c)(1). *See also*, *United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 1004 (C.D. Ill. 2014) ("A violation of the TSR constitutes an unfair and deceptive act or practice in violation of § 5(a) of the [Federal Trade Commission] Act.").

[41] SoMF at ¶¶ 1, 4-5.

[42] SoMF at ¶ 12; [ECF No. 50-4, at 16:10-18].

[43] SoMF at ¶ 12; [ECF No. 50-6, at 10:12-13, 41:10-11].

[44] *See Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316–17 (1945) ("activities of the corporation's agent within the state" establish corporation's presence).

[45] SoMF at ¶ 15.

[46] *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, ¶54 (1992) (the "1992 Order").

analyzed to common carriers' liability for the transmission of obscene or indecent material and concluded that liability exists if Defendant demonstrates "a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions."[47] Defendant clearly offers transmission facilities and satisfies the 1992 Order's two additional requirements, specifically, actual notice of the illegal use of Defendant's network and the failure to prevent further illegal transmissions.

### 1. Transmission Facilities

First, Defendant provides transmission facilities because it makes trunks available to its upstream customers to transmit telephone calls to Defendant's softswitch, which then transmits the calls so that they can be connected to the end recipient.[48] Furthermore, Defendant conclusively admits that it is engaged in the transmission of call traffic.[49]

### 2. *Actual Notice of Illegal Transmissions*

Next, Defendant had actual notice of the illegal use of its network. Actual notice is not defined by the FCC, but appears analogous to Express Actual Notice, which "includes what might be called direct information."[50] Defendant received direct information about the illegal use of its network from traceback notifications and complaints by its suppliers.[51] The ITG emailed Defendant, and Defendant responded to, at least 261 traceback notifications which contained a

---

[47] *Id.; See also*, *In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials*, 2 F.C.C.R. 2819, 2820 (1987); *Couser v. Pre-paid Legal Servs., Inc.*, 994 F. Supp. 2d 1100, 1104 (S.D. Cal. 2014); *Asher & Simons, P.A. v. j2 Glob. Canada, Inc.*, 977 F. Supp. 2d 544, 551 (D. Md. 2013); *Mey v. All Access Telecom, Inc.*, No. 5:19-CV-00237-JPB, 2021 WL 8892199, at *6 (N.D.W. Va. Apr. 23, 2021).

[48] SoMF at ¶¶ 6-10.

[49] [ECF No. 50-7, pg. 1, RFA 1 & 3].

[50] *Sunshine Children's Learning Ctr., LLC v. Waste Connections of Fla., Inc.*, No. 21-CV-62123, 2023 WL 3057995, at *7 (S.D. Fla. Apr. 24, 2023) ("Actual notice is also said to be of two kinds: (1) Express, which includes what might be called direct information; and (2) implied, which is said to include notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use, or, as it is sometimes called, 'implied actual notice.'") (internal quotations omitted).  However, the Supreme Court has found that the qualifier actual distinguishes between something real and something imputed or presumed. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020). Here, the Court need not determine whether actual notice within the scope of the 1992 Order can be both express or implied, because Defendant was indisputably provided with Express Actual Notice through direct, specific evidence of the illegal use of its network.

[51] SoMF at ¶¶ 21, 30-32.

specific statement as to why calls transiting Defendant's network violated the TCPA and other laws, as well as a recording of the calls so that Defendant could hear the illegal transmissions for itself.[52] For example, on January 24, 2023,[53] the ITG emailed the addresses for Defendant's CFO and network operations center[54] about traceback number 11970.[55] This notification, in part, stated that the call was prerecorded and made to wireless numbers and numbers on the National Do Not Call Registry without prior consent of the recipients, which establishes prima facie violations of both the TCPA and the TSR.[56] The operative language of the traceback notification is set forth below:

| Call Details for Traceback #11970 0 seconds ago | |
|---|---|
| Campaign: | Employee-RefundCredits |
| Date/Time: | 2023-01-24 20:48:39 +0000 UTC |
| To: | +12532799944 |
| From: | +12186071382 |
| Prerecorded calls suggesting availability of employee refund credit. Caller does not appear to identify the entity responsible for the call, as identified entity does not appear to have any online presence. Prerecorded calls made to wireless numbers as well to numbers on the National Do Not Call Registry apparently without consent or prior relationship. Evidence of high-volume calling and consumer complaints about campaign. | |

The above sample notification, as well as hundreds of other, similar traceback notifications, informed Defendant's staff and executives that Defendant's network was transmitting illegal call traffic.[57] Furthermore, Defendant had received **eighty-two (82)** prior traceback notifications for the customer, Whisl, who sent Defendant the call that resulted in Traceback Number 11970.[58] By the eighty-third notification that Whisl was transmitting illegal calls through Defendant's network, Defendant was doubtlessly on notice of the continuing illegal use.[59]

---

[52] SoMF at ¶¶ 21-22, 27.

[53] This action was filed on December 5, 2022. The fact that Defendant was still transmitting illegal calls even after being sued for the practice further underscores the fact that Defendant will not eliminate illegal traffic from its network.

[54] Defendant commonly referred to its technical staff as its network operations center or "NOC." SoMF at ¶ 12.

[55] [ECF No.50-12, pg. 441].

[56] *Id.*

[57] A sample recording of the associated call is available at: https://portal.tracebacks.org/api/public/attachments/1214845.

[58] SoMF at ¶ 25 and Exhibit 14, Smartbiz TB History 6-26-2020 to 1-30-2023 (reflecting 83 total tracebacks for Whisl with Traceback Number 11970 as the most recent).

[59] *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 895 (W.D. Tex. 2001) (actual notice found when State Attorney General informed Defendant of illegality of unsolicited intrastate faxes); *Fax.com, Inc.*, 19 F.C.C. Rcd. 748, 755 (2004) (citations provided Fax.com with actual notice that its fax broadcasting activities violated federal law).

Defendant received traceback notifications at least once per month from June 2020 to January 2023.[60] The consistency of notifications as well as Defendant's responses establish actual notice of the illegal use of Defendant's network. The ITG's records indicate Defendant responded to 261 traceback notifications and identified the customer who had sent the call to its network.[61] This shows that Defendant received the traceback notifications and read them closely enough to discern that the illegal calls had transited its network. Defendant also frequently left comments informing the ITG of the actions it purported to take to stop the illegal traffic.[62]  On over 100 occasions, the ITG recorded a response to a traceback notification from Defendant with the assertion: "In addition to notified [sic] immediately our customers, they are identified as the account sending us FRAUD calls into the US territory (as we are currently doing). We will required [sic] them to take immediate action and stop these calls while giving information regarding the upstream carrier originating those calls. If we don?t [sic] receive a formal response and actions taken as requested within 24hrs, Their account will be blocked temporarily until they comply with our requirements."[63] Although Defendant's responses were not truthful as to the steps it took to prevent further illegal use of its network, providing the response itself establishes that Defendant had actual knowledge, not just actual notice, of the illegal use.

The ITG was not the only entity informing Defendant that its network was being used to transmit illegal calls. Defendant's suppliers also complained on numerous occasions about Defendant's traffic and provided specific examples of illegal calls.[64] Directo, a Mexico based VoIP service provider that Defendant used to complete calls to the United States, sent at least fifteen (15) complaints about illegal traffic to Defendant from December 2020 to April 2022.[65] On December 22, 2020, another of Defendant's suppliers complained about a call attempt that transited Defendant's network with a phone number spoofed to appear as the contact number for the Chief of Police for the Florida City Police Department.[66] Similarly, in June and October of 2020, Defendant escalated complaints from suppliers to their customers Chock Telecom and

---

[60] SoMF at ¶ 26.
[61] SoMF at ¶ 27.
[62] *Id.*
[63] SoMF at ¶ 28.
[64] See e.g. SoMF at ¶ 29-30.
[65] SoMF at ¶ 30.
[66] SoMF at ¶ 31.

Family Communications regarding government impersonation calls and fraudulent caller ID spoofing where a phone number called itself.[67] Defendant consistently received complaints about illegal traffic it was passing to its downstream suppliers and credited the complaints enough to escalate them to upstream customers, though they took no meaningful action to address the continuing illegal traffic.[68] Courts have found that communications and complaints evidence actual knowledge of unlawful conduct in other contexts.[69] This case is no different. Defendant indisputably had actual notice of the illegal use of its network as required for TCPA liability under the FCC's 1992 Order.

3.   Failure to Prevent Illegal Use

In addition to actual notice of an illegal use, TCPA liability under the 1992 Order requires "failure to take steps to prevent such transmissions."[70] Defendant clearly failed to prevent illegal transmissions through its network as it has received tracebacks about illegal calls transiting its network at least once a month since at least June 2020.[71] However, examining Defendant's practices and procedures regarding illegal calls on its network further demonstrates that it failed to take steps to prevent illegal traffic. Defendant ignored warnings that its practices allowed illegal traffic to flow through its network, failed to follow the nominal procedures it did put in place, and actively blended suspicious, short duration traffic with longer duration traffic to circumvent downstream providers' robocall mitigation programs.[72]

Defendant set forth the steps it claims to take to eliminate illegal traffic from its network in its filing in the FCC's Robocall Mitigation Database.[73] The procedures include five parts:  A. "Know Your Customer Criteria" ("KYC"), B. an "Acceptable Use Policy," C. STIR/SHAKEN implementation, D. "Proactive Network Monitoring," and E. cooperation with tracebacks.[74] Most

---

[67] SoMF at ¶ 32.
[68] SoMF at 30-32, 37-46.
[69] See *FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268, 1343 (N.D. Ga. 2022) (finding individual has actual knowledge of corporation's unlawful practices based on, inter alia, volume of email communications and customer complaints.); *FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1368 (S.D. Fla. 2016) (finding knowledge based in part on numerous complaints).
[70] 1992 Order at ¶ 54.
[71] SoMF at ¶ 26.
[72] SoMF at ¶¶ 27, 30-44.
[73] SoMF at ¶¶ 33, 36. The FCC's Robocall Mitigation Database is described by regulations at 47 C.F.R. § 64.6305.
[74] [ECF No. 50-20] (Exhibit 20 to SoMF, Robocall Mitigation Procedures).

of Defendant's procedures wouldn't address illegal traffic even if Defendant implemented them, and those that can be considered steps for preventing illegal traffic Defendant did not implement.

First, Defendant's KYC program is ineffective and does nothing to keep illegal traffic off its network. The ITG recommends that VoIP providers require their customers give a description of their call traffic, including the expected call volumes, expected call durations and the nature of the calls.[75] This makes sense because illegal robocalls, including those that violate the TCPA, tend to have high call volumes, low connection rates, and durations that skew towards calls of less than one or two minutes.[76] Thus, it would make sense for Defendant to ask its customers whether their traffic is expected to match this profile and, if the traffic does match the profile of illegal robocalls, ask the customer to articulate why the traffic is legal; however, this is not a part of Defendant's KYC procedures. Defendant's policy does not include asking its customers for specific information that is useful for eliminating illegal traffic, but largely seeks financial information that may make it easier for Defendant to invoice its customers but is not useful for stopping the illegal use of its network.[77]

Defendant's implementation of its KYC policy is similarly ineffective. As an initial matter, Defendant appears to rarely collect KYC forms at all, and produced only seven forms in response to discovery requests despite having twenty-one customers whose call traffic generated tracebacks.[78] Furthermore, most of the KYC forms Defendant did produce were only obtained well after litigation began between the parties and after the Attorney General propounded discovery.[79] When Defendant did bother to gather KYC information, Defendant's KYC questionnaire asked only general questions about the nature of customer traffic, e.g. whether it contains prerecorded messages and autodialed calls or whether it constitutes telemarketing; however, there is no request for customers to demonstrate that the calls they send are made with consent, or that callers have permission to use phone numbers assigned to the United States.[80] Defendant's KYC procedures are mere window-dressing designed to make it appear that Defendant is taking steps to prevent illegal traffic on its network, while actually permitting and profiting from illegal traffic. Even when

---

[75] [ECF No. 50-22, pg. 8].
[76] [ECF No. 50-10, AG MSJ 012-13].
[77] [ECF No. 50-20, p. 2].
[78] SoMF at ¶ 24.
[79] [ECF No. 50-30, pgs. 12, 14, 16, 18].
[80] [ECF No. 50-29, pgs. 2, 7, 9, 12, 14, 16, 18, 20].

Defendant knows a customer is sending call center traffic, which Defendant understands to mean short duration traffic that it not conversational in nature, it does nothing to vet this traffic to ensure it is legal.[81] Merely knowing that a customer is sending call center traffic is pointless unless Defendant takes additional steps to ensure that the call centers are not making illegal calls.

Next, the second element of Defendant's robocall mitigation policy is also deceptive and does nothing to prevent illegal use of its network. Defendant claims it has its customers agree to an "Acceptable Use Policy" with "terms and conditions" which forbid, *inter alia*, fraudulent calls, unsolicited advertising, and various statutory violations, as well as require adherence to industry guidelines and best practices.[82] However, Defendant does not have an "Acceptable Use Policy" and the only terms and conditions Defendant's customers agree to are contained in their contracts with Defendant.[83] These contracts do not contain the prohibitions Defendant's claim in their Robocall Mitigation Procedures.[84] Not only are Defendant's Robocall Mitigation Procedures blatantly false in this respect, but the actual terms of Defendant's service encourage illegal calls. For instance, many contracts state "[t]he Parties shall not withhold any payment due each other on the basis that fraudulent calls comprised a portion of the traffic volume."[85] This provision indicates that transmitting fraudulent calls is an accepted part of Defendant's service. Defendant also offers "1/1" billing for calls to the United States, meaning it bills call durations by the second instead of rounding up to a longer interval such as six seconds.[86] Many of Defendant's invoices are even more generous, as they calculate the billable duration to a hundredth of a minute, so that call lengths are rounded to .6 second intervals.[87] Defendants also use as many as six decimal places to calculate the billable call duration ensuring that short duration traffic is as inexpensive as possible.[88] ITG best practices note that many terms of Defendant's services, such as no penalty for short-duration calls, allowing many simultaneous calls,[89] and high calls per minute,[90] are on what

---

[81] SoMF at ¶ 43.

[82] [ECF No. 50-20, pg. 2].

[83] SoMF at ¶ 43.

[84] See generally, [ECF No. 50-5].

[85] *Id.* at pgs. 14, 23, 57, 75, 115, 150, 157, 188, 198.

[86] SoMF at ¶ 46.

[87] *Id.*

[88] [ECF No. 50-6, 284:9-285:10].

[89] Defendant's softswitch allows for up to 35,000 simultaneous calls. [ECF No. 50-6, 16:24-17:1].

[90] Defendant's call records reflect extremely high numbers of calls per minute. *See e.g.* [ECF No. 50-9, Rows 2-449] (showing 448 call attempts in one second through one customer trunk).

ITG has coined the "Fraudster Shopping List."[91] Far from proscribing illegal traffic, Defendant's terms of service facilitate it.

      The third element of Defendant's Robocall Mitigation Procedure is implementation of STIR/SHAKEN,[92] which is a set of technical and procedural standards that require the originator of a call to attach a piece of cryptographic information, called a token, to the call such that the token travels through the call path and identifies the originator.[93] From July 1, 2021 to July 1, 2023, implementing STIR/SHAKEN meant only that Defendant, as an intermediate provider, needed to "respond fully and timely" to tracebacks and pass tokens that it received unaltered to the next provider in the call path.[94] After June 30, 2023, Defendant was required to authenticate caller ID information when it is the first domestic VoIP provider to transmit the call, and the calling phone number is formatted as a North American Numbering Plan number.[95] Even assuming, *arguendo*, that Defendant has fully complied with its regulatory obligation to implement STIR/SHAKEN,[96] this does not show that Defendant took steps to prevent illegal use of its network. Defendant does not claim it used STIR/SHAKEN information in any way whatsoever, and certainly not for its intended purpose which is to discern whether the calling phone number accurately represents the identity of the caller.[97] This element of Defendant's Robocall Mitigation Procedures is also mere optics and does not reflect any substantive action to eliminate illegal calls from is network.

      The fourth element of Defendant's Robocall Mitigation Procedure is "Proactive Network Monitoring."[98] Defendant claims to "analyze traffic on its network for potentially suspicious traffic patterns that are likely to be associated with illegal robocalls or other potentially unlawful usage" and to "take prompt action to identify the party that is using its network to carry these calls and

---

[91] [ECF No. 50-22, pg. 6].
[92] [ECF No. 50-20, pg. 3].
[93] [ECF No. 50-6, at 33:6-10].
[94] 47 C.F.R. § 64.6302(a)-(b).
[95] 47 C.F.R. § 64.6302(c).
[96] Defendant's misleading or outright false statements made to the ITG in connection with tracebacks indicate that Defendant did not honor the requirement to respond fully to tracebacks. SoMF at ¶¶ 28, 39.
[97] [ECF No. 50-20, pg. 3] (Section C, stating Defendant is capable of accepting and correctly transmitting all STIR/SHAKEN-related data, but failing to state is uses that data for robocall mitigation).
[98] [ECF No. 50-20, pg. 3].

take appropriate action."[99] Defendant does not follow its stated policy and continues to allow illegal traffic to flow through its network without question, even when its policy requires investigation.[100] Sometime after January 2021, Defendant created a template email which it claims to have used to implement its traffic monitoring policy.[101] Defendant's email states Defendant tracks four indicators of potentially illegal calls, specifically, the short duration percentage ("SDP") of its customers' daily call traffic defined as the percentage of calls with a duration greater than zero seconds but less than six seconds, the answer seizure ratio ("ASR") which is the percentage of calls that connect, and the percentage of calls that fail to connect because they are either attempting to call an invalid phone number resulting in a SIP code 404 or because the caller ended the call before it had time to ring resulting in a SIP code 487.[102] If for three consecutive days a customer's SDP exceeds 45%, meaning almost half of the calls are hung up in less than six seconds, or a customer's ASR is less than 25%, meaning fewer than one in four calls connect, or the customer's traffic exceeds 20% calls to invalid numbers or 58% caller-side disconnections, then Defendant claimed to send an email notifying the customer and would investigate the non-compliance.[103] Defendant did not follow this procedure.[104] The Attorney General was unable to find a single instance when Defendant contacted a customer or otherwise investigated ASR rates under 25% or non-compliance with the thresholds for calls to invalid numbers or caller-side disconnections. Also, there are few instances where Defendant contacted its customers about excessive SDP, and Defendant's CEO estimates that it occurred approximately five times.[105] When Defendant did contact its customers about high rates of short calls, Defendant did nothing to determine whether the traffic was legal or to prevent further illegal transmissions.[106] In fact, Defendant would close its investigations even though its customers told it they were taking no action.[107] In one instance, Defendant's customer sent an email disclosing that that the customer would artificially lengthening calls by delaying the SIP bye signal that ended the calls, which

---

[99] *Id.*
[100] SoMF at ¶¶ 36-40.
[101] [ECF No. 50-23, pg. 1]; [ECF No. 50-6, at 51:20-57:23, 63:9-12].
[102] SoMF at ¶ 36.
[103] *Id.*
[104] SoMF at ¶¶ 37-38.
[105] [ECF No. 50-6, 63:3-8].
[106] SoMF at ¶¶ 38-40.
[107] SoMF at ¶ 39.

circumvented Defendant's monitoring SDP altogether, but Defendant continued to accept call traffic from the customer.[108]

Defendant's failure to monitor its traffic is particularly egregious because an astonishing number of suspicious or even clearly illegal calls transited its network which could have been detected had Defendant monitored the caller IDs its customers used. The Attorney General obtained 3.4 billion unique Call Detail Records ("CDRs") in discovery covering traffic mostly in 2022 and early 2023,[109] sent by 21 customers who had been the subject of tracebacks.[110] The CDRs show that caller ID spoofing was rampant in Defendant's call traffic. For instance, over 294,000 calls impersonated law enforcement, financial institutions, or well-known brands using Do-Not-Originate numbers, which are phone numbers that the assignee has indicated never make outbound calls.[111] These obviously spoofed, imposter calls include, but are not limited to: 10,000 from numbers that Apple indicates are never used to place outbound phone calls, 23,000 calls from one or more phone numbers associated with Wells Fargo, 12,000 with Citi, 30,000 from Chase, almost 3,000 Bank of America, and hundreds using numbers from Mastercard and Discover, as well as 64,707 calls made from a phone number belonging to the Fairbanks Police Department – Alaska State Police, 18,389 calls coming from hundreds of phone numbers associated with the Social Security Administration, and 1,852 calls from a phone number of Florida's Polk County Sheriff's Office.[112] Like the other aspects of Defendant's Robocall Mitigation Procedures, Defendant's call monitoring policy did nothing to prevent the illegal use of its network.

Finally, the fifth prong of Defendant's Robocall Mitigation Procedures, "Commitment to Traceback Cooperation," is not on its own a step to eliminate illegal calls from its network. Although Defendant responds to tracebacks, it clearly does not use traceback information to remove the illegal traffic since it continually receives tracebacks about illegal calls sent by the same customers over and over again.[113] Defendant's Robocall Mitigation Procedures are mostly a work of fiction, and are not steps to prevent illegal transmissions; therefore, under the 1992 Order

---

[108] SoMF at ¶ 40.
[109] Approximately 10.5 million records out of the 3.4 billion CDRs were sent in 2020 or 2021, and the remainder were sent between January 10, 2022, and June 1, 2023. [ECF No. 50-10, at AG MSJ 053-54].
[110] SoMF at ¶ 15.
[111] [ECF No. 50-10, AG MSJ 020, Finding No. 24].
[112] [ECF No. 50-10, AG MSJ 019, Finding Nos. 19-21].
[113] SoMF at ¶ 25.

the Attorney General is entitled to summary judgment on Counts I and II because Defendant had actual notice of the illegal use of its network and failed to take steps to prevent further illegal transmissions.

### C. Defendant was Involved in Placing Calls

Additionally, in 2015 the FCC issued another order addressing the scope TCPA liability.[114] The agency found that "one can violate the TCPA either by taking the steps necessary to physically place a telephone call, or by being so involved in the placing of a specific telephone call as to be deemed to have initiated it."[115] The FCC set forth several non-exhaustive factors to consider and instructed that the adjudicator must look to the totality of the facts and circumstances surrounding the placing of a particular call.[116] Relevant factors include the extent to which Defendant "willfully enables fraudulent spoofing of telephone numbers" and "has knowingly allowed its client(s) to use [its] platform for unlawful purposes."[117] Courts have distilled the guidance articulated in the 2015 FCC Order to two principles: TCPA liability attaches to those who control or are deeply involved in making specific calls, and to those who knowingly allow their system to be used to make prohibited robocalls.[118] Defendant satisfies both criteria.

First, Defendant is deeply involved in the calls that transit its network because it plays a vital role in connecting the calls. Defendant physically controls whether its customers' calls connect by controlling the trunks that the calls flow through, and Defendant can enable or disable these trunks with "two clicks."[119] Defendant also plays an active role in disguising illegal traffic by blending distinctive short duration call traffic with longer duration traffic.[120] Defendant's CEO controls the "mix" of traffic sent to downstream suppliers by looking at statistics about the calls coming over the trunks, such as the average length of calls, and then routing certain customer's trunks to certain suppliers to create a traffic profile that the supplier or other downstream providers

---

[114] *Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Red. 7961, 7890 (2015) (the "2015 FCC Order").

[115] *Off. of the Att'y Gen. v. Smartbiz Telecom LLC*, No. 1:22-CV-23945-JEM, 2023 WL 5491835, at *3 (S.D. Fla. Aug. 23, 2023); *Mey v. All Access Telecom, Inc.*, No. 5:19-CV-00237-JPB, 2021 WL 8892199, at *4 (N.D.W. Va. Apr. 23, 2021).

[116] 2015 FCC Order at ¶ 30; *Cunningham v. Montes*, 378 F. Supp. 3d 741, 747 (W.D. Wis. 2019).

[117] 2015 FCC Order at ¶ 30.

[118] *Cunningham*, 378 F. Supp. at 748; *Hurley v. Messer*, No. CV 3:16-9949, 2018 WL 4854082, at *4 (S.D.W. Va. Oct. 4, 2018).

[119] [ECF No. 50-6, 178:23-25].

[120] SoMF at ¶ 44.

won't block.[121] In June 2019, the FCC ruled that phone companies may block unwanted robocalls by default, based on reasonable analytics, such as "large bursts of calls in a short timeframe; low average call duration; low call completion ratios; invalid numbers placing a large volume of calls" and numerous other factors."[122] Carriers that provide consumer cellular and residential phone service spend heavily on traffic monitoring, blocking, and call labeling.[123] Blending call traffic, as Defendant does, makes it more difficult for downstream providers to use call analytics to protect their customers from phone scams, thwarting other providers' efforts to reduce the number of illegal calls that reach recipients. It is not difficult to see why Defendant takes pains to make sure illegal calls do not get blocked. Defendant is only paid for calls that connect, so it has a financial incentive to circumvent analytics-based call blocking.

Next, Defendant knowingly allows its system to be used to make prohibited robocalls. As previously discussed, Defendant has received actual notice of illegal traffic through over 260 traceback notifications, and Defendant has received numerous complaints about traffic it sent to downstream suppliers.[124] Defendant could follow its stated policies and actually investigate suspicious traffic it learns of through complaints or traffic monitoring, but Defendant refuses to do so.[125] When Defendant even bothers to investigate complaints and tracebacks, it seldom takes any action whatsoever and will close investigations even if a customer takes no action to address suspicious traffic or based on vague assurances that the customer has spoken to the source of the illegal traffic who said it won't happen again.[126] Instead, Defendant knowingly profits from illegal robocalls as its revenue from transmitting calls to the United States increased substantially as its number of tracebacks increased – almost doubling each year from approximately $570,000 in 2019, to $1,009,000 in 2021, and then $1,910,000 in 2022.[127]  In the totality of the circumstances, Defendant not only demonstrated a high degree of involvement, but also had actual knowledge of

---

[121] [ECF No. 50-6, 312:1-313:13, 314:2-5] (When asked whether Defendant mixed short duration traffic with longer duration traffic for other customers or just its customer Matchcom, Defendant's CEO responded, "I did it -- again, remember it's -- it's a relationship with the carriers, what the carriers are asking you to do.")

[122] *In the Matter of Advanced Methods to Target & Eliminate Unlawful Robocalls*, 34 F.C.C. Rcd. 4876, 4887-88 (2019).

[123] [ECF No. 50-11, 143:5-10].

[124] SoMF at ¶¶ 18-30.

[125] SoMF at ¶¶ 31-40.

[126] SoMF at ¶¶ 38-40.

[127] SoMF at ¶ 52.

transmitting fraudulent calls. Under the 2015 FCC Order, Defendant made or initiated the calls that transited its network.

### D. Defendant Transmitted Prerecorded or Artificially Voiced Calls

The final element of the Attorney General's TCPA claim is that calls went to cellular or residential lines and played prerecorded or artificially voiced messages.[128] At least 166,628 calls transited Defendant's network and connected to cellular or residential phone lines belonging to YouMail[129] subscribers and left a prerecorded or artificially voiced message on the subscriber's voicemail.[130] YouMail serves consumers with residential and cellular phones, not business landlines or other non-actionable lines, and therefore each of the prerecorded or artificially voiced calls YouMail captured through its voicemail services violate the TCPA.[131]

The Attorney General is entitled to statutory damages of $500 per call and the Court may treble the damages up to $1,500 per call if Defendant's violations are willful.[132] The Attorney General does not need to show the Defendant's intent to violate the TCPA to trigger the minimum $500 per call statutory damages, and is therefore entitled to an award of at least $83,314,000.00 in damages.[133] However, the Court should increase this award because Defendant's violations were willful. Under the TCPA, willful violations require the violator "to know he was performing conduct that violates the statute."[134] Defendant's actions were willful because it was specifically informed that it was transmitting prerecorded calls to wireless numbers, and the notifications both informed Defendant the calls were made without consent and showed that the content of the calls

---

[128] Consumer consent to receive prerecorded or artificially voiced calls is an affirmative defense under the TCPA and the burden is on Defendant to prove that otherwise violative calls were made with consent. *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014). Therefore, the Attorney General need not prove the absence of consent as an element of Counts I and II; although, the fraudulent nature of the calls at issue leaves no doubt that consumers did not consent to receive them. Furthermore, Defendant failed to raise this affirmative defense in its Answer. [ECF No. 35, pgs. 17-24].

[129] Youmail is a private company that provides call answering services to nearly 12 million U.S. consumer accounts. SoMF at ¶ 47.

[130] SoMF at ¶ 48.

[131] SoMF at ¶ 47.

[132] 47 U.S.C. 227(g)(1).

[133] *Penzer v. Transportation Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008), *certified question answered*, 29 So. 3d 1000 (Fla. 2010) ("[T]he TCPA does not require intent, except when awarding treble damages."); *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) ("The TCPA is essentially a strict liability statute").

[134] *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015).

were fraudulent such that no consumer would or could consent to receive them.[135] The TCPA leaves the exact amount that damages may be increased to the Court's discretion, but here the maximum damages of $249,942,000.00 would be appropriate given that the 166,668 violative calls the Attorney General has specifically identified represent only a tiny fraction of the actual number of calls Defendant transmitted in violation of the TCPA. Analysis of Defendant's traffic shows that the vast majority of calls it transmitted were extremely short duration traffic consistent with illegal robocalls.[136] Only 1,624 calls, fewer than 1% of calls mapped to Youmail records, were identified as wanted robocalls such as appointment reminders or school notices, indicating that virtually no legal robocalls transited Defendant's network.[137] Although the approximately $250 million penalty the Attorney General requests is large, "[s]omeone whose maximum penalty reaches the mesosphere only because the number of violations reaches the stratosphere can't complain about the consequences of its own extensive misconduct."[138]

Last, the TCPA authorizes this Court to enjoin violative calls.[139] The Attorney General requests that the Court enter an injunction prohibiting Defendant from transmitting any calls to phone numbers with area codes in the United States. Anything less than a complete ban on transmitting calls to the United States would be ineffective, as Defendant has shown no inclination to stop profiting from fraudulent or otherwise illegal robocalls.

## II.    Defendant Violated the Truth in Caller ID Act

The Attorney General' third Count alleges Defendant violated 47 U.S.C. § 227(e), the Truth in Caller ID Act. The first elements of this claim, that Defendant is in the United States, is addressed above and established by Defendant's incorporation in Florida and contacts with the United States.[140]   The next element of the claim is that Defendant acted "in connection with any

---

[135] [ECF No. 50-12, pgs. 7, 52, 54, 68, 112, 114, 118, 120, 126, 132, 134, 136, 150, 152, 154, 156, 158, 160, 162, 166, 174, 176, 178, 180, 182, 184, 188, 190, 198, 204, 206, 208, 210, 214, 216, 218, 220, 222, 226, 228, 234, 242, 262, 281, 286, 288, 290, 291, 293-302, 307-9, 313-14, 320-24, 330, 342-50, 352-53, 362, 365-66, 369-70, 379-84, 387-99, 418, 421-22, 424-25, 429, 435, 438, 441].
[136] [ECF No. 50-10, at AG MSJ 012-14].
[137] SoMF at ¶ 50.
[138] *United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 729, 208 L. Ed. 2d 508 (2021).
[139] 47 U.S.C. § 227(g).
[140] SoMF at ¶¶ 1-5.

Voice Service."[141] Voice Service is defined, in pertinent part, as "any service that is interconnected with the public switched telephone network and that furnishes voice communications to an end user using resources from the North American Numbering Plan."[142] Defendant's service is clearly connected with Voice Service because it routes voice telephone calls using United States' phone numbers conforming to the North American Numbering Plan,[143] which are ultimately answered by end users.[144] Defendant is directly providing Voice Service, and as such Defendant's actions are well within the ambit of the statute.

### A. Defendant Knowingly Transmitted Spoofed Calls Attempting to Harm and Steal

The final element of the Attorney General's Truth in Caller ID Act claim is that Defendant knowingly caused a caller identification service to transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value.[145] At least one court interpreting the statute broadly construed the intent requirement and found emotional harm as well as attempts to obtain non-tangible things of value satisfy this element of the Truth in Caller ID Act.[146] Here, Defendant was alerted hundreds of times to the fact that it was transmitting calls with misleading or inaccurate, spoofed phone numbers through traceback notices and complaints from downstream providers.[147] These notifications included specific information, such as that the caller was impersonating law enforcement or a well-known brand, which demonstrates that the intent of the calls was to defraud, cause harm, or wrongfully obtain something of value.[148] At a minimum, using spoofing to impersonate law enforcement or commercial entities intentionally causes harm because these entities suffer reputational damage or have to waste their time answering calls from consumers who contact them in response to the

---

[141] 47 U.S.C. § 227(e)(1).

[142] 47 U.S.C. § 227(e)(8)(E)(i).

[143] "The North American Numbering Plan (NANP) is the basic numbering scheme permitting interoperable telecommunications services within the U.S., Canada, Bermuda, and most of the Caribbean." https://www.fcc.gov/north-american-numbering-plan-general-management-and-oversight (last accessed: September 20, 2023).

[144] SoMF at ¶¶ 6-10, 15.

[145] 47 U.S.C. § 227(e)(1); 47 C.F.R. § 64.1604(a).

[146] *United States v. Rhodes*, No. CV 21-110-M-DLC, 2022 WL 17484847, at *4 (D. Mont. Dec. 7, 2022).

[147] SoMF at ¶¶ 21-22, 30-32.

[148] [ECF No. 50-12, pgs. 70, 72, 78, 80, 102, 108, 116, 126, 128, 140, 142, 146, 164, 170, 172, 192, 194, 196, 202, 230, 232, 244, 246, 277, 278, 287, 290-91, 293-97, 336-37, 350, 371-73]; SoMF at ¶¶ 30-32.

spoofed calls. Defendant received a complaint specifically alerting it that its upstream customer was using Defendant's network to send calls impersonating a Florida police department that was "receiving return calls complaining the [sic] their number is on their caller ID."

Furthermore, Consumers who reported answering spoofed calls transmitted by Defendant confirm that the intent of the calls was to steal things of value, including money or personal information.[149] For instance, a senior who received calls from a robocall campaign that transited Defendant's network in high volumes answered the call and complained to the Attorney General about: "Robocall messages left that are attempts at identity theft: A caller left a message on my phone from the 'department of tax debt and financial settlement' offering to help me. I have no tax problems but I'd like to see scammers like this punished."[150] Sadly, another consumer reports losing thousands of dollars to an Amazon imposter scam call that transited Defendant's network in high volumes.[151] Defendant knowingly transmitted call traffic that caused consumers' caller identification services to display inaccurate or misleading information in furtherance of attempts to steal from the call recipients. This violates the Truth in Caller ID Act and entitles the Attorney General to summary judgment on Count III.

### B. Civil Penalties Under the Truth in Caller ID Act

The Attorney General seeks civil penalties for Defendant's statutory violations as authorized by 47 U.S.C. § 227(e)(6)(A). The civil penalties available under the statute are up to $10,000 for each violation, with no stated maximum aggregate penalty, or up to $30,000 for each day on which Defendant transmitted illegally spoofed calls to a maximum penalty of $1,000,000 for continuing violations.[152] Plaintiff's expert identified at least 294,000 calls Defendant transmitted which impersonated law enforcement, financial institutions, or well-known brands by spoofing into phone numbers that the owners have placed on a Do-Not-Originate list because those numbers never make outbound phone calls.[153] Applying the $10,000 per violation penalty, Defendant could be assessed a civil penalty of no more than $2,940,000,000.00.

The maximum penalty would not be improper in these circumstances given the egregious nature of the calls which impersonated trusted government entities and well-known corporations,

---

[149] [ECF No. 50-10, AG MSJ 048-50, Findings 59-63].

[150] [ECF No. 50-10, AG MSJ 049, Finding 61].

[151] [ECF No. 50-10, AG MSJ 050, Finding 62].

[152] 47 U.S.C. § 227(e)(5)(A)(i).

[153] [ECF No. 50-10, at AG MSJ 020, Finding 24]

to exploit consumers. Also, the 294,000 calls are a small subset of the total number of spoofed calls that transited Defendant's network. For instance, the Attorney General's expert identified 86.6 million calls which used invalid phone numbers as the caller ID.[154] Although the improper intent of these calls is not obvious on their face like it is for calls impersonating government agencies and other trusted entities, many of these calls are likely scams because legitimate callers generally want the recipient of their call to be able to use caller ID to return the call, which is impossible if the caller ID is an invalid number, whereas scammers prefer the recipient of their call to have as little information as possible about their true identity. Defendant's traffic also displays high volumes of "snowshoeing" which refers to rotating though many originating numbers to evade behavioral analytics detection, or to bypass blocking based on the origination number,[155] and "neighborhood numbers" which are calling numbers that intentionally match three or more digits of the recipients' phone number to increase the odds of the call being answered because it is perceived as local.[156] While these calls are highly likely to be illegal, their ill intent is not necessarily obvious on its face. However, imposing the maximum penalty for the 294,000 documented calls Defendant transmitted that unequivocally violated the Truth in Caller ID Act recognizes the seriousness of knowingly transmitting comparatively greater numbers of likely illegally spoofed calls and serves an important deterrent purpose.

Alternatively, the Court could impose civil penalties based on Defendant's continuing violations of the Truth in Caller ID Act of up to $30,000 per day to a maximum penalty of $1,000,000 for Defendant's intentional failure to address illegal spoofing on its network.[157] Defendant received notifications about caller ID spoofing as early as June 26, 2020, but failed to prevent further violations up to and beyond January 30, 2023, a period of approximately two years and seven months.[158] This period easily justifies the Court imposing the maximum, $1,000,000.00 penalty.

---

[154] [ECF No. 50-10, at AG MSJ 019, Finding 15].
[155] [ECF No. 50-10, at AG MSJ 009].
[156] [ECF No. 50-10, AG MSJ 019].
[157] 47 U.S.C. § 227(e)(5)(A).
[158] [ECF No. 50-12, pgs. 2, 444) (informing Defendant of illegal calls claiming to be from consumer's utility company threatening to disconnect service and displaying "assorted toll-free or other numbers" in the caller ID.))

## III.   **Defendant Violated the TSR and FDUTPA**

Counts IV and V of the Attorney General's Complaint alleged violations of the TSR and FDUTPA, respectively.[159] As previously stated, these Counts are related in that violations of the TSR are violations of FDUTPA.[160] The Attorney General is entitled to summary judgement on Counts IV and V because Defendant has violated 16 C.F.R. § 310.3(b) of the TSR, which prohibits providing "substantial assistance or support to any seller or telemarketer when [Defendant] knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of [the TSR]." There are three elements to the Attorney General's substantial assistance claim, first, that Defendant transmitted calls that violated 16 C.F.R. §§ 310.3(a) or 310.4,[161] second that by transmitting the calls Defendant provided substantial assistance or support to the sellers or telemarketers associated with the calls, and third, that Defendant had actual knowledge or deliberate ignorance that the sellers or telemarketers were violating the TSR.[162]

### A.   *Defendant Transmitted Calls that Violated the TSR*

First, Defendant transmitted huge numbers of calls that violated the TSR, and specifically: (1) 16 C.F.R. § 310.3(a)(2)(iii), by misrepresenting material aspects "of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;" (2) § 310.3(a)(2)(vii), by impersonating government entities and corporations; (3) § 310.3(a)(4) by making false or misleading statements to induce payment for goods or services; (4) § 310.4(a)(8), by failing to transmit the telemarketer's telephone number to recipient's caller ID services; (5) § 310.4(b)(1)(iii)(B), by calling telephone numbers on the National Do Not Call Registry; and, (6) § 310.4(d)(1), by failing to disclose the identity of the seller. Plaintiff's expert witness matched

---

[159] [ECF No. 1, 26-31].

[160] *supra* Fn. 40; *FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246, 1264 (M.D. Fla. 2018), *aff'd*, No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9, 2022) ("misrepresentations and omissions that violate the TSR constitute unfair or deceptive acts or practices in violation of . . . the FDUTPA"); *FTC. v. Lalonde*, 545 F. App'x 825, 840 (11th Cir. 2013) ("A violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce").

[161] 16 C.F.R. §§ 310.3(c) and (d), are also predicate violations for liability under §310.3(b), but these involve credit card laundering and charitable solicitations and the Attorney General has not alleged that Defendant assisted and facilitated violations of these sections of the TSR.

[162] *FTC. v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008); *Statement of basis and purpose and final rule*, Telemarketing Sales Rule, 60 FR 43842, 43851-52.

calls from Defendant's CDRs to prerecorded or artificially voiced messages left on YouMail subscribers' voicemails, transcribed those messages, and matched the transcriptions to known robocall campaigns.[163] The Attorney General's expert provided the top fifty robocall campaigns, and the content of these calls show extensive TSR violations. For instance, the most commonly captured robocall that Defendant transmitted states: "Esta es una llamada es muy importante del centro de cobertura médicas, para hablar con un agente oprima uno. Para ser eliminado de la lista oprima dos" [This is a very important call from the Medical Coverage Center to speak with an agent press one. To be removed from the list press two].[164] Defendant sent this call at least 16,917 times to YouMail subscribers, and of those at least 10,158 calls went to YouMail subscribers whose telephone numbers are on the National Do Not Call Registry.[165]  This call is either attempting to sell insurance, or if no insurance policy was in fact available or only a worthless policy was available, then the call was a scam designed to extract money or personal information from the recipient. Whether it was an attempted sale or a scam does not impact whether it constitutes Telemarketing within the scope of the TSR because the call is to "induce the purchase of goods or services" without respect to whether the goods or services actually exist.[166] A sale does not need to be consummated on the call, nor do the goods or services offered need be real or legitimate.[167] Thus, this robocall campaign violates 16 C.F.R. §§ 310.4(b)(1)(iii)(B) and § 310.4(d)(1)  because it was placed to numbers on the National Do Not Call Registry and because it provides a generic name for a non-existent company, "centro de cobertura médicas" instead of identifying the name of the seller.[168]

---

[163] SoMF at ¶¶ 48-49.

[164] [ECF No. 50-10, AG MSJ 083]; sample recordings of the robocall are available at https://media.youmail.com/mcs/glb/audio/s3diZGlyX3J3d2RmYTp0b21jYXQ2NDUzOjE2MTQ2NDE3ODQzMTB5mqY0fE.gen.wav and https://media.youmail.com/mcs/glb/audio/s3diZGlyX3R0bmRmYTp0b21jYXQ0MzU0OjE2MTQyOTYYwMDQyMTFSAfGq2M.gen.wav.

[165] [ECF No. 50-10, AG MSJ 029].

[166] 16 C.F.R. § 310.2(gg).

[167] *FTC v. Day Pacer LLC*, No. 19 CV 1984, 2023 WL 5671618, at *14 (N.D. Ill. Sept. 1, 2023) ("Neither the definition of telemarketer nor telemarketing requires a direct sale or sales offer between the person placing the call and the consumer."); *Telemarketing Sales Rule*, *2015 Statement of Basis and Purpose*, 80 FR 77520-01, 2015 WL 8537254 ("The TSR is fundamentally an anti-fraud rule that protects consumers from deceptive and abusive telemarketing practices.")

[168] *See United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258, 1278 (D. Utah 2015) ("The rule allows consumers to judge whether to listen to the message and purchase the product

Similarly, traceback notifications illustrate that Defendant transmitted calls which violate the TSR. For instance, Defendant received substantial numbers of traceback notifications about calls impersonating the Social Security Administration.[169] These calls constitute telemarketing because they threaten that social security benefits will be cancelled and offer to connect the recipient with an agent who can eliminate the problem in exchange for a fee. This is within the definition of Telemarketing because it is an offer of a service in exchange for consideration, even if the service is overtly fraudulent.[170] Government imposter scams, such as the traced calls impersonating the social security administration, violate 16 C.F.R. § 310.3(a)(2)(iii), § 310.3(a)(2)(vii), and § 310.3(a)(4). Many of traceback notifications also specifically advised Defendant that calls used spoofed caller ID's in violation of 16 C.F.R. § 310.4(a)(8).[171] Overall, Defendant transmitted an overwhelming number of calls that violated the TSR, including 98,368 illegal telemarketing calls that connected to YouMail subscribers with phone numbers on the national Do Not Call Registry.[172]

B.   *Knowingly Transmitting Scam Calls Constitutes Substantial Assistance or Support*

Next, Defendant provided substantial assistance or support to the telemarketers or sellers associated with violative calls. A finding of substantial assistance or support requires "something more than casual or incidental help to the telemarketer, but does not have to show a direct connection between the assistance and the misrepresentation for an entity to be liable under § 310.3(b)."[173] "[C]leaning a telemarketer's office is not enough to support substantial assistance liability but providing lists of contacts to a seller or telemarketer that identify persons over the age

---

and also gives consumers information so they can contact the seller to prevent future calls. Merely stating that the call is on behalf of the producers of *The Velveteen Rabbit* does not give the consumer important information.")

[169] [ECF No. 50-12, 5, 7, 16, 18, 20, 22, 24, 26, 78, 82, 273, 275, 276, 281-83, 285, 289, 303-04, 306].

[170] *See Telemarketing Sales Rule*, *2015 Statement of Basis and Purpose*, 80 FR 77520-01, 77529 (referencing government impersonation scam that violated the TSR).

[171] [ECF No. 50-12, 5, 7, 16, 18, 20, 22, 24, 26, 78, 82, 273, 276].

[172] SoMF at ¶ 49.

[173] *FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1369 (S.D. Fla. 2016) (internal quotations omitted).

of 55 could be."[174] "The threshold for what constitutes substantial assistance is low."[175] Here, Defendant provided a service that was essential to the success of the telemarketers or sellers' schemes. Defendant had the power to stop every call that transited its network before the call connected to a potential victim by simply disconnecting the trunks over which the fraudulent calls flowed.[176] But-for Defendant's service, at least 98,368 documented telemarketing calls to phone numbers on the Do Not Call Registry would not have completed.[177] Defendant also provided misleading or outright false responses to tracebacks and mixed short duration calls with less suspicious traffic, helping to hide misconduct from law enforcement and downstream providers who would not otherwise have accepted the traffic.[178] Defendant also generated millions of dollars in revenue from transmitting the calls.[179] Courts have found less direct services constitute substantial assistance or support as a matter of law.[180] Defendants were key enablers of phone scams, which satisfies the second element of the Attorney General's TSR and FDUTPA claims.

### C. Knowledge or Conscious Avoidance

Third, Defendant knew or consciously avoided knowing that the calls it facilitated violated the TSR. As previously stated, Defendant received hundreds of traceback notifications, as well as

---

[174] *FTC v. HES Merch. Servs. Co.*, No. 6:12-CV-1618-ORL-22, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014), *aff'd sub nom. FTC v. HES Merch. Servs. Co., Inc.*, 652 F. App'x 837 (11th Cir. 2016) (quotation and citation omitted).

[175] *FTC v. Lake*, 181 F. Supp. 3d 692, 699 (C.D. Cal. 2016) (quoting *FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012)).

[176] SoMF at ¶ 9; [ECF No. 50-6, 178:23-25].

[177] SoMf at ¶ 49.

[178] SoMF at ¶ 28, 44.

[179] SoMF at ¶ 52.

[180] *HES Merch. Servs. Co.*, 2014 WL 6863506, at *7 (finding substantial assistance as a matter of law where company provided two merchant accounts essential for processing credit card payments); *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) (find substantial assistance for, *inter alia*, "helping develop the questionnaire the telemarketers used to obtain information from grant-seeking customers; training a sales group on processing grant research requests; assisting in responding to inquiries from different state attorneys general; providing the Kansas defendants with justifications and explanations to deal with consumer complaints; brainstorming ways for them to collectively expand their business."); *United States v. Dish Network, L.L.C.*, 667 F.Supp.2d 952, 961 (C.D.Ill.2009) (substantial assistance found where defendant paid dealers to engage in telemarketing that violated TSR and allegedly knew or consciously avoided knowledge of violations); *Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d at 1369 (substantial assistance to process payments, provide handbook and materials to customers, open merchant accounts, review marketers' materials, and deal with complaints to the Better Business Bureau).

downstream provider complaints.[181] Defendant also ignored high rates of short duration calls and high rates of calls that failed to connect, which even Defendant's own policy required Defendant to investigate.[182] Defendant had actual knowledge that it was facilitating illegal calls as well as ample reason to investigate the traffic on its network, which more than satisfies the knowledge or conscious avoidance standard under 16 C.F.R. 310.3(b).[183]

### D. Transmitting Scam Calls is a Deceptive Trade Practice

Finally, even if Defendant's conduct did not constitute a violation of the TSR, which it does, Defendant should still be held liable under FDUTPA because knowingly connecting scam calls is a deceptive trade practice. Count V of the Complaint requests injunctive relief, civil penalties, and attorney fees.[184] When seeking injunctive and other statutory relief, the Attorney General need not establish actual damages, irreparable harm, lack of an adequate legal remedy, or that an injunction is in the public interest, and need only show a clear right to an injunction by establishing that Defendant's practices are deceptive.[185] Under FDUTPA, a deceptive trade practice is one which is "likely to deceive a consumer acting reasonably in the same circumstances."[186] Here, Defendant transmitted scam calls that routinely deceive consumers. The types of phone scams at issue lead to hundreds of millions of dollars in consumer fraud losses annually.[187] Complaints to the Attorney General confirm that scams, such as the Amazon imposter scam Defendant transmitted, lead to consumer fraud losses.[188]

---

[181] SoMF at ¶¶ 21, 30-32.

[182] SoMF at ¶¶ 36-38.

[183] *Chapman*, 714 F.3d 1211, 1218 (10th Cir. 2013) (finding knowledge of at least three inquires by state attorneys general sufficient for violation of 16 C.F.R. § 310.3(b)); *Consumer Fin. Prot. Bureau v. Daniel A. Rosen, Inc.*, 2022 WL 1514439, at *5 (C.D. Cal. Apr. 5, 2022) (describing "red flags" that should have prompted investigation); *Fed. Trade Comm'n v. Walmart Inc.*, No. 22 CV 3372, 2023 WL 2646741, at *13 (N.D. Ill. Mar. 27, 2023) ("an ordinary transaction becomes extraordinary—and processing it can constitute substantial assistance—if a defendant knows enough about the underlying fraud.").

[184] [ECF No. 1, ¶¶ 125-127].

[185] *Off. of Att'y Gen. v. Bilotti*, 267 So. 3d 1, 3 (Fla. Dist. Ct. App. 2019).

[186] *Coleman v. CubeSmart*, 328 F. Supp. 3d 1349, 1361 (S.D. Fla. 2018) (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016)).

[187] The FTC's Consumer Sentinel Network Data Book 2022 reports that consumers lost at least $798 million to phone scams in 2022. https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Data-Book-2022.pdf at pg. 12.

[188] [ECF No. 50-10, AG MSJ 050] (Exhibit 10 to SoMF, Expert Report, at page AG MSJ 50, finding 62).

Furthermore, Defendant routed 86.9 million connected calls to numbers with Florida area codes, and on average these calls lasted just 17.5 seconds.[189] Of these calls, 11,032 delivered fraudulent or otherwise illegal prerecorded or artificially voiced messages to Florida YouMail subscriber's voicemail accounts.[190] Although many consumers who received deceptive calls are outside of Florida, Defendant is a Florida corporation headquartered in Florida and conducting its business within the State.[191] FDUTPA is applicable to out of state consumers because Defendant's practice of knowingly routing deceptive calls occurred within Florida.[192]

E.  *Injunction and Civil Penalties Under 15 U.S.C. § 6103 and FDUTPA*

The Attorney General is entitled to an injunction prohibiting Defendant from transmitting further calls to United States area codes under 15 U.S.C. § 6103(a) and §§ 501.207(1)(b) and 501.207(3), Florida Statutes.  Additionally, the Attorney General is entitled to civil penalties of up to $10,000 per violation under § 501.2075, Florida Statutes, for Defendant's willful violations of FDUTPA. Here, Defendant transmitted at least 294,000 calls impersonating law enforcement or well-known brands, which constitute violations of the TSR and FDUTPA.[193] The Attorney General requests that the Court enter an award for up to $2,940,000,000.00, for Defendant's willful FDUTPA violations.[194] Alternatively, Defendant transmitted at least 98,368 Telemarketing calls which connected to numbers on the National Do Not Call Registry. These calls violate the TSR and constitute violations of FDUTPA, entitling the Attorney General to civil penalties of up to $983,680,000.00.

## CONCLUSION

WHEREFORE, the Attorney General respectfully requests that the Court enter summary judgment in the Attorney General's favor on Counts I through V of the Complaint.

Dated: October 16, 2023.

---

[189] [ECF No. 50-10, pg. AG MSJ 021, Finding No. 26].

[190] [ECF No. 50-33, Column C].

[191] SoMF at ¶¶ 1-5.

[192] *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000)

[193] SoMF at ¶ 51.

[194] "Willful violations occur when the person knew or should have known that his or her conduct was unfair or deceptive or prohibited by rule." 501.2075, Florida Statutes. Defendant's actions constitute willful violations for the reasons discussed above.

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General of the State of Florida**

*/s/ Patrick Crotty*
Patrick Crotty
Florida Bar # 108541
Senior Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Patrick.Crotty@myfloridalegal.com

Miles Vaughn
Florida Bar # 1032235
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Miles.vaughn@myfloridalegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2023, I electronically filed the foregoing

with the Clerk of Court by using the CM/ECF system and thereby served the other parties of record.

*/s/ Patrick Crotty*
Patrick Crotty
Senior Assistant Attorney General