UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

OFFICE OF THE ATTORNEY GENERAL,

STATE OF FLORIDA,

DEPARTMENT OF LEGAL AFFAIRS,

      Plaintiff,

vs.                              1:22-cv-23945-JEM

SMARTBIZ TELECOM LLC,

A Florida limited liability company,

      Defendants.

_____/

OFFICE OF THE ATTORNEY GENERAL,

STATE OF FLORIDA,

DEPARTMENT OF LEGAL AFFAIRS,

      Plaintiff,

and                          22-23945-CIV-MARTINEZ/BECERA

SMARTBIZ TELECOM LLC,

      Counter-Defendants.

_____/

**CERTIFIED COPY**

VIDEOCONFERENCE DEPOSITION OF JOSHUA BERCU

DATE & TIME TAKEN:    August 9, 2023, at 9:05 a.m.

Exhibit C - Josh Bercu Deposition

Joshua Bercu                August 09, 2023

```
 1 | APPEARANCES:
 2 |
 3 |     PATRICK CROTTY, ESQUIRE
 4 |     3507 EAST FRONTAGE ROAD, SUITE 325
 5 |     OFFICE OF THE ATTORNEY GENERAL
 6 |     TAMPA, FLORIDA 33607
 7 |     ATTORNEY ON BEHALF OF THE PLAINTIFF
 8 |
 9 |     SEAN GELLIS, ESQUIRE
10 |     EDUARDO MALDONADO, ESQUIRE
11 |     GELLIS LAW, PLLC
12 |     300 WEST PENSACOLA STREET
13 |     TALLAHASSEE, FLORIDA 32301
14 |     ATTORNEY ON BEHALF OF THE DEFENDANT
15 |
16 |     JACOB SOMMER, ESQUIRE
17 |     ZWILLGEN
18 |     1900 M STREET NW, SUITE 250
19 |     WASHINGTON, DC 20036
20 |     ATTORNEY ON BEHALF OF THE WITNESS
21 |
22 | ALSO PRESENT:
23 |
24 |     JOSE OLIVAR, CORPORATE REPRESENTATIVE
25 |     EDUARDO BORRERO, CORPORATE REPRESENTATIVE
```

Joshua Bercu                  August 09, 2023

```
 1                    I N D E X

 2    WITNESS                                   PAGE

 3    JOSHUA BERCU

 4    Direct Examination, by Mr. Crotty            8

 5    Cross Examination, by Mr. Gellis            40

 6    Redirect Examination, by Mr. Crotty        161

 7    Recross Examination by Mr. Gellis          176

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Joshua Bercu                August 09, 2023

```
 1                E X H I B I T S

 2    EXHIBIT NO.    DESCRIPTION                      PAGE

 3    Exhibit 1      Subpoena                           9

 4    Exhibit 2      Investigative Subpoena            10

 5    Exhibit 3      Traceback Notice                  12

 6    Exhibit 4      Investigative Subpoena            15

 7    Exhibit 5      Letter from Telecom               36

 8    Exhibit 8      Traceback Subpoena                16

 9    Exhibit 9      Spreadsheet                       16

10    Exhibit 10     Spreadsheet                       28

11    Exhibit 14     Traceback Notice                  30

12    Exhibit 15     11/03/2020 Traceback Notice       33

13    Exhibit 19     Duke Energy Email                 35

14    Exhibit 20     Letter from NGM Latem             36

15    Exhibit 21     ITG Policies & Procedures        172

16

17

18      PLAINTIFF'S EXHIBITS 6-7, 11-13, 17-18, AND 22-24 PER

19     AGREEMENT OF COUNSEL, ARE ATTACHED TO THIS DEPOSTION

20

21   DEFENDANT'S EXHIBITS 1-6, PER AGREEMENT OF COUNSEL, ARE

22                ATTACHED TO THIS DEPOSTION

23

24

25
```

Joshua Bercu                    August 09, 2023

```
 1              P R O C E E D I N G S
 2        (Thereupon, the following proceedings were held at
 3    9:05 a.m.)
 4              MR. GELLIS:  I think we're ready to begin.
 5              THE COURT REPORTER:  All right.  Give me one
 6        moment.  Okay.  We are now on the record.  The time
 7        is 9:05 AM.  Today is Wednesday, August 9th, 2023.
 8        We are here today for the video conference
 9        deposition of Industry Traceback Group LLC in the
10        matter of Office of the Attorney General, State of
11        Florida, Department of Legal Affairs versus
12        SmartBiz Telecom, LLC, a Florida Limited Liability
13        Company, case number 1:22-CV-23945-JEM.  My name is
14        Miriam Brighton.  I'm the court reporter present.
15        Will all parties and their counsel please announce
16        your appearance by stating your name and the party
17        you represent?
18              MR. CROTTY:  My name is Patrick Crotty.  I'm a
19        Senior Assistant Attorney General with the Florida
20        Attorney General's Office representing the Florida
21        Attorney General's Office.
22              MR. GELLIS:  My name's Sean Gellis.  I'm an
23        attorney representing the defendant, SmartBiz
24        Telecom LLC, and I'm joined by Eduardo Borrero, who
25        is the CFO and corporate representative of
```

Joshua Bercu                August 09, 2023

```
 1    SmartBiz.
 2         MR. SOMMER:  I'm Jacob Sommer.  I'm from
 3    ZwillGen, Z-W-I-L-L-G-E-N, and I'm representing the
 4    witness today.
 5         THE COURT REPORTER:  Thank you.  Does the
 6    witness consent to my administering the oath
 7    remotely?
 8         THE WITNESS:  I consent.
 9         THE COURT REPORTER:  Please raise your right
10    hand.  I will now administer the oath remotely.  Do
11    you solemnly swear or affirm that the testimony
12    you're about to give will be the truth, the whole
13    truth, and nothing but the truth?
14         THE WITNESS:  I do.
15         THE COURT REPORTER:  Please state and spell
16    your full name for the record.
17         THE WITNESS:  It's Joshua Minkinbercu, J-O-S-
18    H-U-A M-I-N-K-I-N-B-E-R-C-U.
19         THE COURT REPORTER:  Thank you.  You may put
20    your hand down.  Before we went on the record, I
21    asked you to provide a form of identification.
22    What form of identification did you provide to me?
23         THE WITNESS:  My driver's license.
24         THE COURT REPORTER:  And that was a Washington
25    DC driver's license?
```

Joshua Bercu                August 09, 2023

1           THE WITNESS:  Yes, Washington DC.

2           THE COURT REPORTER:  Okay.  And can you read

3      the license number into the record please?

4           THE WITNESS:  Absolutely.  2949858.

5           THE COURT REPORTER:  Thank you.  You may

6      proceed.

7           MR. CROTTY:  Okay.  The Florida Attorney

8      General's Office will do direct exam first.  Prior

9      to the start of the deposition, Mr. Gellis

10     indicated that he was willing to stipulate to the

11     admissibility as business records of the 20

12     Exhibits that I had previously provided.  Mr.

13     Gellis, would you state on the record that you

14     stipulate so?

15          MR. GELLIS:  I -- Yes, we confirm to avoid

16     time and expense that the 20 Exhibits -- I think

17     it's 20.  The Exhibits listed for today are

18     admissible as business records.

19          MR. CROTTY:  Okay.  Exhibits 14 through 18

20     were examples of Traceback notices that are part of

21     a much larger group of Traceback notices provided

22     by the Industry Traceback Group.  Do you stipulate

23     to the admissibility of all such Traceback notices?

24          MR. GELLIS:  Not sure we're going to go that

25     far at -- on the -- on the spot, but we can have a

Joshua Bercu              August 09, 2023

```
 1        conversation about that after the depo, Patrick.
 2             MR. CROTTY:  Okay.
 3             THE COURT REPORTER:  Sorry, one moment.
 4        Someone just came into the waiting room.  JR,
 5        iPhone 13 Pro.  Would you like me to let them in?
 6             MR. GELLIS:  Patrick, it's Marcus.
 7             MR. CROTTY:  Mr. Olivar?
 8             MR. BORRERO:  Yeah, that's the CEO of the
 9        SmartBiz Corporation.
10             THE COURT REPORTER:  Okay.  Thank you.
11        Whoever just came on, could I please have you state
12        your name for the record?
13             MR. OLIVAR:  Jose Olivar.
14             THE COURT REPORTER:  Thank you.  You may
15        proceed.
16                        DIRECT EXAMINATION
17   BY MR. CROTTY:
18        Q    Okay.  Thank you for your time this morning,
19   Mr. Bercu.  Have you ever been deposed before?
20        A    Nope.
21        Q    Have you ever conducted depositions?
22        A    Nope.
23        Q    Okay.  And I'd like to start with just a few
24   items that will make the questioning go more smoothly.
25   Obviously, everything that we're saying is being taken
```

Joshua Bercu                    August 09, 2023

 1   down so if we speak over one another it makes it very
 2   difficult to get an accurate record.  So, I'll try my
 3   best not to speak over you if -- I ask you to do the
 4   same.  Also, you may hear your counsel say, "Object to
 5   the form," or Mr. Gellis -- or when I'm no longer
 6   questioning, I may say, "Object to the form."  We have
 7   agreed to limit all objections to simply stating,
 8   "Object to the form" for purposes of this procedure, but
 9   please give your counsel or any other parties here time
10   to raise any objections before you answer.  So, please
11   try and delay your answer by just a second or two.  Is
12   there any reason why you may be unable to testify
13   accurately and honestly today?
14        A    No.
15             MR. CROTTY:  Okay.  So, I would like to share
16        my screen and introduce the -- what I've marked as
17        Exhibit 1.  Are you able to see what I've intro --
18        or what I've marked as Exhibit 1?  No.  Nope,
19        because I haven't hit share.  Never mind.  Okay.
20        (Thereupon Plaintiff's Exhibit 1 was marked for
21   identification.)
22   BY MR. CROTTY:
23        Q    Now, are you able to see what I've marked as
24   Exhibit 1?
25        A    Yes.

Joshua Bercu                    August 09, 2023

1      Q    Okay.  Do you recognize this as a subpoena

2  directed at Industry Trace -- Traceback Group LLC?

3      A    Yes.

4      Q    Did you review this subpoena and the attached

5  notice?

6      A    Yes.

7      Q    Are you appearing today pursuant to this

8  subpoena?

9      A    Yes.

10     Q    Are you prepared to testify on all of the

11 topics noticed in the subpoena?

12     A    Yes.

13          Q    Okay.  Great.  I'm going to stop sharing

14     that.  Okay.  Next Exhibit I would like to

15     introduce is -- I've marked as Exhibit 2.  Let me

16     share my screen.

17     (Thereupon Plaintiff's Exhibit 2 was marked for

18 identification.)

19 BY MR. CROTTY:

20     Q    Are you able to see what I've marked as

21 Exhibit 2?

22     A    Yes.

23     Q    Okay.  Do you recognize this as an

24 investigative subpoena duces tecum directed to US

25 Telecom, the Broadband Association dated March 26th,

Joshua Bercu                   August 09, 2023

```
 1   2021?

 2        A    Yes.

 3        Q    Do you recall my office issuing US Telecom the

 4   subpoena?

 5        A    Yes.

 6        Q    Can you describe the relationship between US

 7   Telecom, the Broadband Association and Industry

 8   Traceback Group LLC?

 9        A    Yes.  The Industry Traceback Group LLC is a

10   wholly owned subsidiary of US Telecom.  The -- at the

11   time -- at this time I think it -- it may have predated

12   when Industry Traceback Group LLC was created, but --

13   but in any event, US Telecom employees support the

14   industry Traceback Group LLC, through an intercompany

15   agreement.

16        Q    At this time -- at the time of the subpoena,

17   was US Telecom acting as the single consortium that

18   conducts private led efforts to traceback the origin of

19   suspected unlawful robocalls appointed by the FCC

20   pursuant to 47-CFR-64.1203?

21        A    Yes.

22        Q    Okay.  Has Industry Traceback Group LLC

23   subsequently taken over that role?

24        A    It -- Yes, it -- it -- it's sort of combined

25   in the -- the way the FCC's designated it.  It's US
```

Joshua Bercu          August 09, 2023

1  Telecom's Industry Traceback Group.

2      Q    Okay.  Is there any reason to distinguish

3  between US Telecom and Industry Traceback Group LLC for

4  purposes of discussing the documents produced either by

5  US Telecom or Industry Traceback Group in the subpoenas

6  that have been issued in this case that you're aware of?

7      A    Not that I'm aware of.

8      Q    Okay.  Did Industry -- or did US Telecom

9  respond to this subpoena and produce documents?

10      A    Yes.

11          MR. CROTTY:  Okay.  Give me one second because

12      I just want to review the questions that I was

13      going to ask about the next Exhibit given the

14      stipulation.  Okay.  Yeah.  I'd like to introduce a

15      third Exhibit I've marked as number 3.  Sharing my

16      screen.  Okay.

17      (Thereupon Plaintiff's Exhibit 3 was marked for

18  identification.)

19  BY MR. CROTTY:

20      Q    Are you able to see my screen and the Exhibit

21  that I've marked as Exhibit 3?

22      A    Yes.

23      Q    Okay.  Do you recognize this as a document

24  produced pursuant to the subpoena that I marked as

25  Exhibit 2?

Joshua Bercu                    August 09, 2023

1       A    Yes.

2       Q    Okay.  Directing your attention to the first

3  tab, HOPS -- you see at the bottom here, it says HOPS?

4  Is each line -- each row on this tab reflective of a

5  Traceback notice sent to the HOP provider?

6       A    Yes.

7       Q    Okay.  And does this tab reflect information

8  obtained from conducting tracebacks?

9       A    Yes.

10      Q    And backing up, can you describe what you

11 would understand me to mean when I say a trace back?

12      A    Yes, a traceback is a process that we rerun,

13 where we identify the source of an illegal -- a

14 suspected illegal call by going provider -- by provider

15 to provider to find out exactly all the different

16 providers that carried the call and who originated it

17 and who the caller is.

18      Q    Okay.  And you number these trace backs under

19 the numbers assigned to each traceback present in Column

20 A?

21      A    Yes.

22      Q    Okay.  Directing your attention to the second

23 tab of the spreadsheet, Provider call records.  Can you

24 describe what information is present in the second tab

25 of Exhibit 3?

Joshua Bercu                 August 09, 2023

1      A    These are -- are notes that we documented in

2  our portal about conversations we had with the provider.

3      Q    Okay.  The Spoke with Column, does that note

4  who at this provider, SmartBiz Telecom LLC, you spoke

5  with on the calls recorded here?

6      A    Yes.

7      Q    And the Created by Column, does that reflect

8  who wrote these notes?

9      A    Yes.

10     Q    The DF in row two, Column F, does that refer

11 to David Frankel?

12     A    Yes.

13     Q    Who was Mr. Frankel?

14     A    Mr. Frankel was our -- our former contractor

15 as part of the Industry Traceback Group process.

16     Q    Okay.  In row three, Column F, the JB, does

17 that refer to you?

18     A    Yes.

19     Q    Okay.  Do you recall either or both of the

20 calls reflected in this spreadsheet?

21     A    I -- I do recall the -- the -- the one in row

22 three.

23     Q    Okay.  And to the best of your knowledge, that

24 call actually occurred?

25     A    Yes.

Exhibit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

```
 1      Q    Okay.  I'll stop sharing my screen for now and

 2  move on to another Exhibit.  Given the stipulation, I am

 3  going to skip over the Exhibits -- several Exhibits,

 4  however, I would still like to have them attached to the

 5  deposition transcript to make the numbering make sense

 6  and to be able to use them.  Is there any objection to

 7  attaching the 20 Exhibits that I previously provided?

 8           MR. GELLIS:  No objection.

 9           MR. SOMMER:  No objection here.

10           Q    Okay.  I'm sorry.  Give me a minute to go

11       through my notes to decide what I want me to ask

12       about.  I just established the second subpoena that

13       we sent.  Okay.  Sharing my screen for what's been

14       marked as Exhibit 4.

15      (Thereupon Plaintiff's Exhibit 4 was marked for

16  identification.)

17  BY MR. CROTTY:

18      Q    Are you able to see what I've marked as

19  Exhibit 4?

20      A    Yes.

21      Q    Do you recognize this as another investigative

22  subpoena duces tecum served on US Telecom, the Broadband

23  Association dated March 15th, 2022?

24      A    Yes.

25      Q    And did the ITG produce -- or did US Telecom
```

Joshua Bercu                    August 09, 2023

1    produce documents pursuant to the subpoena?

2         A    Yes.

3              MR. CROTTY:  Okay.  Let me go to -- are you

4         able to see what I've marked as Exhibit 8?

5              THE WITNESS:  Yes.

6         (Thereupon Plaintiff's Exhibit 8 was marked for

7    identification.)

8    BY MR. CROTTY:

9         Q    Do you recognize this as a subpoena issued in

10   the instant litigation directed to Industry Traceback

11   Group LLC and dated February 9th, 2023?

12        A    Yes.

13        Q    Do you recall receiving the subpoena?

14        A    Yes.

15        Q    Did Industry Traceback Group respond and

16   produce documents?

17        A    Yes.

18             MR. CROTTY:  Okay.  Okay.  I'm moving on to

19        Exhibit 9.  Sharing my screen.

20        (Thereupon Plaintiff's Exhibit 9 was marked for

21   identification.)

22   BY MR. CROTTY:

23        Q    Okay.  Do you -- let me get to the top.  Do

24   you recognize this as a spreadsheet produced in response

25   to the subpoena that I had marked as Exhibit 8?

Joshua Bercu                    August 09, 2023

1    A    Yes.

2    Q    Okay.  I'd like to cover the meaning of the

3  Column headings in the spreadsheet.  So, traceback

4  notice in Column A, does that have the same meaning as

5  the previous spreadsheet -- that Exhibit?  Is it a

6  numbering of tracebacks performed by the ITG?

7    A    Yeah.  Yeha, it's a -- it's a unique number

8  for each traceback.

9    Q    Okay.  And you see that this spreadsheet has

10  four tabs and that I'm on the first tab marked "HOPS"?

11    A    Yes.

12    Q    In Column B, it's labeled as, Notes.  Does the

13  information reflected in Column B indicate when a voice

14  service provider was labeled with respect to its

15  position in the traceback, each point of entry or down

16  from a non-responsive provider?

17    A    Yes.

18    Q    Okay.  Where FPD appears in this Column, does

19  that stand for foreign point of departure?

20    A    Yes.

21    Q    Can you describe what that means?

22    A    That is our terminology for the voice service

23  provider that is a non-US provider in our system

24  identified as the one that sent the call to a provider

25  that's identified as US-based in our system.

Joshua Bercu                    August 09, 2023

1       Q    Okay.  And NR, does that stand for non-
2   responsive?
3       A    Yes.
4       Q    And does that mean that they failed to respond
5   to a traceback notice?
6       A    Yes.
7       Q    If I say, traceback notice, what would you
8   understand that to mean?
9       A    I -- I would understand to mean the email
10  notification that a provider would get asking them to
11  sign into our portal and respond to the -- the traceback
12  request.
13      Q    Where POE appears, does that stand for point
14  of entry?
15      A    Yes.
16      Q    Can you describe what that means?
17      A    That is for a suspected illegal call that we
18  traceback that originates outside the US.  It is the
19  first provider that is US-based in our system that
20  receives the call and brings it into the United States.
21      Q    Okay.  Can you describe what down NR means in
22  these notes?
23      A    That means it is the provider immediately down
24  from a non-responsive provider.  So, the provider that
25  accepted a call from a provider that did not cooperate

Joshua Bercu                August 09, 2023

 1  with the traceback request.

 2      Q    And I believe you mentioned this previously,

 3  but just to clarify, is it fair to say that when you

 4  conduct a traceback, you start with the company that

 5  delivered the call to the -- that is being traced back

 6  to the recipient of the call and then you work up the

 7  call path by asking the first provider to identify who

 8  sent them the call and going in turn until you find who

 9  originated or dialed the phone call being traced?  Is

10  that a fair description?

11      A    Yes, that's -- that's right.

12      Q    Okay.  So, when you say downstream, it means

13  that's the provider who received a call from an upstream

14  provider?

15      A    Yes.

16      Q    What does down ORG mean in these notes?

17      A    So, that means downstream from the originating

18  provider.  So, the provider that identified it -- the

19  originating provider is the provider that identified

20  itself as putting the -- the call on the phone network

21  and having the relationship with the end user that made

22  the call.  So, down of that is the immediately down --

23  downstream provider.

24      Q    Okay.  And what does IOR mean in these notes?

25      A    That means the same thing.  The -- the

Joshua Bercu                    August 09, 2023

1  originator, but one that is not US-based, so

2  international originator.

3      Q    Okay.  I believe that's all of the codes.  Oh.

4  And so, ORG means originator, is that correct?

5      A    Yes.

6      Q    Is originator generally synonymous with the

7  person that actually dialed the phone number to initiate

8  the call?

9      A    It's the -- it's their voice service provider.

10 So, the platform that they used -- that the caller used

11 to make the call.

12     Q    Okay.  The HOP number field in Column C, does

13 that track the -- the voice service provider's position

14 in the traceback starting with the terminating carrier?

15     A    Yes.

16     Q    Okay.  Column D and E, does that capture the

17 calling phone number and the called phone number for the

18 call that's being traced back respectively?

19     A    Yes.

20     Q    Column F, HOP provider, does that refer to the

21 company that received the trace back notice associated

22 with a particular HOP?

23     A    Yes.

24     Q    And we've already discussed upstream provider

25 and downstream provider, but do these Columns have the

Joshua Bercu                    August 09, 2023

1  same meaning as we had previously identified?

2       A    Yes.

3       Q    Call date in Column I, does that refer to the

4  date and time of the call that's being traced back?

5       A    Yes.

6       Q    Notified date in Column J, does that refer to

7  the date and time that a provider is sent a trace back

8  notice?

9       A    Yes.

10       Q    Completion date, does that refer to the date

11  and time that a provider responds to a traceback notice?

12       A    Yes.

13       Q    Is elapsed time the difference between the

14  notified date and time and the completed date and time?

15       A    Yes.

16       Q    Column M, Caller end user/ -- or caller/end

17  user or no response/not found reason, does that capture

18  whether a HOP provider failed to respond to the trace

19  back notice or whether the HOP provider supplied

20  information about the entity that originated the call or

21  provides a reason why the HOP provider could not locate

22  the call in its call detail records?

23       A    Yes.

24       Q    When I say, call detail records, what would

25  you understand that to mean?

Joshua Bercu              August 09, 2023

1      A    The record the provider maintains about the --

2   the call at issue.  So -- so, the -- the date and time

3   of the call, the call number, calling number, duration

4   of the call, etcetera.

5      **Q    Does Column N note whether the traceback was**

6   **completed, hit an unresponsive provider or hit a**

7   **provider who could not find the call in its CDR's?**

8      A    Yes.

9      **Q    Does Column O note whether the trace -- the**

10  **called number was registered on the national do not call**

11  **registry?**

12     A    Yes.

13     **Q    How is this determined?**

14     A    We -- we rely on a vendor plugin that -- that

15  checks the FTC's database.

16     **Q    So, to clarify, you have a vendor who**

17  **subscribes to all area codes of the FTC's do not call**

18  **registry and queries the called number to see if it**

19  **appears on the do not call registry?  Is that correct?**

20     A    So, slight clarification.  We subscribe to all

21  the area codes and then we -- through our subscription,

22  the vendor has the automation that allows us to pull

23  from it.

24     **Q    Okay.  Column Q, does this state whether the**

25  **call number is wireless or is a VOIP phone line?**

Joshua Bercu                    August 09, 2023

1      A    Yeah, wireless or -- or landline phone.  Yeah.

2      **Q    Row 137, I believe, is what I'm looking for.**

3   **Sorry.  There's not very many non-wireless in here.**

4      A    Mm-hmm, or VOIP, yeah.

5      **Q    Yeah.  So, where it says, Class 1_ NClass --**

6   **or _2_VOIP_with_numb_abbreviation of assignment, that**

7   **means VOIP telephone line?**

8      A    Yes.

9      **Q    And is that what you refer to as a landline?**

10     A    There could also be -- maybe not in this, a --

11  a traditional copper landline that might -- would have a

12  different designation.  I believe residential, but

13  that's less frequent.

14     **Q    Okay.  How is this field determined?**

15     A    It is based on the service that the -- the

16  person who received the call, it's their service.  The

17  term -- So, on the terminating side.

18     **Q    Okay.  So, the terminating provider discloses**

19  **whether it's a wireless or a VOIP line or a traditional**

20  **copper wire landline?**

21     A    Yeah, it's automatically deter -- determined

22  based on the -- the carrier ID that -- the proceeding

23  Column, because that -- that carrier is associated with

24  wireless -- the numbers are associated with wireless,

25  but yes.

Joshua Bercu                August 09, 2023

1    Q    So, where it says wireless, does that mean

2  that the number is assigned to a cellular telephone

3  service?

4    A    Yes.

5    Q    Column R, does that capture the state that the

6  call recipient's phone number is associated with?

7    A    Yes.

8    Q    How is that information derived?

9    A    From the area code in the phone number.

10    Q    Okay.  Does Column S, Campaign refer to the

11  label assigned to the type of content that is being

12  delivered by the traced call?

13    A    Yes.

14    Q    How is it determined that different calls

15  might be part of the same campaign?

16    A    It is typically done based on the data source

17  supplying the same or substantially the same examples in

18  the campaign, or our team determining that it matches in

19  other cases like referrals.

20    Q    Does Source in Column T refer to the entity

21  that provided information sufficient to initiate the

22  traceback?

23    A    It's -- it's the -- It's the data source that

24  we relied on for the -- the calls, but they -- we -- our

25  -- our team still initiates the traceback.

Joshua Bercu                  August 09, 2023

1      Q    Okay.  Does low volume in Column U state

2  whether the campaign that the trace call is associated

3  with consists of many similar calls or just a small

4  number of calls?

5      A    So, it -- low volume represents -- is -- is it

6  a robocall campaign versus we sometimes trace back

7  targeted phishing attacks, swatting calls, etcetera,

8  where they don't have the same quantity.  So, those

9  would be as low volume.

10     Q    Okay.  So, the threshold for deciding what's

11 the low volume and what's a high volume has more to do

12 with the type of call that it is?

13     If it's a prerecorded message call that you suspect

14 is being blasted out to a lot of people, you would label

15 it as high volume?  If it's a live voice, more targeted

16 type of call, then you would label it as low volume?  Is

17 that fair to say?

18         MR. SOMMER:  Object to the form.

19         THE WITNESS:  Yes.

20 BY MR. CROTTY:

21     Q    Okay.  Does audio link in Column V contain a

22 link, if available, that would allow a traceback notice

23 recipient to listen to the traced call or a call with

24 substantially similar content?

25     A    Yes.  And -- and the traceback recipient also

Joshua Bercu                    August 09, 2023

1  can listen in -- in the portal itself while responding

2  to the traceback.

3      Q    Okay.  Can you describe what you mean when you

4  say, the portal?

5      A    So, the -- any -- any provider that receives

6  a traceback request must ex -- exclusively reply in the

7  -- the ITG's -- the Industry Traceback Group's web

8  application and that's where they log in with their

9  credentials and are able to respond in -- within the --

10  the web application, which we call the portal.

11      Q    Okay.  Do the comments appearing in Column W -

12  - are they entered by the person whose name appears

13  after the word by with a colon?

14      A    I'm looking -- yes.

15      Q    Okay.  Does this Column include information

16  that the HOP provider supplied in response to the

17  traceback?

18      A    Yes.

19      Q    Is this information generally accurate?

20      A    To the best of our knowledge.

21      Q    Okay.  Directing your attention to the next

22  tab, number of HOPS.  Are you able to see that?

23      A    Yes.

24      Q    Is this a list of tracebacks labeled by

25  traceback number where the defendant in this case has

Joshua Bercu                August 09, 2023

```
 1  appeared in the call path?
 2      A    I -- I believe that's right.
 3      Q    Okay.  Is Column B the total number of HOPS
 4  for each traceback?
 5      A    Yes.
 6      Q    And Column A is the traceback number that
 7  we've discussed previously?
 8      A    Yes.
 9      Q    Is it accurate to say that as of the date that
10  Exhibit 9 was produced to the Attorney General,
11  defendant had received at least 262 traceback notices?
12      A    Yes, assuming that Row 1 was a heading.
13      Q    You would agree Row 1 is a heading?
14      A    Yes.
15      Q    Directing your attention to the tab labeled
16  Providers.  Is Column C a list of each time the ITG
17  corresponded with SmartBiz or resp -- or recorded
18  information about SmartBiz?
19      A    Yes.
20      Q    Directing your attention to the tab Provider
21  call records.  Is this the same information that was
22  provided in response to the earlier subpoena that we
23  reviewed previously?
24      A    Yes.
25           MR. CROTTY:  Okay.  Do you see the Exhibit
```

Joshua Bercu                    August 09, 2023

1      that I've marked as Exhibit 10?

2           THE WITNESS:  Yes.

3      (Thereupon Plaintiff's Exhibit 10 was marked for

4  identification.)

5  BY MR. CROTTY:

6      **Q     Was this spreadsheet produced in response to**

7  **the subpoena sheet by my office?**

8      A     Yes.

9      **Q     Directing your attention to the first tab.**

10 **Does this show the user ID that SmartBiz and Eduardo**

11 **Borrero can use to log into the traceback portal and**

12 **respond to tracebacks?**

13     A     Yes.  The -- the -- Row 2 specifically being

14 the -- the NOC -- associated with the NOC user -- that

15 email address.

16     **Q     When you say NOC, do you mean that to be**

17 **network operation center?**

18     A     Yes.  Yes, but just clarifying that that --

19 that is a specific user ID to an email address, not --

20 not to the SmartBiz as a whole.

21     **Q     Okay.  Directing your attention to the second**

22 **tab labeled User access details.  Does this show each IP**

23 **address that logged into the traceback portal and each**

24 **login date?**

25     A     Yes.

Joshua Bercu                    August 09, 2023

1    Q    And so, the IP address is associated with the
2  user ID's that appeared in the first tab, is that
3  correct?
4    A    Yes.
5    Q    Directing your attention to the third tab,
6  Common user details.  Does this show that the same IP
7  address logged into SmartBiz -- or the Network Operation
8  Center for SmartBiz's account -- at least the account
9  associated with NOC@SmartBiztill.com and to the email
10  associated with Whisl's account?  I'm sorry.  Let me
11  repeat the question.  I got unclear.  Does the
12  information on this tab show that the same IP address
13  logged in to SmartBiz's Network Operation Center's
14  account on the portal and Whisl's account on the portal
15  over a period from April, 2022 to August, 2022?
16    A    Yes.  Yes, it shows that those three email
17  logins logged in with that same IP and in -- in Column
18  B, that -- that those are associated with SmartBiz, two
19  of them, and then one of them with Whisl.
20    Q    Okay.  So, this IP address in Column A logged
21  in to the three -- to the portal accounts associated
22  with the three email addresses that are shown in Column
23  C, is that correct?
24    A    Yeah, so those three email addresses all
25  logged in using that same IP.

Joshua Bercu                    August 09, 2023

1       Q    Okay.  And then, in Row 2, does it reflect

2  that the same IP address logged into the portal accounts

3  associated with the two emails shown in Column C, Row 3?

4       A    Yes.  Yes.  Those -- those two email address

5  logins utilize that same IP address.

6       Q    And -- And that was in December of 2022, is

7  that correct?

8       A    Correct.

9            MR. CROTTY:  Okay.  I believe I can skip a few

10      more Exhibits.  Give me a second to find where I

11      want to go.

12      (Thereupon Plaintiff's Exhibit 14 was marked for

13  identification.)

14  BY MR. CROTYY:

15      Q    Are you able to see the document that I've

16  marked as Exhibit 14 on my screen?

17      A    Yes.

18      Q    Okay.  Does this appear to be a traceback

19  notice email sent to SmartBiz?

20      A    Yes.

21      Q    Is the date at the top of this email

22  reflective of when that was sent?

23      A    Yes.

24      Q    And was the notice sent to the email addresses

25  in the 2 line?

Joshua Bercu                    August 09, 2023

```
 1        A     Yes.

 2        Q     Are bounce backs oth -- other evidence that

 3   the email failed to be delivered recorded?

 4        A     Not to my knowledge.

 5        Q     Is there any reason to believe that traceback

 6   notices sent to this defendant were not delivered?

 7        A     No.

 8        Q     Bottom of this email, does date and time refer

 9   to the time and date of the traced call?

10        A     Yes.

11        Q     And do the to and from lines refer to the

12   called number and the calling number respectively for

13   the traced call?

14        A     Yes.

15        Q     Does campaign have the same meaning as we

16   discussed previously?

17        A     Yes.

18        Q     And would a provider be able to access an

19   audio recording associated with the traced call through

20   the link that appears here?

21        A     Most typically.

22        Q     Okay.  When an audio recording is not

23   available, is there a description of the call provided -

24   -

25        A     Yes.
```

Joshua Bercu                August 09, 2023

1      Q      -- the call content provided?

2      A      Yes.

3      Q      I'm sorry.  I asked the question poorly and I

4  spoke over you.  Let me repeat it.  If an audio

5  recording is not available, would a provider typically

6  be given a description of the content of the traced

7  call?

8      A      Yes.  And -- and that description is available

9  whether or not there's an audio recording.  There's

10  always a description.

11      Q      Okay.  And the text at the bottom -- well,

12  that's everything.  Is this a statement about the

13  content of the traced call and why ITG suspects that the

14  call is illegal?

15      A      Yes.

16      Q      And how is this information derived?

17      A      It is derived when we have a recording.  It is

18  based on our listening to the recording of the calls in

19  the campaign.  If we don't have a recording, it is

20  derived based on the referral that we received from that

21  -- that gave us the basis for the call -- for the

22  traceback.

23              MR. CROTTY:  Okay.  Are you able to see what

24      I've marked as Exhibit 15?

25              THE WITNESS:  Yes.

Joshua Bercu                    August 09, 2023

```
 1      (Thereupon Plaintiff's Exhibit 15 was marked for
 2  identification.)
 3  BY MR. CROTTY:
 4      Q     Does the date and time of this traceback
 5  appear to be -- or this traceback notice appear to be
 6  November 3rd, 2020?
 7      A     Yes.
 8      Q     Do you recall whether November 3rd, 2020 was
 9  the date of the US presidential election?
10      A     I -- I -- I -- It was election season, I
11  suppose, but yeah, I don't remember the exact election
12  date.  I guess so.
13      Q     Okay.  Was this call selected for traceback in
14  part because it suggests that recipients should stay
15  home on election day?
16      A     So, I -- I think that was part of it.  It was
17  also extremely prolific at the time, and -- but it was
18  concerning because of that reason as well.  And -- and
19  it -- I think it started to pick up, if I recall, in --
20  in -- around the October timeframe, maybe a little
21  earlier.
22      So, there -- there was some thought it might have
23  related to election.
24      Q     Okay.  Are the traceback notices that I've
25  shown and marked typical of all traceback notices that
```

Joshua Bercu                    August 09, 2023

1  have been sent to this Defendant?

2       A    Yes, you know, from time to time we -- we

3  update the language based on changing regulations,

4  etcetera, but they are -- you know -- roughly the same.

5       Q    Okay.  I haven't marked these as an Exhibit.

6  I can certainly add them if necessary, but these three

7  traceback notices that I have in the first three tabs on

8  my screen don't seem to appear in the list in Exhibit 9

9  on --

10      A    Mm-hmm.

11      Q     -- number of HOPS.  Do you know why that --

12 assuming that what I've stated is true, do you know why

13 that might be the case?

14      A    Can I look at that again?

15      Q    This is the first one.  And specifically

16 traceback number 2644 doesn't seem to appear.  It seems

17 to be doubled up with 2659.  So, if that's a reason then

18 --

19      A    I don't think that's -- that would be the

20 reason, but I -- I -- I don't -- I'd had have to dig in

21 deeper to know why it didn't appear and look at what

22 happened with that traceback.

23      Q    Okay.  And then I didn't see 9820 and I didn't

24 see 9823.

25      A    Yeah, I'd have to -- I'd have to look into

Joshua Bercu                August 09, 2023

```
 1  that.
 2          MR. CROTTY:  Okay.  Can you see the document
 3      that I've marked as Exhibit 19?
 4          THE WITNESS:  Yes.
 5      (Thereupon Plaintiff's Exhibit 19 was marked for
 6  identification.)
 7  BY MR. CROTTY:
 8      Q    Do you recognize this document?
 9      A    Yes.
10      Q    Can you describe what it is?
11      A    It is an email that I sent to Duke Energy in
12  October 2020.
13      Q    And do you see that it has other emails in the
14  chain?
15      A    Yes.
16      Q    Is Mr. Halley's title at the bottom of page 2
17  of this Exhibit accurate at the time the email was
18  written?
19      A    Yes.
20      Q    Were you both regularly involved in ITG's
21  investigations of scam calls?
22      A    Yes, Patrick was, and then he hired me in part
23  to take over that work, so he became less involved over
24  time.
25      Q    And did you and Mr. Halley have personal
```

Joshua Bercu                August 09, 2023

1 | knowledge of the facts presented in your emails?
2 |     A    Yes.
3 |          MR. CROTTY:  Okay.  Are you able to see the
4 |     Exhibit that I've marked as Exhibit 20?
5 |          THE WITNESS:  Yes.
6 |     (Thereupon Plaintiff's Exhibit 20 was marked for
7 | identification.)
8 | BY MR. CROTTY:
9 |     Q    Do you recognize this document?
10 |     A    Yes.
11 |     Q    Is this a letter sent to you by NGM Latam
12 | Corp, a subsidiary of Datora after the ITG sent the
13 | company a letter about the extent to which it had been
14 | identified as an international point of entry for
15 | robocalls into the US Fund network?
16 |     A    Yes.
17 |     Q    Had Mr. -- Did the call referred to at the --
18 | in the first line of this email, did that actually
19 | occur?
20 |     A    Yes.
21 |     Q    Did Mr. Kelly represent himself to you as
22 | counsel for NGM Latam on that call?
23 |     A    Yes.
24 |     Q    Is Mr. Kelly relating information that he
25 | would've received from his client, NGM Latam?

Joshua Bercu                    August 09, 2023

1      A    To the best of my knowledge.

2      Q    **Do you have any reason to believe that the**

3 **information in Mr. Kelly's letter is false?**

4      A    No.

5           MR. CROTTY:  I think there's just one more

6      thing I wanted to circle back to.  Are you able to

7      see the document that I've marked as Exhibit 5?

8           THE WITNESS:  Yes.

9      (Thereupon Plaintiff's Exhibit 5 was marked for

10 identification.)

11 BY MR. CROTTY:

12     Q    **And this is a letter sent by US Telecom as the**

13 **Industry Traceback Group appointed by the FCC to**

14 **SmartBiz.  Is that correct?**

15     A    Yes.

16     Q    **This was labeled -- was produced to us labeled**

17 **as an escalation letter.  Was it so labeled because the**

18 **ITG had concerns about the frequency with which SmartBiz**

19 **appeared in the call path of traced suspected illegal**

20 **robocalls?**

21     A    Yes, specifically as the point of entry.

22     Q    **The letter contains a statement, You are one**

23 **of the larger contributors to the illegal robocalling**

24 **problem based on information available to the ITG.  Was**

25 **this an accurate statement at the time it was made?**

Joshua Bercu                    August 09, 2023

1        A     Yes.

2        Q     **The information referred to knowledge that was**

3  **gained from conducting trace backs of suspected illegal**

4  **robocalls?**

5        A     Yes.

6        Q     **Is there anything else that that was based on?**

7        A     It was based on -- that at that time they were

8  one of the larg -- the highest identified as point of

9  entry.

10        So, it was based on the tracebacks we ran, yes.

11  And specifically, which providers were most frequently

12  showing up as the point of entry.

13        Q     **Okay.  How did you determine whether a company**

14  **was a point of entry at that time?**

15        A     So, it's -- it's automated in our system and

16  it's -- it's pretty simple and it's whatever provider is

17  the -- is in our traceback is the US based provider in

18  our system that accepted a call from a foreign provider.

19  It's automatically labeled as a point of entry in that

20  case.

21        Q     **Okay.  How did you determine whether a**

22  **provider was US-based?**

23        A     So, at the time, we -- we largely depended on

24  the representations that the provider made to us.  There

25  are -- were times that the information we -- we reviewed

Joshua Bercu                August 09, 2023

1  that information and it may have had other information.

2  Today, we -- we rely on the FCC's robocall mitigation

3  database and the -- the certifications providers may

4  make in that database.

5      Q    Okay.  I believe that's all the questions I

6  have, but if you could just give me a few minutes to

7  review.

8      And we've been going for about an hour, so should

9  we take a five minute break and I'll review my notes and

10  then if there's anything else I'll ask and if not, we'll

11  move on?

12           MR. SOMMER:  That sounds good to me.

13           MR. GELLIS:  Perfect.  Want to -- may just

14     want to reconvene at 10:05 and make it easy?

15           MR. CROTTY:  That sounds good.

16           THE COURT REPORTER:  Okay.  The time is 9:57

17     AM.  We're off the record.

18           MR. CROTTY:  Thank you.

19     (Thereupon, a break was held at 9:57 a.m.; after

20  which the following was heard at 10:05 a.m.)

21           THE COURT REPORTER:  All right.  One moment.

22     Okay.  The time is 10:05 AM.  We're back on the

23     record.

24           MR. CROTTY:  Okay.  I have no further

25     questions, although -- would you like me to send

Joshua Bercu                  August 09, 2023

```
1      you -- email you the Exhibits that I'd attached to
2      the transcript or --
3            THE COURT REPORTER:  Yeah, that would be
4      great.
5            MR. CROTTY:  -- Okay.
6            THE COURT REPORTER:  Thank you.
7            MR. GELLIS:  And I'm going to have to email
8      you after the deposition as well.  I was not so
9      organized as Patrick to do it all in advance, but I
10     am going to write them down this time so there's no
11     confusion about Exhibit numbers as we go.  But
12     Patrick, you've largely seen all of them.  So,
13     shouldn't be any surprises.  All right.  Are we
14     ready?  Okay.  All right.
15                       CROSS EXAMINATION
16  BY MR. GELLIS:
17      Q    Good morning, Mr. Bercu.  Did I say that
18  right?  Bercu?
19      A    Bercu.
20      Q    Bercu.  Okay.  I'm going to go over a couple
21  things that were kind of glanced over earlier, just
22  basic background stuff that you hear in a deposition.  I
23  remember Mr. Crotty kind of gave you his explanation.
24  Let's please not talk over each other.  Say yes or no.
25  Don't -- uh-huh, or uh-uh, or head shakes can't be taken
```

Joshua Bercu               August 09, 2023

1  down obviously.  I believe you said this is your first

2  deposition?

3       A    Yes.

4       Q    Okay.  Why don't you walk me through your

5  education background?  Let's start there.

6       A    So, I -- I did go to law school.  I am an

7  attorney, so -- but I have never been a litigator, so

8  that's why I have not done a lot of taking depositions

9  either.  Do you want more than that or is that

10  sufficient?

11       Q    Yeah, like -- So, where'd you go to law

12  school?  What did you -- what bars are you admitted to?

13       A    Sure.  So, I went to Georgetown University Law

14  Center.  I graduated in 2010.  I'm -- I was admitted to

15  the Virginia Bar and then waived into DC.  I did go

16  inactive in Virginia, but I am still a member of the DC

17  bar.

18       Q    Any special certifications, credentials,

19  anything like that?

20       A    Sure.  I -- I -- For the Inter -- the IAPP,

21  the International Association Privacy Professionals.

22  I've got the -- the SIP-US and the --this -- the DIPM,

23  the privacy management because that was a big part of my

24  practice when I was at a law firm.

25       Q    Congratulations.  On a side note, I just got

Joshua Bercu                    August 09, 2023

1  board certified in state and federal government admin

2  law and I have decided to pursue that area and I'm

3  studying for the SIP-US exam as we speak.  So --

4       A    Oh.

5       Q     -- It -- it is not --

6       A    Good.

7       Q     -- it's not easy, so congratulations on that.

8       A    Oh, thank you.

9       Q    I hope to follow somewhat in your footsteps.

10 It's an interesting area with data privacy and all that,

11 so I can appreciate that.  Let me ask you this then.

12 So, what was your undergrad in?

13      A    Economics.

14      Q    And employment history?

15      A    So, I went straight from undergrad to law

16 school and then when I graduated law school, I worked at

17 Wilkinson Barker now, where I was for nine and a half

18 years, which is a health communications boutique.  First

19 as an associate, then as a partner.

20      Q    Oh, cool.  Where'd you graduate for the BA?

21      A    Harvard.

22      Q    Excellent.  Okay.  And I guess then that comes

23 into your time here.  You're employed by US Telecom,

24 right?  You're -- Where are you currently employed?

25      A    Yes, US Telecom.

Joshua Bercu                  August 09, 2023

1       Q    And what's your position there?

2       A    So, I -- I have two titles.  I'm Vice

3   President of Policy and Advocacy, but I'm also the

4   Executive Director of the Industry Traceback Group.

5       Q    Okay.  And tell me when you first started

6   working for US Telecom and if your roles have changed

7   along the -- the way and when.

8       A    So, I started working in August 2020.  So,

9   we're -- we're right on the third anniversary.  The --

10  the role hasn't really changed.

11      The Executive Director title for the Industry

12  Traceback Group came at some point as we stood up the

13  Industry Traceback Group LLC, around that time, give or

14  take a few months.

15      Q    All right.  And if I say ITG or US Telecom, we

16  can use them interchangeably for purposes of today

17  unless otherwise noted by you?

18      A    Yeah, I -- I -- I think for purposes of today,

19  I don't -- I don't see an issue.

20      Q    Okay.  Just let me know if for some reason

21  there's a nuance that --

22      A    Sure.

23      Q    -- because I -- I may say ITG and you may say

24  US Telecom and I'm -- I'm not trying to have some term

25  of art and confuse you, I just -- it seems they're the

Joshua Bercu                August 09, 2023

1  same based on what I heard your testimony earlier to be.

2      A    Yeah.

3      Q    They function the same.  It's a wholly owned

4  subsidiary?

5      A    I -- So, I mean, yes, but we -- there's no

6  policy advocacy done in -- in our ITG -- in our ITG

7  role.  So, that -- that is the distinction.

8      Q    What was your title again?  VP of --

9      A    Policy and Advocacy.

10      Q    Of the ITG or of US Telecom?

11      A    That's -- that's why I have two titles so that

12  I -- we're -- so, in -- in -- you know, I use a

13  different email address when I --

14      Q    Okay.

15      A     -- am acting on behalf of the ITG.

16      Q    So, for the ITG, what is your title?

17  Executive Director?

18      A    Yes.

19      Q    And for US telecom, you are the VP of Policy

20  and Advocacy?

21      A    Yes.

22      Q    But ITG does not do policy and advocacy?

23      A    No.

24      Q    Okay.  Interesting.  Okay.  Let's go ahead and

25  get into a little bit more about the ITG then.  We went

Joshua Bercu                August 09, 2023

1  over the difference between them.  Does one -- well I

2  guess let me ask this.  How do you get into the ITG?

3  How do you become a member of the ITG?

4       A    So, some of that's based on the history.

5  Early on, it was a coalition of the willing that my

6  predecessors got entities to agree to cooperate and

7  support the effort.  Now, we -- we -- we do have a

8  membership that's on our policy -- our public policies

9  and procedures and providers do ask from time to time to

10  become members and we go through a process to determine

11  if they can be.

12       Q    Do you have to be a member of US Telecom in

13  order to be a member of the ITG?

14       A    No.

15       Q    Would you say most members of the ITG are

16  members of US Telecom?

17       A    No.

18       Q    If you had to guess what percentage,

19  approximately?

20       A    Just guessing, probably less than a third.

21       Q    So, less than a third are US telecom members.

22  So, about two thirds would be non-US telecom members

23  that have joined the ITG?

24       A    Off the -- off the top of my head, something

25  like that roughly.

Joshua Bercu                    August 09, 2023

1      Q    Okay.  I want to talk about this process real

2  quick.  So, I mean is there a process promulgated

3  somewhere?  Is it published --

4      A    It's --

5      Q     -- the process to join the ITG?

6      A    -- I'm sorry.  Yeah, we do have -- we do talk

7  about membership in our public policies and procedures.

8      Q    So, all the criteria that would be required

9  and all the -- what you're going to be evaluated against

10 would be in those documents?

11     A    Yes.

12     Q    Okay.  Why don't you tell me a little bit

13 about the ITG's role, like via the -- the FCC?  So, the

14 ITG is contracted with the FCC, correct?

15     A    No.

16     Q    Okay.  Well -- yeah, explain that to me.

17     A    So, the -- the ITG was stood up as a voluntary

18 industry effort about seven or eight years ago.

19 Subsequent to that, congress passed the Traced Act which

20 created a formal role for a private Industry traceback

21 consortium.  And the FCC stood up a process to designate

22 a -- the consortium formally -- annually and we are

23 designated as that, but there is no contract.

24     Q    So, what governs the F -- the ITG's conduct?

25     A    The -- the policies and procedures -- the

Joshua Bercu                    August 09, 2023

 1 | public policies and procedures.

 2 |      Q     So, there's no like regulations or anything --

 3 |      A     There's --

 4 |      Q     -- or anything that the FCC has put out?

 5 |      A     -- There's oversight in that -- that there's

 6 | an annual designation.

 7 |      Q     So, where would I go look to find what this

 8 | designation encompasses

 9 |      A     In the FCC's documents.  It's -- it's all

10 | public record.  So, their -- their designation order.

11 |      Q     Do members of the ITG receive information

12 | that's not available to the public?

13 |      A     So, not -- not about tracebacks other than

14 | some information about just what we're focused on.  They

15 | guide our effort, especially our executive committee.

16 | But no, they don't receive more information about

17 | providers or anything like that.

18 |      Q     What about like best practices?

19 |      A     No.

20 |      Q     So, you don't like send email updates out to

21 | the ITG membership -- you know -- warning them or

22 | advising them about certain things or -- you know --

23 | telling them, Hey, we suggest you do these things,

24 | something like that?

25 |      A     No.

Joshua Bercu               August 09, 2023

1      Q    Does the ITG have the authority to recommend
2  different things to carriers?
3      A    What do you mean by authority?
4      Q    Well, under -- pursuant to its -- you know --
5  its designation from the FCC, which is done through
6  Congress, right?  And Congress passed a law that gave
7  FCC this designation.  So, when the ITG acts in that
8  capacity -- let's start there.  You're acting according
9  to that congressional authority that's been given to you
10  through the FCC.  Do you agree with that?
11         MR. CROTTY:  Object to the form.
12         THE WITNESS:  No.
13  BY MR. GELLIS:
14      Q    Okay.  So, what does the designation mean?
15      A    The -- the designation makes it a requirement
16  to cooperate, but it's specific in contract that it's
17  still private industry effort.  We don't have -- what we
18  do is we run tracebacks and per the designation, it's a
19  regulatory obligation to cooperate with those
20  tracebacks.
21      Q    So, on the part of who?  It's an obligation on
22  the part of who to cooperate?
23      A    Providers -- voice service providers.
24      Q    So, you're no different than any other private
25  company?

Joshua Bercu                   August 09, 2023

 1        A    The difference -- I -- I'm not following what
 2   you mean by that.
 3        Q    I mean, I asked -- you know -- you're acting
 4   pursuant to some power by Congress you say, No, we're
 5   just a private company.  But I mean, there's this FCC
 6   designation out there.  I -- I'm just trying to
 7   understand the relationship between the federal law, the
 8   federal agency, the federal agency's designation of you,
 9   the ITG, and then the ITG's function in roles.
10   Somewhere in there it feels like there's some federal
11   power -- there's some power being vested, given,
12   transferred to the ITG and I just want to get what your
13   thought is on that.
14              MR. SOMMER:  Object to the form.
15              THE WITNESS:  So, I -- I think as I said
16         before, the ITG was created before there was even a
17         Trace Act and was running tracebacks before there
18         was even a Trace Act.  The designation ties in
19         because the FCC requires cooperation with the --
20         with the -- with the designated registered
21         traceback consortium.
22              So, that's -- but it -- it -- so, that -- I
23         would not say that confers any authority to the
24         ITG.  What that does is create an issue of non-
25         compliance with FCC rules if providers don't

Joshua Bercu              August 09, 2023

```
 1      cooperate, but there's no authority.
 2   BY MR. GELLIS:
 3      Q    Well they must cooperate with you under the --
 4   under the law, right?
 5      A    Yes.
 6      Q    That's what you're telling me?
 7      A    Yes.
 8           MR. SOMMER:  Object to the form.
 9   BY MR. GELLIS:
10      Q    Okay.  I mean, so -- and that's different than
11   any other private corporation, right?
12      A    I don't -- I'm not an expert on the -- I know
13   there's a variety of quasi-private public entities out
14   there.  I'm not an expert on any of them.
15      Q    Well, what about the ITG?  You know about
16   them, right?
17      A    Yes.
18      Q    Or do you consider the ITG a quasi-public
19   private entity as you said?
20      A    No.  Oops, sorry.  No.
21      Q    So, it's purely private but it has the ability
22   -- but -- but Telecom providers have to respond to it
23   pursuant to law based on the designation?
24           MR. SOMMER:  Object to the form.
25           THE WITNESS:  Yes.
```

Joshua Bercu                August 09, 2023

```
 1   BY MR. GELLIS:
 2        Q    Is the ITG authorized by Congress to give
 3   notice of violation on behalf of the FCC?
 4        A    No.
 5        Q    Does the ITG make a distinction in tracebacks
 6   between unlawful, fraudulent and illegal calls?  Do they
 7   have different categories?  Do you know what I mean by
 8   that?
 9        A    Yeah, please explain.  What -- what do you
10   mean by that?
11        Q    Do you make a -- Does the ITG make a
12   distinction between an unlawful call and an illegal
13   call?
14        A    No, I am not follow --
15        Q    The ITG --
16        A    -- yeah, I'm not following what the
17   distinction would be there.
18        Q    What about unlawful and fraudulent, any
19   distinction there in the ITG's mind?
20        A    So, what we do is we explain in our
21   descriptions why we believe a call is illegal and that
22   can be for several reasons, that it violates
23   telemarketing laws or that we believe it's fraud.  So, I
24   -- I -- so, we don't really use that categorization you
25   said, per se, but that's -- that's how we would describe
```

Joshua Bercu                 August 09, 2023

1  that to the providers that receive it -- the traceback

2  notices.

3      Q    Okay.  Do -- does the ITG have any contracts

4  with governmental entities that are not the FCC?

5      A    No.

6      Q    Okay.  The ITG has no contracts with any

7  governmental entity of any kind?

8      A    No.

9      Q    Let's talk about the -- the traceback process.

10     A    Oh.

11     Q    Oh.  Sorry.

12     A    Just the one -- the one thing is government

13 entities do log into our portal and there's terms of

14 service that govern their use of the portal.  That's it.

15     Q    But it's not like an MOU or something like

16 that?

17     A    No.

18     Q    Let's talk about the -- the traceback process.

19 Just walk me through sort of -- you know -- your -- the

20 ITG's understanding of how a traceback begins and kind

21 of just give me the description to the end and then

22 we'll break it apart and talk about it.

23     Q    Sure.  So, the -- the vast majority of the

24 tracebacks we run are based on data our team sources

25 from YouMail.  For example, other partners like that,

Joshua Bercu                August 09, 2023

1   where we're getting a lot of examples and we're -- out -
2   - our team is initiating trace backs based on the call
3   examples we have.
4        And basically, once our team in our system hits go,
5   it automatically goes out to the -- the first provider
6   and continues along as providers respond to the
7   traceback until we complete the traceback.
8        Q    Okay.  You said that it's sourced from ITG
9   staff including YouMail.  So, I mean how do you choose
10  which calls get a traceback or don't?
11            MR. SOMMER:  Object to the form.  Go ahead.
12            THE WITNESS:  So, it's not sourced from ITG
13       staff.  It's from data sources we have and we -- we
14       get examples.  How do we choose is we have
15       examples.  We -- Our relationship with YouMail, we
16       only are able to get -- they -- we get a -- we get
17       a snapshot of what are the biggest campaigns going
18       on in the country hitting consumers.  We are able
19       to select a certain amount of that where we get
20       call examples of those and we run trace backs on
21       those.
22  BY MR. GELLIS:
23       Q    It sounds -- okay.  Aside from YouMail --
24  let's put that aside.  I understand that.  What other
25  sources of information do you get that result in the

Joshua Bercu                    August 09, 2023

1  initiation of tracebacks?

2      A    So, we also get -- another major source is we

3  get examples from a honeypot that Verizon has stood up

4  and automatically feeds us examples of prolific robocall

5  campaigns.  We get referrals from AG's, the FCC, and

6  others as well.  And occasionally -- but this is a

7  really small percentage -- from ITG members and all --

8  all this is in our public --

9      Q    Which honey --

10     A    -- oh, sorry.  All -- all this is in our po -

11 - in our policies and procedures as well, not -- not the

12 specific entities, but the -- the categories of sources.

13     Q    -- We're going to do a little jumping around

14 because you mentioned the word honeypot.

15     A    Mm-hmm.

16     Q    So, before I ask you what a honeypot is, can

17 an individual, like a consumer, report a suspected

18 robocall to the ITG?

19     A    There's -- An individual can always send us

20 examples.  It -- Typically, it's been our experience

21 that the quality of referrals is -- is not as good.  The

22 providers -- all providers in the -- in the chain

23 strongly prefer having voicemails so that we have that

24 record of what is actually the call and not just an

25 allegation.

Joshua Bercu                  August 09, 2023

```
 1      So, that -- and we're very cognizant of the fact
 2  that every time we run a trace back, even though it's
 3  automated on our end, providers like SmartBiz have
 4  humans responding to it.  So, we do need to prioritize
 5  what is hitting the most consumers and want to do it in
 6  as -- as an effective way we can.
 7      Q    So, you're getting the -- it sounds like
 8  you're primarily relying on the Youmail recordings,
 9  right?  I mean, is that accurate?
10      A    It's a major source.
11          MR. SOMMER:  Object to the form.
12          MR. GELLIS:  Okay.
13  BY MR. GELLIS:
14      Q    Okay.  So, let's talk about those recordings
15  then.  What is the ITG's knowledge about how Youmail
16  sources these recordings?
17      A    To the best of my knowledge, You -- YouMail is
18  an over the top app that many people have put on their
19  phone and as part of that, the consumer authorizes that
20  YouMail can use the voicemails that YouMail receives on
21  behalf of the consumer and -- to analyze for among other
22  things, fraud and -- and robocalls.
23      Q    Okay.  It's your understanding that it's
24  voicemails only or -- I mean, what's your understanding
25  as -- is it voicemails only is your understanding?
```

Joshua Bercu                    August 09, 2023

1      A     From YouMail, to -- to the best of my

2   knowledge, yes.

3      **Q     So, you don't know whether YouMail will**

4   **intercept, block, pick up or record a call prior to a**

5   **voicemail?**

6      A     To the best of my knowledge, YouMail does not

7   live answer the calls for its customers, but I -- that'd

8   be a question for them.  I -- I don't know if they have

9   some service, but the examples we're getting are YouMail

10  -- are -- excuse me -- are voicemails.

11     **Q     And you're sure of that?**

12     A     Yes, they're recorded -- they're recordings.

13     **Q     I mean -- Well, if it's not -- the data's not**

14  **coming from you, I want to know how you're sure that**

15  **they're voicemails.**

16     A     To the best of my knowledge -- sorry.  To the

17  best of my knowledge, they are voicemails.

18     **Q     Okay.  How -- in what way is it to the best of**

19  **your knowledge?  What do you know?**

20     A     We have the recording.  It is not a back and

21  forth conversation.  It is not a live caller.  It's a

22  recording and we usually have scores -- many, many

23  examples of the same recording to many different call

24  entities.

25     **Q     Do you know whether what you are listening to**

Joshua Bercu                    August 09, 2023

 1  is a transcription that was done by YouMail or whether

 2  that's the actual recording that was left on the

 3  voicemail?

 4      A    You mean on a -- can you clarify what do you

 5  mean by that?

 6      Q    Sure.  You have -- you have links to

 7  recordings.  Okay?  So, you're hearing this recording.

 8  So, it's your understanding that this YouMail recording

 9  that you're listening to was the same -- is essentially

10  what an end user would hear on their phone when they

11  went to access their voicemail?  That's your

12  understanding, right?

13      A    I believe that is the case with YouMail.

14      Q    Okay.  So, you don't know whether YouMail is

15  just transcribing someone else's voice into a robo-

16  automated voice and packaging it up for you?

17           MR. SOMMER:  Object to the form.

18           THE WITNESS:  I -- I know they're not

19      transcribing.  I -- but yeah, they're not a

20      transcript.

21  BY MR. GELLIS:

22      Q    How do you know that?

23      A    Well, a transcription is a text, so I -- I'm

24  not really following the question of how a transcription

25  would be a recorded message.

Joshua Bercu                    August 09, 2023

1      Q    Well, that's what I'm trying to understand and
2  get at.  We haven't taken YouMail's deposition yet, so
3  we haven't had the chance to quite examine how that
4  works, but I'm asking what the ITG knows about the
5  recordings that it uses to initiate tracebacks because
6  obviously, you -- you seem to take these recordings
7  pretty seriously.
8      A    Mm-hmm.
9      Q    You begin tracebacks based on them.  So, I
10 just want to understand what you know about where they
11 come from, the source of them, and -- and it sounds like
12 what you're telling me is you believe that they're just
13 straight recordings from voicemails?
14     A    Yes.
15          MR. SOMMER:  Object to the form.
16 BY MR. GELLIS:
17     Q    So, you don't know for sure whether YouMail is
18 transcribing potentially live voices?
19          MR. SOMMER:  Object to the form.
20          THE WITNESS:  I know the recordings we
21     received are not live voices, but very different
22     recordings that differ campaign to campaign and we
23     have multiple examples of the same recording.
24 BY MR. GELLIS:
25     Q    Sure.  And if I were to copy/paste text from

Joshua Bercu                    August 09, 2023

1   this transcript into an automated AI voice, it would

2   spit out what sounds like a recorded message, right?

3           MR. SOMMER:  Object to the form.

4           THE WITNESS:  I -- I suppose

5   BY MR. GELLIS:

6       Q    My question is do you know if that's what

7   YouMail is doing?

8       A    I have no reason to believe that YouMail is

9   doing that.

10      Q    Okay.  So, you think they're just taking

11  voicemail recordings that are left on people's

12  voicemails and handing them over to you?

13          MR. SOMMER:  Object to the form.

14          THE WITNESS:  I -- I believe they are taking

15      voicemails that are left on people's phones that

16      have the YouMail app.  They're analyzing and

17      categorizing those to see the broader picture of a

18      campaign and then, they're providing examples of

19      that to us.

20  BY MR. GELLIS:

21      Q    Okay.  And that -- and then, These -- these

22  recordings, wherever they may -- however they may have

23  gen -- been generated or came from, these recordings are

24  what you use then as evidence to begin a trace back?

25      A    Yes.

Joshua Bercu                    August 09, 2023

1     Q     Okay.  So, it sounds -- I mean, do you have a
2  contract with YouMail?
3     A     Yes.
4     Q     All right.  What does the contract say?
5  Paraphrase.  I mean, I understand that's a very broad
6  question.  What is the contract related to?  Let me --
7  let me say that.  What's it related to?
8     A     So -- So, it's -- it's our acquisition of data
9  from them.
10    Q     So, you pay them for these recordings?
11    A     Yes.
12    Q     Okay.  And then, you're able to use then those
13  recordings to initiate tracebacks?
14    A     Correct.
15    Q     When you pay for the recordings, do you get
16  them in bulk or do you kind of get to pick?  Do you have
17  like categories?  You -- you buy certain calls or
18  certain other recordings or do you buy them all?
19    A     Our arrangement with them is that we -- they
20  send us a snapshot on a monthly basis of what are the --
21  according to their analysis, the biggest campaigns --
22  the top, I believe, 30 campaigns going on -- or 40.  I -
23  - I forget the exact number.  And of those, we can
24  select a certain number that we get call examples
25  automatically through an API into our portal that we

Joshua Bercu                    August 09, 2023

1  then -- our team then reviews and trace -- and initiates

2  tracebacks on.

3      Q    Are there data sharing -- other data sharing

4  provisions in that contract?

5      A    What do -- what do you mean by that?

6      Q    I mean, aside from just recordings, are you

7  sharing honeypot numbers with them or are they sharing

8  other information with you?

9      A    We get certain information about the calls,

10 you know?  So, we need the -- the call detail records

11 that they have in order to initiate the traceback.  So,

12 we get that from them.

13     Q    Youmail has a CDR?

14     A    Yes.

15     Q    And that -- I guess that must be generated

16 through their proprietary software?

17     A    As -- as --

18     Q    No?

19     A    -- they've described themselves to me,

20 they're America's voicemail.  So, they sort of take over

21 as the app on your phone if you download -- for your

22 voicemail app.

23     Q    Do you know if YouMail like pre-flags

24 potential fraudulent numbers?

25     A    To the best of my knowledge, for their

Joshua Bercu                    August 09, 2023

 1  customers, they do have -- you know -- blocking type

 2  services based on their analysis.  I believe that's how

 3  they got into this -- is because they started as a

 4  voicemail transcription and there were too many

 5  robocalls that they had to start diverting them for

 6  their customer base because there were too many unwanted

 7  robocalls.

 8      Q    Did you just say your understanding was they

 9  started as a voicemail transcription service?

10      A    Well, a voice -- a premium voicemail service

11  is how I believe the origin of the company -- but I

12  think those are -- that's the best of my knowledge, but

13  you have to ask them.

14      Q    Like why'd you say transcription?

15      A    I -- I think that was one of the features they

16  had where a voicemail -- they would transcribe for their

17  user so you can read it, but I -- again, I'm

18  speculating.  That's just as I understood them, but I

19  know that they got into illegal robocalls because of

20  their voicemail service.  They were finding that

21  everyone's voicemail was just getting overloaded with

22  unwanted and illegal robocalls.

23      Q    So, that -- that kind of gets back to what I

24  was saying.  You -- you said they have the blocking

25  service now, right?  So, that's what they do now?

Exhibit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

1      A    I -- I don't know exactly what their services

2  are for their customers.

3      **Q    Okay.  I thought you said they started in**

4  **voicemail recording, it got to be too much for them,**

5  **there were too many robocalls and now they do blocking.**

6  **Was -- is that -- did I mischaracterize your testimony?**

7      A    I --

8           MR. SOMMER:  Object to the form.

9           THE WITNESS:  -- to -- to the best of my

10          knowledge, they started with a premium voicemail

11          app for people who didn't want to use their native

12          app and they felt they had to advance like everyone

13          else in the industry has because of the rise of

14          unwanted illegal robocalls a way that it wasn't

15          just -- that -- that they could divert or treat

16          those differently.  That is to the best of my

17          knowledge, but I -- I -- just -- you know -- some

18          speculation in there and some -- based on some --

19          some information, but I don't know that firsthand.

20  BY MR. GELLIS:

21      **Q    Okay.  So, it's possible some of these**

22  **recordings are not actually purely from voicemail**

23  **inboxes, right?**

24          MR. SOMMER:  Object to the form.

25          THE WITNESS:  No, that's not to my knowledge.

Joshua Bercu                August 09, 2023

1          I believe it may be that for their customers they
2          diverted them from the customer receiving them.  I
3          don't know that.  That'd be for them, but it's
4          calls that were made to that customer to the best
5          of my knowledge.
6    BY MR. GELLIS:
7          **Q    Okay.  I'm -- I'm just trying to unravel --**
8    **and this will be for YouMail I guess -- to unravel**
9    **whether or not the recordings you're receiving are the**
10   **actual pre -- prerecorded calls that are being sent or**
11   **whether a live person is being recorded and/or**
12   **transcribed into a message that then is packaged to you**
13   **that you hear in a voice other than the person who**
14   **actually was making the call.  Do you follow?**
15          MR. SOMMER:  Object -- Object to that form.
16          THE WITNESS:  To the best of my knowledge and
17         consistent with information we get from -- have
18         gotten from other sources with the exact same
19         robocalls, they -- YouMail does not transcribe the
20         examples they get to us.
21          They are actual recorded voicemails sent to
22         consumers that they then sent to us.  And again,
23         we've seen the same exact examples.  Everything
24         where you get from YouMail, you can go on to
25         Nomorobo and hear the identical voice and message.

Joshua Bercu                August 09, 2023

1      You can go on Nomorobo's public site.

2  BY MR. GELLIS:

3      **Q     What was that exactly?**

4      A    What do you mean

5      **Q     The website?  I'm sorry, I -- I --**

6      A    Nomorobo is another similar service out there

7  like YouMail.  So, the examples we get from YouMail, you

8  can -- Nomorobo has a lot of them publicly available and

9  you can press play.  If you listen to our example that

10 we got from YouMail and that, it will be the exact same

11 voice, exact same message, etcetera, matching entirely.

12          MR. SOMMER:  Josh -- Josh, can you spell

13     Nomorobo?

14          THE WITNESS:  Yeah, sure.  N-O-M-O-R-O-B-O.

15 BY MR. GELLIS:

16     **Q     All right.  Great.  Thank you very much.  So,**

17 **we'll go now to the honeypots we were going to get to.**

18 **What's a honeypot?**

19     A    So, we -- we refer to it as a honeypot.  A

20 honeypot, in this case, is a bit of a misnomer, but

21 honeypots -- again, not the total expert on the origin

22 of the phrase, but my understanding is it's a term that

23 arose out of the cybersecurity world where you had

24 hackers, etcetera, and you tried to attract them to an

25 area so you can learn more about their hacking and --

Joshua Bercu                    August 09, 2023

1  and use that to protect your network analysis.

2       In our case, it's really a misnomer.  When we use

3  honeypot, we still use it because there's nothing to do

4  to attract.  What it means in this case is there's

5  numbers set up to just listen for robo-callers that just

6  dial those numbers and then take voicemails of -- of the

7  calls hitting those numbers.

8       Q    What is the ITG -- strike that.  It sounds

9  like the ITG has access to the list of these honeypot

10  numbers through Verizon.  Is that accurate?

11      A    So -- so, Verizon has its honeypot and they

12  are collecting and analyzing examples and they will --

13  when they identify a campaign, they will -- we can get

14  those examples of a campaign through our API.  So, we

15  get that automatically in our portal.

16      Q    Does the ITG have any other kind of contracts

17  or agreements with other telecommunications companies?

18      A    Not with telecommunications.

19           MR. SOMMER:  Object to the form.

20  BY MR GELLIS:

21      Q    I'm sorry?

22      A    Yeah, not -- not with any telecommunications

23  companies.  Well, I get -- we do have -- I -- I don't --

24  I was trying to decide if there's a telecommunications

25  company.  We -- we do get call examples from ZipDX as

Joshua Bercu                    August 09, 2023

```
 1  well -- from their --
 2      Q    Yeah.  We'll get into that.  Yeah, yeah.  Do
 3  you have a contract with US Telecom?
 4      A    There's an intercompany agreement between
 5  Industry Traceback Group, LLC and United States Telecom
 6  Association, which is the -- the official name --
 7  corporate name of -- of US Telecom.
 8      Q    And US Telecom is made up of telecom
 9  companies, right?
10      A    No, it's the 501C6 nonprofit trade
11  association.
12      Q    Okay.  It has members that are
13  telecommunications companies?
14      A    Yes.
15      Q    Including Verizon?
16      A    Yes.
17      Q    Okay.  So, US Telecom doesn't do any political
18  advocacy?
19      A    US Telecom does political advocacy.
20      Q    Yeah, they're lobbyists, right?  It's a
21  lobbying association?
22      A    Lobbying regulatory trade association.
23      Q    Okay.  And so, the lobbying association has a
24  contract with the entity responsible for doing trace
25  backs?
```

Joshua Bercu                 August 09, 2023

```
1        A    The --
2        Q    They own them, in fact, right?
3        A    -- so, I -- I --
4             MR. SOMMER:  Object to the form.
5             THE WITNESS:  -- it's a trade association.
6        So, political advocacy is one thing that a trade
7        association does.  Trade associations also do
8        various other things routinely.
9   BY MR. GELLIS:
10       Q    And the biggest sponsors or the high -- what's
11  the term sponsor mean in the ITG world?
12       A    We don't use that term.
13       Q    Members -- What about -- aren't there
14  different levels of membership in the ITG?
15       A    So, we have supporting members.  Is that what
16  you're referring to?
17       Q    Yes, that must be what I mean.
18       A    So, those are -- those are entities that help
19  support the effort including financially and through
20  guidance.
21       Q    That's my point.  So, does -- does a different
22  donation -- what -- what do you call the financial
23  support?  Let's start -- What do you call the financial
24  support that they provide to you?
25       A    Contribution.
```

Joshua Bercu                    August 09, 2023

1    Q    Okay.  Does the amount of contribution

2  determine the sort of status and your -- your membership

3  level, if you will?

4    A    There -- so, there -- there is an executive

5  committee that is -- is a higher contribution level,

6  yes.

7    Q    Do they have any more power in the ITG because

8  of that?

9    A    They do not have more power in the day-to-day

10  operation of the ITG.  They help direct the -- the --

11  the overall effort through guidance almost like a board

12  of directors would.  So, setting -- you know -- future

13  investments, things like that.

14    Q    Does the ITG create honeypots?

15    A    No, no.

16    Q    Does the ITG authorize honeypots?

17    A    No.

18    Q    Does the ITG inform any carriers about the

19  phone numbers associated with these honeypots?

20    A    No.

21    Q    I'm sorry?

22    A    No.

23    Q    Are honeypots that are included in the do not

24  originate list sold or given to ITG members?

25    A    Are you referring to the do not call list?

Exh bit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

1    Q    No, the DNO list.

2    A    The ITG's DNO list?

3    Q    No, the -- let me -- let me take that part out

4  and say, are honeypots numbers sold or given to ITG

5  members?

6    A    I -- I'm not following the question.

7    Q    The -- Are the list of honeypot numbers sold

8  or given to any ITG members?

9    A    No way.  We don't -- we don't even know that.

10 So, Verizon would never tell us the full list of

11 honeypots nor anyone else.

12    Q    Well, you say the full list so you have some

13 knowledge as to some of the list?

14    A    Well, we get call examples that we know hit a

15 Verizon number, but that's the extent of it and I

16 believe that there's some rotation too that they -- to -

17 - that they continue to change in and change out their

18 numbers, so -- but no, we don't.  I have absolutely no

19 knowledge -- We have no knowledge of the full scope of

20 the honeypot numbers.

21    Q    Does Verizon refer potential tracebacks to you

22 directly?

23    A    From time to time.  Predominantly, we -- the

24 examples we get, we -- we look at and we decide based on

25 the campaigns we are focused on that we want to trace

1   it.  Occasionally, we also go to Verizon and say, "We're

2   hearing from a State AG.  They're very concerned about

3   this campaign.  Have you seen any hits on the honeypot

4   about that?," and we might get examples if they have.

5       **Q    Will the ITG conduct trace backs for private**

6   **industry if they're paid to do it?**

7       A    We -- Consistent with our public policies and

8   procedures, we do have -- we do work with enterprises

9   from time to time.

10      **Q    I mean, so you'll sell your traceback services**

11  **to private industries?**

12      A    If the -- if the call examples meet the

13  criteria we've set, which is a suspected illegal call,

14  we -- our team reviews all of them, but that's part of

15  helping fund the effort.

16      **Q    That would include Marriott, right?  Has**

17  **Marriott paid you for tracebacks?**

18      A    Yes.

19      **Q    Do you remember how much they paid you?**

20      A    I don't know off the -- I don't recall off the

21  top of my head.

22      **Q    Does you -- does the ITG sell information to**

23  **anybody?**

24      A    I --

25      **Q    I guess so.  I mean aside from the tracebacks**

Joshua Bercu                August 09, 2023

1  we just mentioned?

2              MR. SOMMER:  Object to the form.

3              THE WITNESS:  So, I would not call that

4        selling information.  That's -- that's it -- So

5        it's all laid out in our -- it's all very

6        specifically called out in our public policies and

7        procedures.  Essentially, they bring us call

8        examples of things harming their customers or

9        harming consumers at large and we're able to trace

10       those back and report to them very consistent with

11       our public policies and procedures certain

12       information about that and not the full

13       information.

14  BY MR. GELLIS:

15       Q    But certain -- I mean, they get information,

16  right?

17       A    Yes, and -- and they get it -- and -- and

18  they're limited in contract about what they can do with

19  that information.

20       They can use it exclusively to try to mitigate the

21  unlawful calls -- calls and protect their customers.

22  So, we actually restrict them by contract, how they can

23  use the information.

24       Q    Okay.  Would anyone have the ability to

25  control or exempt themselves from a traceback?

Joshua Bercu                August 09, 2023

```
 1      A    No.

 2      Q    Does the ITG do any independent verification

 3  of information that's referred to them?

 4           MR. SOMMER:  Object to form.

 5           THE WITNESS:  What -- What category of

 6      information are you referring to, the examples we

 7      get or the information we get from providers?

 8  BY MR. GELLIS:

 9      Q    Let's go through each one.  Let's start with

10  recordings.

11      A    So, recordings -- I mean, our team reviews

12  things when we get referrals from -- even from State

13  AG's, for example, we have them certified to the

14  information to the best of their knowledge as well.  We

15  do -- but we do take a look, we get referrals even --

16  and sometimes from AGs, where we look at it and we say,

17  we're not sure this call is illegal, and we'll -- we'll

18  push back and say, we -- we don't think we can run this

19  traceback, and -- and from providers as well --

20      Q    You talked about --

21      A    -- by the way.

22      Q    -- And we discussed YouMail a little bit

23  earlier in your knowledge about it.  Is there anyone at

24  the ITG that could tell me exactly how YouMail captures

25  these recordings?
```

Joshua Bercu                    August 09, 2023

 1      A    I think that's a question for YouMail because
 2  no one on our team works at YouMail.
 3      Q    Well, I guess that's my point.  No one at the
 4  ITG -- like the -- you've been the -- you've been
 5  designated as the rep for -- and we'll go through the
 6  topics later.  I mean, I -- I know you're here, but one
 7  of the topics was YouMail, right?  And so, you're here
 8  to talk about the relationship between ITG and YouMail
 9  and I asked what you know about the recordings that are
10  sent, how they're generated, where they come from, and
11  you gave me your answer.  My point is anybody, is
12  anybody -- is there any other person that I would talk
13  to at the ITG who would have more knowledge about that
14  than you?
15           MR. SOMMER:  Object to the form.
16           THE WITNESS:  No.
17  BY MR. GELLIS:
18      Q    No?  And just -- Okay.  Do you have any
19  contracts with state entities?
20      A    No, other than the terms of service that I had
21  mentioned earlier.
22      Q    So, the authority to require providers to
23  respond to tracebacks is pursuant to the designation by
24  the FCC, correct?
25           MR. SOMMER:  Object to the form.

Joshua Bercu               August 09, 2023

```
 1          THE WITNESS:  The FCC's authority to bring
 2      enforcement against providers that do not cooperate
 3      is pursuant to the FCC's rules.
 4  BY MR. GELLIS:
 5      Q    Is a traceback an inquiry or proof that a call
 6  is fraudulent?
 7      A    I think that's a question for prosecutors and
 8  lawyers.  That's not our role.
 9      Q    I mean, do you consider a traceback to be an
10  inquiry?
11      A    I -- I consider a traceback to be our effort
12  to identify where illegal calls are coming from.
13      Q    Potentially illegal calls, right?
14      A    Sus -- Suspected illegal calls.
15      Q    Okay.  Suspected.  Do you know if you received
16  reused recordings from YouMail?
17      A    To the best of my knowledge, no.
18      Q    Does the ITG advise companies on how to comply
19  with the law?
20      A    No, we go out of our way to tell them we're
21  not their legal counsel.  It would be inappropriate, as
22  you know, under ethical rules for us to be providing
23  legal guidance to any of the providers.  We do at times
24  put -- you know -- as we did with SmartBiz, say some
25  things that we've seen work and not work to stop the
```

Joshua Bercu                    August 09, 2023

1  legal robocalls.

2      Q    What do you mean by as you did with SmartBiz?

3      A    I -- I think Patrick -- Mr. Crotty pulled up

4  the information before, but we went through and it

5  referenced the call where I -- I think that email talked

6  about some of the things we had discussed at that time

7  with SmartBiz.

8      Q    Yeah, we're going to look at all that in a --

9  in a little bit.  I'm just doing this preliminary stuff

10 and then we'll get into the Exhibits.  Do you have --

11 does the ITG have standards for when companies should

12 terminate upstream providers?

13     A    No, we -- we do not.  We -- One of the shifts

14 we've done as this became a legal requirement in early -

15 - before my time, there was more explicit pressure to --

16 to terminate our role.

17     We believe now and we've shifted this way as it

18 became a legal requirement -- We do our job, we get

19 illegal call examples and we -- and we develop

20 information.  Whether a prosecutor decides that -- you

21 know -- whatever the response was sufficient, that's

22 between the prosecutor -- that's -- that's not our role.

23     Q    What role did David Frankel play in the ITG?

24     A    So, he was our contractor.  He built the --

25 the first portal.  We did move on to one that we -- we

Joshua Bercu                 August 09, 2023

1  had built on our half -- on our behalf, but he -- he

2  built the first version of the portal and he also --

3      **Q    Got it.**

4      A    -- I think a lot of the traceback idea, he --

5  he was one of the early thinkers about doing traceback

6  as well.

7      **Q    So, you say he's just a contractor?  So, built**

8  **the portal.  That sounds like an IT contract or was it**

9  **an IT project?  What do you -- what do you mean by built**

10 **the portal?**

11     A    So, he built his own portal that we did not

12 own that portal.  This was well before the traceback,

13 before the designation, the very early days of this

14 effort.  He built a portal to do traceback and -- and

15 technology to do traceback.

16     **Q    Okay.  Did he have some other specialized**

17 **knowledge that made him suitable for that position?  I**

18 **mean --**

19     A    He's been an executive and developer in the

20 technology industry, I believe, his whole career.  He --

21 I mentioned Nomorobo earlier.  He had -- as the robocall

22 problem started getting out of hand -- out of hand, the

23 FCC did a competition of ideas to -- to -- to stop

24 robocall.  Nomorobo won that.  David did -- did submit

25 his idea, which was a sort of preliminary version of

Joshua Bercu                    August 09, 2023

```
 1  traceback at that time too.
 2      Q    Do you know when he became a contractor of the
 3  ITG?
 4      A    I -- I'd have to go back, but he -- he worked
 5  as a consultant for us in that -- in that role helping
 6  us run tracebacks at the time.
 7      Q    All right.  Do you know what year
 8  approximately he contracted with the ITG?
 9      A    Probably six years ago-ish.  So, something in
10  the 2018 timeframe.  He was -- when I started in 2020,
11  he was still consultant for us and I believe he no
12  longer was in probably about 2021 -- sometime in 2021.
13      Q    Well, let's talk about that.  I remember you
14  said he was.  I heard that earlier when you were talking
15  to Mr. Crotty.  So, he's no longer a consultant.  Is
16  that accurate?
17      A    Yes.
18      Q    He's no longer a contractor of any kind with
19  the ITG?
20      A    No, our only relation with him is we get call
21  examples with him that he gets at ZipDX.
22      Q    So, we didn't talk about that before.  We
23  talked about primarily Youmail and carriers.  So, you
24  also receive recordings from ZipDX?
25      A    Yes, a small set.
```

Joshua Bercu                    August 09, 2023

1    Q    And why is he no longer a contractor?  Do you
2    know why that relationship terminated?
3    A    Yes, because it was a mutual decision at the
4    time.
5    Q    Okay.  So, I don't -- I don't know how to ask
6    what the real reason was.  I mean, you know what I'm
7    getting at.
8    A    Yeah.
9    Q    What was the real reason?
10   MR. SOMMER:  Objection to the form.
11   THE WITNESS:  There -- there's no specific
12   event, you know?  When I took over the ITG and got
13   deeper and deeper with it, I took over more
14   management and changed a little bit how we did
15   things and it -- it was a mutual decision that we
16   wanted to go in different directions, but it was --
17   and then, he built what he's working on now,
18   Raptor, and -- and I think we've had a good
19   partnership with him in that.
20   BY MR. GELLIS:
21   Q    Did the ITG ever receive complaints about
22   David Frankel's conduct toward carriers?
23   A    Yes.
24   Q    How many approximately?
25   A    A few.  And -- and to the best of my

Joshua Bercu                August 09, 2023

 1  knowledge, not formal complaints, more informal.

 2      **Q    Did those contribute to this mutual decision**

 3  **to terminate?**

 4      A    To the -- the extent there that -- you know --

 5  there wasn't legal advice I was providing, you know?  He

 6  has a style that not everyone likes and we want to

 7  change how we operate, so that his style was something

 8  that -- you know -- we -- it was a different direction.

 9  That didn't lead directly to it because we did have --

10  you know -- discussions with him for a while about --

11  you know -- working together where this -- in sort of

12  more of the way we wanted to work going forward and we -

13  - you know -- mutually decided that wasn't what he

14  wanted or what we wanted.  So, there wasn't -- that

15  they're there.

16      **Q    The informal complaints you just referenced,**

17  **what kind of companies -- did they kind of come from the**

18  **gamut, big and small.  Was it primarily intermediate**

19  **providers?  Were there a certain sort of category of**

20  **complainers if you would?**

21      A    Big and small.

22      **Q    Can you remember any names that come to mind?**

23      A    The one that comes first to mind is -- is

24  XCAST.

25      **Q    Any others?**

Joshua Bercu                    August 09, 2023

```
 1        A    I believe at the time, that -- that's the one
 2   that comes to mind.
 3        Q    In his role as a contractor, did David Frankel
 4   have access to trace back information independently?
 5   Meaning, did he have the ability to log in and see the
 6   information?
 7        A    He did.  He was restricted by contract of what
 8   he could do with the information.
 9        Q    But there was no physical controls on that, it
10   was contractual controls?
11        A    I mean, he was helping us run tracebacks on a
12   day-to-day basis.  So, the role he was playing for the
13   ITG, seeing the information was a necessary part of it.
14        Q    Was information shared with him to sell his
15   products and services?
16        A    His current products or services?  Is that
17   what you're referring to?
18        Q    Yeah, we'll start with those.  Yeah, current.
19        A    So, we no longer have a rela -- you know, we
20   don't have that relationship with him.  So, the services
21   he's rolled out since he was -- since he was part of --
22   you know -- our consultant.
23        Q    Okay.  But what about when he was your
24   consultant?
25        A    To the best of my knowledge, no.  I mean, his
```

Joshua Bercu                August 09, 2023

1  product and service then was a conferencing service, so

2  I -- I'm not sure how it would be relevant, but I don't

3  know.

4       Q    I think you briefly had mentioned earlier that

5  -- you know -- you changed your traceback -- that the

6  notices -- we looked at a couple notices Mr. Crotty

7  pulled up and you made a comment that those notices

8  could change over time with the regulations.  Is that a

9  fair characterization of your testimony?

10      A    Change over time, or the regulations, or if --

11 you know -- we -- we think it -- we could be more clear

12 or succinct or -- you know, we adapt them as -- as time

13 is needed.

14      They don't change on a traceback by traceback

15 basis.  This is more of a -- you know -- routine review.

16 Is the notice still right?  Do we need to make updates

17 to the notice?

18      Q    Okay.  And -- and that happens because since

19 2020 in the passing of the Trace Act, would you say the

20 regulatory landscape has changed a bit?

21      A    Yes.

22      Q    And would you say it's changed a lot?

23      A    Yes.

24      Q    Okay.  So, can you -- if -- to your knowledge,

25 can you walk me through the changes over time that were

Joshua Bercu            August 09, 2023

1  **made to that notice and what they were made because of**

2  **or do you not have knowledge of that?**

3      A    I -- I have knowledge of several of the

4  changes.  One major --

5      **Q    Let's go through those.  Yeah.**

6          MR. SOMMER:  Hold on, let me just make my

7      objection.  You can answer to the extent it doesn't

8      call for privileged information.

9          THE WITNESS:  So, you know, a lot of the

10     changes goes with the evolution of how traceback

11     worked.  It was voluntary at first, so some of it

12     was really a lot more of an explanation of who we

13     are, why you should cooperate, in earlier versions.

14         As it got -- as the effort became more known

15     in the industry, obviously, that was an obvious

16     change where we didn't need to do as much

17     explaining of why they were getting the notices

18     because people understood what the ITG is.  That's

19     one.

20         The Trace Act, the formal designation, that's

21     -- that's -- that's -- that's another.  And then,

22     just other changes were -- you know -- taking a

23     fresh look at it and saying, Hey, there's too much

24     text up front before it gets to the meat of the

25     CDR.  We're getting confusion from providers about

Joshua Bercu                    August 09, 2023

1      this, just -- just changes like that, for clarity.
2 BY MR. GELLIS:
3      **Q     Do you know approximately what year the ending**
4 **of -- you said it was voluntary at first.  What year did**
5 **that end?**
6      A    I believe the FCC adopted its traceback
7 consortium -- traceback consortium cooperation mandate
8 in 2020.  I think there -- if I recall correctly, there
9 might -- I think there were two phases of it, but I'd
10 have to go back where it applied in certain
11 circumstances at one period and then it applied in all
12 subsequent to that.
13      **Q     Okay.  And we're talking -- Okay.  So, it was**
14 **voluntary to respond and at some point it sounds like**
15 **there was a phase in approach and it became no longer**
16 **voluntary.  Is that fair?**
17      A    When the FCC's regulation took effect, it was
18 no longer voluntary.
19      **Q     And do you know when that regulation took**
20 **effect?**
21      A    As I said, I -- I believe 2020 is when it took
22 effect.  And I -- and if I recall correctly, there was
23 two phases, but I'd have to go back, where I think it
24 only applied to a subset of providers or -- or upon --
25 conditional in one case.  I think it was part of stir

Joshua Bercu                    August 09, 2023

1   shaken, the requirements was an alternative and then it

2   applied more generally later in the year.

3       Q    Okay.  Well, let's talk about after this

4   voluntary period ended and now it's -- you know --

5   mandated, so to speak.  What is the ITG's understanding

6   as to carrier's obligations when receiving a traceback

7   notice from you guys?

8       A    So, I -- I don't have the language of the

9   regulation from me, but if I can sort of paraphrase it,

10  I believe it's respond completely and accurately to the

11  traceback request, not at the time subject to the -- the

12  information that -- that was produced for -- in this

13  case, but the FCC has more recently adopted a

14  requirement to respond within 24 hours.

15      Q    Okay.  So, what is respond?  Like what -- what

16  is -- let me just stop there.  The ITG obviously looks

17  at these responses and determines whether the response

18  is sufficient or not, right?

19      A    No.

20      Q    Okay.  So, if a provider responds and doesn't

21  give you the information for their upstream, you don't

22  write back and say you didn't give us what we need?

23      A    Well, in that -- in that case -- you know --

24  in terms of whether someone complied with the FCC's

25  obligation or not, that would be something we would --

Joshua Bercu                    August 09, 2023

1   what -- what is sufficient under the FCC's rule, we

2   would not make a determination on that.  That would be

3   the FCC.

4       What -- For our purposes, what we're looking for is

5   to keep the traceback going into the end user.  So, to

6   your -- to your immediate question, if someone said,

7   yes, I got it, and didn't go into our form and the

8   traceback stopped, yes, we would say, hey, we didn't get

9   the information we needed to continue the traceback.

10      **Q    Okay.  So -- so, you obviously then have some**

11  **understanding of what information you -- you should be**

12  **receiving from carriers in a traceback?**

13      A    We have our -- yeah, we have our perspective

14  of what we should be receiving, but I -- you know --

15  whether that complies with the FCC's rule or not is a

16  question for the FCC.

17      **Q    Okay.  Well, at a certain point though, you --**

18  **you choose to refer companies to the FCC, correct?**

19      A    We at times do referrals.  We have moved away

20  mostly from doing referrals.

21      **Q    Okay.  That's kind of a broad statement.  Can**

22  **you give me more specific than that?**

23      A    So, especially for when this was voluntary,

24  that was a big part of it.  It's -- before my time was

25  referring to the FCC or other enforcement agencies --

Joshua Bercu                    August 09, 2023

1   you know, we're seeing provider X show up a lot as the

2   point of entry or whatever it is.  We have -- as it

3   became -- as it became a mandate, as it -- the process

4   got more known in the industry, we did move away from

5   that where law enforcement agencies basically wanted to

6   choose their own targets based on their -- on our data.

7        And so, they subpoena us for the information and

8   then they analyze it and decide who -- who they want to

9   hold accountable, rather than referrals.  We may

10  occasionally make referrals where we see something

11  that's particularly an issue.  For instance, we may make

12  a referral if we see what appears to be a bunch of shell

13  companies operating as -- as a -- as different entities

14  related.  So, cases like that, but it's pretty rare when

15  we're making referrals these days.

16      **Q    When you say, these days, approximately when**

17  **would you say this change occurred?**

18      A    Probably throughout most of my time, so

19  probably three years.

20      **Q    Okay.  And so when you're doing -- strike**

21  **that.  Do you know if the ITG ever referred SmartBiz to**

22  **the FCC?**

23      A    To the best of my knowledge, no.

24      **Q    I don't need names.  I'm not trying to dig**

25  **into your invest -- investigative stuff, but from 2020**

Joshua Bercu                    August 09, 2023

1  to present, you obviously have referred a number of

2  companies to the FCC, correct?

3       A    Not really, very -- very rarely.  So,

4  typically what happens -- so, what -- what we have done

5  is we have regular reporting of just who -- what are the

6  providers that are most active right now.  So, I -- I

7  wouldn't consider that a referral.  But then, they --

8  then, the FCC or another State AG -- we routinely get

9  subpoenas based on providers that they -- come on their

10 radar somehow or about campaigns they're interested in,

11 and then they get information about providers that way.

12      Q    And this report goes to the FCC?

13      A    It did.  We -- we've also moved away from that

14 report, but yes, it did.

15      Q    When did you stop sending that report?

16      A    I have to go back for specifics, but I -- I

17 think it -- you know -- sometime this year.

18      Q    Do you know if SmartBiz was ever on one of

19 those reports?

20      I believe SmartBiz had been on what we had called

21 the 60 Day Scorecard, as well as campaign reports that

22 we had done.

23      Q    So, it's accurate to say that Smart --

24 SmartBiz's name appeared on documents that were sent to

25 the FCC?

Joshua Bercu                    August 09, 2023

```
 1        A    Yes.
 2        Q    To your knowledge, has the FCC sent any sort
 3   of notice to SmartBiz?
 4        A    Not to my knowledge.
 5        Q    One minute and then we'll get into all the fun
 6   Exhibits.  I figure we'll break for lunch at 12, come
 7   back at 1, and try to wrap up.
 8             MR. SOMMER:  Would now be a good time for a
 9        five-minute break?
10             MR. GELLIS:  Yeah, I'm good with that.  Let --
11        let's take a  -- let's make it 10 guys.  We'll --
12        we'll make it 10.  We'll come back -- or 9 -- 11 --
13        come back at 11:15.
14             MR. SOMMER:  That works for me.
15             THE COURT REPORTER:  Okay.  The time is 11:06
16        AM.  We're off the record.
17             MR. SOMMER:  Thank you.
18        (Thereupon, a break was held at 11:06 a.m.; after
19   which the following was heard at 11:16 a.m.)
20             THE COURT REPORTER:  Okay.  Are we ready to go
21        back on the record?  Okay.
22             MR. GELLIS:  Yes, yes.
23             THE COURT REPORTER:  All right.  One moment.
24        Okay.  The time is 11:16 AM.  We're back on the
25        record.
```

Joshua Bercu                    August 09, 2023

```
 1          MR. GELLIS:  All right.  Thank you.  I think
 2     we have an appearance announcement first, so I'll
 3     let Mr. Maldonado announce himself.
 4          MR. MALDONADO:  All right.  I thought I
 5     already did it, but good morning all.  Edward
 6     Maldonado on behalf of Smart Business Telecom, co-
 7     counsel with Sean Gellis.
 8          THE COURT REPORTER:  Thank you.
 9          MR. MALDONADO:  Okay.  Thank you.  All right.
10     I'm going to attempt to share my screen here.
11     Let's make sure I can -- let's get this right.
12 BY MR. GELLIS:
13     Q    All right.  Mr. Bercu, tell me if you can see
14 this.
15     A    Yes.
16     Q    Okay.  So, do you recognize it -- this
17 document?  It's the subpoena and the notice of
18 deposition for this matter.
19     A    Yes.
20     Q    Okay.  And there were some topics attached on
21 Exhibit A.  Your counsel had sent some general
22 objections, but notwithstanding those objections, you
23 are the person who's been designated to testify as to
24 topics one to nine, correct?
25     A    Yes.
```

Joshua Bercu                    August 09, 2023

```
 1      Q    Okay.  And that will -- we're going to mark
 2  that as Exhibit 1 for the Defendant.  I believe also
 3  part of the -- your role here is to talk about the
 4  allegations in the lawsuit that was filed against
 5  SmartBiz, correct?
 6      A    To the -- to the extent it -- you know --
 7  relates to the data we produced, yes.
 8      Q    Okay.  And have you reviewed the complaint in
 9  this case?
10      A    Yes.
11      Q    Okay.  And I'm going to go ahead and share my
12  screen.  We're going to make this Exhibit 2.  It's just
13  a copy of the complaint.  And so, you have reviewed this
14  document, you're familiar with it, you know what it is?
15      A    Mm-hmm.  Yes.
16      Q    All right.  Great.  All right.  And there's
17  also a document that was created by, I believe, the ITG
18  and provided to us through your counsel.  It's marked as
19  confidential.  For that reason, I don't necessarily
20  intend to attach it to the deposition transcript, but I
21  want to share my screen and talk about it.  It's okay
22  with you?
23      A    Yes.
24      Q    All right.  So, let me just go ahead and make
25  sure we're all on the same page about that document
```

Joshua Bercu                    August 09, 2023

1  because we're going to be bouncing kind of around a

2  little bit.  I want to make sure we're all on the same

3  page.  So, this is not in a numbered Exhibit, we're just

4  going to talk about it, but I don't know if you can see.

5  I don't know if you see this?

6        A    Yes.

7        Q    Are you're familiar with this document?

8        A    Yes.

9        Q    Okay.  And this is the document you produced?

10       A    Yes.

11       Q    Okay.  So, when we're on it, let's go ahead

12  and talk about it really quick.  So, if I understand

13  this correctly, the left Column here, Column A, is the

14  month and the year?

15       A    Yes.

16       Q    Total TB's, that's total tracebacks received

17  in that month, correct?

18       A    Yes.

19       Q    Total traceback rank, this Column, that is the

20  rank in that month only, correct?

21       A    Yes.

22       Q    Okay.  POE, Column D, that means point of

23  entry.  We talked about that earlier -- that term,

24  right?

25       A    Yes.

Joshua Bercu                    August 09, 2023

```
 1        Q    And so, these are the number of tracebacks

 2   received by SmartBiz as -- where it was identified as

 3   the of entry, correct?

 4        A    Yes.

 5        Q    Okay.  And POE rank, this is the rank among

 6   all point of entry tracebacks, correct -- all companies?

 7        A    Yes.

 8        Q    Okay.  So, for example, December 20, here --

 9   December of 2020, it reflects SmartBiz has 15 tracebacks

10   as a POE and its rank was 1.  So, that would signify

11   that in that month SmartBiz was the number one point of

12   entry -- ranked number one, correct?

13        A    Of -- of the -- of our tracebacks, yes.

14        Q    Of your tracebacks.  Okay.  Very good.  Is

15   there anything else that I need to know about this chart

16   or any -- any nuance that we haven't covered?

17        A    The -- the only thing I'd say is -- you know,

18   this is not something we -- we normally would have in

19   any sort of our normal routine course.  We were just

20   trying to be responsive to the requests you made.  So, I

21   just wanted to make sure you understood that.

22        Q    So, let's bounce back then to the complaint.

23   Some -- I'd have to find in the complaint -- one minute.

24   I think the 28th or 29th.  I can't -- was it 28th or

25   29th, Patrick?  Let me find it.  Trying to find the
```

Joshua Bercu                    August 09, 2023

1   paragraph where they were -- Strike that.  Let's just
2   ask this then.  So, if the complaint --
3            MR. CROTTY:  So, the percentile is what you
4       had searched for.  Sorry.
5            MR. GELLIS:  A percentile?  Yeah.  Thanks,
6       man.  I appreciate it.  No, you're -- you're great.
7       98 percentile.  Here we go.  It was 20 hyphenate.
8   BY MR. GELLIS:
9       Q    Okay.  So, you see paragraph 4 here of the
10  complaint?
11      A    Yes.
12      Q    Okay.  So, it says 28 companies have received
13  more tracebacks than SmartBiz.  See that first sentence?
14      A    Yes.
15      Q    Okay.  So, that is not a statistic that the
16  ITG would've provided?
17      A    The -- No.
18      Q    Neither is this 98th percentile language here,
19  correct?
20      A    That's correct.
21      Q    Okay.  So, the -- the AG -- Attorney General's
22  Office must have gotten that from somewhere else?
23      A    Yes, or -- or derived based on data they got
24  from us, but we -- we didn't make that calculation.
25      Q    Okay.  Well, I'd like you to just kind of take

Joshua Bercu                    August 09, 2023

1   a good look at these numbers and remember them because

2   I'm going to ask you when we pull the chart up if you

3   think these numbers hold up in light of your analysis.

4        A    Okay.

5        Q    All right.  So, now we're going to bounce back

6   to this chart here and talk about history of SmartBiz

7   tracebacks and what started all this.  I believe you

8   testified earlier that the point of entry part and the

9   high number of point of entry tracebacks is what kind of

10  caused you to send that escalation letter.  Is that

11  correct?

12       A    That -- that's correct, as well as in the

13  past, SmartBiz also had taken traffic from providers

14  that didn't cooperate with traceback.

15       Q    Okay.  Yeah, we're going to look at some of

16  those -- those emails.  This is why I think the year was

17  important.  You said SmartBiz was taking traffic from

18  companies that would not cooperate with tracebacks,

19  right?

20       A    From foreign companies.

21       Q    Do you know whether any of that traffic was in

22  this -- the voluntary cooperation period?

23       A    So, the -- the FCC's authority doesn't extend

24  to foreign providers anyway, so it's -- it's always

25  voluntary from foreigners.

Joshua Bercu                    August 09, 2023

1      Q    Understood.  Okay.  So, certainly here,

2   there's -- if you look at the data, in December of '20,

3   we looked at SmartBiz was number one point of entry

4   rank, and I think that's consistent with the same month

5   you sent the escalation letter --

6      A    Mm-hmm.

7      Q     -- right?

8      A    Yes.

9      Q    So, what happens in the months following that

10  escalation letter with regard to SmartBiz's point of

11  entry tracebacks?

12     A    So, you know, according to this data, SmartBiz

13  was still high up there in -- in January, but then

14  declined.

15     Q    You say they declined.  I mean, for what --

16  over what period did they decline?

17     A    So, from February, 2021 and on.

18     Q    Would you say it was a meaningful decline?

19          MR. SOMMER:  Object to the form.

20          THE WITNESS:  It's -- it's -- Yeah, it's --

21      it's less than before.

22  BY MR. GELLIS:

23     Q    A little bit less or a lot less?

24     A    It -- I mean, it --  I think the ranks speaks

25  for itself in number.  It's -- They're not one at the

Joshua Bercu                    August 09, 2023

1 top anymore, they're much lower down the list according

2 to the ranking.

3    Q    So -- So, they were number one in December of

4 '20 and six months later, in May of 21 they have zero.

5 Is that accurate?

6    A    Yes.

7    Q    Is that significant to you?

8    A    Yes.

9    Q    Does that -- I mean, is that consistent with

10 an entity that took that escalation notice seriously?

11         MR. SOMMER:  Object to the form.

12         THE WITNESS:  To best of my knowledge, yes.

13 BY MR. GELLIS

14    Q    It appears, right, based on the data that

15 SmartBiz was told by the ITG, hey, you got a serious

16 problem here, and in the months following, they

17 seemingly completely eradicated the point of entry

18 traceback problem save one or two months in '21,

19 correct?

20         MR. SOMMER:  Object to the form.

21         THE WITNESS:  Yes.

22 BY MR. GELLIS:

23    Q    Would you say that's consistent with

24 cooperating with the ITG?

25         MR. SOMMER:  Object to the form.

Joshua Bercu                    August 09, 2023

```
 1              THE WITNESS:  Yes.
 2   BY MR. GELLIS:
 3       Q     Based on your experiences dealing with
 4   SmartBiz, would you say they were cooperative
 5       A     SmartBiz through the whole time always
 6   responded tracebacks, which -- which I think is the --
 7   the key point on cooperative as they cooperated with
 8   tracebacks.
 9       Q     Well, did they do more than that?
10       A     What do you mean by that?
11       Q     Well, I mean, the -- for example, I mean they
12   had telephone conferences with I believe you and Mr.
13   Frankel, right?
14       A     So, yes, they -- they were -- So, they did
15   more than respond.  Yes, they -- they were engaged with
16   us.  Yes.
17       Q     Okay.  And in many instances, we've reviewed
18   many emails.  I can drag them all out.  But to your
19   recollection, they would respond pretty quickly to you
20   guys, right, sometimes within an hour?
21       A     To my recollection, yes.
22       Q     Okay.  Do you ever recall them not responding
23   to you?
24       A     I -- I don't recall any non-responsive
25   traceback.  Certainly, I don't know if there were some
```

Joshua Bercu                 August 09, 2023

```
 1  early ones on or not, but -- but I -- I don't recall
 2  any.
 3      Q    Do -- do you ever feel that SmartBiz was lying
 4  to you?
 5      A    I -- I don't really have much basis one way or
 6  another to say they were lying or not.  Yeah.
 7      Q    Did you have any reason to suspect that they
 8  were lying to you?
 9      A    No.
10      Q    Can you think of any instances where they told
11  you they were going to do something and then later you
12  found out they had not?
13      A    I -- I'm not sure where that scenario would --
14  would come up, but no.
15      Q    Were you familiar with the family
16  communication issue that SmartBiz had in approximately
17  2020?
18      A    I -- I believe so, but I -- you know, I don't
19  know if you have specific documents --
20      Q    I -- I --
21      A    -- to reference, but yeah.
22      Q    -- I do, I do.  And we're going to get to
23  that.  And I think this is going to be -- let me find it
24  here in my documents.  I think this is -- I'm going to
25  end up marking this as number 3.  Give me one moment.
```

Joshua Bercu                August 09, 2023

```
 1  Okay.  Can you see this?
 2       A    Yes.
 3       Q    You are on the email.  So, why don't take a
 4  minute and review it and proceed -- perhaps see if it
 5  refresh -- refreshes your recollection and let me know
 6  when I need to scroll down.
 7       A    Okay.  I'm just move in our faces.  Give me
 8  one sec.  You can scroll down.  Okay.
 9       Q    Thank you.  Does that refresh your
10  recollection at all about the situation?
11       A    Yes.
12       Q    Okay.  And you know this is December, 2020,
13  that month that we saw they were the highest point of
14  entries -- tracebacks?
15       A    Yes.
16       Q    And so, this letter is family communication
17  apologizing essentially for its traffic, right?
18       A    Yes.
19       Q    Okay.  And -- and it's apologizing because it
20  made SmartBiz Telecom look bad?
21       A    Yes, presumably.
22       Q    Right.
23       A    Yup.
24       Q    And you see here where he said, I had a
25  detailed talk with our partners?  See that?
```

Joshua Bercu                    August 09, 2023

```
 1      A    Yes.
 2      Q    Okay.  So, assuming -- I want you to assume
 3 that was SmartBiz.  So, if SmartBiz reached out to
 4 family and encouraged them to cooperate with the ITG and
 5 to work with Mr. Frankel, I mean that's a sign of
 6 cooperating with the ITG, right?
 7            MR. SOMMER:  Object to the form.
 8            THE WITNESS:  Yes.
 9 BY MR. GELLIS:
10      Q    If I told you the Attorney General testified -
11 - one of the employees testified that SmartBiz's
12 cooperation with the ITG was just a smokescreen to
13 continue committing fraud, would you say that that's a
14 fair statement based on your experience with SmartBiz?
15            MR. SOMMER:  Object to the form.
16            THE WITNESS:  Not -- not specific to SmartBiz,
17        but more generally we see all the time where
18        there's different affiliated entities that get put
19        in the chain to avoid being the POE.  So, I -- I
20        don't have anything specific with SmartBiz, but
21        that -- we see a fact pattern that appears to be
22        that case all the time.
23 BY MR. GELLIS:
24      Q    Okay.  So -- so, that -- that is a fact
25 pattern that you run into, but you have no knowledge of
```

Joshua Bercu                    August 09, 2023

```
 1  any reason -- or any reason to believe that that -- that
 2  would apply to SmartBiz?
 3       A    I don't.
 4       Q    Did SmartBiz ever do anything that would lead
 5  you to believe that they were fitting in that fact
 6  pattern?
 7       A    No.
 8       Q    Okay.  When SmartBiz says it terminated it
 9  upstream, did you have any reason to think they were
10  lying?
11       A    No.
12       Q    Do you agree that anytime SmartBiz terminated
13  an upstream following a traceback, that its termination
14  was voluntary?
15       A    You mean --
16            MR. SOMMER:  Object to the form.
17            THE WITNESS:  -- So, not required by us?  Is
18       that --
19  BY MR. GELLIS:
20       Q    Correct.  Yeah.
21       A    Yes.
22       Q    Okay.  And you would also agree then, that if
23  they terminated without notice from the FCC to mitigate,
24  that that would also be voluntary, wouldn't it?
25       A    I suppose.
```

Joshua Bercu                    August 09, 2023

1      Q    When you run into sort of bad act or carriers,
2  do they give a lot of voluntary compliance?
3      A    Yes.
4      Q    Okay.  What else do they do then that
5  differentiates them from SmartBiz?
6      A    So, I -- I mean, what do you mean by
7  differentiates them?
8      Q    Well, you said that that fact pattern is
9  common, but SmartBiz never gave you any indication or
10 any reason to believe that they fell in that fact
11 pattern.  So, my question is, what do these other bad
12 guys do that lead you to believe they fall in the fact
13 pattern?
14     A    So, there's only so much we see.  So, you
15 know, we may not always see it in all cases, but -- you
16 know -- there -- there are some things, common IP's
17 where the traffic goes to a new one -- new one.  A lot
18 of resurgence where -- you know -- the traffic stops,
19 but then it comes back, things like that.
20     Q    Okay.  I'm going to go to Exhibit 4 -- what
21 we'll mark as Exhibit 4, which is an email between Mr.
22 Frankel and JR.  Now, Josh, you are -- excuse me.  Mr.
23 Bercu, you are not on there.  So, take a minute and read
24 it please and tell me if you've seen it.
25     A    Yes, I've seen this.

Joshua Bercu                    August 09, 2023

```
 1      Q    Okay.  So, you're familiar with the contents
 2  of this email chain?
 3      A    Yes.
 4      Q    I mean, I can scroll through the whole thing,
 5  but I'm going to represent to you it's the -- the email
 6  chain.  Okay?
 7      A    Yes.
 8      Q    I just want to go up here and talk about Mr.
 9  Frankel's statement.
10      A    Mm-hmm.
11      Q    Mr. Olivar, thanks for being proactive with
12  call sources that are repeatedly delivering legal calls.
13  So, the ITG's contractor at this time felt that Mr.
14  Olivar was being proactive, yes?
15      A    Yes.  And I -- I think he was referring to the
16  fact that there were terminated customers -- accounts
17  closed.
18      Q    Without any requirement to do so by the ITG,
19  right?
20      A    Right.  Because we would -- we would not have
21  authority to require that.
22      Q    Would -- Is terminating an upstream following
23  a traceback consistent with an effort to stop illegal
24  robocalls?
25      A    Yes.
```

Joshua Bercu                    August 09, 2023

1      Q    Now, if a company were to engage in that

2    practice regularly and begin terminating any upstreams

3    that got tracebacks, I mean that would evidence that

4    they were attempting to stop illegal robocalls as well,

5    correct?

6      A    To an extent.  I -- I think one of the issues

7    is also what were they doing before that to prevent them

8    from being on the network in the first instance, but --

9    but it's -- it's an aspect of it, but to -- to -- your

10   back --

11     Q    Well, that's an interesting point.

12     A    -- Oh, sorry.  Yeah.

13     Q    No, that's an interesting point because wasn't

14   that a requirement that the FCC implemented somewhere

15   along the way?

16     A    What specifically?

17     Q    Well, I believe there is an email chain that

18   you may have been on between the FCC -- find it -- where

19   the FCC is discussing their new authority they just gave

20   themselves in December of 2020.  Let me reshare my

21   screen and we're going to make this -- I think number 5.

22   This is the -- Okay -- due process email.  Sharing my

23   screen.  All right.  Let me see if you are -- you are

24   not on here either, Josh.  So, why don't you take a

25   minute?  But it is -- there's some US Telecom people on

Joshua Bercu                    August 09, 2023

```
 1 │ there.
 2 │      A    Yup.
 3 │      Q    So, just start -- tell me when to scroll down.
 4 │      A    You can scroll down.  Tou can keep going.
 5 │      Q    That sentence?
 6 │      A    Yes.
 7 │      Q    Okay.  So, it appears the FCC in March of 21
 8 │ is referencing a December, 2020 order that gave it
 9 │ authority to pursue enforcement for non-compliance,
10 │ right?
11 │      A    Yes.
12 │      Q    And they think that the date the ITG notified
13 │ -- I don't -- this sentence, I think, is a little off.
14 │ we think the date of -- think the date of that -- the
15 │ ITG notified -- I'm trying to figure out what they're
16 │ trying to say.  I think they're trying to say the date
17 │ the ITG notified the potential bad actor provider is
18 │ important for due process.  You see that?
19 │      A    Yes.
20 │      Q    But you agree the syntax is a little off,
21 │ right?
22 │      A    Yes.
23 │      Q    Okay.  They're -- I think they're referencing
24 │ this 2020 December order, right?
25 │      A    Yes.
```

Joshua Bercu                    August 09, 2023

1      Q    Okay.  Now, to your knowledge then, prior to
2  December, the FCC said they couldn't pursue any
3  enforcement for non-compliance?
4      A    I -- I think the -- I -- I -- I don't know if
5  I would agree with that.  I think the -- again, I --
6  it's not -- I didn't write this, but I think the FCC has
7  added to its rules over time, but it has a long history
8  of actions against calling platforms and this goes from
9  my time in private practice, when I was very familiar
10 with some of the actions the FCC had brought against
11 providers in this space.
12     Q    So, you disagree with the FCC about this?
13     A    I think that's the sentence out of context
14 where I -- I don't think the full context is clear in
15 that sense, but in December, they adopted a bunch of new
16 tools.  One is that they can do a notice where they say,
17 we believe this actor's a bad actor and authorize all
18 providers to seize taking traffic from that provider,
19 and they can basically kick them out of the network.
20 Some of those are new tools they're talking about there,
21 but -- but I don't think it was nothing before.  It's
22 just changed.
23     Q    Okay.  But those were new tools in December,
24 2020, correct?
25     A    Yes.

Joshua Bercu                    August 09, 2023

 1      Q    The same month that SmartBiz was the highest
 2  point of entry traceback?
 3      A    Yes.
 4      Q    And following this new authority, we go back
 5  to the chart, what happens to Smart Biz's -- not just
 6  point of entry tracebacks, but what happens generally to
 7  Smart Biz's tracebacks following December, 2020?
 8      A    They -- they did decrease till they resurged
 9  later in 2022.
10      Q    Yeah, for the three-month little spike here.
11      A    Yup.  Yup.
12           MR. SOMMER:  Object to the form.
13  BY MR. GELLIS:
14      Q    Okay.  So, for some of these months with these
15  ranks -- I know we saw in the complaint that trace --
16  that SmartBiz is number 28, right?  Based on these ranks
17  though -- I mean, there are months when SmartBiz's is
18  140-something -- tied for 142.  That's certainly not
19  28th or 29th, is it?
20           MR. SOMMER:  Object to the form.
21           THE WITNESS:  Yeha, it's not --
22           MR. GELLIS:  I'm sorry?
23           THE WITNESS:  -- 142 is not 28th or 29th.
24  BY MR. GELLIS:
25      Q    Yeah.  In fact, for many of these months

Joshua Bercu                    August 09, 2023

```
 1   they're nowhere even near 28 or 29, are they?
 2           MR. SOMMER:  Object to the form.
 3           THE WITNESS:  That's right.
 4   BY MR. GELLIS:
 5       Q    Okay.  And I think one of the topics we looked
 6   at on that notice was there -- SmartBiz was ranked
 7   relative to other entities.  Now, this is a breakdown by
 8   month.  Do you happen to have any knowledge about -- you
 9   know --  as it stands today in aggregate where SmartBiz
10   would fall in rank on the list?
11       A    For point of entry or for --
12       Q    Total.
13       A    Oh.
14       Q    Either -- Either -- any knowledge you do have?
15       A    I -- I don't -- I don't have the specific
16   knowledge right now.
17       Q    Okay.  Do you know approximately how many
18   tracebacks the number one highest traceback entity would
19   have in aggregate?
20       A    So, I think one clarification really important
21   -- all -- all tracebacks start with terminating
22   providers.
23       Q    Mm-hmm.
24       A    So, they are by far the most, followed by
25   intermediate large transit providers.  So, you know,
```

Joshua Bercu                    August 09, 2023

1   it's sort of very heavily stacked for those -- those

2   type of providers first.

3       Q     How -- How many providers are we talking

4   about, which would be heavily stacked as terminating

5   providers?  It can't be that many.

6       A     I guess it's probably -- what is it? It's 7,

7   8, something like that -- 6, 7, 8 -- maybe up to 10.

8       Q     Okay.  Now, I -- I understand your nuance and

9   why their numbers are going to be higher, but even given

10  that approximately, do you know the number for like the

11  highest?

12      A     I don't know off the top of my head, but --

13  you know -- at this -- at this point in time, we've run

14  12-something -- thousand tracebacks and -- you know --

15  you know -- roughly a third -- a third each come from

16  the major terminating carrier.  So, it's got to be --

17  it'd be in the thousands for those.

18      Q     Okay.  Do you know SmartBiz -- well, we know

19  SmartBiz's total is approximately 200-something -- 260 I

20  think -- ish.  We talked about it earlier.  Can you sit

21  here today and tell me where SmartBiz falls relative to

22  anybody else or relative to intermediate providers?

23      A     I'd have to look it up.

24      Q     Okay.  During testimony at the Attorney

25  General's Office, we talked about some months where

Joshua Bercu                    August 09, 2023

1  SmartBiz had one traceback, for example, or two -- One

2  or two.  And I think -- you know -- the testimony was

3  essentially, "Well, you know that's -- it's still one."

4  Is it common to have one traceback in a month perhaps?

5       A    So, in terms of -- you know -- further away

6  from the terminating side -- but you know --

7       Q    Yeah.

8       A     -- what -- what do you -- what do you mean?

9  Just like what -- what category of provider?

10      Q    I mean, I just -- is it -- are there a lot of

11 companies that have one traceback in a month -- only

12 one?

13      A    There's some.  There's some we see and then

14 never see again too.  We -- we see a variety of things.

15      Q    So, receiving a traceback is not necessarily

16 notice of liability, right?

17      A    I -- I think that --that's s a question more

18 from -- from the -- for a prosecutor's side.

19      Q    Well, the ITG can't impose any penalties,

20 right?

21      A    We -- we are not the regulator.  We -- we

22 don't find liability.  We don't impose penalties.

23      Q    Okay.  So, we've talked about intermediate

24 carriers too and intermediate providers.  So, a

25 traceback starts at the terminating provider, obviously,

Joshua Bercu                    August 09, 2023

1  which is probably -- you know -- the guy -- the company
2  that connects the cell phone call?
3       A    Correct.
4       Q    Generally, right?
5       A    Yes.
6       Q    Okay.  And we saw that chart earlier, Mr.
7  Crotty showed with a number of HOPS as well for
8  tracebacks.  It's -- How many -- how -- I mean, is it
9  standard, you say, for trace backs to have like 6 to 10
10 HOPS?  I mean, it appeared most of those HOPS were in
11 the 6 to 10 range.
12      A    Yeah, that -- that's -- that's roughly
13 standard.  Sometimes more, sometimes less, but yeah.
14      Q    So, for every traceback where -- for every
15 traceback recording you receive or whatever, the call
16 had to connect through the terminating provider,
17 correct?
18      A    Yes, every -- every last one has to have a
19 terminating provider.
20      Q    So, doesn't that mean then that the
21 terminating provider made the phone ring on the other
22 end for the consumer to pick up the phone, yes.
23           MR. SOMMER:  Object to the form.
24           THE WITNESS:  There's -- It may ring.  There -
25 - there's also -- you know -- some ringless

Joshua Bercu                August 09, 2023

```
 1        voicemail, other examples like that.
 2   BY MR. GELLIS:
 3        Q    Well, if the call connected, it means that the
 4   terminating provider connected the call, yes?
 5        A    I -- I suppose so.
 6        Q    Okay.  That means they didn't block it, right?
 7        A    If -- If it came to us from YouMail, it means
 8   the call was not blocked.
 9        Q    Okay.  Which again, means that the terminating
10   provider connected the call?
11        A    To the best of my knowledge, yes, or it was a
12   ringless voicemail.
13        Q    Okay.  And so, the terminating providers --
14   we're just starting there through the chain.  They are
15   certainly connecting the potentially illegal robocalls,
16   right?
17        A    I suppose.
18        Q    And they're not blocking them since it
19   connected, right?
20        A    In -- in those cases, they wouldn't have
21   blocked those.  Yeah.
22        Q    Yeah.  So, they connected the calls, even
23   calls that are on the DNC list, right?
24             MR. SOMMER:  Object to the form.
25             THE WITNESS:  Yeah, and they could have been
```

Joshua Bercu                    August 09, 2023

```
 1        labeled too as spam.
 2   BY MR. GELLIS:
 3        Q     Well, I -- I guess I'm saying the records we
 4   looked at show whether or not some of these calls were
 5   to numbers on the DNC list, correct?
 6        A     Yes.
 7        Q     Okay.  And if it connected and you have a
 8   recording, then that means that the terminating provider
 9   connected the call to a number on the DNC list, correct?
10        A     Yes.
11        Q     Okay.  And then, that also means that their
12   immediate upstream -- so one HOP up, same thing, right?
13   They passed the call through.  They obviously didn't
14   block it either --
15        A     Right.
16        Q      -- and it got to the terminating provider and
17   it connected, yes?
18        A     Yes.
19        Q     Okay.  And so, the terminating provider, they
20   didn't make the call, did they?
21        A     No.
22        Q     They didn't initiate the call, did they?
23        A     Not -- not in my own interpretation.
24        Q     And what about their upstream?  It -- it --
25   Let's assume there's six HOPS.  If there's six HOPS,
```

Joshua Bercu                August 09, 2023

1  then they're upstream certainly didn't either, did they?

2          MR. SOMMER:  Object to the form.

3          THE WITNESS:  That -- that's not my phrase.  I

4      -- I wouldn't phrase it that way.

5  BY MR. GELLIS:

6      Q    What would you say

7      A    When we talk about it, we usually talk about

8  who they received the call from and sent the call to --

9  transmitted the call to.

10      Q    And who's they, each -- each individual

11  carrier?

12      A    Yes, each individual carrier.

13      Q    Okay.  So, those terminating providers

14  transmitted the calls to the consumers then?

15      A    That's -- that's more intermediate, where I

16  would say transmitted -- that --

17      Q    Okay.  Well --

18      A     -- that would be terminated would be the

19  term.  I believe the correct term of art -- terminated

20  the call.

21      Q    Okay.  And at the very, very beginning of this

22  chain, when you get to the end of this traceback

23  process, somebody somewhere picked up a phone or

24  initiated this process somehow to put a call through to

25  somebody, right?

Joshua Bercu                    August 09, 2023

 1      A    Yes.

 2      Q    And you call that an originating provider?  Is

 3  that the term of art used in your world?

 4      A    Yeah, we would -- we would call the -- the

 5  platform -- the -- the voice service provider, VOIP

 6  provider, whatever it may be -- other type of provider,

 7  the originating provider.

 8      Q    And so, the call then goes down the stream

 9  through multiple HOPS and ends up presumably in

10  YouMail's system somewhere and then gets sent to you,

11  right?

12      A    In -- in the case of one way based traceback

13  off YouMail, yeah -- YouMail data, yes.

14      Q    Okay.  So, from the ITG's perspective, what

15  are you trying to detect by going through this trace --

16  traceback process?

17      Q    So, our ultimate mission is to stop illegal

18  robocalls.  So, what we're trying to detect is the

19  source of the calls and other relevant information along

20  the way, including if there are providers that more

21  prolifically show up in our tracebacks and key spots.

22      Q    And so, if a provider keeps showing up, what

23  does that tell you about that provider?

24      A    It -- it -- it could mean -- I'd -- I'd have

25  to speculate, but it's just useful information that then

Joshua Bercu                August 09, 2023

1  can be something that an enforcer can make a

2  determination based off.

3      **Q    You're speculating as to what it means when**

4  **you get a lot of tracebacks for one company?**

5      A    I would have to speculate because -- you know

6  --  all we see is the calls we traceback.  We don't --

7  we don't traceback legal calls.  We only traceback sus -

8  - suspected unlawful calls.  So, I don't know.  We never

9  -- we never --- I mean, I'd have to speculate, but we

10  never know whether it's 2 percent of a provider's

11  traffic or 98 percent.

12     **Q    Okay.**

13     A    It would be purely speculative to determine

14  which.

15         MR. GELLIS:  I'm going to go ahead and open --

16         Patrick, I don't know how we would do this.  Your

17         Exhibit 9 -- Do I make that, I guess, my Exhibit 6

18         or -- I guess so, right?

19         MR. CROTTY:  It's probably going to be

20         confusing to have the same Exhibit with multiple

21         numbers.  If you just want to say, I'm referencing

22         Plaintiff's Exhibit 9 --

23         MR. GELLIS:  Plaintiff's 9.

24         MR. CROTTY:  -- I think it's probably the

25         clearest.

Joshua Bercu                    August 09, 2023

```
 1              MR. GELLIS:  Okay.  I'll do that.
 2   BY MR. GELLIS:
 3       Q     So, I'm going to reference Plaintiff's Exhibit
 4   9.  It's a spreadsheet when it went over and I think
 5   this is the one -- Okay.  Let me know if you can see.
 6       A     Yup.
 7       Q     I know we talked about the note here from you,
 8   but I'd like to talk about Mr. Frankel's note.
 9       A     Mm-hmm.
10       Q     Are you fam -- Do you need to read this real
11   quick or are you familiar with it?
12       A     Let me read it again, first thing.  Okay.
13       Q     All right.  I want to look at this sentence
14   here that begins with, told him that it's their problem.
15   US Telecom cannot be the go-between.  Lengthy friendly
16   conversation where I told him he has to take
17   responsibility for the calls and for his upstreams, none
18   of which are responsive.  Do you see that?  Do you --
19   based on what you've said today, I'm not sure you're
20   going to agree with that sentence.  Do you agree with
21   what Mr. Frankel said there?
22       A     What do you -- what do you mean?  What
23   specifically about it?
24       Q     That it's a carrier's -- it's a provider's
25   responsibility.  They're responsible for the calls their
```

Joshua Bercu                 August 09, 2023

```
1  upstream send them.
2      A    I -- I think we believe that all providers
3  have a responsibility to stop illegal robocalls,
4  including by accepting traffic from trusted partners.
5  And if there's a reason not to trust the partner, take
6  action, that's -- that's what we believe.
7      Q    And you would also apply those standards to
8  terminating providers?
9      A    I -- I think we feel the closer you are to the
10 originator is more relevant because if you apply those
11 standards to terminating providers, there'd be no phone
12 calls.  Because if they don't take traffic from
13 intermediate providers, there's no phone network.
14     Q    Okay.  But don't the terminating providers --
15 aren't they extremely large multinational corporations
16 with deep pockets?
17          MR. SOMMER:  Object to the form.
18          THE WITNESS:  I -- I think some of them are US
19     focused, but generally they're big -- they're
20     bigger entities.  Yeah.
21 BY MR. GELLIS:
22     Q    Okay.  And so, you don't put any
23 responsibility on them perhaps to implement some kind of
24 protection mechanisms that would not connect the calls
25 to their customers?
```

Joshua Bercu                    August 09, 2023

```
 1              MR. SOMMER:  Object to the form.
 2              THE WITNESS:  they do.  They do blocking, they
 3         do labeling, they help develop stir shaken.  But
 4         generally speaking, if we're talking about taking
 5         traffic from providers, if they cut off large
 6         intermediate providers, which is the --
 7         predominantly who they get illegal robocalls from,
 8         we wouldn't have a phone network.  There would be
 9         no legal calls that get through.
10    BY MR. GELLIS:
11         Q    Explain that to me.  It sounds like you're
12    saying intermediate providers have to have rob --
13    fraudulent robocalls.  I -- I don't follow.
14         A    I think the best analogy is if you think of
15    like a package delivery and if you have a -- you know --
16    illegal counterfeit goods coming from one end to the
17    other, at -- at some point it's a truck full of illegal
18    counterfeit goods.  It gets laundered in through the
19    process with legal goods.  And when the FedEx person
20    delivers it to my house -- if FedEx said, I can't take
21    any more packages at all, you'd have a lot of -- no
22    packages at all.  That'd be the closest analogy I can
23    come up with.  But -- but that -- that's kind of the
24    notion is it gets laundered in with legal traffic as
25    well.
```

Joshua Bercu                    August 09, 2023

```
 1      Q    Well, I'm glad you used the trucking analogy
 2  because that's actually something that we -- we used in
 3  the somewhat similar analogy in the AG's deposition,
 4  right?  I said -- you know, I treated -- I said, aren't
 5  intermediate providers kind of like a trucking company?
 6  I mean, when there's food outbreaks and food spoilage
 7  and E. Coli outbreaks -- you know -- you don't shut down
 8  the trucks.  You go to the source of the outbreak and
 9  the factory that caused it.  You don't punish the
10  Walmart that it was shipped to and you don't punish the
11  truckers who delivered it.  You usually try to stop it
12  at the source, right?
13      A    I'm not familiar with how the E. Coli -- you
14  know -- how they do that in -- in that context.
15      Q    Okay.  So, you stop the truck.  So, if there's
16  a food outbreak, stop the truckers?
17           MR. SOMMER:  Object to the form.
18           THE WITNESS:  I -- So, you know, I -- I think
19      you're getting into some things that are really, I
20      think more policy and prosecutorial discretion
21      questions than mine.  But you know, I -- I think
22      there's a question in your analogy, if 100 percent
23      of the truck had contaminated food and that truck
24      routinely had 100 percent contaminated food, I
25      think that'd be a different assessment than -- you
```

Joshua Bercu              August 09, 2023

```
 1        know -- one box out of a thousand being
 2        contaminated.
 3  BY MR. GELLIS:
 4        Q    Do you have any reason to believe that
 5  SmartBiz was carrying 100 percent contaminated calls, if
 6  you will?
 7             MR. SOMMER:  Object to the form.
 8             THE WITNESS:  As I mentioned before, we don't
 9        have insight one way or another into that.
10  BY MR. GELLIS:
11        Q    Well, you know where they -- I mean, you were
12  asked to come testify about their standing relative to
13  other entities in number of tracebacks.  So, where do
14  they fall relative to everyone else?
15             MR. SOMMER:  Objection, form.
16             THE WITNESS:  But I -- But I don't see what
17        their full call path flow looks like.  But what I
18        see is that they were one of our most prolific
19        point of entries for -- for a period, and then less
20        so on that -- that other chart we had.
21  BY MR. GELLIS:
22        Q    Well, do you believe that getting a traceback
23  is indicative of more robocalls?
24        A    I can say --
25             MR. SOMMER:  Object to the form.
```

Exhibit C - Josh Bercu Deposition

Joshua Bercu               August 09, 2023

1          THE WITNESS:  -- I can say definitively it is
2      because we just run a sampling of examples we have
3      that are meant to be a represented sample of a much
4      larger quantity.  So, yes.
5  BY MR. GELLIS:
6      **Q    Okay.  So, if you get -- you getting a**
7  **traceback is indicative of more robocalls?**
8      A    For a period and then less so on that -- that
9  other chart we had.
10     **Q    Well, do you believe that getting a traceback**
11 **is indicative of more robocalls?**
12     A    I can say --
13         MR. SOMMER:  Object to the form.
14         THE WITNESS:  -- I can say definitively it is
15     because we just run a -- the sampling of examples
16     we have that are meant to be a represented sample
17     of a much larger quantity.  So, yes.
18     **Q    Okay.  So, if you get --**
19     (Thereupon, the deposition went off record at 11:57
20 a.m. due to technical difficulties; after which the
21 following was heard at 12:03 p.m.)
22         THE COURT REPORTER:  Sorry about that.  Thank
23     you.
24         MR. GELLIS:  Would you mind telling us what
25     the last thing you caught was?

Joshua Bercu                  August 09, 2023

1          THE COURT REPORTER:  Yeah, so the last

2      question was, well do you believe getting a

3      traceback is indicative of more Robocalls?  Mr.

4      Sommers, objection to the form.  Answer, I can say

5      definitively it is because we just ran a sampling

6      of examples we have that are meant to be a

7      represent sample of a much larger quantity.  So,

8      yes.  Question, okay.  So, if you get -- and that's

9      where I cut off.

10         MR. GELLIS:  We'll just scrap that question,

11     break for lunch and come back, if everyone's good

12     with that.

13         MR. CROTTY:  Sounds good.  Works for me.

14         MR. SOMMER:  And Ms. Brighton, may I get your

15     email address quickly?

16         THE COURT REPORTER:  Yes.  And do you want to

17     go off the record or do you want to stay on the

18     record?

19         MR. GELLIS:  Oh man.

20         MR. CROTTY:  We'll take that as off the

21     record.

22         THE COURT REPORTER:  Okay.  All right.  The

23     time --

24         MR. CROTTY:  And we'll go eat and we'll see

25     you back at about 12:35, 12:40.

Joshua Bercu                August 09, 2023

```
 1              MR. GELLIS:  Yeah.
 2              THE COURT REPORTER:  Okay.  We are off the
 3       record.
 4       (Thereupon, a break was held at 12:05 p.m.; after
 5   which the following was heard at 12:38 p.m.)
 6              THE COURT REPORTER:  Okay.  One moment.  Okay,
 7       the time is 1:38 PM.  We're back on the -- 12:38
 8       PM, I'm sorry.  We're back on the record.
 9   BY MR. GELLIS:
10       Q    All right.  Good afternoon.
11       A    Hey.
12       Q    I'm going to go ahead and jump in and share
13   another Exhibit that you reviewed this morning.
14       A    Yup.
15       Q    So, this is going to be Plaintiff's 19.  It
16   was the Duke Energy email.  You -- you remember that?
17       A    Yes.
18       Q    Okay.  Let me share it.  Sorry, guys.  Give me
19   a minute.  All right.  So, familiar here, right?
20       A    Yes.
21       Q    It is your email in 2020?
22       A    Yes.
23       Q    We were talking about the ITG's role and
24   giving advice and telling people what to do or not to
25   do.  I just want to ask you about this paragraph here.
```

Joshua Bercu                August 09, 2023

```
1        A    Yes.
2        Q    If you take a minute -- okay.  You see this,
3   And therefore Chock and SmartBiz have not done enough --
4        A    Yup.
5        Q     -- or at least have not done enough quickly
6   enough.  Okay.  What do you mean by that?
7        A    So, you know, I think it -- that sometimes
8   where -- when we're -- we are trying to get the phone
9   calls off the network, right?  That's the baseline of
10  what we're trying to do.  And we sometimes get responses
11  from -- especially back then from providers that they
12  blocked the number.  Well, if you block the number and
13  it's a spoofed number, it's literally not taking any
14  mitigation action whatsoever because the spoofer just
15  changes to a different number, right?  So -- so, what
16  our goal here -- was that there was a really pernicious
17  campaign going on at the time that was using not just
18  Duke, but utilities, and we -- we -- we -- I believe the
19  introduction was from the North Carolina AG Office to
20  Duke Energy to try to work together on this.  But we
21  were just trying to get the calls to stop and Chock was
22  not responding to tracebacks, I believe at that time.
23       Q    Do you know, did Duke Energy pay you for this
24  too, or is this unpaid?
25       A    We had a very small pilot project with Duke.
```

Joshua Bercu               August 09, 2023

1  I don't recall if this was specifically with that or was

2  separate to that.

3       Q    Okay.  But at some point, you -- when you say

4  a pilot project, what does that mean?

5       A    Yeah, they -- we had -- Duke paid us a very

6  nominal amount as we sort of tried to get examples and -

7  - and work with them on that and --

8       Q    So, when a company approaches you -- how does

9  that work if a company approaches you and says, I want

10 to pay you to do tracebacks?  What do they bring with

11 them?

12      A    So, first of all, we've got to hear what --

13 what it is they're trying to achieve.  It's all part of

14 us trying to make sure this is a sustainable and growing

15 effort and increase our impact, right?  Because you

16 know, I mentioned we pay for a lot of our data.  This is

17 one way we can continue to raise resources to -- and get

18 other data.  So -- so, it depends what their -- we -- we

19 -- they -- they are some times where it's phishing

20 attacks where they've got customers actually defrauded

21 and we are able to -- you know -- trace those actual

22 fraud -- known fraud calls back and work with them to

23 get -- find out who the illegal actors are on the other

24 side of things and dedicate the resources we need to

25 that.  Other times it's where -- like this case, you

Joshua Bercu                    August 09, 2023

1  mentioned Marriott earlier, where the -- the brand name

2  is being used without permission in the -- in the

3  robocalls.  So, yeah, I don't know if that answered the

4  question or not, but --

5       Q    It -- it -- it does.  It's sufficient.

6       A    Okay.

7       Q    What -- Approximately, like how often do

8  companies pay you for robocalls -- for traceback

9  services?  I'll call them trace back services, I guess.

10      A    Sure.

11      Q    Is that fair?  Yeah.

12      A    Yeah.  We -- we -- we have had about a half a

13  dozen partnerships like that.

14      Q    And you referenced the data that you -- the

15  recordings I think we talked about earlier that you

16  acquire through YouMail or other sources.  So, we read -

17  - we talked about YouMail.  I believe you said ZipDX

18  also?

19      A    Yup.

20      Q    Okay.  Do -- When you have these payment

21  models, are they flat fee?  Are they based on per

22  recording?  What's the payment mechanism?

23      A    So, we don't usually acquire the data.  So, it

24  -- you know, if it -- so, they might -- one of these

25  entities might work with YouMail too and -- and get

Joshua Bercu                August 09, 2023

1  examples that YouMail feeds to us.  But we usually --

2  it's varied a little bit over time, but the -- the model

3  we have is sort of an event basis where we do back --

4  basically a certain number per month of -- of -- of

5  batches of trace packs that we'll run for them.

6       Q    Okay.  Now, let's go -- putting the private

7  sector purchasing aside -- just I'm talking about the --

8  the contract between YouMail and the ITG or the --

9  however you acquire the recordings that were referenced.

10      A    Okay.  Got it.

11      Q    When you pay YouMail for those, how do you pay

12  them?  Is it by recording?  Is it flat fee?  What's the

13  mechanism?

14      A    It's -- It's a flat fee, a subscription

15  basically.

16      Q    And is there some minimum number guaranteed in

17  that?

18      A    So, to -- to -- to run for -- So, we -- we

19  just get the data.  What we do with it isn't theirs.  We

20  run them on our own initiative, but it's -- we get a set

21  number of campaigns and they feed us examples on those

22  campaigns.

23      Q    You say a set number -- I mean, that's what

24  I'm asking.  So, you pay a flat fee.  Are they required

25  to give you a minimum number of recordings per month or

Joshua Bercu                 August 09, 2023

1  per week or whatever?

2      A    So, yeah, it's done on a campaign basis.  So,

3  the structure has generally been for each month and we

4  can make some changes through the month, but we -- we

5  tell them, Of the data you're seeing as the top 30 or 40

6  campaigns in the country.  These 10, we'd like to get

7  examples from you, and -- and then the examples just --

8  they sort of turn on towards us.

9      Q    Okay.  So, they kind of send you information

10 or some reference -- or information of some kind of list

11 where you look at it and then you decide what you want

12 to buy if you will?

13     A    Yeah, more or less.

14     Q    It's like a shopping list?

15     A    Yeah, more -- more or less.  I guess that --

16 yeah, I guess that -- that tracks closer now.

17     Q    And what -- You get the recording from them,

18 but you also -- I think you said you get a CDR from them

19 as well?

20     A    So -- so, if we get -- so, if we say, you

21 know, this campaign -- this illegal telemarketing scam,

22 whatever it is, we want this campaign.  They all -- it -

23 - they turn it on, it flows directly into our portal and

24 we get -- we can go into our portal -- what we call

25 incidents, and we might have -- you know 100, 200, 300,

Joshua Bercu                    August 09, 2023

1   1,000 different incidents in a day under that campaign.

2   And our team -- for each of those incidents, we have a

3   recording, we have the -- the -- you know -- the calling

4   number, the called number, the day and time of the call,

5   and then our system's designed where we can go -- you

6   know -- our team goes in.  The recordings aren't always

7   the same quality, so sometimes they're cutoff middle.

8   So, our team will go in and check and make sure we've

9   got some high quality ones and then they'll select those

10  to run tracebacks on --

11      **Q    Okay.**

12      A     -- some subset of that.

13      **Q    Getting back to your language here about not**

14  **doing enough, I just thought there was testimony earlier**

15  **where you said the ITG was not supposed to be telling**

16  **providers what to do?**

17      A     So, I -- I --  I said we've evolved a lot over

18  time, right?  This -- you know, I think October, 2020

19  was my second month there.  And one of the things,

20  especially as the -- as -- as I -- as we sort of saw how

21  things were and -- and how things have evolved, we more

22  and more went away from that.  But that's sort of the

23  earlier model where there was a little more

24  encouragement, I -- direct encouragement, I guess I

25  would say.

Joshua Bercu                    August 09, 2023

1     Q    Do you know if this email was sent during what

2   we to as that voluntary period or was that after the FCC

3   made it mandatory to respond to tracebacks and cooperate

4   with the ITG?

5     A    I'd have to double check.  Yeah, I don't -- I

6   don't recall the exact date.  I -- I -- I think that the

7   first half of the requirement might have been March,

8   2020, but I believe December, 2020 was when it applied

9   in all -- all contexts, but --

10    Q    Okay.  And -- But this email's not just some

11  internal email, right?  This is to an external company,

12  Duke?

13    A    Yes.

14    Q    I mean, so -- so, you're kind of opining -- is

15  this -- was this email sent in -- in your capacity of

16  ITG Executive Director or some other ITG capacity?

17    A    Yes.  That was before we created the LLC and

18  gave the -- the full title.  Part of the reason we did

19  is we thought it would benefit all stakeholders to have

20  more -- more clarity about what -- what hat we were

21  wearing at what time.  So --

22    Q    Okay.  But I mean, you -- you were telling

23  Duke Energy, a private company -- advising them that

24  SmartBiz was not doing enough, right?

25         MR. SOMMER:  Object to the form.

Joshua Bercu                   August 09, 2023

 1          THE WITNESS:  I -- I don't think that's what
 2      it says.  I think it says if the calls kept
 3      happening and SmartBiz showed up, then it could
 4      mean that.  So, it's a little more conditional than
 5      that.
 6  BY MR. GELLIS:
 7      Q     Okay.  Okay.  Do you know if Smart ended up
 8  terminating Chock?
 9      A     I -- I had have to -- I -- I'd have to go back
10  to the records on that, but --
11      Q     Do you agree that if they did terminate Chock,
12  it was a voluntary action?
13      A     Yes, it was their own -- their own risk man --
14  mitigation management.
15      Q     Okay.  And at the end here, you also
16  referenced, or if the scammers have found a new way onto
17  the US network, you see that?
18      A     Yup.
19      Q     So, that was like a big concern.  I think you
20  had testified earlier about that escalation letter was
21  sent out because SmartBiz was the number one point of
22  entry, right?
23      A     Yup.
24      Q     So, the con -- one of the big concerns of the
25  ITG was foreign robocalls being brought into the

Joshua Bercu                August 09, 2023

```
 1  country, yes?
 2      A    That it -- Yes.  It's a big part of the effort
 3  -- a big -- big part of the problem, and therefore a big
 4  part of the ITG's focus.  Yes.
 5      Q    Okay.  And we looked at that spreadsheet and
 6  we saw that after December, SmartBiz's point of entry,
 7  tracebacks basically dropped off, correct?
 8      A    Mm-hmm.
 9      Q    Okay.  So that means, that they were no --
10           THE COURT REPORTER:  I'm sorry.  Is that a
11      yes?
12           THE WITNESS:  Yeah, sorry.  Yes.
13           THE COURT REPORTER:  Thank you.
14  BY MR. GELLIS:
15      Q    So, that means they were no longer bringing
16  that traffic into the country, were they?
17           MR. SOMMER:  Object to the form.
18           THE WITNESS:  I suppose.  I mean, one thing,
19      that email was specifically about one campaign,
20      right?  And there -- there could be other campaigns
21      that were involved, but to -- to your direct
22      question, yes, if we weren't seeing them as point
23      of entry for the tracebacks we were running, they
24      were not bringing those in.
25      Q    Well, we also talked about how you believe one
```

Joshua Bercu                    August 09, 2023

1  trace back is indicative of many more potentially

2  illegal calls, correct?

3       A    Typically, yes.

4       Q    **What is zero trace backs indicative of?**

5       A    It indicates that of the campaigns we're

6  tracing back, none showed that provider --

7       Q    **Okay.**

8       A     -- as the point of entry here.

9       Q    **And -- and you choose the -- and so, of the**

10 **campaigns you've selected, they had none?**

11      A    Correct, that -- You're right.  Of what we're

12 currently tracing back, which is based on what we

13 selected, referrals we're getting or not getting,

14 etcetera.

15      Q    **Does the ITG consider zero point of entry**

16 **tracebacks to be a good thing?**

17      A    You know, typically, I do think when we see a

18 provider active in tracebacks and less active, that is

19 certainly better than the alternative.

20      Q    **Okay.  And SmartBiz here in that six month**

21 **window we looked at going from number one to zero, is**

22 **that a good change that they made?**

23      A    Presumably, yes.

24      Q    **And they seem to have kept it up, right?  Save**

25 **these two in '21 and '22 -- line 21, line 22.**

Joshua Bercu                    August 09, 2023

```
 1              MR. SOMMER:  Object to the form.
 2              THE WITNESS:  I -- I suppose.  Yeah, they were
 3         not -- they were not showing up as a point of entry
 4         in as many tracebacks.
 5   BY MR. GELLIS:
 6         Q    So, in December of '22, which I believe this
 7   is supposed to be December of '22.  on the chart, it was
 8   marked as 1-December.
 9         A    Yes.
10         Q    Yeah, I think it was a scribner's error.  So,
11   in December '22, when the lawsuit was filed and the
12   allegations that SmartBiz is flooding the country with
13   millions of illegal robo -- foreign robocalls was made
14   in '22, did the ITG's records for the month of December
15   '22, did they support that statement?
16              MR. SOMMER:  Object to the form.
17              THE WITNESS:  I -- I -- In December we did not
18         see SmartBiz in -- in very many tracebacks.
19   BY MR. GELLIS:
20         Q    What about all of 2022?  How many point of
21   entries did they have in '22?
22         A    Zero.
23         Q    So, that whole year, not a single traceback
24   evidencing they had brought a single call -- foreign
25   call into the country, right?
```

Exhibit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

1      A    That -- that's right.  At least according to

2  our records, Sir.

3      Q    Okay.  In fact, in those months, let's look at

4  the overall tracebacks -- two in 22.  There is a bit of

5  a spike here in the summer months, June, July, August.

6  Do you see that?

7      A    Yes.

8      Q    So, in July they were actually ranked 28th?

9      A    Yes.

10     Q    August 12th.  Okay.  But aside from that,

11 these other months, they have very few tracebacks.  3,

12 2, none, right?

13     A    Mm-hmm.

14     Q    What -- Where's the line for what's a lot or

15 not a lot of tracebacks in a month?

16     A    So -- so, I -- I don't believe we have enough

17 information to sort of weigh in on what is and isn't

18 enough or a lot because of limitations in our dataset.

19     Q    Well, you decide who to send to the -- well,

20 scratch that.  You don't send to the FCC anymore, do

21 you?

22     A    Very atypically and only in unique fact

23 patterns where there's some clear obvious illegality --

24 apparent illegality.

25     Q    You -- You report information to the FCC

Joshua Bercu                    August 09, 2023

1  though, right?

2      A    So, basically at this stage, the law

3  enforcement community has access to aggregate data on

4  all providers, and then that lets them take a deeper

5  dive into what they believe may be a legal violation.

6      Q    Okay.  And I'm going to show you Plaintiff's

7  20.  We looked at this as well.

8      A    Mm-hmm.

9      Q    It's the US -- letter to US Telecom on behalf

10 of Latam -- NGM Latam Corp.

11     A    Mm-hmm.

12     Q    You familiar with this?

13     A    Yes.

14     Q    It's directed to you.  I'm -- I'm just trying

15 to figure out what's the significance of this letter to

16 you?

17     A    It -- What do you mean by that?

18     Q    Well, I'm not -- quite frankly, I'm not sure

19 what it's attempting to be used to show.  So, I mean,

20 why don't you just -- you know, it's obviously an

21 Exhibit for a reason.  I'm guessing the plaintiff used

22 it for a reason.  So, what -- what is -- you know, what

23 is this about?  I mean, what was significant about this

24 letter?

25              MR. SOMMER:  Object to the form.

Joshua Bercu                August 09, 2023

```
 1          THE WITNESS:  I mean, I -- I think that you --
 2     you have to ask the Plaintiff what -- what the
 3     reasoning behind the letter is.  I -- I think it --
 4     what I -- what I can say is it's just an example of
 5     a response that we did get to an escalation and
 6     explains what they did -- what they did and how --
 7     what actions they took -- this particular provider.
 8 BY MR. GELLIS:
 9     Q    Do you know any knowledge -- do you have any
10 knowledge about this provider's like subsequent activity
11 after 2021?
12     A    I -- I'd have to double check, but I believe
13 it basically went to -- to zero, but I'd have to double
14 check that.
15     Q    Okay.  One minute.  Okay.  Just got a couple
16 more questions, should be getting near the end.  When
17 you reach the end destination of a traceback, do you
18 find that it was a legal call?
19     A    So, very atypically, but what we do -- so --
20 and this has evolved somewhat too.  We do get providers
21 pushback sometimes and say it's a legal call.  They may
22 on different grounds -- they -- you know, sometimes they
23 say it's not a robocall.  It was a live call.  More
24 often than not, the pushback we get, they ignore a lot
25 of the things we -- we've flagged, including FCC rules
```

Joshua Bercu                    August 09, 2023

```
 1  about identifying the responsible entity, things like
 2  that.  You know, a lot of the calls we traceback are
 3  pure fraud.  So, they're fraud on their face.  The
 4  utility disconnection department -- there's no such
 5  thing as a disconnection department in the United
 6  States, right?  Those are fraud calls from overseas.
 7  Illegal telemarking.  We -- we see a lot of calls that
 8  are made with purported consent.  We get pushed back on
 9  -- pushed back on those.  Usually, when we're tracing
10  those back, we're seeing them hit.  You know, there was
11  one example of a campaign that was hitting, I believe
12  millions and millions and millions people per month for
13  auto warranties calls.  So, it was also hitting
14  honeypots, things like that.  So, we had pretty good
15  evidence that the purported campaign consent was -- was
16  likely not valid.  What we do in those cases, especially
17  as we've evolved, because I think we've taken very
18  seriously and evolved over time about what's the proper
19  role of the ITG, we let providers document it.  All that
20  documentation gets in the system.  If an AG or the FCC
21  or FTC wants to go after a provider and the provider
22  says, hey, we -- we thought these calls were legal, it's
23  all in the record.  Their arguments are in the record,
24  our view is in the record, and they can -- you know --
25  litigate that out with the enforcer.  We have more --
```

Joshua Bercu                    August 09, 2023

1   more recently formalized this into a -- but not at the

2   time of these tracebacks -- into a formal dispute

3   mechanism that has more of a normalized flow for -- for

4   that type of question.

5        Q    So, you just talked about telemarketing calls

6   that didn't have consent, for example.  You know, I know

7   that's a common issue.  I think in this case there's

8   allegations of that as well.  And when you test -- you

9   testified earlier about the terminating providers, how

10  they have high traceback numbers because they're the

11  terminating providers and you didn't really seem to put

12  too much -- I felt they didn't put too much emphasis on

13  their -- their responsibility.  You're tracing back,

14  right?  So, I guess my question is -- is this, I'm kind

15  of setting it up.  In the number of call HOPS, how many

16  HOPS do you have to go from the originator before it's

17  kind of -- the ITG doesn't really consider you at fault

18  anymore?

19           MR. SOMMER:  Object to the form.

20           THE WITNESS:  So, I don't know.  You know, we

21       don't really have a formal at fault evaluation like

22       that, you know?  I can tell you my own personal

23       view is the closer you are to the origination point

24       or bringing in the country, there's some more

25       responsibility there because that is probably where

Joshua Bercu                August 09, 2023

1         it has not gotten as watered down, mixed in with

2         other traffic by that point.  So, that's -- that's

3         my personal opinion.  We don't have a formal

4         mechanism that -- that weighs in on fault like

5         that.

6   BY MR. GELLIS:

7         Q    Okay.  But I do -- the term -- we used the

8   example I gave of terminating a provider earlier where a

9   call may connect, the number was on the DNC, YouMail

10  generates a recording, whatever and sends it to you.

11  And we talked about how the terminating provider

12  connected that call, even though it was on the DNC.  But

13  the ITG seems to take the position that it's not really

14  the terminating provider's fault, right?

15        A    So, I -- I think we've taken our lead from the

16  FCC and -- and enforcement community on that.  What I

17  can say is -- you know -- one, there's -- the way the

18  telecom network works is there's -- they can't actually

19  just block all the calls.  They -- they have legal

20  obligations to complete the calls, particularly at the

21  terminating side, where carriers have more flexibility

22  as their wholesale relationships where they can -- you

23  know -- cease to have a wholesale relationship.  So, the

24  FCC has in the last decade authorized some blocking.

25  You couldn't block all calls on the do not call list

Joshua Bercu                    August 09, 2023

1  because by the nature of just going to the do not call,

2  that doesn't inherently make it illegal.  It just

3  requires that it not be a telemarketing call -- an

4  unsolicited telemarketing call.  So, you know, that --

5  so, I -- I think all of that is -- is relevant.  I will

6  say the terminating carriers have spent millions and

7  millions and millions of dollars trying to solve this

8  issue.  They've all -- virtually all rolled out

9  blocking, labeling.  They blocked billions of calls per

10 month.  So, all that's in the public record -- block or

11 label.

12     **Q     You don't --**

13     A     Yeah.

14     **Q      -- You also testified earlier about how -- I**

15 **think you said the big intermediates like -- you know --**

16 **Peerless and I think you cited another one, you couldn't**

17 **-- you couldn't shut them down because then the system**

18 **wouldn't work, I think is what you said, right?**

19          MR. SOMMER:  Object to the form.

20          THE WITNESS:  Yeah.  I -- I think it's fair to

21     assume if the large terminating providers shut down

22     all the large intermediate providers, there'd be no

23     -- no calls -- very few calls getting to get

24     through whatsoever.

25 BY MR. GELLIS:

Joshua Bercu                    August 09, 2023

1      Q     So, you see a distinction between a large
2   intermediate and a smaller intermediate?
3      A     No, not necessarily.  Again, I -- I -- to me,
4   the distinction is just how much legal traffic's on the
5   network and that's not something I have insight into in
6   any context.  I can only make -- yeah, so I don't have
7   insights there.
8      Q     Okay.  Well, you seem to be in the opinion,
9   you can't shut down the big intermediates, but you -- do
10  you believe that you could shut down someone like
11  SmartBiz and everything would be okay?
12            MR. SOMMER:  Object to the form.
13            THE WITNESS:  I -- I -- I don't know.  I think
14      that's a question of what -- what legal traffic
15      there is on the network.  I think we do know that
16      there's a lot of illegal traffic that's on the
17      phone network.  That we know very clearly.
18  BY MR. GELLIS:
19      Q     Do you hold companies to different standards
20  based on the size or their net worth?
21            MR. SOMMER:  Object to the form.
22            THE WITNESS:  No.
23            MR. GELLIS:  What's wrong with the question,
24      Jake?
25            MR. SOMMER:  Your -- your -- you -- you're

Joshua Bercu                    August 09, 2023

 1        assuming facts.  You're assuming that he -- that he
 2        said over and over and over and over again they
 3        don't have the authority to prosecute.  So, I -- I
 4        -- he's just answered this question a hundred
 5        different times, but I -- I didn't tell him not to
 6        answer.
 7             MR. GELLIS:  Well, I just asked if they
 8        treated different size companies differently in
 9        their traceback process.
10             MR. SOMMER:  No, that is not the question I
11        heard.
12   BY MR. GELLIS:
13        Q    Okay.  Do you treat different companies --
14   different sized companies differently in the traceback
15   process?
16        A    No.
17        Q    Do you have knowledge -- So, in December of
18   2020 we looked at the tracebacks list.  We saw SmartBiz
19   was number one point of entry.  Do you have knowledge
20   about how many calls SmartBiz made in that time period
21   relative to say CenturyLink?
22        A    I -- I don't.  All -- all I have knowledge of
23   was that in our tracebacks SmartBiz -- you know -- was
24   showing up as one of the top point of entries in that
25   time period.

Joshua Bercu                    August 09, 2023

1    Q    Do you guys ever analyze like the publicly
2    available YouMail data -- like the monthly number of
3    robocalls detected or anything like that?
4    A    Yeah, I -- I look at it.  I -- I don't know if
5    we like analyze or incorporate it, but I tend to read it
6    and think about it myself.
7    Q    So, what would cause a company to be denied
8    access to the ITG?
9    A    Nothing.  You mean, as a member -- I mean, I
10   think an important point is everyone and anyone can
11   cooperate and participate in the process, right?  We've
12   got -- what's the -- I think over 15 -- 1500 providers
13   that have cooperated -- something like that -- foreign
14   and domestic.  So, there's nothing that denies anyone
15   from being a participant in the ITG process.
16   Q    What about -- I forgot the term of art we
17   discussed earlier -- for a sponsor, or member, something
18   like -- what was the proper term that we used?
19   A    A membership?
20   Q    Now, let's talk -- not about cooperation --
21   membership.  I mean, isn't it true SBT and Whisl have
22   been denied membership in the ITG?
23   A    So, we -- we have been going through a --
24   slower than I'd like, but just as other priorities
25   popped up -- a process to reform how we do membership

Joshua Bercu                    August 09, 2023

1  generally.  But I -- I think the context of where we

2  came from is really important here.  Which membership

3  was really, really key and important when the ITG

4  process was stood up because that was the way to get

5  people to commit to cooperate is -- you know -- come

6  join the ITG, work together and -- you know -- we can --

7  we can all work together.  It is less relevant these

8  days including in terms of what you asked before about

9  information sharing.  We go out of our way.  If we ever

10 did best practices, we feel -- feel it's incredibly

11 important that goes to every participant, not just ITG

12 members if we ever did anything like that.  So, we are

13 in a -- we are in a -- again, longer than I'd like

14 process to reform how we've done that.  We haven't

15 really let any -- any new members in, if I recall

16 correctly, as we've started the process to reform how we

17 do membership because we never sort of had it catch up

18 to our current operation.  That -- that's something

19 still in the works.  I'm hoping we roll out later this

20 year.

21     **Q    So, you -- they were denied membership because**

22 **nobody's getting membership?  That's your testimony.**

23     A    I -- I had have to go back specifically on

24 them.  We -- we -- you know, this -- we've denied

25 membership of various providers for various reasons.

Joshua Bercu                    August 09, 2023

1  Sometimes it's them showing up in tracebacks as point of

2  entry, as originator, all things like that too

3  frequently.  But as a general matter, yes, we have not

4  been actively trying to grow membership as we've been

5  working to change how we do membership.

6      **Q    Do you view it as a bad thing that a company**

7  **with a lot of tracebacks wants to be a member of the**

8  **ITG?**

9      A    What do you mean by that?

10     **Q    Well, I mean you said tracebacks are a reason**

11 **you would deny membership.  It just personally to me,**

12 **seems like the companies that are getting tracebacks are**

13 **the ones who would want to join the ITG to figure out**

14 **how to stop it and what to do to make it right.  So --**

15         MR. SOMMER:  Object to the form.

16         THE WITNESS:  I -- I think there's a variety

17     of players in our space that you can look at

18     various enforcement actions to see -- you know -- a

19     lot of providers that popped up as new shell

20     companies, etcetera.  Once enforcement started,

21     every single provider in the ecosystem, even ones

22     that had shell companies, wanted to become a member

23     of the ITG because they wanted it as -- I -- I

24     presume -- as a layer of defense for if they get

25     enforcement.  So, look, I -- I think for us, it's -

Joshua Bercu                  August 09, 2023

1          - it's -- membership's a challenging thing.  I
2          don't think it means that much one way or the
3          other.  Right now, we require contributions to fund
4          the effort.  So, that's part of membership is -- is
5          that, but we don't do any sort of discriminatory
6          views towards that.  And again, you can look at the
7          FCC's designation, but year after year they've
8          found our effort to be neutral.
9    BY MR. GELLIS:
10         **Q     Are you aware of any enforcement actions that**
11   **are currently being taken against ITG members?**
12         A    I -- I am aware of prior actions that were
13   public that were taken against ITG members, yes.
14         **Q     Prior -- What does that mean?**
15         A    So, like the -- the FTC, for example, had a
16   cease and desist against an ITG member that they
17   announced.  They -- they announced about, I believe two
18   years after they sent the cease and desist.  The FCC had
19   a cease and desist against an ITG member as well.  The
20   FTC does have a case against a former ITG member and I
21   believe North Carolina had an -- an action against an
22   ITG member.
23         **Q     But none are active right now to your**
24   **knowledge?**
25         A    No.  One of the things -- we did update our

Joshua Bercu                 August 09, 2023

1  policies and procedures is that during the pendency of

2  any enforcement action, we suspend the member from all -

3  - all business.  So, that was part -- again, we --we're

4  -- we keep evolving as this -- as this whole -- you know

5  -- as -- as everything evolves here.  And that was

6  something -- you know -- we realized made a lot of sense

7  for -- for everyone's optics so that -- and honestly,

8  one of the reasons we implemented that was because it's

9  a challenging issue.  If one of the ITG members gets an

10 enforcement action, what -- what does the ITG do?  Do we

11 kick them out or not?  And we decided the automatic

12 suspension was the fairest way where when the member is

13 then suspended, they can honestly say to the enforcer,

14 yes, that -- look at the policies and procedure that's

15 automatic.  It's not the ITG making a judgment call.

16     **Q    If membership has no real benefit, like you**

17 **were alluding to, why would you need to suspend**

18 **somebody?**

19     A    Why would we need to suspend someone?  So --

20 and I -- I didn't say it had no benefit.  I mean, I -- I

21 think there are -- you know, I just think it's -- it's

22 not a critical input into being a responsible entity in

23 the space.  Why would we need to suspend someone?

24 Because I think it's -- it's just frankly an optics

25 challenge and -- and it's cleaner for all parties I

Joshua Bercu                August 09, 2023

1  think if they're not part of ITG business during the

2  pendency of enforcement action against them.

**3       Q    Does the FCC pay the ITG?**

4       A    I wish.

**5       Q    Does -- does ITG pay US Telecom?**

6       A    No.

**7       Q    To your knowledge, have you ever opened a**

**8  traceback on a call that did not complete?**

9       A    What do you -- what do you mean by not

10  complete?

**11      Q    Like non answered?**

12      A    We have traced back ringless voicemail in

13  pass.  We have also traced back T-DOS attacks, which is

14  a telephone denial of service attack where -- so, in

15  that case, some of the calls completed and not all of

16  them may have because -- you know -- some of this --

17  what the term main provider -- some of the crafty ones

18  know way to divert the attack traffic so that they can

19  continue operation.  So, those would be the scenarios.

**20      Q    And just to confirm, the ITG doesn't have an**

**21  opinion one way or the other on whether SmartBiz or any**

**22  Telecom company broke the law?**

23      A    So, where we -- we have opinions where it's

24  black and white, right?  So, not responding to

25  tracebacks when you're a US entity, we -- not assigning

Joshua Bercu                    August 09, 2023

1 calls that are supposed to be signed under FCC rules.

2 We do have alerts related to that where it's a clear,

3 here's the rule.  Someone's out.  Our feeling is as

4 things have evolved, that for those who cooperate with -

5 - with traceback, but nonetheless should be held

6 accountable is inherently a prosecutorial discretionary

7 thing and it's not our role to decide who deserves that

8 when they're cooperating with our trace back request.

9      **Q     What do you do when you get these notices**

10 **about those violations you just referenced?  Do you**

11 **refer those to the FCC?**

12      A    So, that -- so, we -- for non-responsive

13 providers under the Trace Act, we have to report every

14 year, every provider that did not cooperate with

15 traceback requests.  We have more recently also made

16 that information available in our portal to the provider

17 community because one of the things we've heard a lot

18 from the provider community is what information tools

19 can you feed back to us so we know not -- you know -- if

20 we want to be on the right side of this issue, we know

21 who not to work with, etcetera.  So, we have done that.

22 We also implemented about a year ago an alert to -- an

23 automatic alerts to the downstream provider if their

24 upstream is nonresponsive.

25      **Q     Was David Frankel paid to create the portal or**

Joshua Bercu                    August 09, 2023

1  did he sell the portal to you?

2      A    No, he -- he created his own portal.  We did

3  compensate him for his time on working with us, but --

4  but yeah, then we built our own portal ourselves.

5      Q    Oh, okay.  So, you're not using his portal

6  anymore?

7      A    No, we have -- we have our own proprietary

8  portal that we -- we built with a development partner --

9  software development team.

10     Q    In your interactions with SmartBiz, do you

11 have any reason to believe any information they provided

12 you was untruthful?

13     A    I wouldn't have reason to -- to believe that,

14 no, not that I'm aware of.

15     Q    Do -- does US Telecom also reject potential

16 members?

17     A    The -- the trade association -- Not ITG?

18     Q    Yeah.

19     A    Yes.

20     Q    Do you know if SmartBiz or Whisl was rejected

21 from US Telecom?

22     A    I do not know.  As a general matter, there's

23 long -- long standing bylaws about who can be a full

24 member of US Telecom and believe it or not, because

25 we're -- we're cutting edge into broadband these days,

Joshua Bercu                 August 09, 2023

1  but US Telecom's one of the oldest trade associations in

2  the country.  And so, only facilities based telecom

3  providers can be full members.  Although we've added

4  sort of other -- I'm forgetting the exact term, but we

5  have others sort of non-carrier members as well, but

6  they're -- they're not the full members.

7       **Q    Do you know any people or persons who might**

8  **have common ownership in Youmail and ZipDX?**

9       A    To clarify that -- that there's common

10 ownership between the two company or other people that

11 have common ownership in one of those?

12      **Q    They're like a person who may -- yeah, not --**

13 **not between the two companies.  Do you of any person who**

14 **may have -- do you know of any person who may have**

15 **ownership of both?**

16      A    No.

17      **Q    Do you see ZipDX as a competitor to the ITG?**

18      A    No, except that a year ago -- not this year --

19 a year ago, ZipDX did apply to be the registered

20 traceback consortium.  So, in that regard, they competed

21 for that official designation role, but they aren't this

22 year.

23      **Q    And you still were under contract with them**

24 **that whole time period and paying them for recordings?**

25      A    No, and by the way, we don't pay ZipDX for

Joshua Bercu                    August 09, 2023

1  recordings.

2      Q    Oh, okay.

3      A    No, we weren't -- after -- after the

4  designation process is where -- when we -- we decided we

5  had a partnership that we -- where we had mutually

6  beneficial things because one of the thing -- one of the

7  things we rely on ZipDX for is their system does answer

8  the calls live.  And so, we've been able to sort of

9  expand the campaigns we are tracing with data from ZipDX

10  and their Raptor surveillance system, including some

11  live fraud calls that they're able to capture.

12      Q    Okay.  I'm going to go ahead and share my

13  screen.  This should be my Exhibit 6.  This is a

14  document that was produced in discovery by the Attorney

15  General's Office.

16      A    Mm-hmm.

17      Q    Patrick, I'm sure you see this.  This is the -

18  - this is what was produced to us.  It's a purported

19  list with the total aggregate count of tracebacks.

20  SmartBiz is shown.  Obviously, no other ones are.  Have

21  you seen this document?

22      A    No.

23      Q    Okay.  So, you don't compile anything like

24  this?

25      A    I mean, I -- no.  I -- I have access to --

Joshua Bercu                    August 09, 2023

 1 | directly to data, so -- you know -- I could, but we
 2 | don't compile it and send anything like that to anyone.
 3 | **Q     Do you view total trace backs as any kind of**
 4 | **metric that you measure anything against?**
 5 | A     No, not -- not just the raw number itself, I -
 6 | - I wouldn't.
 7 | **Q     So, the ITG does not ascribe any value to the**
 8 | **total number of tracebacks?**
 9 | MR. SOMMER:  Object to the form.
10 | THE WITNESS:  That -- that number alone, I --
11 | We have no formal mechanism ascribing value to
12 | that.
13 | BY MR. GELLIS:
14 | **Q     Okay.  Do you believe that like -- All right.**
15 | **When a company gets a traceback and they're in this call**
16 | **path, the fact that they had a traceback doesn't**
17 | **necessarily mean they did anything wrong, right?**
18 | A     That they're in the call path for a traceback?
19 | It doesn't -- in -- in my personal view, it doesn't
20 | inherently mean anything wrong.  It can mean that -- you
21 | know -- they have failures of robocall mitigation, know
22 | your customer things.  It depends on the context.
23 | **Q     Well, we talked about the six HOPS earlier.**
24 | **Some were 10.  I mean, let's use 10 as an example.  If**
25 | **there were 10 HOPS in the call chain and you're**

Joshua Bercu                August 09, 2023

1  **somewhere in the middle, I mean that means you're four**

2  **or five layers contractually removed from the**

3  **originating provider, right?**

4       A    It does.  However, one of the things we have

5  seen over time is the number of HOPS has increased.

6  Some of that is that we complete more tracebacks where

7  we used to -- you know -- die in the mill.  But a big

8  part of it is more shell companies, more affiliations,

9  more different entities being put into this stream.  So,

10 again, I think it depends on the context.

11      **Q    Okay.  But there is a difference between the**

12 **originating provider who picks up the phone and makes a**

13 **fraudulent call and perhaps an intermediate provider**

14 **somewhere in America, six HOPS down the chain who just**

15 **pushed it along, yes?**

16      A    Yes.  In my view, most important is what steps

17 each provider is doing to make sure they work with

18 trusted partners.  That's my own personal view.

19      **Q    If I were to tell you there was testimony that**

20 **following that December 2020 escalation letter, that**

21 **SmartBiz undertook an affirmative effort to only**

22 **contract with other intermediate providers who held 4-**

23 **99's, would that be the kind of effort you're talking**

24 **about?**

25      A    Yeah, I think that's part of it.  I -- The

Joshua Bercu                    August 09, 2023

1  form 4-99 is -- you know -- not -- not -- not that hard

2  to get a form 4-99, you know?  So -- But yeah, it -- I

3  think -- you know -- all -- all prove -- I think we have

4  a belief at the ITG that all providers have

5  responsibility to work with trusted partners and make

6  sure they vet their partners and then take action when

7  tracebacks or other information suggest that they

8  shouldn't be trusting their partners.

9       Q    Well, that -- that big drop off in the point

10 of entry trace backs we saw following December 2020,

11 that would be consistent with somebody who changed their

12 model to only do business with American companies,

13 right?

14      A    Seems so.

15      Q    Okay.  And considering the trace -- the ITG's

16 attention seemed to be on foreign providers and foreign

17 traffic, would you consider American partners more

18 trusted perhaps than foreign partners?

19      A    We have -- I do think we see a lot of

20 providers that claim they're in the US and probably have

21 no US presence.  They -- they register in Delaware or

22 Wyoming precisely because a lot of providers in response

23 to traceback and in response to how the enforcement

24 environment has changed, have taken that step where they

25 say, if you're not in the US, we don't want you.  So,

Joshua Bercu                    August 09, 2023

1  what happens is there's more entities put in the -- in

2  the middle that are from a legal perspective in the US

3  but they're -- they don't -- they -- they have no

4  presence in the US, right?  So -- so, I -- I -- I don't

5  know if that answers it, but that is -- that is

6  something we -- we've seen too.

7      Q    I think it -- it almost sounds like you're

8  saying they may have a 4-99, but then they would still

9  be routing international traffic into the US?

10     A    Yeah, they -- they would basically be there to

11 enable some of the international traffic to still get in

12 the US.  I -- I think that's one way to put it.  The

13 form -- form 4-99 and a -- you know -- a domestic LLC

14 registration.

15     Q    And the ITG would encourage -- well, scratch

16 that.  You guys don't encourage.  Cutting down on the

17 number of trace backs you receive is a good thing,

18 right?

19     A    I -- I think it's better than the alternative

20 for sure.

21     Q    I'm going to take one final five-minute break

22 and I think after that, I'll be wrapping up and Patrick

23 can take over.  Okay?  So, we'll come back in -- we'll

24 make it seven minutes -- 1:30.

25          MR. CROTTY:  Sounds good.

Joshua Bercu                    August 09, 2023

```
 1              MR. GELLIS:  Thanks.

 2              THE COURT REPORTER:  Okay.  The time is 1:23

 3      PM.  We're off the record.

 4      (Thereupon, a break was held at 1:23 p.m.; after

 5  which the following was heard at 1:32 p.m.)

 6              THE COURT REPORTER:  Back on the record.

 7              MR. GELLIS:  Yeah, I'm --

 8              THE COURT REPORTER:  Okay.  The time is 1:32

 9      PM.  We're back on the record.

10              MR. GELLIS:  Thanks.

11  BY MR. GELLIS:

12      Q    You had referenced a list of companies that

13  you -- or a document that you sent to the FCC every

14  year.  Is that public?

15      A    Yes.  So, the -- the -- the FCC publishes it.

16  We don't publish it, but the FCC does publish a Trace

17  Act report every year, including a couple Excel files

18  that are based -- that came from us.

19      Q    And just to wrap up and confirm your prior

20  testimony, being a member of the ITG does not get you

21  access to any information or data that non-members don't

22  get?

23      A    No, I mean some -- in -- in a ITG call it

24  might share, hey, we're seeing this -- this thing going

25  on, or something like that.  But yeah, it wouldn't be
```

Joshua Bercu                    August 09, 2023

 1  any data -- it wouldn't be anything like that.

 2      Mostly it's, hey, we're building X, Y, Z for the

 3  future.  So, these are some capabilities we want your

 4  feedback on -- that we're going to roll out on, much

 5  more about that.

 6      **Q    Okay.  And just to confirm, a call to a number**

 7  **on the DNC is not necessarily an illegal call, right?**

 8      A    An unsolicited telemarketing call to the DNC

 9  is illegal, but a call -- you know -- I'm on the DNC and

10  you can call me legally.

11          MR. GELLIS:  All right.  That's all I have.

12      Thank you.

13          MR. CROTTY:  Okay.  I have a couple of

14      questions on cross-exam.

15                   REDIRECT EXAMINATION

16  BY MR. CROTTY:

17      **Q    Josh, you mentioned that prior to becoming the**

18  **FCC appointed neutral consortium, the US Telecom was**

19  **involved in doing tracebacks.  Is that correct?**

20      A    Yes.

21      **Q    Do you know approximately when they first**

22  **started doing tracebacks?**

23      A    I believe it was 2016 or 2017.  I think 2017.

24      **Q    Okay.  Do you know whether SmartBiz received a**

25  **traceback on April 7th, 2020.  And was that prior to --**

Joshua Bercu          August 09, 2023

```
 1  or was that part of the informal tracebacks?
 2      A    I'd have to double check that -- that chart
 3  again, but -- and -- and both when the regulatory
 4  obligation came in.
 5      Q    Okay.  Is it possible?
 6      A    Yes, I -- I -- I -- I believe they did, but
 7  yes, it's definitely possible.
 8      Q    Okay.  You mentioned that Marriott paid for
 9  some tracebacks pursuant to an investigation that they
10  were conducting.  Is that an accurate statement?
11      A    Yeah, we -- we had a partnership with them and
12  there was compensation, so it was sort of more
13  standardized throughout, but yeah.  Sort of a monthly
14  payment, yes.
15      Q    Do you recall the timeframe that that was
16  occurring?
17      A    Not -- I believe in 2021, but I -- I am not
18  positive.
19      Q    Okay.
20      A    I'd have to go back.
21      Q    Did that partnership impact the way the
22  tracebacks were carried out -- the mechanics of it at
23  all?
24      A    No.  All it did was -- you know, we -- we used
25  those partnerships to add to what we're doing so it
```

Joshua Bercu                    August 09, 2023

1  doesn't subtract and it allows us to -- you know --

2  bring in more resources and add.  So, it was additive to

3  our effort.  But it -- generally, the -- the way the

4  trace back mechanism works is the same thing.  It just -

5  - you know, we would report consistent with our policies

6  and procedures, a subset of information to them for

7  those referrals.

8      **Q    Okay.  Does the number of backs performed**

9  **every month fluctuate over time?**

10     A    A little bit, but we try to be pretty

11 consistent, but it -- you know -- fluctuates, including

12 based on -- you know, December tends to be a little

13 slower with our team's vacation schedules for instance.

14     **Q    You mentioned that you switched the online**

15 **portal for responding to trace backs to go from one that**

16 **David Frankel had created to one that you created with a**

17 **partner.  Is that correct?**

18     A    Yeah.

19     **Q    Did that transition result in a reduction in**

20 **the number of tracebacks over a period?**

21     A    Yeah, there -- there was in the transition

22 period where we just onboarded -- I believe there was

23 some reduction as we went down for a little bit in the

24 transition, but then back to business as usual.

25     **Q    Okay.  Do you remember when that transition**

Joshua Bercu                    August 09, 2023

```
 1  period was?
 2       A    I believe -- well, excuse me, I -- I misspoke.
 3  So, let me -- let me go back.  I don't believe there was
 4  -- I think that transition was smooth.  We did change a
 5  development partner at one point and switched our
 6  software developer where we did have about a month where
 7  we had -- had to go -- I -- I think two or three weeks
 8  where we went down before we came back up.  That was
 9  later.  That happened I believe, in 2021 or 2022.  The
10  transition from David's portal to the new portal, I
11  don't -- I don't think there was much of a reduction,
12  but I'd have to double check.
13       Q    Okay.  So, it's a fair statement to say that
14  for approximately a month in 2021 or in 2022, the number
15  of tracebacks that ITG was performing was markedly less?
16       A    Yes.
17       Q    And that is the only disruption in the
18  tracebacks -- number of tracebacks that you're aware of?
19       A    Yeah, that -- that's the only significant
20  disruption.
21       Q    Okay.  Does ITG investigate the
22  representations that people responding to tracebacks
23  make to it?
24       A    So, we have no surefire way to validate
25  responses.  Traceback is dependent on user and -- and
```

Joshua Bercu                    August 09, 2023

1  users here being voice service provider responses to us.

2  There's some sort of self-validation, right, where if

3  you -- if you're intermediate and you name your upstream

4  provider and they come back and say, that call's not on

5  my network, there's sort of an automatic validation of

6  that.  But -- but if we see something that just clearly

7  is off and doesn't look accurate, we might investigate

8  it.  But as a general matter, there's no sort of way we

9  can actively validate all the information.

10      Q    So, the ITG did not actively validate the

11  representations that SmartBiz made to it?

12      A    In terms of action taken after?  No.  No, we

13  wouldn't have a mechanism to validate that other than --

14  you know -- if -- so, the other thing we have done in

15  times is the opposite where -- you know -- someone said

16  they fired that provider or that customer and we might

17  see that then keep popping up.  So, that was the case.

18  But yeah, we wouldn't have a way to validate that

19  information -- what SmartBiz said to us.

20      Q    Okay.  So, you have no reason one way or

21  another to believe that SmartBiz was telling you the

22  truth or was lying to you about customers that they may

23  have represented that they turned off or actions that

24  they took in response to traceback?

25      A    The -- the only information we have is -- is

Joshua Bercu                    August 09, 2023

 1  the traceback themselves and what we saw in traceback.

 2  But yeah, no other information to validate one way or

 3  the other.

 4  **Q    I believe your testimony was that there are a**

 5  **number of providers that only receive one traceback and**

 6  **then you never see them again.  Is that the case?**

 7  A    Yeah.  There's -- there's -- we -- we've seen

 8  scenarios where one or -- you know -- has a hot month

 9  and sometimes it's they brought on a new customer or

10  start a new business and then they decide -- they saw

11  what happened and -- and quickly -- they represented to

12  us, hey, we're no longer sending traffic to the US, or

13  something like that and we don't see them again.

14  **Q    Other than terminating providers and larger**

15  **transit providers, is it common for a company to receive**

16  **at least one traceback every month over a three-year**

17  **period?**

18  A    I'd have -- I'd have to go to that -- go back

19  to that, but I -- I think there's a handful of providers

20  that that might be the case for, but I -- I don't think

21  it's -- you know -- that frequent.

22  **Q    So, is it fair to say that the vast majority**

23  **of providers who have received at least one traceback do**

24  **not receive them month after month for extended periods**

25  **of time?**

Joshua Bercu                August 09, 2023

1     A    I -- I believe so, but I'd have to confirm

2  actually digging in a little deeper, but I -- I -- it

3  feels consistent with -- with what we've seen.

4     **Q    Okay.  You mentioned, I believe, that the**

5  **point of entry designation is based off of information**

6  **that's provided in the robocall mitigation database.  Is**

7  **that correct?**

8     A    Yes.  Since -- once that was stood up and

9  operational, that became our source of truth for if

10  someone's in the US or not.

11    **Q    Do you recall around when that robocall**

12  **mitigation database was stood up?**

13    A    I want to say April 2020, but I -- I'd have to

14  double check.  I -- I -- it might have been -- it might

15  have been later than that, so I'd have to double check.

16    **Q    But it's fair to say that as soon as the**

17  **robocall mitigation database was stood up, you relied on**

18  **it to determine whether a company was in -- was a**

19  **domestic provider?**

20    A    Yeah, first manually, but we -- we did have to

21  do some time to build an automation to pull directly

22  from the database.  But yes, we -- we would.  If there

23  was any question, we would go to the database and look

24  at what the database had.

25    **Q    Okay.  Is the information in the robocall**

Joshua Bercu                    August 09, 2023

1  mitigation database self-reported by providers?

2        A    Yes.

3        Q    Does the ITG confirm the accuracy of that

4  information in any way?

5        A    No.

6        Q    So, is it fair to say that being labeled as a

7  point of entry provider means that you accepted a call

8  from someone who had self-reported as a domestic voice

9  service provider?

10       A    Yeah.  Will -- will you say it again?  I want

11  to make sure I -- I understand the question exactly.

12       Q    When a voice service provider is designated as

13  a point of entry in a traceback, is it fair to say that

14  the significance of that is that they accepted a call

15  from someone who had self-reported as a domestic

16  provider in the robocall mitigation database?

17       A    So, if -- if they're identified as the point

18  of entry, then it means they accepted a call from a

19  provider that is either in the robocall mitigation

20  database as foreign or one that we have as foreign in

21  our system and isn't in the robocall mitigation database

22  at all.

23       And we -- we have had that scenario come up where

24  we've gotten folks disputes and say, hey, we weren't the

25  point of entry.  They're a US entity.  And we say, well,

Joshua Bercu                    August 09, 2023

1  they're not in the robocall mitigation database, so

2  either they're out of compliance with the FCC's rules or

3  their foreign.  So, we've had that.

4      Q    And is it possible that somebody who is in

5  fact based outside of the United States reports

6  themselves as a domestic provider in the robocall

7  mitigation database?

8      A    Unfortunately, I think it's quite prolific.

9      Q    Okay.  So, you don't see any reason to

10  inherently trust the representation that a company is a

11  domestic provider made in the robocall mitigation

12  database?

13      A    So, personally, if I were doing compliance

14  advice for someone this -- I think it'd be one factor

15  among many, many others that I would recommend looking

16  at.

17      Q    Okay.  So, it's possible for a voice service

18  provider to not be labeled as the point of entry in a

19  traceback, but have in fact been the first domestic --

20  like factually domestic provider to accept the call on

21  the call path?

22      A    Yes.

23      Q    Just to confirm, being a member of the

24  Industry Traceback Group does not get you any

25  information that would assist in circumventing the

Joshua Bercu                    August 09, 2023

1    traceback process, is that correct?

2        A    No.  To your, is that correct?  Yes, that's

3    correct.  No, to the first part of the question, just --

4    just to be explicit there.

5        Q    Sorry.  Sometimes go on a deposition mode --

6        A    Yeah.

7        Q    -- verbal ticks make things a little

8    inconsistent and unclear.  It's my own bad habits.

9    During the time that David Frankel was an Industry

10   Traceback Group contractor, are you aware of him making

11   inaccurate statements or inaccurate representations?

12       A    Not -- not on facts.  You know, I -- I --

13   Sometimes I think his interpretation of law didn't

14   always agree with mine, and I sometimes had to go

15   clarify that because he -- he is not a lawyer and also -

16   - you know, he has strong opinions.

17       Q    If, for example, he were to suggest a way that

18   someone could reduce the presence of illegal traffic on

19   their network, do you think that it's likely that those

20   suggestions would be unfounded or would be inaccurate?

21       A    No, I -- I think he's quite knowledgeable in

22   that regard and -- and his ideas would probably have

23   merit there.

24       Q    Are you aware of any motivation that guided

25   David Frankel's actions while he was an ITG contractor,

Joshua Bercu                August 09, 2023

1  other than the desire to reduce the number of illegal

2  robocalls entering the United States phone networks?

3          MR. GELLIS:  Object to form.

4          THE WITNESS:  I think he is driven by how much

5      he hates robocalls and that -- and I think he's

6      also sort of intellectually interested in how to

7      stop them.  I think those are the two things that

8      drive him.

9  BY MR. CROTTY:

10      Q    Do you think that David Frankel was motivated

11  by a desire to increase the profits of ZipDX through his

12  actions with the ITG?

13      A    No, we -- I mean, he didn't receive much

14  compensation from us, and as far as I know, he -- he's

15  done well enough with his company and he is not that --

16  he -- he volunteers a lot of his time to this effort

17  because of his passion for it.

18      Q    You referenced public procedures that guide

19  the ITG's actions.  Am I correct in that?

20      A    Yes.

21          MR. CROTTY:  I would like to mark Exhibit 21.

22      Well, first before I mark it as Exhibit 21, let me

23      share my screen and show you a document that I

24      downloaded from Industry Traceback Group's website

25      marked, Policies and Procedures revised April 2022.

Joshua Bercu                   August 09, 2023

```
 1      (Thereupon Plaintiff's Exhibit 21 was marked for

 2 identification.)

 3 BY MR. CROTTY:

 4      Q    Do you know, is that the most recent set of

 5 policies and procedures?

 6      A    I believe --

 7      Q    Let me share my screen to show you.

 8      A    -- And that -- that was the one you just

 9 downloaded at tracebacks.org, right?

10      Q    Stupid chrome extensions.  Tracebacks.org, ITG

11 policies, procedures.  Can you see my screen with the

12 website?

13      A    No, I can see just the PDF.

14      Q    Let me show you the website.

15      A    I believe that is, but just --

16      Q    Okay.

17      A    Yes.

18      Q    Are you able to see the website?

19      A    Yes, that's -- that's the most recent.

20      Q    This is what you were referring to?

21      A    Yes.

22      Q    Okay.  Let me stop my share.  Let me share the

23 actual document.  Let me introduce it as Exhibit 21.

24 Okay.  Does this document, that I will label as Exhibit

25 21 and include with the other Exhibits for this
```

Joshua Bercu                    August 09, 2023

1  **deposition, reflect the ITG's policies and procedures**

2  **that you were referring to earlier in your testimony?**

3      A    Yes.

4      **Q    Okay.  Do you think that this document speaks**

5  **for itself or is there anything that you'd like to**

6  **direct our attention to as in interpreting the policies**

7  **and procedures as written?**

8      A    Not -- not that comes to mind.  I think it

9  speaks for itself and we take very seriously that we --

10 you know -- act in concert what we're permitted to do

11 under our -- our public policies and procedures.

12     **Q    So, is there any part of this document that's**

13 **inaccurate?**

14     A    Nothing inaccurate.  There's some sort of more

15 -- you know -- permissive -- we may do this, which might

16 be things we don't actually do, but -- but there's

17 nothing -- you know -- any of the shell language,

18 there's nothing there that we don't follow to the best

19 of my knowledge.

20     **Q    Okay.  Did you generate -- did the ITG**

21 **generate these policies and procedures as a part of its**

22 **regularly conducted activity in being the Industry**

23 **Traceback Group appointed by the FCC?**

24     A    So, they -- they predated -- I believe they --

25 they predated them so we had public policies and

Joshua Bercu                    August 09, 2023

1  procedures that were available to everyone and we

2  operate transparently.

3      But yes, as part of the -- the traceback requires

4  that the registered traceback consortium have published

5  policies and procedures that are submitted as part of

6  the -- a letter of intent to be the registered traceback

7  consortium.  So yes, it's -- it's incorporated into that

8  process.

9      Q    Okay.  The link that I downloaded it from, was

10  that made active at or around the time that these

11  policies and procedures were written?

12      A    Yes.  We -- when we updated the April version,

13  yes, it should of -- it was made active around then.

14  The one thing is we shifted it to a landing page so that

15  we did pull off old versions so that people always had

16  access to our new -- newest version.  So, we -- we did

17  change the link -- how the link worked a little bit when

18  we made this update.

19      Q    Okay.  Is there anything about the way that I

20  downloaded it or the way that this document was stored

21  that would indicate a lack of trustworthiness?

22      A    Not -- not to my knowledge.

23      Q    Okay.  Previously -- So, previously in my

24  testimony, I -- or in my questioning, I had asked you

25  about three tracebacks that didn't seem to appear in the

Joshua Bercu                 August 09, 2023

1  list in Plaintiff's Exhibit 9.  Do you recall that?

2      A    Yes.

3      Q    Is there any reason why those three traceback

4  notices would not have been sent to SmartBiz?

5      A    So -- and -- and just to make -- why they

6  weren't sent?  So, they -- what you showed me before was

7  data submitted to you and produced to you, right?  But

8  you're asking if --

9      Q    Are you -- yeah.

10     A    -- Yeah.  I -- if -- if there's no reason a

11  traceback that went to SmartBiz -- so, again, I'm not

12  sure why it didn't get to that production and would have

13  to investigate that, but if SmartBiz was identified, I

14  have no reason to believe it didn't get to SmartBiz.

15  And then, certainly if they -- you know -- responded to

16  it, then we would know that they did receive it and

17  responded to it.

18     Q    Okay.  Is there any objection if I mark these

19  as Exhibits 22, 23 and 24?  Hearing none?

20         MR. GELLIS:  None.

21         MR. CROTTY:  I'll go ahead and label these as

22     Exhibits 22, 23 and 24.

23  BY MR. CROTTY:

24     Q    And just ask you one more time, is there any

25  reason why Exhibits 22, 23 and 24 would not have been

Joshua Bercu                    August 09, 2023

```
 1  sent to SmartBiz same as any other traceback notice
 2  generated by the ITG?
 3       A    No.
 4       Q    Okay.  Give me about 20 seconds to look over
 5  my notes and see if there's anything else I want to ask
 6  about and then I think we'll be done.  Okay.  One last
 7  question.  Does -- Is receiving a traceback notice
 8  suggestive that the upstream provider may not be worthy
 9  of being trusted in your opinion?
10       A    I -- I think it's a worthy reflection after
11  receiving a traceback notice in most cases --
12       Q    Okay.
13       A     -- or many cases.
14       Q    I have no further questions on cross-examine
15  at this time.
16            MR. GELLIS:  Very briefly.
17                      RECROSS EXAMINATION
18  BY MR. GELLIS:
19       Q    We saw the policies and procedures just now.
20  Mr. Bercu, I'm assuming there were prior publicly
21  available procedures as well posted on the internet?
22       A    Yes.  The -- the prior versions, yes, would've
23  been posted previously as well.
24       Q    Would you be willing to either link us -- link
25  me to them or have your counsel just provide me copies
```

Joshua Bercu                August 09, 2023

1  from say, 2020 to present of whatever was publicly
2  available?
3       A     Yeah, we -- we could pull the prior versions
4  that were publicly available and -- and get that to you.
5            MR. GELLIS:  I appreciate that.  Thank you.
6       Let me look over my notes and I -- I'm pretty sure
7       that'll -- one sec.  Let me just make sure.  No
8       further questions.
9            MR. CROTTY:  Okay.  Then, I think we can
10      conclude this deposition.  Is that correct?
11           MR. SOMMER:  I just -- I think I just need to
12      go on the record and officially request the Rule 50
13      to review the transcript and provide --
14           MR. CROTTY:  Read or waive, of course.
15           MR. SOMMER:  -- corrections.  And I think I
16      have to put it on the record.  So, I do.  And I
17      have no questions for the witness.
18           THE COURT REPORTER:  Okay.
19           MR. CROTTY:  Would you like to explain read or
20      waive to your client and get that on the record?
21           MR. SOMMER:  We'll just -- I'll talk to him
22      afterwards, but we'll -- we'll -- we want to be
23      able to read and correct the transcript.
24           THE COURT REPORTER:  Okay.
25           MR. SOMMER:  People use these terms

Joshua Bercu               August 09, 2023

```
1        differently, although we're only going to correct
2        it for transcription errors of course.
3             THE COURT REPORTER:  And --
4             MR. CROTTY:  Sorry, it wasn't clear to me, but
5        yeah.  So, you're requesting to read the
6        transcript?
7             THE COURT REPORTER:  And Mr. Sommer, what
8        email should I send that to if the transcript is
9        ordered?
10            MR. SOMMER:  Yes.  And we will take it a copy
11       of the transcript and I put my email in the chat.
12            THE COURT REPORTER:  Thank you.  Mr. Gellis,
13       did you want to order the transcript?  You're on
14       mute.
15            MR. GELLIS:  Not at this time.  Yeah, we'll --
16       we'll probably -- we may get a quote soon, but not
17       at this moment.  And I will email you the six
18       Exhibits from today's deposition.  I'll copy Mr.
19       Crotty on there so he can see him as well.
20            THE COURT REPORTER:  Okay.  And Mr. Crotty,
21       did you want to order the transcript at this time?
22            MR. CROTTY:  Florida Attorney General will
23       order, yes.
24            THE COURT REPORTER:  You said you would like
25       to order?
```

Joshua Bercu                August 09, 2023

```
1              MR. CROTTY:  We will order.

2              THE COURT REPORTER:  Standard delivery?

3              MR. CROTTY:  Standard delivery is fine.

4              THE COURT REPORTER:  Okay.  And Mr. Sommer --

5              MR. SOMMER:  Standard is good for us too.

6              THE COURT REPORTER:  -- a copy --

7              MR. SOMMER:  Standard for us.  Yeah.

8              THE COURT REPORTER:  -- Okay.  And Mr. Gellis,

9       would you like a copy?

10          MR. GELLIS:  I think we're -- like I said,

11      we're going to -- we're going to wait on that.  I

12      may get a -- We may order subsequently from you.

13          THE COURT REPORTER:  Okay.

14          MR. GELLIS:  We have some other transcripts

15      we're going to have to buy eventually anyway from

16      Laws.  So --

17          THE COURT REPORTER:  Okay.  All right.  And

18      the time is 2:00 PM.  We're now off the record.

19      Let me see.  Okay.  I'm going to put in a different

20      email to send the Exhibits to.  Okay.

21          MR. GELLIS:  The way this is being -- Please

22      sign off right now.  Josh, you can -- you can go if

23      you want.  You're done.

24      (Thereupon, the proceedings were concluded at 2:00

25      p.m.)
```

Joshua Bercu                    August 09, 2023

```
 1                    CERTIFICATE OF OATH

 2

 3   THE STATE OF FLORIDA

 4   COUNTY OF MIAMI-DADE:

 5

 6       I, the undersigned authority, hereby certify that

 7   Joshua Bercu appeared before me via Zoom on August 9,

 8   2023; and was duly sworn.

 9       WITNESS my hand and official seal on this August

10   16, 2023.

11                        Miriam Brighton-Meneely

12                        _____

13                        Miriam Brighton-Meneely,

14                        Notary Public-State of Florida

15                        My commission # HH 387107

16                        Expires August 14, 2027

17

18

19

20

21

22

23

24

25
```

Joshua Bercu          August 09, 2023

```
 1              REPORTER'S CERTIFICATE

 2

 3  THE STATE OF FLORIDA

 4  COUNTY OF MIAMI-DADE:

 5

 6      I, Miriam Brighton-Meneely, Court Reporter and

 7  Notary Public, certify that this transcript is a true

 8  and complete record of my notes.

 9

10      I further certify that I am not a relative,

11  employee, attorney, or counsel of any of the parties,

12  nor am I a relative or employee of any of the parties'

13  attorney or counsel with the action, nor am I

14  financially in the action.

15

16      DATED on this 9th day of August 2023.

17
                    Miriam Brighton-Meneely
18                  _____

19                  Miriam Brighton-Meneely,

20                  Notary Public-State of Florida

21                  My commission # HH 387107

22                  Expires August 14, 2027

23

24

25
```

Joshua Bercu                    August 09, 2023

Joshua Bercu                 August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                August 09, 2023

Exh bit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

Joshua Bercu                  August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                 August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu              August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Exhibit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Exh bit C - Josh Bercu Deposition

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                   August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                    August 09, 2023

Joshua Bercu                 August 09, 2023

Joshua Bercu                    August 09, 2023