UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

### Case Number: 22-23945-CIV-MARTINEZ-BECERRA

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

     Plaintiff,

v.

SMARTBIZ TELECOM LLC,

     Defendant.

_____/

### DEFENDANT SMARTBIZ TELECOM LLC'S
### DAUBERT MOTION TO EXCLUDE TESTIMONY AND REPORT OF
### MIKE RUDOLPH

Defendant **Smartbiz Telecom LLC ("SBT")**, through counsel, hereby files its Daubert Motion to Exclude Testimony and Report of Mike Rudolph, in compliance with the Court's Order [ECF. No 13] and the Order extending the deadline to file [ECF No. 43], and seeks to exclude the expert testimony and report of Mike Rudolph because his opinions cannot be tested and will confuse the trier of fact:

### Background

### The OAG Hires Mr. Rudolph

1. The Plaintiff Office of the Attorney General, State of Florida, Department of Legal Affairs ("OAG") has retained the services of Mike Rudolph, the Chief Technology Officer at YouMail.

2. A copy of Mr. Rudolph's expert affidavit and amended report are attached hereto as Exhibits A and B.

3. Mr. Rudolph did not produce a resume.

4. Mr. Rudolph's deposition was taken in this matter and the transcript is attached as Exhibit C.

5. The Summary Report includes 63 findings/conclusions, broken down into the following Sections

    a. Analysis of "Snowshoeing" Calling Tactics

    b. Analysis of Phone Number Spoofing

    c.   Analysis of Recipient Geographic Location

    d.   Analysis of Telemarketing Hours and Do-Not-Call Registry (DNC) Data

    e.   Analysis of YouMail Consumer Voice Call Evidence

    f.   Analysis of Recorded & Transcribed Calls Matched to CDRs

    g.   Analysis of Call Traceback Data

    h.   Analysis of Florida Consumer Complaint Data

<u>See</u> Exhibit B.

<u>Mr. Rudolph's Qualifications and Report</u>

6. Mr. Rudolph purports to be an expert in "unlawful and unwanted communications in communication networks" <u>See</u> Exhibit C at 11:13-16.

7. He holds a bachelor's degree in computer science and electrical engineering, with a minor in economics. <u>Id.</u> at 11:19-25. Mr. Rudolph holds no advanced degrees or certifications. <u>Id.</u> at 12:20-23. While he took statistics classes for his undergraduate degree, he has no statistical education outside of his degree. <u>Id.</u> at 12:24-13:8.

8. The Patents listed in Mr. Rudolph's affidavit, Exhibit A, "don't divulge the special cause, the KFC Chicken recipe. That's underlying proprietary information that is not contained within the patent itself." <u>Id.</u> at 13:24-14:5.

9. Mr. Rudolph drafted "a good number of sections" of the report, <u>Id.</u> at 58:13-18; tried not to put too much opinion in the report, <u>Id.</u> at 56:10-11; and says that it involves numerous "copy/pastes." <u>Id.</u> at 59:13-19.

10. Mr. Rudolph merely "ran the query, took them from the reporting tool, and I put them into the word document. I didn't write a sentence, like Shakespeare in this case, but I ran the query that produced  the, you know, the table, and I put it into the document." <u>Id.</u> at 60:4-6.

11. All the work was done at Mr. Rudolph's direction, but some of it was done by an assistant named Jasper. <u>Id.</u> 63:17-22.

<u>Mr. Rudolph's Methodology</u>

12. Nobody has ever published a peer review of YouMail's best practices. <u>Id.</u> at 68:11-13. The YouMail technology is "materially confidential" and "proprietary." <u>Id.</u> at 74:7-12. When asked how the scientific community could have tested it if it's proprietary, Mr. Rudolph responded "I don't think that's necessary. So, they couldn't have, but I don't think that's a necessary step." <u>Id.</u> at 74:24 – 75:4.

13. Mr. Rudolph's report states that no specialized expertise is required to conduct behavioral analyses, and that "my son is a fourth grader and can take a CSV file and sum in Excel. So I'm suggesting it doesn't take specialized expertise to do some aggregate behavioral analysis on call records. See Exhibit C at 103:11-104:11.

14. Mr. Rudolph was asked if there was anything scientific about his methodology, to which he responded "Absolutely, sure." Id. at 76:7-9.

15. When asked what was scientific about it, he responded "I mean scientific is you have a hypothesis and you test it. So, I mean as we refine algorithms, right, you know, we'll go through an iterative development process to refine those and make them more accurate." Id. at 76:10-15.

16. SBT's counsel pushed:

Q: So if it's proprietary how can anybody except you apply the scientific method to it?

A: Again, that's correct. Only we would be able to.

Id. at 76:19-22.

17. Mr. Rudolph then attempted to give an example of trying to find a single "Hulk" figurine in a million cereal boxes. Id. at 77:2-16. He noted:

It doesn't matter what I do, if it's proprietary, secret, scientifically reviewed. If I pull out a cereal box and show you there's a hulk figurine inside, I've proven that it doesn't matter what my methodology is. We found a hulk figure, right? So, like you don't necessarily need to have an open box to know that somebody has the capability of finding a Hulk figurine in a million cereal boxes.

Id. at 77:2-16.

18. The following exchange then occurred:

Q:        Ok, We'll take this for a second and run with it. My problem is, you know, the way you sound and talk about it, I think your methodology would be fine if everyone got to stand in the room and watch it.

But, what you're doing, you're saying is you're going through a door behind a closed wall with a million boxes and walking out with a figurine and saying it came from the box. And you're just – and nobody gets to see that, right? So that's what I'm getting at. Your methodology is secret.

> You're saying we have results, so it's okay. But I'm asking how does somebody test that? Can anybody – are people in the room with you when you're opening these boxes? I don't think so, right?
>
> A:       I get what you're saying. I answered, it's a great observation. And I'd say, you know, we're happy to invite, you know, the observation of the process.

Id. at 77:17-78:8.

19. Mr. Rudolph also indicated he was making a determination that something was a robocall based on the duration and seizure (answer) rate:

> Q:       That was a very long answer. I just want to make sure I understand. You're determining these are robocalls just based on the call duration and seizure (answer) rate?
>
> A:       Those are indications that you have a high amount of nonorganic traffic, a/k/a a robocall, yes.

Id. at 146:6-11.

20. The ITG Executive Director on the other hand has advocated against requiring monitoring based on average call duration. [ECF No. 53-12 at 11].

21. The FCC in July 2023 rejected the notion that all short duration calls are illegal, stating "While many illegal calls are of short duration, it does not follow that all calls of short duration are inherently suspect."[1]

22. The FCC is currently soliciting input because the process is evolving. See Exhibit C at 182:10-24.

23. According to Mr. Rudolph, his methodology across the report "for almost all of these the error would be less than one percent." Id. at 69:3-10.

24. He was not provided any information about what security features SBT had enabled on its trunks, instead saying "The opinion I'm rendering isn't what did Smartbiz do is good. My opinion is the results weren't achieved." See Exhibit C at 157:17-158:11.

The Things Mr. Rudolph Did Not Review or Doesn't Know

25. Mr. Rudolph did not see SBT's Chart [ECF No. 53-1 at Exhibit A-10] prior to rendering his opinions but says it would not change anything. See Exhibit C at 84:5-12.

---

[1] https://www.federalregister.gov/documents/2023/07/10/2023-13035/advanced-methods-to-target-and-eliminate-unlawful-robocalls-call-authentication-trust-anchor at 43452, ¶ 36.

26. Mr. Rudolph was not given information about SBT's communications with its upstreams, has no knowledge about how SBT vets its customers, and did not ask for that information. See Exhibit C at 113:12-19.

27. Mr. Rudolph has no knowledge about any due diligence SBT performed before it onboarded its customers and did not ask for such information. See Exhibit C at 115:3-8.

28. He cannot show where the terms "abnormal" or "problematic" are defined, and intentionally chose terms that did not have any binding definitions in the regulations. See Exhibit C at 124:2-19.

29. Mr. Rudolph never reviewed the ITG's Chart [ECF No. 53-9], but admitted it would be helpful to have more data. See Exhibit C at 128:18-129:8.

**Legal Standard**

The Court must "engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291-92 (11th Cir. 2005).

It is not the role of the court simply to agree or disagree with an expert's final conclusions. Rather, it is only to determine whether the principles and methodology underlying the testimony are valid, or, in other words, to see if how he got to where he ended up makes reasoned, scientific sense. United States v. Bonds, 12 F.3d 540, 556 (6th Cir. 1993). If the methodology is scientifically sound, the conclusions are deemed scientifically valid. McCreeless v. Global Upholstery Co., 500 F.Supp. 2d 1350, 1353 (N.D. Ala. 2007).

In Daubert, the Supreme Court pointed to several non-exclusive factors to guide the trial court's reliability analysis, including: (1) whether the expert's theory has been subjected to scientific testing; (2) whether the expert's opinions and research has been reviewed by academic peers; (3) the rate of error and controls standards; and (4) the general scientific acceptance of the technique or theory. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). These factors are not the only ones that can be considered, but these, at least, should be considered. Id. at 593.

The Court in <u>Daubert</u> explained that the adjective "scientific" in Rule 702 "implies a grounding in the methods and procedures of science." 509 U.S. at 590. "[E]xperts commonly extrapolate from existing data," but where the opinion evidence is connected to existing data by nothing more than "the ipse dixit of the expert," the district court is free to "conclude that there is simply too great an analytical gap between the data and the opinion proffered" for reliability. <u>Lee-Bolton v. Koppers Inc.</u>, 319 F.R.D. 346 (N.D. Fla. Mar 20, 2017).

"In sum, Daubert indicates that to obtain scientific knowledge, the proper epistemological approach is empiricism, i.e., testing or experimental validation. In other words, a hypothesis (such as Plaintiffs' binding clip-jamming cable hypothesis) ceases to be mere speculation only when it is elevated to the status of a theory through analysis of its falsifiability, refutability or testability. As noted by the Supreme Court, "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." <u>Richardson v. Bombardier, Inc.</u>, No. 8:03-cv-544, 2005 U.S.Dist.LEXIS 30025.

## ANALYSIS

Here, Mr. Rudolph's expert testimony should be stricken because it does not carry the hallmarks of reliability. Mr. Rudolph repeatedly admitted that his methodology is the product of materially confidential and proprietary processes. YouMail uses algorithms and code to do much of its work. This is evidenced by Mr. Rudolph's statements that he "copy/pasted" large portions of the document. Further, Mr. Rudolph's testimony that "You can – you can go to a command line and you can type a few letters and you've got some pretty good behavioral analysis." <u>See</u> Exhibit C at 106:13-15. His processes have also never been peer reviewed, and he claims a less than 1% error rate. Testimony that the expert opinions have a less than 1% error rate, without any peer review or independent testing due to the proprietary nature of the technology, is inherently suspect. Finally, there's the issue of using average call duration as a metric to identify "Robocalls" when the ITG's Executive Director rejected such notions, and the FCC subsequently refused to differentiate between the two, noting "it does not follow that all calls of short duration are inherently suspect." In its analysis, YouMail uses average call duration as a metric for illegal calls, but SBT cannot know solely based on the duration of a call whether it was a robocall or it was illegal. The opinions are unreliable and should be rejected.

**WHEREFORE**, SBT respectfully requests that OAG's Expert Witness Report be excluded because the methodology is suspect due to be confidential and proprietary.

Respectfully submitted,

SMARTBIZ TELECOM LLC

/s/ Sean W. Gellis
SEAN W. GELLIS, B.C.S.*
Florida Bar No. 105924
Gellis Law, PLLC
300 W. Pensacola St.
Tallahassee, Florida 32301
Telephone: (561) 371-2848
sean@gellislaw.com
*Board Certified in State and
Federal Government and
Administrative Practice*

/s/ Edward A. Maldonado
EDWARD A. MALDONADO
Florida Bar No. 129781
The Law Office of Edward A. Maldonado, P.A.
2850 S Douglas Rd, Suite 303
Coral Gables, Florida 33134-6903
Telephone: (305) 477-7580
eam@maldonado-group.com
*Counsel for Defendant SBT*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed electronically through the Court's CM/ECF portal and served via the same on all parties of record on this October 16, 2023.

/s/ Sean W. Gellis
SEAN W. GELLIS