UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 22-23945-CIV-MARTINEZ/BECERRA


OFFICE OF THE ATTORNEY GENERAL,

STATE OF FLORIDA,

DEPARTMENT OF LEGAL AFFAIRS,

     Plaintiff,

vs.

SMARTBIZ TELECOM, LLC,

     Defendant.

_____/

**CERTIFIED ORIGINAL**


VIDEOCONFERENCE DEPOSITION OF MICHAEL RUDOLPH


DATE TAKEN:     AUGUST 23, 2023

TIME:     1:32 p.m.

LOCATION:     Via Zoom Videoconference


Taken before Miriam Meneely, Court Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above-style cause.

Michael Rudolph          August 23, 2023

APPEARANCES:

    PATRICK CROTTY, ESQUIRE

    MILES VAUGHN, ESQUIRE

    OFFICE OF THE ATTORNEY GENERAL

    CONSUMER PROTECTION DIVISION

    3507 EAST FRONTAGE ROAD, SUITE 325

    TAMPA, FLORIDA  33607

    ATTORNEY ON BEHALF OF THE PLAINTIFF

    SEAN GELLIS, ESQ.

    GELLIS LAW, PLLC

    300 WEST PENSACOLA STREET

    TALLAHASSEE, FLORIDA  32301

    ATTORNEY ON BEHALF OF THE DEFENDANT

    ALSO PRESENT:

    EDUARDO BORRERO

    JOSE OLIVAR

Michael Rudolph          August 23, 2023

I N D E X

WITNESS                                              PAGE


Direct Examination, by Mr. Gellis                      7

Laws Reporting, Inc.    305.358.2700
schedule@lawsreporting.com    www.lawsreporting.com

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Affidavit | 17 |
| Exhibit 2 | Summary of Findings | 57 |
| Exhibit 3 | LinkedIn post | 149 |
| Exhibit 4 | LinkedIn post | 150 |

Laws Reporting, Inc.    305.358.2700
schedule@lawsreporting.com    www.lawsreporting.com

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

P R O C E E D I N G S

(Thereupon, the following proceedings were held at 1:32 p.m.)

THE COURT REPORTER:  Okay.  We are now on the record.  The time is 1:32 p.m.  Today is Wednesday, August 23, 2023.

We are here today for the videoconference deposition of Mike Rudolph in the matter of Office of the Attorney General State of Florida, Department of Legal Affairs versus SmartBiz Telecom, LLC; case number 22-23945-CIV-MARTINEZ/BECERRA.

My name is Miriam Meneely, I'm the Court Reporter present.  Will all parties and their counsel please announce your appearance by stating your name and the party you represent.

MR. CROTTY:  Patrick Crotty, representing the Plaintiff, Office of the Attorney General.  And with me is Miles Vaughn, also representing Plaintiff, Office of the Attorney General.

MR. VAUGHN:  Thank you.

MR. GELLIS:  Sean Gellis, representing the Defendant, and two representatives, Mr. Olivar and Mr. Borrero, are present from the Defendant.

THE COURT REPORTER:  Thank you.  Does the

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

witness consent to my administering the oath remotely?

THE WITNESS:  That's me?  I consent.

THE COURT REPORTER:  Please raise your right hand.  I will now administer the oath remotely. Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT REPORTER:  You may put your hand down.  Please state and spell your full name for the record.

THE WITNESS:  Michael, M-I-C-H-A-E-L; Joseph, J-O-S-E-P-H; Rudolph, R-U-D-O-L-P-H.

THE COURT REPORTER:  And before we went on the record I asked you to perform a form of identification.  What form of identification did you provide to me?

THE WITNESS:  California state driver's license.

THE COURT REPORTER:  And what is the driver's license number?

THE WITNESS:  Stand by.  B3769572.

THE COURT REPORTER:  Thank you.  You may proceed.

Michael Rudolph          August 23, 2023

DIRECT EXAMINATION

BY MR. GELLIS:

Q    All right.  Good afternoon.  But I guess for you it's still morning, Mr. Rudolph; is that correct?

A    Yes, 10:30 here.

Q    Excellent.

A    But I had lunch already, so I'm good.

Q    Good.  Is this your first deposition?

A    It's the first one in over a decade.

Q    Okay.  So, it sounds like no.  How many have you done before?

A    Just one.

Q    And what type of case was that?

A    It's been a long time.  It was, I think, just a civil matter.

Q    Like a -- anything to do with like Telecom or --

A    No.  It's so far in left field it's probably not applicable.

Q    That's fine.  I don't need to know about it then.  Have you ever testified?

A    No.

Q    Like in court, okay.  All right.  We're going to go over a quick kind of ground rules for the deposition.  I'm sure you've practiced this with your

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

attorney.

But the court reporter here is taking down everything that we're saying.  So, if we could please not talk over each other.  If you could wait for me to finish my question, I will try to wait for you to finish your answer.  Sometimes I'm bad about that.

The use of uh-huh or uh-uh, or shaking your head is meaningless for this.  So, please verbalize yes or no.  And if I say to you yes, no -- I mean I'm not trying to antagonize you, it's just we need a record.

And the court reporter can't, you know, those kind of sounds that you and I are used to making, uh-huh, it's hard to read on a transcript.  So, please try to verbalize your answer yes, no or otherwise.  Essentially, I mean that's it.

So, we're going to go -- you're under oath.  I'm just going to ask you some questions about your role in this case.  So, we're here today in the case of the Florida Office of the Attorney General verse SmartBiz Telecom.  And you have been designated as the expert witness; is that correct?

A    Correct.

Q    Have you reviewed the Complaint in this case?

A    I have, yes.

Q    So you're aware that there's links to

Michael Rudolph          August 23, 2023

**numerous YouMail recordings cited in the lawsuit?**

A    Correct, yes.  I'm aware.

**Q    Okay.  To your knowledge, were those recordings actually from YouMail servers?**

A    The recordings are stored on servers that YouMail operates, correct.

**Q    What qualifies you to be an expert witness in this case?**

A    So for those unaware or, I guess, for the record --

MR. CROTTY:  Hold on one second, Mike.  I'll object to the form of the question to the extent it calls for a legal conclusion.  One thing that we didn't cover is that if there's an objection, I'll sometimes need a second to say it.  You'll still answer the question, but I need to get my objections to questions on the record.  Sorry.

MR. GELLIS:  That -- that's -- thank you, Patrick.  I'll touch on that briefly.  Your attorney may object, common in Florida, object to the form.  It's this weird thing you're going to have to get used to.  You still have to answer, unless he instructs you not to.

So just give him a second to make his objection on the record, for his purposes.  And

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

then the real hard part for the witness is trying to remember the question when you've got somebody saying objection in your ear, so keep that in mind.  That good?  We good, Patrick?

MR. CROTTY:  Yes.

BY MR. GELLIS:

**Q    So subject to the objection, the question was what qualifies you to be an expert witness in this case?**

A    Should I answer now?

**Q    You can answer.**

A    So YouMail is a consumer answering service that started about 15 years ago, in 2007.  So, we distribute software and services for consumers to process incoming voice calls and SMS messages.

About ten years ago the consumers, as they were getting hit by unwanted calls and SMS, began to ask us to enhance the features that would protect them against those unwanted communications.

So, for the past decade or so, as the Chief Technology Officer for the company, we've been innovating new ways, using technology, to receive those incoming calls on behalf of our end users and understand which ones are unlawful, unwanted.

Through that past ten-year term, I think I have 21

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

approved patents in the United States for processing signals in data to determine if the signals would allow us to draw a conclusion if the communications were either unlawful or unwanted.

And in the past several years I've been a presenter, a speaker at numerous conferences in cyber security, financial services, Telecom on this topic. So, it appears that I've become something of an expert the past ten years in this topic.

**Q    What topic?  What topic would you be ---**

A    Unlawful, unwanted communications in telephone networks.

**Q    Unlawful -- I want to get it exact, so I'm writing it down.**

A    Unlawful and unwanted communications in communication networks.

**Q    Unlawful and unwanted communications --**

A    In communication networks.

**Q    Where did you get -- I'm assuming you have all sorts of degrees and certifications, and fancy stuff like that.  So just give me the quick rundown on your educational background and your certifications.**

A    A UCLA graduate, with a degree in computer science, electrical engineering; and a minor in economics.  Prior to You Mail, which is a company that

Michael Rudolph          August 23, 2023

focuses nearly exclusively on answering and providing safe communications for our customers, two of my previous companies, I worked for a company that build software and services for compliance that eventually became the Oracle GRC, which is governments -- governance and risk  and risk and compliance platform.

And prior to that I worked for a company that developed services for doing background checks for pre-employment screening.  So, most of my background, since receiving my degree, has been processing large sets of data to look for signals and patterns, which would indicate risk for the person who is analyzing that data.

**Q     So is there anything beyond a bachelor's; masters, PhD, anything like that?**

A     No.  Most people who were graduating with bachelor's in the dot com bubble joined industry pretty quickly versus pursuing advanced degrees.  There was a window there where that was what was in vogue.

**Q     And certifications?  Maybe I missed them. Any special -- I know that IT has a lot of certifications, I just -- I know that, so.**

A     No, I have not needed certifications.

**Q     Any statistical education or -- let me rephrase that.  Any education on statistics?**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A    I mean to get a minor in economics and to get the bachelor's at UCLA in computer science and engineering, there are a lot of statistical courses relative to most other universities in the country, so a pretty -- a pretty heavy -- a pretty heavy amount of those.

Q    But nothing outside of a bachelor's program.

A    Correct.

Q    In your Affidavit, the Expert Affidavit, you reference a number of patents.  And I think, you know, I'm just confirming, you were the primary author on all those patents?

A    My fingers to the keyboard, yes.

Q    Okay.  So, what does primary author mean?  Just to make sure it's not some special term of art that I don't recognize.

A    I don't know if it's got any, you know, like legal codified meaning.  I think it's just indicating that the copy and the diagrams that were produced that were the substance of the patent, you were the -- in my case I was 85, 90 percent of the person typing at the keyboard.  I think you'd probably claim that if you had the plurality of typing away at the keyboard.

Q    Is there anything confidential about the technology in those patents?

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A    I mean when you -- when you write a patent you try to cover the substance that you would need to get an approved patent.  And you wouldn't necessarily divulge the special sauce, right, the KFC chicken recipe.

Q    That's what I was -- that's what I was actually going to get at.  I said can anyone look under the hood, so to speak.  So, it sounds like -- let me rephrase.  It sounds like there's some proprietary element to the patents.

A    Yeah, I think most good patents in tech would have that, yes.

Q    Okay.  So, there's underlying proprietary information that is not contained within the patent itself.

A    Correct.

Q    So reading the patent wouldn't necessarily enable you to fully understand the secret sauce, as you say.

A    Depending on the patent.  I mean I'm sure there are patents out there where folks have been -- have revealed everything.

Q    Your patents.

A    Yeah.

Q    Your patents.  I meant yours.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A    I think in our patents, I mean there are some where if you read that specific patent you would have essentially everything that you would need to replicate what we do.  So depending on the patent, right.  If it was necessary to go into the details and create a patent coverage, you would disclose it in the patent.  But if you weren't seeking to patent something, you wouldn't necessarily disclose it in the patent your filing.

**Q    In paragraph three of the Expert Affidavit, it's entitled Independence and Remuneration, yes?  Does that sound familiar?**

A    If you're asking me, I don't know off the top of my head.

**Q    You don't recall signing an affidavit?**

A    I do recall I signed the affidavit, but the independence and remuneration section is not something that I have memorized on the top of my head.

**Q    Would it help you if I pulled it up?  If I pulled it up it would help you out, right?**

A    Absolutely.

**Q    I guess this is going to become number 1. And I am notorious recently for messing these exhibit numbers up, so it's not happening this time, Patrick. I promise you.  Here is your affidavit.  Of course, it**

Michael Rudolph          August 23, 2023

gives me a PDF error when I open the screen.  I'm going to go ahead and attempt to share my screen.  Can you see that?

A    Yes.

Q    So you see the section three, Independence and Remuneration?

MR. CROTTY:  Sean, before you go on could you just scan through this quickly so I can make sure I have the copy in front of me.  If that's ---

MR. GELLIS: Yeah, I was going to go to the signature at the bottom after, but I'll be happy to start at the top.

MR. CROTTY:  Okay.

BY MR. GELLIS:

Q    And I'll scroll down to section two.  The patents we discussed here, you know, some of the patents.  And then we go to section three, Independence and Remuneration.  Down here, Summary of Opinions, and that is your signature, I believe, Mr. Rudolph, correct?

A    That is.

Q    Okay, great.  So, this is entitled section three, Independence and Remuneration, yes?

A    Yes.

MR. GELLIS:  Okay.  So, this Affidavit is

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

going to be Exhibit 1.  And so I'll send this to the court reporter at the end, but everybody has a copy.  It shouldn't surprise anybody.

(Thereupon, Defendant's Exhibit 1 was marked for identification.)

BY MR. GELLIS:

Q   So, getting back to the matter at hand.  Your company, YouMail, provided the evidence the AG's using in this case, yes?

A   I know we provided some evidence.  I don't know if it's, you know, the evidence, representing all evidence.

Q   Well, you said you reviewed the Complaint, yes?

A   I did.

Q   And you've seen the numerous links to YouMail recordings.

A   I have, yes.

Q   Okay.  So, the AG is at least relying in part on that evidence, yes?

A   Correct.

Q   And that was provided by your company, correct?

A   Yes.

Q   And you sell your data to the ITG.  Let me

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

rephrase, not your.  You sell data to the ITG, correct?

A    Yes.

Q    Can you estimate how much YouMail has been paid by the ITG in 2022?

A    In the year 2022, probably somewhere between 200 and 250 thousand dollars.

Q    Do you know this year, to date?

A    To date, again, I am estimating.  Probably about 150 to 170 thousand.

Q    How do you know that?

A    I am generally aware of the terms of the contract and the work product of the analysts who are doing the labor that forms the basis of that contract.

Q    Did you sell data to the Florida Office of the Attorney General?

A    Not in the -- I mean we have yet to be paid by the Florida Office of the Attorney General, so we haven't sold data, if that makes sense.

Q    Is there a contract to provide that you will be paid to provide data to the Attorney General?

A    I mean as the expert witness in this matter, I mean we have an agreement for that, yes.

Q    They provided you the data in that matter, correct?

A    I suppose it's both, right?  They provided us

Michael Rudolph                August 23, 2023

data that they obtained via subpoena from your client. Then YouMail independently has data of answered calls. And for our expert report, you know, those records were joined to find the ones that we answered from that subpoena data set.

Q    So did you sell or are you planning to sell data to the Attorney General's Office?

A    When you say sell data, again, I just want to make sure I'm clear that we performed a service from which we accessed data.

Q    So it sounds like the answer is no. Essentially, it's kind of a yes or no question in my book.  I mean did you sell or do you intend to sell data to the Attorney General's Office?

MR. CROTTY:  Object to the form.

BY MR. GELLIS:

Q    You can answer.

A    I'm not sure what to do here, sorry.

Q    I can ask it again.  I mean I don't want to move on.  I don't want to get, you know, I understand we're not going to sit here for 20 minutes talking about this.

A    As a technology person, when you say sell data, like my mind is we put files onto a USB drive and we give it to you.  And obviously, you can transfer the

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

files over the internet.  So, selling data is hey, here's, you know, a bunch of data.  Whereas I believe our contract with Florida is here is data, you already have data, you know, tell us, you know, your conclusions from looking at that data.  So if our conclusions are also data, then yes, we sold data.  Data's a very ambiguous term, or a very broad term.

**Q    Well, there are recordings linked in the Complaint.  So, did the AG's office pay YouMail for those recordings?**

A    Again, the AG has retained us as an expert witness, so, you know, the recordings are things that were produced as part of that.  But I think our service is what we were paid for rather than we were paid for raw data, if that makes sense.  So, it depends how you're using the term data.

**Q    I understand.  I think there's a timeline problem here though to discuss.  You've recently been retained as an expert, correct?**

A    Correct.

**Q    Okay.  So, the Complaint was filed in December of 2022, and contained links to YouMail recordings.  So, my question is ---**

A    Yeah, at that point we had not been ---

**Q    -- were those recordings ---**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A    At that point we had no agreement to be paid for that data.

Q    Thank you.  Do you sell any other -- do you sell recordings to anybody else besides the ITG?

A    Sell recordings.

Q    I believe -- well, let me -- I want to get it right because I understand it's technical.  So what is it that you -- what would you call what you sell the ITG?

A    So what we sell the ITG -- so the ITG typically has some -- some goal of what they're trying to find in the communications industry.  Like hey, we're looking for Social Security importer calls; hey, we're looking for auto warranty calls.  And they'll give us some clues about those calls.  We think that they're saying, you know, get out of debt today.

And then our team, they essentially pay us so that analysts, you know, a person can roll up their sleeves, sit at their computer, and find call records which are, you know, a call occurred.  They would match that query,  right, and then run those through a traceback process.  So again, I think of the ITG as not necessarily paying us for recordings, but paying us for the analysis time to find call records that match, you know, purported, you know, illegal behavior, which they

Michael Rudolph          August 23, 2023

would then use as the terminating call to run a traceback.

Q    But in order -- I mean, I understand.  Thank you.  In order to do that though, isn't it required at some point the recording or some CDR or something changes hands from YouMail into the ITG's possession?

A    Yeah, so generally we would think of that as the CDR, which is the call detail record, that's what that acronym is.  And it doesn't necessarily have to have a recording.  So, let's say a bank operates a toll free number, and it's known that that bank never makes calls from that toll free number.

If we have call detail records where we've received calls from that toll free number that should never make calls, we can provide those call detail records because they're evidence of illegal behavior, even though there's no audio recording.  If that makes sense.

Q    How do you know there was illegal behavior then?

A    I mean we received a call from a phone number that does not make that call.  So, typically, if it's a bank's toll free number, the only -- your odds are very, very high that the person that was spoofing that bank's toll free number was doing it to pretend to be

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

the bank and commit a crime.

Q    Okay.  I understand the CDR part.  You said sometimes there can be recordings.  So I still -- I haven't heard it from you, but I want to make sure I understand.  The recordings are sent to outside parties outside YouMail, right, or accessed to them, links to them, or something along those lines.  They are ---

A    Sure, with the call detail record, the important attributes of that record are a timestamp, source number, destination number.  And if -- length of call; was it 20 seconds, a minute.

If there is a recording, a link to that recording.  And then, if it's available, the text transcription of the recording, which is, you know, just characters of what that recording would contain if you listen to it.

Q    But do you only sell analysis -- I'm going to call them like analysis services, it sounds like what you were saying.  People come to you and ask for you to use your data and do analysis for them.  Do you ever just sell like   ---

A    Yeah, and ---

Q    My question is do you ever sell the bulk, just CDR's, like the data?

A    No, not that I'm aware of.  No, I don't think so.

Michael Rudolph          August 23, 2023

Q    Has the ITG ever been sent CDR's from YouMail?

A    Yeah, that's the service they procure from us, is hey, go find these unlawful calls.  And then we'll make available the CDR's that we find, that we identify that match those attributes.

Q    Can anyone buy this data or this service?

A    Yeah, I mean we make it available to communication providers who want to know what their own calls are doing.  So if the ITG or an entity has engaged us to, you know, go understand, you know, problematic auto warranty calls or Social Security imposter calls, our team does that work.

We then have an ability for a communication provider to come to us and subscribe when we match their calls to that problematic behavior, so that they can get those, and, you know, ideally preemptively address them before they continue.

Q    Do you know when YouMail was first contacted by the AG's office about this case?

A    The Florida AG?

Q    Yes, sir.

A    I don't -- not off the top of my head.  Some time in 2022, summer, fall.

Q    Did you perform services for them at that

Michael Rudolph          August 23, 2023

time but without payment?

A    Yeah, I mean we were asked to look into some calls, and we looked into them.  I mean we didn't require payment or a contract to do that.

Q    **You're being paid $900.00 an hour to testify today?**

A    Correct.

Q    **Do you think YouMail has a stake in the outcome of this case?**

A    I mean I don't want to be called as a witness for a side that, you know, doesn't have a strong case. So I mean outside of the obvious, I mean there's not -- there's no like financial gain I think we've got here, the company.

Q    **Well, if the AG is relying on your -- the Florida AG is relying on your evidence and were to fail to prove its case, do you think that would make YouMail look bad?**

A    So I'm not a lawyer, I know lots of time cases -- like the outcomes have nothing to do with the data that was provided by somebody who was retained in this manner.  I mean there's nuances of the law that I think end up affecting, you know, the outcome of cases more than anything else.  So, I personally don't, but I could see how somebody in industry might.

Michael Rudolph                August 23, 2023

**Q     Well, I'm asking these questions because the Affidavit says independence.**

A     Okay.

**Q     So I mean I'm trying to get at I don't really think you're independent.  So, I mean do you think you're an independent expert, given the fact that you have a prior relationship with the AG, your data is supporting the Complaint, you're being paid by them; do you feel you're independent?**

A     I think we are possibly probably the most independent arbiter of this in industry.  I mean we have many communication companies who trust us to go through their communication records, who are not under investigation, and help them understand their traffic.

And if Patrick wanted to, you know, investigate one of them, you know, we would be an arbiter between those two parties.  So, you know, there's no -- there's no, I don't know, like bias towards one side or the other.  It's just what the data is.

**Q     Aren't you being retained to help support their case against SmartBiz?**

A     In the case of Florida, yeah.  Florida has retained us, obviously, here today.  We have other examples of problematic communications industry where the communication provider has retained us, so.

Laws Reporting, Inc.    305.358.2700
schedule@lawsreporting.com    www.lawsreporting.com
Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q     Give me some examples of comms providers who've retained you.

A     If you visit YouMail you can see a customer list.  But recent customers retaining us, I'm happy to disclose Skytel ---

Q     No, that's -- if I can look it up online I'll save everybody a little bit of time.

A     Okay.

Q     Thank you.  Okay.  I'm assuming you have an understanding of what an intermediate provider is.

A     Absolutely.

Q     Okay.  What is that to you?

A     Intermediate provider, just generally speaking, is a provider who's in the middle of the call path.  So you've got a provider who perceives they own the exact customer who, you know, is a real human being or a robot making a phone call.

An intermediate provider is one of potentially many providers that calls transit before they reach the terminating provider, which most consumers would think of as whatever, AT&T, Verizon, T-Mobile as their terminating -- they wouldn't think of it as a terminating provider.  They would think of it as their carrier, but that would be the terminating provider and not an intermediate.

Michael Rudolph                August 23, 2023

Q    Can you explain to me what, you know, YouMail is?  What is YouMail?

A    YouMail is -- can I give you like a very specific -- we're an over the top information service that provides answering services for consumers whose numbers are with the carriers we listed, T-Mobile, AT&T, Verizon.

Q    YouMail is a capitalist company that exists to make profit, correct?

A    One would think, yes, we are.

Q    Well, you've had some venture capital funding rounds, right?

A    We have, yes.

Q    You talked about that on a YouTube interview, right?

A    I'm sorry.  What?

Q    You talked about the venture capital funding rounds on a YouTube interview you did, correct?

A    I'm not aware of a YouTube interview I did. That might have been our CEO.

Q    No, no.  That was you.  You don't recall doing an interview?

A    A YouTube interview, no, I don't.

Q    An interview with a company that's posted on YouTube.

Exhibit E - YouMail Deposition

Michael Rudolph                August 23, 2023

A     An interview with a company posted on YouTube.

Q     **I'll get the link after a break and we can talk about that.**

A     Okay.  Yeah, that's fine.

Q     **It was in 2021, with a Canadian company.  And you discussed a bunch of stuff about YouMail's technology and ---**

A     Oh, yeah.  Okay, I think that was like a ---

Q     **Do you remember that?**

A     Yeah, that was like a podcast or something like that.  Okay, yeah, that might make sense.

Q     **Okay, yeah.  So, do you remember talking about the venture capital rounds in that interview?**

A     I don't, but it wouldn't surprise me if that was asked.  It's not ---

Q     **So yes, the answer is yes.  You're a capitalist company that exists to make money for your shareholders.**

A     The company has received investor dollars, yes.  I'm not trying to evade anything.  I honestly just don't remember the ---

Q     **That's okay.  No, that's okay.  But you are a capitalist company that exists to create profit for shareholders, correct?**

Michael Rudolph                    August 23, 2023

A    Correct.

Q    What's the relationship between YouMail and the Florida Attorney General's Office?

A    Again, I perceive it as we've been retained as an expert witness to go through the data of this specific matter.

Q    Okay.  But you did say -- I believe you testified earlier there was somewhat of a preexisting relationship to this retaining, yes?

A    I mean not a contractual relationship, but we -- we've known each other, I suppose.  We met at a conference.

Q    Who is we?  You met who?

A    Patrick and I met each other at a conference.

Q    The AG's office is very big, that's why I had to classify who.

A    Okay, sorry.

Q    You said oh, we met.  Okay.  So, you met at a conference, when?

A    That was the National Attorney Generals' Conference, their robocall summit in the summer of 2022.  I don't have the month or date off the top of my head.

Q    So I understand some services may have been rendered without a contract in some way, but what did

Michael Rudolph          August 23, 2023

**you do for the Attorney General's Office prior to being retained as an expert?**

A    I mean I believe we received some CDR's and we reported on, you know, the counting matrix within those CDR's.

**Q    And you provided that to the Florida Attorney General's Office?**

A    Yes.

**Q    Do you recall any of that being cited or listed in the Complaint anywhere?**

A    I don't know off the top of my head.

**Q    What's the relationship between YouMail and the ITG?**

A    So the ITG, as you know, is a division of U.S. Telecom that the FCC designates as the traceback consortium.  And, you know, via the traceback they, you know, have a goal to, you know, find and stop unlawful robocalls in industry.  And YouMail, because of the nature of our business as an over the top information service, has, you know, essentially irrefutable evidence of those communications.

So the ITG comes to us to, when they've got, you know, a goal in mind; you know, auto warranty calls, student loan scams, social security imposters.  YouMail, we're interested in staying atop of those and

Exhibit E - YouMail Deposition

Michael Rudolph                August 23, 2023

trying to, you know, protect consumers from those calls.

And they'll engage us to -- in cyber security you get this -- this term, you're looking for needles in a haystack.  So, you know, we're looking for the -- in the entire communication industry, find Social Security imposter calls.

And then when we find those, you know, understand where those are coming from, so that those providers can be informed hey, you're enabling really problematic calls, do what you can to stop those.  You're on mute.  Sean, you're on mute.

**Q    Thank you, sir.  We briefly discussed patents previously.**

**So YouMail sells services for consumers and enterprises; is that right?**

A    Correct.

**Q    Can you explain to me how those YouMail recordings from the Complaint that we talked about, how are those generated?**

A    So when a -- when a end user downloads our app, and let's say that you're on Verizon, one of the on-boarding steps that you will take is you'll issue codes to the Verizon network that forward your unanswered calls to a phone number operated by YouMail.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

So now when a phone call would come to your phone, Sean, that you don't answer, as opposed to landing at a phone number operated by Verizon for their visual voicemail platform, it terminates that number operated by YouMail for our visual voicemail platform.

And so as that call comes in to our switch, we will answer that call.  And, you know, this works this way for everybody.

And, you know, we'll play the outgoing greeting, you know, thanks for calling Sean, please leave a message.  And then there's a beep, and then when that remote party speaks or, you know, has audio played, you know, there's a recording session that occurs that captures that media, saves it to disc in your account.

THE COURT REPORTER:  You're on mute again.

MR. GELLIS:  Oh, my gosh.  Long day.  I did a CLE right before this and -- so my brain is all scattered in crypto-land.  It's a lot of CLE classes, and I raced over here.  Let's try this one again, shall we?

BY MR. GELLIS:

**Q    So is the call transferred away to your voicemail technology?**

A    Is the call transferred away?  What do you mean?

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q    Okay.  So, I believe you said it's forwarded to a YouMail number.

A    Yep.

Q    So you would not refer to that as transferring away.  What would the term of art you would use for what's happening?

A    I mean you could say it's transferred, that's fine.

Q    So does the -- is the -- when it's call forwarded it ends up terminating at YouMail's number.

A    Correct.

Q    Is it ever blocked?  Do you guys block calls?

A    Blocking is another term that has ambiguity in industry.  So, as a technology person I'll -- I'll look at what I mean by ---

Q    Tell me what you mean.

A    Yeah, so blocking, one interpretation is just you blocked it, it didn't ring on your device.  So, the ringer was suppressed.  But the call still reached the termination point, the originating party could still leave a, you know, a voice recording for you.

You could still see that voice recording, listen to it, return that communication.  But it was blocked because it didn't ring your phone.  Not really blocking.  I would consider that ring suppression.  But

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

broadly in industry that's referred to as blocking.

Blocking could also be the calling party, as it rings through the network, just gets dropped, click-click, right?  And, you know, the call is blocked, it never rung on your device, never reached the terminating provider, never reached their voicemail system.  There's a bunch of ways to accomplish that.

Blocked could also be it rang on your device, but you didn't answer it, and it reached your voicemail, but your voicemail box was full.  And so the caller was blocked because they couldn't leave a message in a full mailbox.

Or some folks will make it so their outbound voicemail recording plays disconnected tones, kind of emulating, you know, this call cannot be completed. Lots of ways to create a façade of blocking.  So, there's like technical blocking, consumer perceived blocking, originating caller perceived blocking.  Does that help?

**Q    Does the YouMail service perform any of those blocking functions you have just enumerated?**

A    YouMail can perform all of those various blocking manners, yeah, behaviors.

**Q    So if I understand correctly, the voicemail recordings are not coming from the users' native**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

voicemail inboxes, if you will.  They're coming from the YouMail voicemail inbox that the call is forwarded to.

A     Correct.

Q     Do people who are making calls and think that they're leaving a voicemail to their friend, do they have any way of knowing that they're actually leaving a voicemail to a company?

A     I mean they probably have more awareness of that, it going to YouMail, than they do if it's going to Verizon as a company, or AT&T as a company.  And what I mean by that is if you call somebody who has not done a custom greeting, I think our outbound greeting is the YouMail user at 1,2,3,4,5,6 is not available, please leave a message.  So, I mean we have that as our outbound greeting if you do not record something in your own voice.

Q     I guess what I'm getting at is if I call my friend and leave a voicemail, I'm assuming it's going to my friend's voicemail.  But when my friend is using the YouMail service, it sounds like I'm also now leaving a voicemail to a third party that I didn't know about.  Is that correct?

A     That's kind of always the case if you're leaving a voicemail for somebody, whether or not

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

YouMail is providing ---

Q    How?  I mean ---

A    -- the voicemail service or Oracle is, or Verizon is.

Q    **Well, I mean -- I would think most people would assume if I called my friend's AT&T phone and left a voicemail, that I was leaving a voicemail with my friend's AT&T phone, yes?**

A    I don't think most people know that AT&T is their friend's cell service provider or voicemail provider, usually.

I know my wife's cell phone provider because I pay the bill.

Q    **Do you know if the terminating providers sell that information?**

A    Which information?

Q    **Well, the, you know, information based on voicemail recordings.**

A    I mean I'm aware that many, you know, similar services to YouMail provide analytics based upon voice recordings.  I know a company called Vittori does that, Verizon does it.

Q    **What do they sell?  I mean they're selling analytic services based on voicemails from their users?**

A    Most companies are selling analytic services

Michael Rudolph          August 23, 2023

based upon signals of which, you know, what's being done in a voicemail box from originating numbers could be a signal.

Q    So you're suggesting that when a wife leaves a personal message to her husband on any voicemail, that they should expect that a bunch of Telecom companies have access to it, analyze it, scan it, and all that?

A    I don't want to misconstrue what kind of a typical standard art here is.  If there's a phone number out there and it calls a million people an hour and never leaves a recording, that's a completely different way to get a signal from interaction between a phone number and a voice mail box than a husband and a wife calling one another and leaving -- leaving a message.

So, you know, usually the state of, I guess, you know, terminating call analytics is based on aggregate bulk operations by originating numbers, or in, you know, some cases communications at all say the same thing.

Q    So in that podcast you did, do you recall listening to different examples of recordings and playing them and listening to them from the YouMail service?

Michael Rudolph          August 23, 2023

A    I don't, but I'm not -- I would not be surprised if I received a link to it to refresh my memory.

Q    You don't recall then where you had three different examples, and you played -- you described how these top two were clearly robocalls based on the analytics.  But the third one was somebody's personal message.  And you don't recall comparing how robocalls against personal messages are analyzed and how the YouMail technology can differentiate between robocalls and personal messages; do you remember that?

A    Yeah, yeah.  Okay, that does -- that does refresh my memory about that ---

Q    Yeah, and you played somebody's personal message, right?

A    I don't think I've ever done that, so that -- I don't recall that.

Q    So the recordings in the Complaint, are those verbatim recordings or are they like transcribed robo voices based on speech to text?

A    The Complaint recordings are direct links to individual files from an individual phone call.  When you say speech to text, I mean the calls would then be sent to a party that does voice to text processing and it comes up with the text transcription of the audio.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q    Okay.  That was my question.  The recordings are not replayed text -- they're not replayed transcriptions.  They're the actual recordings that were left directly on the YouMail voice service box.

A    Yeah, but I mean I believe you got a URL link that's, you know, a long path and like dot MP3 or dot wave.  That's a link to the exact file, the exact file of that -- of one call.

Q    I was just making sure that it wasn't just a text to speech -- you're replaying, i.e., you transcribed a call, and then you create a recording of what the transcription was and play it out.

A    Yeah, that's the audio that just popped off the network and was sent over that call.

Q    Okay.  Would you say the patents are really just a call forwarding service?

A    I mean there's a lot of patents, so it's -- there's a lot of patents that have nothing to do with call forwarding.  So, there are some that are related to a call forwarding service, absolutely.

Q    Who pays for a call when it's answered by YouMail service?

A    Who pays for a call?  So, we have -- I mean we're a premium company, so users can get onto our service without paying us and kind of explore if we

Michael Rudolph          August 23, 2023

demonstrate enough value for them to want to pay us for a paid subscription.

So, as an example, one of the features we have that can potentially better protect consumers is when a call comes in, we'll greet that call to say hey, you know, you've reached Sean Gellis, you know, he's screening for robocalls.  Press, and we'll say 7-2, it's a random number, like a captcha, to connect to Sean.

So, that's a paid upgrade that users can pay and subscribe as a monthly service.  We will present your callers with a captcha in order to connect and, you know, bother them with a ringing call --.  So, we've got a free service that no one is really paying for, but the hope is we can show them value and convince them that we're doing other things that are worth paying for, for that value.

Q    I'm getting at when somebody makes a robocall outside the country and come into the country. Somewhere somebody is paying for that.  I think there's been analytics, and I think your company has talked about, you know, the cost of robocalls and who pays for them and all of that.

A    Okay.

Q    So my question is if a robocall comes in and

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

is transferred to the YouMail box, who is paying for that call to be made?  Is the terminating -- like is the user, am I paying on my bill as if that call came to me, or is that call coming to you and you're paying?

A    I mean YouMail has to pay to pay the provider to terminate the phone call that we received on behalf of a customer, so it ---

Q    Thank you.

A    -- does cost us money, yeah.

Q    Thank you.  That's my point.  You pay the termination.

A    Yeah.

Q    YouMail pays for that, okay.

A    Correct.

Q    So it's -- I mean so it's costing you money to host these -- obviously, to host these voicemails for free.

A    Correct, yes.

Q    So does the terminating provider pay, like AT&T and -- I mean, I guess the consumer would.  But you have an account with somebody, right?  How do you create these voice mailboxes; is it cloud or where does that all come into play?

A    Are you talking about like what YouMail's cost of goods are for doing what we do?

Exhibit E - YouMail Deposition

Michael Rudolph        August 23, 2023

Q    Well, I mean you said that you are essentially paying for termination for those calls that end up at your YouMail service box, so.

A    Correct.

Q    Who are you paying or, you know, how does that work?

A    So, Sean, if you were to get a voice mailbox hosted with YouMail, one of the things that we would provide is a dedicated phone number for you that is your voicemail forwarding number.

And YouMail has contracts with different voice providers industry, Inteliquent, Bandwidth, and several others, where we pay them for the telephone services that we would then assign to you for those incoming calls.

Q    So you pay some intermediate providers for ---

A    That's correct.

Q    You pay SmartBiz?

A    No.  I don't think so.

Q    So you're in business with SmartBiz's competitors.

A    I don't know SmartBiz's competitors to ---

Q    You're an intermediate provider, right?

A    I guess, yeah.  I guess, by that definition,

Exhibit E - YouMail Deposition

Michael Rudolph             August 23, 2023

sure.

Q    And you just -- I believe you said you're paying other intermediate providers the numbers.

A    Sure, yeah.

Q    So you are paying, and you're in business ---

A    Yep.

Q    -- your business with SmartBiz's competitors.

A    Yeah, by that definition I believe that you can connect those dots.

Q    And you're here as an expert against SmartBiz, correct?

A    Correct.

Q    And not any other intermediate providers.

A    I'm sorry.  I think ---

Q    You're not an expert witness in any other matters against any other intermediate providers, correct?

A    We are retained as an expert witness against other intermediate providers potentially.  Some of those reached settlement stage before they -- before they conclude, and others are yet to -- yet to pass, I suppose.

Q    Okay.  So, you may have never been deposed, but you've been retained as an expert before many times, it sounds like.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A     There you go.

Q     **Approximately, how many times?**

A     Ten.

Q     **And who retained you?**

A     We're often retained -- I think one case that we have is public, is -- where Marriot was, you know, observing impersonating robocalls through complaints. And, you know, sought justice or relief against the perpetrators of those calls, retained by several other states.

Q     **Have you ever been retained to provide justice, as you said, against any of those intermediate providers that you're in business with?**

A     Yes.

MR. GELLIS:  I did just get a text that apparently a motion to dismiss was denied in this case.  So, I have to go read that later.  Was it entirely dismissed -- denied, Patrick?  I guess in the entirety?  You're muted Patrick.  I know this is unusual, but this is strange for this to occur at this time.

MR. CROTTY:  Yeah, why don't we go off the record for five minutes?

MR. GELLIS:  Yeah, let's go off the record for a second.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

THE COURT REPORTER:  Okay.  The time is 2:20 p.m.  We are off the record.

(Thereupon, a break was had at 2:20 p.m., after which the following was heard at 2:22 p.m.)

BY MR. GELLIS:

**Q    Does YouMail scan all voicemails that it receives on its voicemail service?**

A    When you say scan, can you elaborate?

**Q    Like perform analytics.**

A    I mean I want to say we'll issue queries against the aggregate calls.  Like we'll say hey, how many calls did we get last week, and the count is whatever, ten million, or something like that.  So, that voicemail wasn't scanned, but it was counted. From an individual voicemail perspective, is it processed for if it was unwanted or unlawful or not, no.  Not every one is.

**Q    I guess, you know, in that interview you did, you talked about the fingerprints.**

A    I did, yes.

**Q    Okay.  So, do you attempt to fingerprint every voicemail.**

A    No.

**Q    And how do you ---**

A    No.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q    -- differentiate?  How do you know what's personal and what's robocall without looking at them?

A    Yeah, so for users who opt into the service, those users can disable the service for any individualized processing of voicemails.

If you think about -- I don't know if you've ever used like an MP3 player.  I'm old enough to know what Winamp is, but when you play music, you've got like a wave form.  Like, you know, if it's loud it's got a high peak and a low -- and a low trough, I suppose.

So if I were to say to you you're auto warranty is expiring, press one for more, there's a wave form that kind of matches what's being said there.  If I were to call you and say hey, honey, don't forget to pick up the kids after swim today, it ends early by an hour, that would have a wave form.

So when folks express to us hey, there's unlawful calls that are saying this is Social Security Administration, there's an arrest warrant in Texas, there's a wave form that matches that call.  And the way robocalls work, they just have usually a single source recording, and it's always almost the exact same wave form.

So if we get a phone call and we try to map it against that wave form, we're like wow, that's a

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

perfect fit.  We now know if we've got an example of a Social Security Administration imposter call threatening a Texas arrest warrant.  They're not even listening to it.

Computers can take those -- those curves and say hey, that's pretty much a perfect fit.  And now we know you received an SSA imposter call without ever listening to it, turning it into text.  You know, those curves fit.  Now you can look and say how many -- how many calls had a curve fit, and you've got hey, there's all the SSA, Texas arrest warrant imposter calls this afternoon.

**Q    Okay.  You're still required to -- you still have to kind of like look at the wave format for every voicemail to determine that, right?  I mean you have to ---**

A    So, the way that fingerprinting works is as opposed to looking at the wave form, it literally just gets turned into numbers.  You know, zeroes and ones, binary, but more complicated.  You know, full numbers, 437, 992, which are kind of like points on the curve.

So then you basically have these numbers, and these other numbers, and you have no idea what's being said.  You know, those will match.  So you're not really even looking at the wave form when you turn to a

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

fingerprint.  You're turning into an image that's got like a numerical presentation of, you know, is there a pixel, how dark is that pixel.  And it's just numbers and vectors.  It's very math-centric where you're matching.  It really is like a fingerprint.

Q    Okay.  Does YouMail report companies to the FCC?

A    Does YouMail report companies to the FCC?  We don't, no.

Q    Why might a carrier implement YouMail solutions?

A    It would not be uncommon that someone is made aware of a problem they have with unlawful communications, right?

Completely independently of YouMail, you might be getting told by one of your business partners hey, one of our customers got a phone call, it was Social Security Administration, Texas arrest warrant.

And then you're doing this every week for a few weeks in a row, and you're like wow, like how is this happening.  I've got, apparently, a bunch of accounts that are pretending to be the Social Security Administration.

So in that case you're recognizing you've got this problem that you can't seem to figure out how to stop

Michael Rudolph            August 23, 2023

those accounts from finding purchase, you know, among new user creations or partners you're selecting as a business.

So with YouMail, you can partner with us, and because we're fingerprint matching, you know, SSA imposter calls, and you know, we're like hey, this number at two o'clock today, pretending to be the Social Security Administration.

If you tell us hey, these are the numbers I'm originating from, you say well, that one is doing something illegal.

That can help you figure out something, you know, have that moment of recognition that oh, wait, that IP address in Pakistan that keeps creating accounts, that's the one we shouldn't allow into our network anymore.

**Q     Okay.  What's the YouMail robocall index?**

A     The YouMail robocall index is basically like a -- when I say a counting metric, it's a like state by state breakdown of the calls that we terminated in a state that were, you know, match robocall behavior.

**Q     Do you know if Smartbiz has ever been on that top 100 list?**

A     I honestly don't know off the top of my head, no.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

**Q     In paragraph three there is a ---**

A     Is there -- are providers disclosed on that list?

**Q     Do you know if any of the tracebacks that SmartBiz has been -- has received are related on that list?  I mean the terminating numbers, or the originating numbers.**

A     When you say the list ---

**Q     Every month, the top 100.**

A     Well, so the top 100, it's usually robocall campaign.  So, it's not -- I mean there's no campaign I'm aware of that says hey, this is SmartBiz, there's an arrest warrant.  It's, you know, car warranties, student loan, Social Security.

**Q     And there's no providers ever listed on there?**

A     I think if you drill down to an individual number there's been -- there may have -- I don't think presently there's a version of the page that shows the provider for a number.

A lot of the free phone number sites, if you Google a phone number, a lot of the people who surf the webpage to look at that phone number it might say who owns that number.

**Q     But you don't believe there's a whole column**

Michael Rudolph            August 23, 2023

that says carrier on the robocall index webpage everywhere?  Have you seen it?

A    Unfortunately, I have not looked at the robocall index at my own company in several months, so.

Q    Let me -- I'm going to share this then because I may have to.

A    If you want to share, that's totally fine.

Q    Yeah, I'm not going to make it an exhibit or anything, but just to -- I mean here is just an example from robocall index.com.  I just hit Atlanta.

A    Okay.

Q    Do you see this carrier?

A    Yep, yep.  I see it.

Q    Yeah, so has SmartBiz ever, to your knowledge, been listed ever as a carrier on this?

A    I'll be honest, this is not an area that I follow.

That's just doing a number lookup on the owner. And as an intermediate provider SmartBiz wouldn't probably show up as a number owner.

So unless they have their own number inventory, they would not show up there.

Q    In paragraph three of the Complaint it says that according to the ITG SmartBiz is one of the most prolific transmitters of illegal robocalls in the

Michael Rudolph          August 23, 2023

**United States.**

**My question is is that statement consistent with the data found in YouMail's robocall index?**

A      So if you use the word transmitter -- so the robocall index, that carrier column, as I just mentioned, is the person who owns that number in their numbered inventory.

So you had like Inteliquent in there.  So, Inteliquent -- I don't know how many numbers they own. Let's say they own a hundred million numbers, or fifty million numbers in the North American Numbering Plan. That's what that -- that column is indicating, is the company that owns that number.

Not necessarily the company that's responsible for transmitting robocalls within that number.

So the robocall index is maintained by some of my colleagues at YouMail.  And if I'm going to infer their rational for putting the owning carrier, its hey, the owning carrier should potentially be concerned that a number they own is being used by somebody else to transmit calls.

So the transmitter, usually when U.S. Telecom is investigating them, or people who have taken someone else's numbers and they're unlawfully originating or transmitting calls with them.  So, you know, when you

Michael Rudolph          August 23, 2023

look at robocall index, you're not looking at transmitters.   You're looking at owners, who should care as well.

But it would not surprise me, you know, that completely independently there's transmitters who the ITG, you know, have kind of a worst offenders list.

**Q    I mean so you don't even list the transmitters.  You only list the providers with the number, yeah?**

A    We don't have visibility to the transmitters. So, no, we wouldn't list that.

**Q    -- this whole index of the top 100 and make a big deal about it, and all the robocalls in America, and I just want to be clear that you don't  -- you don't publish the transmitters or attempt to identify the transmitters, or any of that.**

A    So the transmitters, that's -- again, that's why traceback exists, right, which is trying to piece together who transmitted these calls owned by someone else.

So the company, the entity that's got the most data of who is transmitting numbers they don't own would be U.S. Telecom ITG.

**Q    Where can I find the language that informs users that information that is generated through their**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

use of the app is going to be sold?

A    When you -- if you download our app from Google's play store or Apple's app store, you get -- there's a whole bunch of things that happen there because Apple is -- Apple and Google are both pretty stringent on this, and will reject apps fairly aggressively for not having full disclosure.

But you'll see just in the store listing page, there's a bunch of copy.  But when you install the app, there are a bunch of in your face pop-ups where you need to affirmatively consent.

Q    All right.  I want to jump to the expert opinions and the methodologies and all that stuff, and get into the meat of it.  We're about an hour in.

Do you need a break, like a five minute ---

A    No, I'm good.

Q    Okay.

A    Keep rocking.  I'll let you know.

Q    Thank you, great.  So, what materials did you review prior to providing your opinions?

A    What materials did I -- so the Florida OAG provided us CDR's.  You know, we ingested those CDR's into a data lake, which is a fancy word these days for a database.

And, you know, queried those records in aggregate,

Michael Rudolph          August 23, 2023

so that's the bulk of the data that formed that Summary of Findings Report that we produced.

Q    And that's what we're going to talk about. So, would you say that your opinions are all in that Summary of Findings document?

A    My opinions?  Generally we try not to ---

Q    Your expert opinions.

A    Yeah, so I mean generally we're trying to just report, you know, raw counts of data and observations.  And we try not to put too much opinion in there, but if there are opinions in there, those -- yeah, those are ours.

Q    Are you familiar with the concept of expert opinions?

A    Yes.

Q    You've been retained in this case, yes?

A    Yes.

Q    To be an expert.

A    Yep.

Q    To render expert opinions.

A    Got it.  We're good.

Q    That's my question.  What are -- are your expert opinions found in the Summary of Findings document?

A    Yes.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q     Are there any other opinions that you are intending to offer that are not found in that document?

A     Not at present, no.

Q     What assumptions were made in connection with your opinions?

A     What assumptions?  Can you give me an example?

Q     I mean usually, you know, experts make assumptions in -- I'm asking you.  So, if there's no -- if you made no assumptions, that's fine.

A     I mean my assumptions are that those are in fact zip files representing, you know, calls that transited SmartBiz's network, yes.  That would be my primary assumption.

MR. GELLIS:  I'm going to go ahead and share my screen.  We're going to make this Exhibit 2.  Afterwards you can take a quick look at it.

It's basically the Summary of Findings document.  It shouldn't shock you.

(Thereupon, Defendant's Exhibit 2 was marked for identification.)

BY MR. GELLIS:

Q     Do you recognize this?

A     Absolutely.

Q     This is actually the original, it's not the

Exhibit E - YouMail Deposition

Michael Rudolph         August 23, 2023

updated one.  I know there was an updated one.  I don't think it's going to be material for our discussion.  I know there were some minor updates.

A    Yep.

Q    But this is the first one, right?

A    Yep.

Q    This is your report.  It's familiar, right?

A    Yep.

Q    Okay, great.  Give me one moment here.  I'm going to re-share in a second.  I just want to get my questions.  All right.  Patrick's a happy camper.  I can't wait to read this thing.

So we have this document up here.  So, what actual work did you put into this document?

A    You've got over like 120 pages, I think.  So, there's a bunch of different things.  So, you know, again, my fingers to keyboard, drafting the copy that you see here for a good number of sections.

When the data goes into our data lake, right, so you've got in this document the raw number of call detail records that we received.

As we run queries against the database to say hey, you know, how many of those records look like that in that given month of time.

In some cases I would have actually written the

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

sequel that, you know, was issued against the database to count up, you know, the number of calls in that month that were between 15 and 30 seconds in duration, and then bucket them that way.

So both the raw sequel queries that performed the summary counting matrixs, as well as the pros you've got here that, you know, describes why we would look at that and what our observations were as we had the results of those queries that would sum up those -- those counts.

**Q     I heard the words fingers to keyboard.**

A     Yep.

**Q     What percentage of this document, approximately, would you say you wrote?**

A     So this document also involves a number of copy/pastes.  So, if you go to the very end there's a lot of pages that are -- there's a lot of page count that I got -- I pushed control V on my keyboard and I pasted it in.

So if I'm taking credit for that, then I get primary credit for the entire document.  But if you look at the pros section ---

**Q     It was primarily copy/pasted?**

A     If you go to the tail end there's a section that's got, you know, a table of counts.  Like this

Exhibit E - YouMail Deposition

Michael Rudolph                    August 23, 2023

campaign 57, this campaign 52.  I ran the query, I had the results.  I took them from the reporting tool and I put them into the word document.

So I didn't write a sentence, like Shakespeare in this case, but I ran the query that produced the, you know, the table, and I put it into the document.

So if I'm taking credit for tables, probably 60/70 percent.  If it's the pros, probably 80 percent, maybe 90 percent.

**Q    The reason I bring it up is not to be a problem, it's just there's this whole thing about a YouMail team who does all this.**

A    Yep.

**Q    And so, you know, I'm being presented with you as an expert, but then I'm told there's actually this secret team who apparently is doing everything behind the scenes, who I don't know if they're qualified.**

**I don't know who they are, why they've done, what portion of this report they've come up with as opposed to you.  So, why don't you tell me about the team?**

A    The entirety of this document production would be myself as your predominant contributor.  And then I've got a threat analyst, his name is Jasper, who would have done the remaining balance.

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

Q    Okay.  So, I mean you're going to have to give me a little more than that.  Can you expound, please?

A    I mean I know you've got some of the emails about how, you know, we iterated on this.  So, ---

Q    So the team is Jasper?

A    Jasper ---

Q    One guy?

A    Jasper Van Beusekom, and myself would be the two YouMail principals who produced this report.

Q    Nobody else worked on it?

A    No.

Q    No other analyst of the company -- because it says a team.  So, I'm assuming, you know.

A    Specifically we try to sandbox, you know, state AG assistance into a very limited set of contributors or resources.  So, just ---

Q    Can you spell Jasper's name, please?

A    I'm going to use a cheat sheet because it's not an easy one.

Q    I got Jasper Von.  You lose me at the other end.  I just, you know, want to know ---

A    B-E-U ---

Q    -- who is actually rendering opinions.

A    B-E-U-S-E-K-O-M.

Michael Rudolph            August 23, 2023

MR. CROTTY:  Sean, would you like me to put that in chat?

MR. GELLIS:  Yeah, that's fine.  Go ahead, Patrick.  Thank you.  We'll just do that.

MR. CROTTY:  And also, just for the court reporter, where Mr. Rudolph was using the term sequel, phonetic I believe it stands for SQL.  Would you like me to put that in as well?

THE COURT REPORTER:  Yes, please.  Thank you.

BY MR. GELLIS:

**Q    Okay.  So, down here in the last paragraph it says an audio to text transcription is made of the recording, that's why we talked about that.**

A    Uh-huh.

**Q    But it says millions of recordings all effectively identical.**

A    Yep.

**Q    What does it mean to be effectively identical as opposed to identical?**

A    So in the robocall industry, let's say there's a robocall out there that says this is the Social Security Administration, there is a warrant for your arrest in the state of Texas.  And it goes on, there's a press 1 to engage.

The party that's configuring that robocall

Exhibit E - YouMail Deposition

Michael Rudolph              August 23, 2023

campaign, in some cases might start prematurely.  They hear your hey, this is Sean, and they think that when you said Sean it was a beep, and they started playing their outbound audio.

So when we get the recording, we might miss that preamble part.  You know, this is the Social Security Administration, like the this is might get cut off.

So when we say they're effectively similar, you know, they've got -- they're materially the same, but because the call might get hung up a few seconds early or the robocall audio deposit might start or have a blip or a glitch, you'll have, you know, some offsets in the recording.

**Q    How much of this report can you say you have personal knowledge of?**

A    I would say all of it.

**Q    I mean even the work done by somebody else?**

A    I mean that work was done with my direction. So, all the work here, you know, for the bit done by Jasper, he would ask me if he should do it, if it was his idea, and I'd say yes; or it was my idea and I'd say, you know, please do this.

**Q    Okay.  So, you -- your testimony is you have personal knowledge of work done by other people.**

A    Yes.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q    What methodology did you use to reach these opinions?

A    Which methodology did I use to reach these opinions?  Is that your question?

Q    Yes.

A    I mean there's a variety of opinions in here. So, I would say, you know, some opinions had different methodologies for, you know, for their specific section.  So, I mean if you wanted to go into a specific one, we could discuss the methodology.

Q    I'm just asking you generally.  And the reason is because, you know, the standard for expert testimony is, you know, potentially scientific -- Federal Courts and your lawyer can talk about that later.

But I'm trying to understand the scientific underpinnings of your opinions.  Ad so I'm just asking you what methodologies did you use to reach the opinions?

A    So, I mean you'll notice that we produced a report which is -- this is a summary of findings document that you're in, right?  So, generally speaking, when we're looking at unlawful communications in, you know, a set of CDR's, there's, you know, I suppose some industry agreement about things that

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

people tend to look for, right?  So, I know one of the sections in here, for example, we looked at the number of unique originating numbers in a set of CDR's.

And we compared the number of unique phone numbers that are given to the State of Florida to operate.  And the number of phone numbers that would have been in a Florida area code exceeded the quantity of total numbers given to the State of Florida.

So that methodology, to look for signals that there's unlawful communications present, is I suppose a methodology that a lot of folks who run fraud ops teams or go to, you know, fraud ops conferences in telco have arrived at that if you have a transit provider, originating provider and they're using almost the entire number supply or exceeding the entire number supply in an area code, you get a pretty good indicator of problematic communication.

So, you know, each one of these sections is a methodology or technique used by, you know, I like to think some of the best fraud fighters in industry to understand that there's problematic communications within a set of CDR's.

**Q    And where are these methodologies published or where can somebody find what they are?**

A    A lot of folks have published methodologies.

Michael Rudolph          August 23, 2023

I think some of the best ones have actually been published by the State Attorney Generals recently in some of their -- their actions.  I know a company like Numerical has posted some best practices.  YouMail has a best practices document.  And you would find those, you know, linked on their websites.

Q    Have these methodologies been tested?

A    I mean there are communication providers who are, you know, following what they believe is reasonable.

Let's say there's a best practices with ten -- ten bullets of things you should do, I am directly aware of some providers who are doing all ten.

I'm aware of some providers who are doing like seven of the ten because they think the other three wouldn't matter for them.

In some cases some of those providers who are following all ten have yet to receive a traceback, from what they've told me, so I would perceive that as success.

Q    Has the techniques that you use been subjected to peer review and publication?

A    Definitely peer review.  I don't know -- I don't know if folks ever publish.

Q    Give me some peer review examples.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A     Some peer review examples, again, we'd be discussing Select Somos is a company that maintains the toll free number registry, and they have a fraud operations team that tries to keep the toll free number system ecosystem clean.

So, you know, we've spent time reviewing what they do and what we do, and you know, ideating other techniques.

We also work with a company called iconectiv, who manages -- in industry there's this thing called stir shaken, where you authenticate calls, and they're effectively the administrator for those certificates to assign calls.  So, we've, you know, gone through these practices with them.

We've gone through these with a couple of communication providers who had problems, I suppose.  And, you know, as they put these in place we would have like hey, we found calls that hit some of these thresholds or some of these matrix.

We terminate the accounts and, you know, the number of calls that they were carrying that was problematic would have decreased after they put certain countermeasures in place.  So, lots of folks at all levels of industry peer reviewing.

**Q     Okay.  But I'm saying is any of that public**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

or is this all kind of privately done?

A    I mean I know some of the folks have said they've posted on their websites.  So, there's some wherein they're knowledge based.  You can find, you know, best practices documents.

I know Numerical is one of the ones who frequently posts on LinkedIn and social media.  They just recently filed with the FCC their best practices.  So, they -- they advertise in the public domain a lot more than anybody else presently.

Q    So has anyone ever published a peer review on YouMail's best practices?

A    No, I don't think -- no, not yet.

Q    Do you know your methodologies error rate?

A    I mean error rates -- again, when you say methodology, there's individual sections that each have their own methodology, which would mean that they each have their individual error rate.

So in some of these cases ---

Q    Can you go through them?  I mean ---

A    Yeah, if you want.

Q    What is the range of error rates that we're talking about here across the report?

A    I mean I think for almost all of these the error rate would be less than one percent.  I mean we

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

don't typically put in a matter such as this anything with any material error rate.

Q    So do you know your methodologies potential error rate?

A    Do I know my methodology -- so again, yeah. There's individual methodologies for individual like statistical groups here, right?

And in the ones that are in this specific report, you're looking at a sub one percent error rate in all the different sections.

Q    Okay.  Well, we talked about -- I heard statistics.

So what statistical methodologies are being applied to produce these results?

A    Again, there's no -- there's no estimations here, right?  So, you've probably got a zero percent error rate in what you're looking for here.

So statistics would mean, you know, you're approximating things, right?  So, if we -- if there were a million CDR's and you gave me a thousand, and from those thousand you ask me to weigh in on the likelihood that you would exhaust the number supplying the state of Florida in my previous example, I would give you a very high error rate.

You know, I think the odds are that it's 60

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

percent, and my error rate is 15 percent.  In this case we literally just counted individual records, and we compared them to a known number.  So, you -- there's no real room for error.

Q    So you don't think there's any room for error in your fingerprinting services, your AI.

A    So the -- so that's where I can give you that, you know, there's a sub one percent error rate, would be -- so there's different sections in here, right.

So the methodology for, you know, number inventory consumption would not have an error rate, right?  You could have a section in here where we find individual call records, right?  And we say here's the transcription, here's the call that we found in the CDR.

When we're looking at the -- the fingerprinting for that call, that individual call, the fingerprint might have said hey, we think that this is a match for the Social Security Administration imposter.

So in that case it would go into a bucket for a second pass analysis.  So, that second pass analysis would actually send it, and we've only put in this document the ones that we had consent from the end user to send to a transcription service, where that exact

Exhibit E - YouMail Deposition

Michael Rudolph                August 23, 2023

audio would be taken to the exact text transcription.

So when the fingerprint was off, let's say, and the text transcription in that one percent error case rate would have come back, and if it wasn't a match, it would have been discarded and it would have not been in this report.

So while there would have been an error rate prior to that section that was doing exact content matching, those would have been discarded, not made this report.

So there would have been a pre-pass, which could have had a one and a half percent error rate.  But you're looking at the second refinement of that data, where you got a very narrow set of exact match.

Q    The second pass analysis, I'm assuming this is also done by technology and not humans.

A    Yeah, that's correct.

Q    Okay.  So, there's no human that does these analytics.

A    I mean in all data science, all technology based analytic is human assisted.  So, I mean a human, you know, a human did interact with the small set of data here, which is included in the appendix of this report.

Q    I mean I guess that's what I'm getting at. So, there's like, you know, allegations of thousands of

Michael Rudolph          August 23, 2023

scam calls transited the network.

A    Uh-huh.

Q    Did a human track down and verify every one of those and make sure it was right?

A    In this case, because there's a small subset, yes, right.  If you had 1.5 million we would have done some sort of sampling and disclosed the sampling.

Q    And so this AI/technology that you used to do these analytics, is that part of your proprietary -- that we talked about earlier?

A    Correct.

Q    So how can a proprietary technology ever be subject to peer review?

A    Well, so -- I'm trying to think about how I could give you a good analogy here.  Let's say that there's a cereal box.  Let's say that you got a cereal box out there and they've got like four toys in the cereal box.

You could have Captain America, Hulk, Captain Marvel or somebody else in the cereal box.  And you wanted to hire YouMail to give you a bunch of boxes that only contained Hulk figures, right?  And then our team came up with a methodology where we weighed the boxes and we thought the Hulk figure weighed the most, he was the bulkiest.  And so our team did that.

Michael Rudolph          August 23, 2023

We weighed a bunch of boxes, we got a million boxes of cereal.  And we used some scales, and we had like a factory.  And all these boxes weighed more on average than all the other boxes.  Then we get a narrow set from the million boxes of cereal, and we've got ten thousand boxes of cereal that we think have Hulk figures in them.

Now our team actually goes and we open every box.  We look at the Hulk figure, we put it back in.  And we say hey, this is a Hulk figure for you.  You don't have to worry about there was a problem weighing on the Captain Marvel figure now.

Q    In that example ---

A    The weighing wasn't necessary.  It was just an optimization to come to, here's all the Hulk figures.

Q    **You still had a human open the box, right?**

A    Yeah.

Q    **You don't have a human doing that here, do you?**

A    No.  I mean we -- the analogy I think is pretty good.  Like we -- we have a bunch of candidates that we think match illegal communications.

And when we set human ears on the audio recording, and we say yep, that's what that one is doing, that's

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

the one that we popped off the network, you know, to that customer from that phone number that matched the one in the CDR's, it's -- it's basically the QA -- the quality control check that that recording was illegal and is part of the appendix in this Summary of Findings.

Q    And I understand you're saying that.  I guess what I'm getting at is if technology is proprietary, we talked about that, right?  A hundred percent confidential, correct?

A    I mean when you say a hundred percent, you know, materially confidential, sure.

Q    And then the way that it operates and does all this secret sauce is proprietary, right?

A    Proprietary, but as a CTO it's not -- it's not insurmountable to understand what's going on here.

Q    Okay.  So, yes or no, it's proprietary?

A    Proprietary, sure, yes.

Q    Okay.  So, this proprietary secret sauce is the thing that is doing the analytics for your report, yes?

A    It's performing the first pass candidate sourcing for communication records for the report.

Q    And I guess I'm circling back to if it's proprietary how can the scientific community have

Michael Rudolph          August 23, 2023

tested it?

A     I don't think that's necessary.  So, they couldn't have, but I don't think that's a necessary step.

Q     You don't believe that your methodology and your technology needs to be tested by the scientific community to be valid?

A     I guess -- how do I -- how do I say it again? So, again, we're looking for Hulk figurines in the box. You gave me a million boxes and I said hey, here's 1,500 Hulk figurines.

If you did not care that I missed 400 that we should have found, then the fact that there wasn't optimization that got you the thousand is, you know, kind of like irrefutable, a truth of that here's a thousand Hulk figures, right?

And we quickly got those thousand because of this -- of a matching algorithm.  And now you're looking at the Hulk figures.

I hate to -- it's a terrible analogy, now that I keep saying the word Hulk figure, but, you know.

The fact that you've got a proprietary method to deliver an optimization to get the -- to have -- you can see him, you can touch him, you can feel Hulk figures, did it matter whether or not you had like a

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

scale that, you know, might have left some in the box still.  Do you understand?

Q    I hear you.  I'm just, you know, I believe that there needs to be more, and some scientific peer review analysis in order for an opinion to be valid.  But we won't get into that now.

Let me ask you; is there anything scientific about your methodology?

A    Absolutely, sure.

Q    Okay.  What's scientific about it?

A    I mean scientific is you have a hypothesis and you test it.  So, I mean as we refine algorithms, right, you know, we'll go through an iterative development process to refine those and make them more accurate.

Q    How does -- correct, the scientific method, right?  Hypothesis ---

A    Uh-huh.

Q    So if it's proprietary how can anybody except you apply the scientific method to it?

A    Again, that's correct.  Only we would be able to.

Q    Exactly.  So, nobody else can verify if it's actually right, correct?

A    I mean you can, right?  When you say that's

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

actually right ---

Q    That your hypothesis is correct.  I said in applying the scientific method.

A    I'm trying to like -- let me -- I'll make it kind of -- I'll over exaggerate to make this point.

I got a million cereal boxes.  And you say can you find one Hulk figurine in a million cereal boxes.  It doesn't matter what I do, if it's proprietary, secret, scientifically reviewed.

If I pull out a cereal box and I show you there's a Hulk figurine inside, I've proven that it doesn't matter what my methodology is.  We found a Hulk figure, right?

So, like you don't necessarily need to have an open box to know that somebody has the capability of finding a Hulk figurine in a million cereal boxes.

Q    Okay.  We'll take this for a second and run with it.  My problem is, you know, the way you sound and talk about it, I think your methodology would be fine if everyone got to stand in the room and watch it.

But what you're doing, you're saying is you're going through a door behind a closed wall with a million boxes and walking out with a figurine and saying it came from the box.  And you're just -- and nobody gets to see that, right?  So, that's what I'm

Michael Rudolph            August 23, 2023

getting at.  Your methodology is secret.

You're saying we have results, so it's okay.  But I'm asking how does somebody test that?  Can anybody -- are people in the room with you when you're opening these boxes?  I don't think so, right?

A    I get what you're saying.  I answered, it's a great observation.  And I'd say, you know, we're happy to invite, you know, the observation of the process.

Q    I mean, but it's proprietary, right?  I mean do you guys publish your proprietary technology somewhere that I can go review it?  Or, I mean where do I get a -- where do I get my hands on your code?

A    Yeah, yeah, yeah.  So, again, I'm trying to think about like how to -- how to provide another analogy here.  So you've got -- again, we're talking about a whole bunch of different things here, right?

So I'm focusing specifically on the observation which produced the exact recording for calls that were in the CDR set, right?  So there's a lot of other analysis here where, you know, the methodology that we use is the methodology used by many others.  And, you know, we're happy -- happy to go into those specific analyses sections in this document.

But the one we were talking about, the exact communication records, is basically you've got, you

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

know, a list of -- let's just say a hundred calls in subpoenaed CDR's, and then we have a list of ten calls, you know, that were the subset of that, that are in our database, right?

But our database has calls from other communication providers as well.  So, you're really -- there's not a lot -- there's not a lot to connect those dots.

And then when we see the communications that come out of those, right, and we're taking, you know, just the ones that have, you know, very specific matches.  We're leaving a lot of stuff on the floor that isn't being pulled in here, right?

Q    I hear your testimony.  So, I'm going to go ahead and just kind of move on for time.

Are you intending to offer any opinions that Smartbiz Telecom, LLC violated the law?

A    I do not believe so, no.  I don't think I have that opinion.

Q    Okay.  Are you intending to offer any opinions that SmartBiz Telecom, LLC lied to regulators?

A    No.

Q    Are you intending to offer any opinions that SmartBiz Telecom, LLC originated the call traffic on its network?

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A     I mean you could ask me for that opinion, I suppose.  We were given the CDR's that SmartBiz produced, which had to match to those calls.

Q     Okay.  You understand the difference between originating a call and transiting -- or transmitting a call, correct?

A     Yeah, I mean ---

Q     Are you offering an opinion that they originated those calls?

A     I do not think so, no.

Q     Are you intending to offer any opinions that SmartBiz failed to take appropriate measures to mitigate traffic on its network?

A     I think so, yes.

Q     What's that opinion?

A     I mean in the Summary of Findings, right, it includes the tracebacks that SmartBiz would have received, saying hey, this call was found in your network again and again and again.

And if you were to ask me for the opinion if they put measures in place at certain points along that timeframe, were they effective, I would observe that they were not because they continued to receive tracebacks.

Q     Okay.  Are you intending to offer any

Michael Rudolph          August 23, 2023

opinions that SmartBiz is not an intermediate provider?

A    No.  I don't think so.

Q    Do you think there's any other additional information that you don't have that if you did have might have impacted your opinions?

A    The thing that I think always is helpful for our opinions is if there were other CDR's that were withheld.

Because the more CDR's that we would have that represent a totality of the calls that transited the network, you know, the more complete picture that we would have of that network.

So I don't know if any CDR's were withheld.  But if there were CDR's, you know, that could shift, you know, our understanding of what the traffic was.

Q    Are you intending to offer an opinion that receipts of a traceback inquiry means you did something wrong?

A    I don't think so.

Q    Then why would you give the opinion that SmartBiz failed to take adequate measures when it received numerous tracebacks?

A    I think it's an observation that anybody with commonsense could provide you, which is, you know, if you get in trouble in class for talking, and that's in

Michael Rudolph          August 23, 2023

the record, you know, every day for a year of going to school, if somebody said do you think that family did a good job making it so their kid wouldn't get in trouble, commonsense observed, no. There's no observable change.

Q    So the receipt of the traceback, in your mind, at a certain point becomes evidence of some kind of bad conduct.

A    Receiving a traceback, I mean this is pretty much consensus, I believe in industry, is you've got something you need to deal with, right?

You gave a driver's license to a -- you give a fake ID to a minor, you let him in the nightclub and they bought a beer, and you've got work to do.

So I think as long as you keep receiving those, you've got an unresolved problem that, you know, you let a minor drink in your bar again.

Q    Were you provided any information about when SmartBiz opened or closed various trunks associated with the call records you analyzed?

A    I think during the investigative process, when we saw -- there's some sections of this report where we can see like a robocall campaign, or a chunk of -- I'm going to say low quality calls, and when the data sets.

Michael Rudolph          August 23, 2023

One of our questions was, was this the full data set or, you know, did SmartBiz only produce 30 days when there were six months, or is this basically showing that a relationship between SmartBiz and another provider came to an end.

Because one of the things that you're looking for in robocalls is if a provider is intentionally moving traffic and just trying to find, you know, a way to get it out there when they know it's bad.

So if SmartBiz had, you know, a longer term duration and didn't provide it, it would show that that, you know, relationship was a long standing one between them and their provider.

So during our investigative efforts we did ask Florida, you know, is this all of the data, because there's a lot of abrupt stoppages in, you know, high volume robocall traffic.

And, you know, the inference you would make -- you could make on that is that relationship was terminated because of the problematic traffic.

And so I think we had like a very brief dialogue of, you know, do you know if that relationship ended or are there more CDR's.

Q    Do you remember the outcome of that?

A    I remember the outcome of that was, I

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

believe, that those were all the CDR's that were provided.  And there might have been some dates, and -- but we didn't really synthesize that into -- it didn't change what we had already written in the report.

**Q    So you were not provided the spreadsheet that SmartBiz produced with its purported trunks and opening and closing dates and all that?**

A    I remember seeing that.  I remember seeing that, but it was provided after the, you know, most of the copy was already written.  And it didn't change, you know, our observations or our, you know, our data here.

**Q    So seeing that SmartBiz may have terminated a bad actor doesn't change your potential opinions about failing to mitigate?**

A    Well, no.  Remember, the table that I saw would have shown, you know, my reading on it was that the downstream from SmartBiz and SmartBiz ended their relationship, which meant the person SmartBiz was giving traffic to said we don't want this traffic anymore.

I think Inteliquent was one of the examples I remember off the top of my head, no longer was taking SmartBiz traffic.

That actually would reinforce that unresolved

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

problem that SmartBiz, if their downstream was terminated for some reason.

Q    You believe that the chart you saw shows that what downstreams terminated SmartBiz as opposed to SmartBiz terminating its upstreams?

A    The table I saw, which again was not material to anything that we wrote here, I think represented dates -- if you could throw it up it would help -- it would help on the merit.

But it had dates, it had, you know, various providers.  And the providers, how they key their data sets, I believe represented a mix of upstream and downstream.

But we were predominantly interested in the downstream because we were looking, you know, at that specific, you know, down-flow point from SmartBiz in -- into the flow of traffic.

So we weren't looking to comment or observe, you know, what their relationship was with an upstream. Does that make sense?

Q    I mean the upstream sends the bad traffic to SmartBiz, yes?

A    Yep.

Q    Okay.  And so you didn't think it was relevant to know when SmartBiz terminated its upstreams

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

who were sending it bad traffic?

A     I mean I think that's relevant for how SmartBiz would conduct its operations.

Q     Didn't you say you're offering an opinion that SmartBiz did not properly mitigate the traffic on its network?  I believe you testified to that.

A     My observation would be did SmartBiz do -- takes sufficient measures to, you know, to stop receiving tracebacks.

And I guess for that observation you just need to observe the fact that they continued to receive tracebacks rather than what did they do internally and making inferences on what they did internally to try to resolve that issue.

I don't have any -- I had that brief potential visibility where I can make a lot of inferences, which are dangerous to make.

Q     I mean, I guess that's what I'm saying.  Is it fair to say then that just because SmartBiz got tracebacks that they weren't doing enough?

A     They weren't doing enough to stop receiving tracebacks, yeah.

Q     Okay.  Let's -- we gave a hypothetical earlier.  You know, SmartBiz potentially has a bunch of clients, right?  I mean a bunch of upstreams.  I think

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

twenty-something are named in the Complaint, right?

A    Yep.

Q    So if SmartBiz goes to a conference and meets another intermediate and contracts with them, and they're now an upstream, SmartBiz gets a couple of tracebacks.  Turns out it's bad traffic, terminates them.

That situation alone, let's just talk facts. That's the situation, they get a couple of tracebacks, they terminate that upstream.

In that situation have they done -- have they sufficiently mitigated, in your opinion?

MR. CROTTY:  Object to the form of the question.

THE WITNESS:  I keep answering?

BY MR. GELLIS:

Q    Yeah, yeah.  You've got to answer it.

A    Just making sure.  Just making sure if we're all clear here.

So in industry you're operating a communication provider, and you've got a baseline of business.  You haven't received any tracebacks.

You've got, let's just say -- I'm going to keep it simple.  You've got three customers.  You've known them, you worked with them for ten years.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Now you decide today to take on a brand new customer. You never had this customer before. And you bring that new customer on, and I don't know where you found him. Maybe you found them at a conference, maybe you found them on a internet forum, but you found a new customer.

You take them on, you get a traceback the next day. And then you tell that customer hey, we got a traceback because of you, but we want to make it work. And they say oh, yeah, we got it.

The next day you receive another traceback, and the next week you receive another traceback. And you keep having these tracebacks for this account four that you brought in.

You're like you know, this is too much. Get rid of account four. But then you go back to that same tradeshow. You go back to that same, you know, internet forum.

You find another company. Looks a lot like company four that you just terminated. You bring them on and the same thing repeats. And you keep bringing on, they're different entities, right, but they keep having the same traffic.

Maybe they're called different things, they've incorporated differently. That is endemic in industry,

Michael Rudolph          August 23, 2023

where you've got a baseline business that's taking risks by bringing in unknown entities and then trancing their traffic.

And so I would say, you know, that that company could be content with the three customers they had and stopped -- it's like you're running -- my example, if you're running a nightclub and you're like -- and you've got a bunch of regulars, but now you've let a bunch of new people come in and they're underage.  You get in trouble for letting underage people drink.

You're like but I really like having my nightclub full, and you keep getting in trouble because you keep going to a high school and saying come to my nightclub. You'd probably stop going to high school and looking for people who shouldn't be drinking in your nightclub.

That kind of analogy, I would say, represents if you've got a certain customer profile that you keep on-boarding into your network that keeps causing this problem, that maybe you don't onboard customers of that profile.

Or maybe you don't onboard new customers at all until you've got a sense of what you're doing that's inviting those same problems.

**Q   Here SmartBiz was contracting with other intermediate providers, right?**

Michael Rudolph          August 23, 2023

A    Yeah.

**Q    Not -- yeah, not the people making the calls, right?**

A    I mean the originators of the calls would have been the ones, you know, paying SmartBiz to send those calls to the network.

So there's a blurry line between upstream provider and upstream like originator, right?

There's a lot of robocall originators who try to look like a provider, or providers who try to look like an enterprise.  So, there's a blurry area now between those two types of entities.

**Q    How many hops away from the originator do you have to be before Mike Rudolph says you're not really at fault?**

A    When Mike Rudolph says you're not really at fault.  I mean fault is a fun word.

I mean clearly anybody in the call path should help provide data and signals for everybody up the call path to investigate and come up with plans to stop the traffic.

So let's just take your ten hops away from the originator, right?  And you've got some great whatever secret sauce.  You're like wow, look at all these calls.  They're all -- pretend to be a bank and they're

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

stealing from people.

And you recognize hey, all of these call paths are using the same media IP to anchor the audio for those calls.  And you can share that with everybody up the chain, and they could all block accounts using that IP.

I mean I think everybody, you know, bore, you know, bore some responsibility to help investigate and resolve that problem and stop people from getting harmed.

So fault is a tough word, but bore some responsibility to mitigate.

**Q     Do you also apply that responsibility to the terminating providers?**

A     Yeah, I think everybody in the call chain bears some responsibility to mitigate.  I think the terminators would have, you know, reports from consumers that these calls are problematic.

And, you know, there's -- go ahead.

**Q     No, no.  Please, finish your thought.**

A     I would say, you know, one signal that, you know, again, you're asking for an opinion.

Occurs in industry is when you got an intermediate provider, whether they're one hop, six hops away, and they've got a baseline of traffic.

And now a new traffic profile -- when I say new

Michael Rudolph          August 23, 2023

traffic profile, like a batch of numbers that all look similar, starts getting rejected.  They start seeing zip air codes, saying this call cannot be completed or, you know, it's being rejected.

If I signed up CVS Pharmacy as my customer, and I saw suddenly a bunch of zip air codes letting me know that that call was being blocked, even if that's the terminating provider, I'm not a very good company.

I'm not going to stay in business if ten percent, even five percent of CVS's calls are getting rejected by the terminating provider.

So everybody along that chain can see whoa, a bunch of calls are getting rejected.  If I want to keep my customers' business, I've got to ask them what's going on here and we've got to figure out how they can resolve that.

And if you find it's CVS Pharmacy, then right now in industry this is happening, like that's being really well known -- made known all the way from the originator or the gateway, or the -- the closest intermediate who gives a damm to get that call cleaned up and stop those rejections.

So usually when you see -- usually when there's rejections happening and it's not, you know, you're ringing the bell, crisis, important customers getting

Michael Rudolph          August 23, 2023

un-falsely blocked, it's, you know, it's questionable whether or not, you know, those calls are of a quality that folks would want to bring investigative joint efforts into resolving.

Q    Do any of YouMail's carrier customers ever get tracebacks?

A    Absolutely.

Q    So does that mean they're doing something wrong?

A    It means a problematic call, you know, traversed their network.

So when you say doing something wrong, I mean if that equates to a lot of problematic call traverses your network, then yes.

Q    Okay.  Yeah, I'm getting at if SmartBiz is at fault for letting these calls on its network, as you've given an opinion, I'm asking are carriers who use your service similarly at fault when they get tracebacks?

A    I mean again, at fault is the term I'm unsure what you're trying to suggest.  At fault of ---

Q    Failing to mitigate.  I mean you said that SmartBiz failed to mitigate because they kept getting tracebacks.

A    I think -- I mean clearly something got in, right?  Again, I'll go back to my club analogy where a

Exhibit E - YouMail Deposition

Michael Rudolph              August 23, 2023

minor got caught for drinking again.

So, I mean yeah, I mean in this case you're at fault because a minor got in your club and ordered a beer and drank it again.  So, there's fault there for letting that happen.

I mean one example, which is egregious, is you could just shut down your nightclub, right?  And then you would never be at fault again, right, which is an extreme example.

But there's somewhere where there is a happy medium in there where a lot of communication providers, many of which are YouMail customers, allow new accounts to send out calls, and you know, they didn't do the proper homework on those accounts.

**Q    Do you believe that using the YouMail service as a carrier is evidence of an attempt to mitigate traffic?**

A    I think so, yeah.

**Q    And that would also apply to SmartBiz, if they were using your services while through the SIPNAV platform?**

A    So you said SIPNAV platform.  So, using YouMail is evidence that you have awareness that you've got a robocall problem that you would like to get ahead of.

Michael Rudolph          August 23, 2023

And when I say robocall problem, I think there is intermediary providers, originating providers, and robocall operations that think of the problem in two different buckets.

Some people think that the problem is I don't want to have unlawful communications that I'm responsible for, and I need to get ahead of that.

Other people think man, I got caught for having unlawful communications, and I don't want to get caught again, right?

So YouMail data, because it is very telling about a robocall problem, can be used for either of those two parties who have that objective.

And, you know, I always hope that it isn't being used for like I don't want to get caught for making robocalls, but it could be used for that way as well.

**Q   You'd agree AT&T, Verizon and T-Mobile, i.e. the big guys, are the carriers with the most customers?**

A   I'd agree.

**Q   Do you know -- well, let me ask you this.  Do they use the YouMail service?**

A   No.

**Q   Do you know why they haven't implemented something like YouMail?  If it's so, you know, less than one percent error rate, right?**

Exhibit E - YouMail Deposition

Michael Rudolph                    August 23, 2023

A    I mean they are the big guys, so you could imagine that they've got, you know, large bureaucracies of different component organizations who have responsibilities, like T-Mobile and Sprint just merged, so there's been a lot of upheaval in personnel at that organization.

All three of those have an incumbent analytics engine that they use to try to essentially mitigate robocalls.

The AE's are like TNS, First Orion, Hiya.  I would say that -- I have to be careful of confidentiality agreements here, but generally speaking, you know, YouMail is answering the calls that the big providers analytics engine should be stopping before they ever get to one of our customers.

So we're just seeing what gets through the current blocking techniques that the big three carriers use. It would not be unsurprising that we've had conversations with those folks about those specific calls that they can't find, that keep getting through.

That's probably as close as I can get to like, you know, there's discussions there, but I can't say more.

**Q    Okay.  So, currently there's no contracts with the big three.**

A    No.

Michael Rudolph                    August 23, 2023

Q    Okay.  And I mean I'm just thinking, you know, if your software and your patents are ironclad, like you say, and they've got less than one percent error rate, you know, by way of analogy, someone invented the polio vaccine and suddenly polio went away.  Why, because it worked.

You guys invent the robocalls technology, the big three don't pick it up.  What's the issue here?  I mean why are they not using you?

A    Well, there's different things.  I mean we're talking about now the shield that Verizon might put around its consumer base through a partnership with an analytics engine, and what that error rate might look like in a partnership with YouMail.

That's different than saying the methodologies or techniques where YouMail was given CDR's from a provider, found the same CDR's that they were the terminating for, looked at those, grabbed the recordings, filtered down to the unlawful recordings.

Like that has a different use case and, you know -- I mean we are effectively the provider that folks are doing that with, you know, all across industry.

That has that low error rate and is somewhat irrefutable, rather than you should be aware -- like Verizon is, you know, has different approaches on, you

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

know, how they would try to prevent an individual call from coming to you and how they label it, right?

Where they've never seen a phone number before, and they're going to say it's scam likely.  And maybe they know that, maybe they don't.  Two different things with two different error rates and efficacy is about how they would assist industry.

Q    I mean at bottom though, using the YouMail service doesn't guarantee that bad actors don't through, right?

A    Nope.

Q    We already have this exhibit up here.  I'm just going to go to page one real quick.

It says here, you can probably see, the first sentence, that YPS data is sourced from YouMail that provides the answering services for 12 million consumer accounts, okay.

A    Yep.

Q    And these consumers represent a significant sample of the North American population.  Do you see that?

A    Correct.

Q    So do you know approximately how many numbers there were in like June, 2021?

A    How many numbers there were?

Michael Rudolph          August 23, 2023

Q    Well, I mean yeah, how many phone numbers?  I mean you said that 12 million is a significant sample.  So, let me strike all this.  Let me go back.  Hold on, let me go back.

What percentage makes something a significant sample?

A    One of the examples I use is monthly active users in Washington, D.C.  Washington, D.C. has got a lot of lawyers that care about communications.

So if I look at Washington, D.C., the metro region, and I look at the adult population, I've got this number I should pull up somewhere.  But for the purposes of example, say 300 thousand adults live in Washington D.C.

I think YouMail answered calls for -- again, I'm giving you examples.  I'll give you -- 14 thousand adults in Washington, D.C. in the last 30 days.

So based upon our numbers, we're answering calls for 1 in 66 adults that live in Washington, D.C.  So, if you made 6660 calls to 666 -- 660 distinct recipients, you should expect YouMail to answer ten of those.

Q    One sixty-sixth is 1.5 percent, yes, approximately?

A    Yep.

Michael Rudolph          August 23, 2023

Q    1.5 percent is significant to you?

A    I think so, yeah.

Q    Okay.  So, would it surprise you if I told you in June, 2021 there were 450 million total wireless wire line and VOIP lines?  Does that sound about right?

A    That's lines.  That's not individual humans, but yeah.

Q    Okay.  And that would only be 2.6 percent. Your 12 million is only 2.6 percent of that, right?

A    We're talking about humans versus -- versus lines though.

Q    How many human -- I mean there's 400 million humans in America, approximately.  I mean what are -- what numbers are you using?

A    My one year old doesn't have a cell phone yet, thankfully, right?  So, we try to look at adults who would actually carry a mobile device on their person.

So, you know, we're looking at like a 12 year old to, you know, like 90 year olds.  And you've got a -- you've got a curve that you map to that -- to the demographics in order to figure out how many humans are actually carrying a cell phone.  I think the number is 315 million or something, as your denominator.

Q    You're taking 1.5 percent of the population

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

and applying whatever you capture from that 1.5 percent and saying that represents a 100 percent of everybody, basically.

A    No.  It's -- again, if you're looking for -- so the term binary means true/false, right.  Does it exist or does it not exist.

And so if you made a call to 660 people in Washington, D.C., and you say -- you want to come to us and say did you get it, did you get one of the calls I made, right?  We just need to say yes, we did; no, we didn't.

It didn't mean -- we're not necessarily extrapolating, you know, three or 666 calls, give me a curve of their durations.  You know what I'm saying?

Q    I'm just trying to get at the 1.5 percent is a significant sample size to you, that's all.

A    Okay.  I mean when you're looking for -- when you're looking for a true/false, is this call out there, that is enough to know if you make several hundred calls, true/false, that call is out there.

It's significant enough for that specific question.

Q    It says here that -- on page two, you provide a significant -- let me make sure I have the right word.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

**You provide a significant quantity of calls to the FCC traceback entity, the ITG, correct?**

A    Correct.

**Q    Isn't the word sell more appropriate in this report than provide?  You sell --, right?**

A    Yeah, I guess.  I mean if you want to go there.  I mean we provide it through a commercial contract, yeah.

**Q    Sorry, I'm just -- I hit already some of these issues.  I'm just going down my list.**

**On page three it talks about a behavioral analysis, a behavioral call analysis was performed.  Do you see that?**

A    Yep.

**Q    What is a behavioral call analysis?**

A    Okay.  That's a good question.  So, behavioral in this case just looks at -- I say counting matrix, right.  Like how did the calls in aggregate behave.

Did you make a million and then go to two, then go to three.  That's a behavior, that you're ramping the number of calls per day, you know, doubling or increasing them by 50 percent or a million or a fixed bid.

Behavioral could also be that 50 percent of your

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

calls were exactly 23 seconds, right?  How did the calls behave in aggregate.

So you're basically judging calls by -- it's like mail going through the post office.  How many envelopes did you ship out yesterday.  You had a million envelopes, where did they go.  You know, 500 thousand went to Texas, 500 thousand went to California, right?

What was the average size of those envelopes. They were 12 inches by 4 inches.  So, behavioral is how they behave without knowing what was inside of them.

**Q     It says here that behavioral analysis of call logs does not require any specialized expertise.  Do you stand by that statement?**

A     When I say specialized expertise, where do you have -- can you highlight it?

**Q     Sure.**

A     Yeah, so specialized in this sense is meant from the perspective of like you don't need to be a lawyer, or you don't need to be a unlawful communications expert.

You just need to have a bunch of records and say, you know, if you have a log file and there's 30 thousand lines in it, you could say there's 30 thousand records.

And if there was a column in that log file that

Michael Rudolph          August 23, 2023

represented the duration of each individual call, you could put them into Excel and you could draw a box over them and sum them up and divide them by the total and have that number.

So specialized expertise isn't meant to cast shade at someone who is really, you know, competent with Excel.

But my son is a fourth grader and can take a CSV file and sum in Excel.  So, I'm suggesting it doesn't take specialized expertise to do some aggregate behavioral analysis on call records.

**Q    Then why did the Attorney General's Office, with hundreds of attorneys and a preeminent Telecom scholar, Mr. Crotty, have to pay you $900.00 an hour to bust out your proprietary technology and your AI to do this report?**

A    Well, so the light lift analysis is kind of representing what a layman can do to understand that they've got problematic communications, right?

So like again, Sean, I don't know what your Excel aptitude is, but if you took a set of calls and you put them in Excel, you can kind of group those and say give me a count distinct on values in this column.

And if you came up with a client that had originated calls from one billion unique originating

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

numbers, you can say hey, there's a problem in our network.

Like that doesn't make sense to me.  There's probably not a billion numbers that our customers actually had the rights to make those calls from.

So that's one part of hey, I've got a problem, right?  It's like when you -- you look in the mirror and you're like wow, like, you know, I've got an outbreak and a rash, right?  You know you've got a problem and you should see a doctor to understand more about what -- what you should do about that.

So I would think that what we're talking about, the behavioral analysis, that's kind of where you would look in the mirror and say I need to go see a dentist or a doctor, I've got a decaying tooth.

And you know, you would come to us to help us coach you with how you resolve that problem.

**Q    Did your kid do this behavioral analysis, because it's so easy?**

A    No.

**Q    No, okay.  Did the AG do this behavioral analysis, the AG's office?**

A    No.

**Q    I had to pay you to do it, right, 900 an hour?**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A    Correct.

Q    And so you think SmartBiz could do what YouMail does.  Easily, right?  I think it says easily, doesn't it?  Simple commands.  Simple commands, that's that it says.

A    Yeah, I mean ---

Q    Correct?

A    That specific section ---

Q    How many patents does it take to have simple commands?

A    That specific section, I do think they can. There's a -- it's really not that hard.

You can -- you can go to a command line and you can type a few letters and you've got some pretty good behavioral analysis.

You can Google this and follow the steps on stack overflow and come up with some of these answers.  So, this is true, it's pretty easy.

Q    Okay.  So, you looked at the CDR's, I mean, and you performed a behavioral call analysis, which is apparently very simple to produce this.

A    Uh-huh.

Q    Did you perform any other sort of analysis other than a behavioral call analysis?

A    Yeah, I believe that's called out in a future

Michael Rudolph           August 23, 2023

section where we talk about like the content analysis, what was the content of those calls.

That is not as easy.  That is not an easier analysis.  That is a hard one that goes through the fingerprinting and the AI, so there's two buckets of analyses.

Q    It doesn't say -- I mean can you show me here where it says in here where these other analysis was done?  I mean I just couldn't find it.

A    You would go down to the header for the section where they would come.

Q    Did you review anything besides the CDR's though, and the AG's complaints?  I mean that's what you said you imported.

So what else did you review if not just the CDR's and the complaints?

A    The section you're in is the CDR import, and it's calling out that the next section to follow is a behavioral analysis.

So if you go down in the document there's a new section that begins we're going to do a content based analysis.

Q    Okay.  But where -- I mean I -- this is page three, right?

A    Yep.

Michael Rudolph          August 23, 2023

Q    So we go down, right?  Page one, here's the background about YouMail.

A    Yep.

Q    Then we get to the team overview.

A    Yep.

Q    And I viewed this as then we get to here's what we were given, and here's what we did with it.  I mean that's why -- so I'm asking.  It says you performed a behavioral call analysis.

A    Yep.

Q    Then you say scroll down, and there's another section.  Well, I do scroll down and it immediately -- it's snowshoeing.

A    Yep.

Q    So was this snowshoeing tactics created through a behavioral call analysis, this section?

A    Yes, snowshoeing is a behavioral analysis.

Q    Okay.  All right, we're getting somewhere. What about low answer rates and short duration calls?

A    That's behavioral analysis.

Q    Okay.  So, again, a four year old could do this, right?

A    That's not what I said, but.

Q    I thought you said your four year old son could do this.

Michael Rudolph          August 23, 2023

A     My fourth grade son.

**Q     Fourth grade, I apologize.**

A     My four year old would not be able to do this.

**Q     A fourth grader could do this, my bad.**

A     No, the fourth grader can give you line counts and unique -- some fourth graders can.

**Q     What about analysis of phone number spoofing, behavioral call analysis?**

A     Now you're getting harder.  The more you go down the harder it gets.

**Q     Okay.  Well, I'm going to stop there then. And I'm going to take a break very shortly.  Let us take ten minutes and we'll come back.  Because it's been two hours.**

**Where is this behavioral call analysis methodology published?  Is it published anywhere?**

**Where do I go to look up how does -- I'm a Telecom provider; how do I do a behavioral call analysis?**

A     You can -- I mean again, you can type in Google -- you can Google it.  You know, you can put, you know, call duration analysis, and Google it.  And you'll find lots of vendors out there who want to sell that to you or give you a playbook to self serve yourself.

Michael Rudolph          August 23, 2023

Q    You also said that any -- let me go back to page three here.

Any provider can determine if the calls in those logs exhibit behavior that can be considered abnormal or problematic.  Does that sound right?  I can go up to it if you need to.

A    Yep.

Q    Okay.  So, what makes data abnormal or problematic such that a provider should take an action?

A    I mean I'm just going back to it as an example.  If you've got -- if you call from more numbers than exist in the North American numbering plan, that would be abnormal.

Q    Okay.  Where do I find the list of these abnormal behaviors?

A    I mean this case, you've got each blue headline is a section introducing another abnormal behavior.  So, it's unfortunately not a bullet list, giving you a preview of the sections to come.

Q    I guess I'm saying if SmartBiz is out there, and you're saying that they failed to mitigate, and that they should have been properly reviewing for these abnormal or problematic behaviors, I'm asking you how do they know what those behaviors are before YouMail comes along and shoves a report in their face?

Michael Rudolph            August 23, 2023

A    I mean typically folks in the communication industry, right, I would say like you could have a small communication provider and they really know their customer.  They're servicing a dentist's office.  And a dentist office isn't making high volume robocalls, you know, isn't, you know, pretending to be government agencies.

And that communication provider can live in blissful ignorance that I don't have a problem where I need to understand behavior of my calls.  If you get a voice provider and they sign up a customer, and they say hey, how did yesterday look.  And they see we did 30 million calls yesterday, they might think wow, who could make 30 million calls per day.

Like the largest banks in America don't make that many calls per day.  We must have one of the fortune 1000 company among our customers.

And if at that same time you start getting tracebacks or cease and desist letters that you're carrying unlawful communications, I would think as a custodian you would go to Google and you would type in -- or you would talk to the person who notified you.

So I know U.S. Telecom, when they served the traceback, has an appendix where they link off to a lot of things that folks can do to try to get a handle of

Michael Rudolph          August 23, 2023

the situation.

So I would say when you're a small communication provider and you don't have a ton of traffic, and you know your customers well, this isn't a thing you worry about.

But when you're running a company and you go from insignificant calls to billions in a month, and you start seeing tracebacks or start getting contacted by downstreams if you've got a problem, you would be using -- again, most human beings just go to Google and start trying to chip away at the problem. And you can find a lot of resources that way.

**Q   I understand what you're saying. But in many instances, like SmartBiz could be an intermediate provider that contracts with another intermediate provider, who might have numerous customers, right? I mean just -- you know, you don't know.**

**And so just because you sign up a new intermediate and suddenly get a bunch of traffic, that traffic could be coming from 50 of that new intermediate's upstreams, right? You don't know, do you?**

A   Yeah, but again, like before you sign the contract, again, in any business, you kind of want to know who you're going to do business with.

And if someone is telling you they've got, you

Michael Rudolph          August 23, 2023

know, such a quantity of calls that you're going to need the capacity to handle those tomorrow, you know, I think most of us would ask questions about those calls.

So if you've got an upstream that you're signing and they're going hey, we're going to send you a hundred million calls tomorrow, you're like wow, man, I got to really scale and it's going to be -- it's going to be like a life changing contract that I'm getting for my business, to ramp that far.

And you can ask questions about that, the origin of that traffic or you can not, and maybe you should.

**Q     Were you given any information about SmartBiz's communications with its upstreams?**

A     No, I don't think so.

**Q     You have no knowledge about what they may or may not do when vetting customers, no clue?**

A     I don't.

**Q     And you didn't ask for that information.**

A     No.

**Q     And you don't think that information would be relevant to your determination about whether or not they properly mitigated?**

A     I don't know if we -- again, you're kind of -- you're judging, you're measuring, counting matrix. You're not measuring how do we achieve those counting

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

matrix, right.

So, you know, if you're persistently getting traceback, and I'm being asked a question is somebody good at not being persistently tracebacked, I don't need to know what you're doing to avoid tracebacks and say no, because you're still getting traceback.

MR. GELLIS:  We're going to go ahead and take a ten minute break.  We'll come back at 12:50, I guess 3:50 for us, so see you all in ten.

THE WITNESS:  Sounds good.

THE COURT REPORTER:  Okay.  The time is 3:40 p.m.  We're off the record.

(Thereupon, a break was held at 3:40 p.m., after which the following was heard at 3:51 p.m.)

BY MR. GELLIS:

Q     Thank you, for the short break, Mr. Rudolph. I'm just going to hit a couple of things previously and then we'll go back to where we were.

Have you ever run an -- have you ever like run an intermediate providing -- intermediate provider company?

A     I have not.

Q     Do you have any knowledge of the profit margins when intermediate providers contract with other intermediate providers?

Laws Reporting, Inc.    305.358.2700
schedule@lawsreporting.com    www.lawsreporting.com
Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

A    I know that from conversational that it is not a high profit margin.

Q    And do you have any knowledge about what due diligence SmartBiz did before it onboarded any of the companies that you have done analytics for?

A    I'm not aware that I have any, no.

Q    Again, you didn't ask for that?

A    No.

Q    And you are offering an opinion that they are -- they did not take sufficient action to mitigate.

A    Again, I'm just narrowing the terms here. Like sufficient action to mitigate would mean reduced traceback, reduced calls of this nature.

So it's less about a referendum on what they might be doing internally that I do not see, but more about the results.

Q    But you don't -- again, you don't think if they tried everything humanly possible but still weren't able to stop it, you don't think that would be relevant?

A    If they tried everything humanly possible, I mean clearly they didn't.  If that -- I mean the outcome shows that things were still not done, right?

Q    So it doesn't matter what they did to you. It's just the outcome is all that matters.

Laws Reporting, Inc.    305.358.2700
schedule@lawsreporting.com   www.lawsreporting.com
Exhibit E - YouMail Deposition

Michael Rudolph                 August 23, 2023

A    When you say it doesn't matter what they did to me, I think it -- it always matters to me that people are trying to stop unlawful robocalls.

**Q    So do you believe there's a difference between somebody who does nothing to stop robocalls and still gets them, and someone who tries to stop them and still gets them?**

A    Absolutely.

**Q    Okay.  And so what's the difference between those two?**

A    I mean you've got, again, so like, you know, robocalls span the gambit between robocalls that are a nuisance and they don't have consent to call, and they're annoying Americans and, you know, people, you know, count up what the time loss is.

And there are robocalls that actually like take 50 thousand dollars from Grandma Smith's bank account and it goes into Crypto coin to somebody overseas.  There's a spectrum of how horrible an individual robocall could be.

So when folks, you know, are, you know, the route they are taking to their victims, again, there's a broad spectrum of the pain of an individual victim based upon an individual robocall.

You know, somebody who does absolutely nothing,

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

there's even worse.  There's somebody who tries to find more of those and assist them in getting into industry.

So I think you've got a spectrum where, you know, there's folks who are actually looking for more robocalls to assist them, and you've got people who have them and, you know, I guess cover their eyes and do zero.

And you've got folks who try to do a little and it's not effective.  And you've got folks who do a ton and it, you know, is potentially effective.

So you've got a spectrum of folks who, you know, do different things to assist or thwart robocalls, and you've got individuals anywhere along that spectrum in industry.

**Q    And without that information you can never know where SmartBiz falls on that spectrum, can you?**

A    Without -- I think even with the information it's hard to know like what someone's true intent is.

I mean we are aware of folks who are offering intermediate VOIPS who approach us with the initial request of hey, we want to stop robocalls and, you know, through looking at the data they send more of those over time.

So it's tough to judge a book by its cover.  Like I said, I think you measure somebody by the results

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

they achieve and say hey, you know, you obviously trained hard, you won the marathon.

Versus you watched somebody run a marathon and come in last, and it's hard to make that assumption that they trained hard.

Q    Okay.  But again, you don't know what they did or didn't do.

A    I do not know how hard SmartBiz tried, no.

Q    And other companies that are intermediates, they keep getting tracebacks to, like Inteliquent, Peerless; isn't that right?

A    Correct.

Q    Okay.  So, do you have an opinion that they're also not doing enough to stop the flow of traffic?

A    I do have that opinion.  They are not doing enough.

Q    Okay.  So, they're not doing enough.  What about Verizon?  They're always getting tracebacks because they're the terminating provider, right?

A    You're asking the wrong guy.  I think every provider can do more.

Q    They could implement YouMail, perhaps.

A    They could.

Q    That would be a sign of trying to do the

Exhibit E - YouMail Deposition

Michael Rudolph                  August 23, 2023

right thing, right?

A    I don't know if that's a sign they're trying to do the right thing.  But I mean it shows they're doing one more thing.

Q    We talked about, a minute ago, before the break, the obligation that you think SmartBiz has to, you know, vet their customers, find out who they're doing business with, etcetera.  Do you remember that?

A    Sure, yes.

Q    And we looked at the robocall index as well, right?

A    Yes.

Q    And those carriers were listed there.  And those carriers are the ones selling the numbers, aren't they?

A    Yes.

Q    They sell numbers to you guys, for example, right?

A    Yes.

Q    Aren't they then also then selling the numbers to the illegal robocallers, or at least selling the numbers to people who are selling the numbers to the illegal robocallers?

A    Yes.

Q    So what's your opinion on whether or not

Michael Rudolph          August 23, 2023

those guys have an obligation to find out who they're doing business with?

A    I mean I think, again, I think, you know, the public communications industry is like a community or a family, right.

So I think everybody has got an obligation to, you know, do their part to improve what's been allowed to transpire here.  So, I think everybody has a part.

Q    Do you know whether SmartBiz sells numbers?

A    I do not.

Q    You don't know?

A    I do not know.

Q    Don't you think that following the money would be the quickest and easiest way to get to stop these robocalls?

A    Following the money is a good approach for any investigative effort to find a root cause of the problems.  So, yeah, I think -- it is a good approach to try to resolve the problem.

Q    If companies that sell telephone numbers stop selling them to illegal robocallers, that would help stem the problem, wouldn't it?

A    If they're spoofed, then there was no transactional, you know, benefit to the number owner in this case, right.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

So like in the CDR's that we looked at, you know, there's like over a billion originating numbers, which is not imposable that that actually was a financial transaction. Those numbers were bought from Inteliquent. Those numbers had to be spoofed.

Q    Do you ---

A    In this case Inteliquent's motivation is hey, someone is using my number and they didn't pay me, right.

**Q    Who is more at fault here, in your mind, the -- someone like SmartBiz, who allegedly didn't do enough analytics, or someone like, you know, the Inteliquent or Peerless, who is selling the numbers to the robocallers?**

A    Well, I mean in the case of this specific summary of findings, right, numbers weren't -- it would be impossible for numbers to actually have been sold, right?

So something like Inteliquent, we need to know the numbers they own are being used and they have no visibility into that unless they're routed through them, which the data says it shows that there was a relationship in that specific case.

But I didn't -- there were no data sets for, let's say, Peerless, right. So, if they're Peerless owned

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

numbers that appeared in these CDR's, Peerless would have no visibility into that.

Q    I guess I'm not following how they wouldn't know who they sell their numbers to.

A    Because the numbers weren't sold, right?  The numbers are sitting there in their inventory.

And maybe they're sold to somebody, but the numbers are being used and spoofed by completely independent parties that don't touch their network or their systems.

Q    Every single call that you looked at was spoofed?

A    I don't think every single call was, but by virtue of more numbers used than exist in the North American Numbering Plan, there had to be spoofing.

Q    Yeah, some portion of spoofing.  Right?

A    Uh-huh.

Q    How much; do you know?

A    I mean you go to the number spoofing section.

Q    Well, it's your report.  I figured -- I mean what page is that on?

A    Let me see.  Page -- I'm in the supplemental, but it was page 14 in the second one.

        MR. CROTTY:  I'll object to the form to the extent, you know, use the supplemental for the

Michael Rudolph          August 23, 2023

specific numbers.

MR. GELLIS:  He can correct me if something is different.

THE WITNESS:  No, you're good.

BY MR. GELLIS:

Q    I'm here.  I see the analysis of phone number spoofing.

A    Yep.

Q    Five percent, three percent?  That's significant -- I mean I guess if 1.5 percent is significant, then certainly five must be like, you know, everything, right?

A    Well, this isn't necessarily -- like you could -- like a hundred percent of the numbers could have been spoofed.

This is just saying five percent use numbers that can't even exist for number formatting purposes.  So, this is your at least five percent, not for sure five percent.

Q    Do you know if any of the calls from the robocall index transited SBT's network?

A    Off the top of my head, I do not.

Q    Can you point me to any regulations that define the term abnormal or problematic?

And we're going back to the behavioral call

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

analysis discussion.

A    You're looking for that term defined somewhere like in the telecommunication ---

Q    You said that there's abnormal or problematic traffic, and that providers should execute simple command -- simple log commands to review these things.

A    Yep.

Q    And so my question is, is there anywhere you know of, as an expert, where those terms are defined in regulations for a provider to find?

A    No.  I think intentionally in here we chose terms that we did not believe had like a binding definition in regulation.

Q    So it's just your own kind of made up words that you've decided to use to call -- you've ascribed these meanings to these words, I should put it that way.

A    I mean it's -- yeah, it's just trying to point out there there's anomalous behavior in calls.

Q    Can you point me to a regulation requiring a voice service provider who can talk to a behavioral call analysis?

A    No.  The FCC recently had an MPR where it asked for comments on this though.

Q    So the FCC hasn't even required that yet.

Michael Rudolph          August 23, 2023

A     The FCC I guess is considering what the requirements are.  If you read that MPR.

Q     **And this is perfect, a perfect point to make. If the FCC hasn't even required it, how can SmartBiz be held at fault or have done something wrong by failing to do something they're not supposed to do yet, that's not required?**

A     Again, I'm not the lawyer, but the FCC does have requirements that companies be effective at mitigation, right?

Q     **Okay.**

A     And I think, you know, your case is one, right?  Where what does it mean to be effective at not enabling robocalls, right?

So effective, we talked earlier, like one measure could be like I have a guy in tracebacks this year. And I'm sending a billion calls to industry.  I'm probably pretty effective at mitigating robocalls.

I got 200 tracebacks in the year, I'm probably not effective at mitigating robocalls.  So, effective is a term that the FCC has regulation -- that we are aware of.

Q     **Do you know when that effective requirement went into law?**

A     Not -- I don't have the date off the top of

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

my head, no.

Q    Did you conduct an analysis of the CDR's to determine which CDR's perhaps were made prior to that requirement coming into play versus after?

A    I think all the CDR's we looked at were predominantly 2020 through 2022, and effective would have been in the Lexicon before that time period.

Q    So you don't believe that that became effective in December, 2020?  You don't know?

A    If that became effective in December of 2020?

Q    The mitigation requirement.  The effective mitigation requirement.

A    I know when the traceback was signed, like that was the triggering event for a lot of these things.

So yeah, December of 2020 would have been within the time period where you should have been effective.

Q    Okay.  And so you, again, but if you don't know, you do not consider that when forming your opinion that SmartBiz didn't do enough to mitigate.

A    Again, I don't know if I've got the statement in here that SmartBiz did not do enough to mitigate.

I think we're presenting just the counting stats of what we found, which is these are robocalls, these are tracebacks.

Michael Rudolph                August 23, 2023

I'm not -- I don't know if we passed a judgment here that it was ineffective.  I think by -- you would read it and see, you know, there's a lot of robocalls here.  So, you can judge the effectiveness by the result.

Q    You don't recall testifying before the break, or a little bit earlier, about, you know, I asked you if you had an opinion that SmartBiz didn't do enough, and you said no, they kept getting tracebacks, so they didn't do enough?  You don't remember that?

A    Again, that's an opinion.  I testified that they didn't do enough to mitigate tracebacks, continue tracebacks, right?

Q    Okay.  And so that's what I'm asking.  If the legal requirement to effectively mitigate didn't come into play until a date certain, did you consider the calls before and after that date certain in your opinion when rendering it?

Or did you just assume that perhaps calls prior to that implementation, you're applying a standard from now to calls three years ago?  That's what I'm getting at.

Did you differentiate when the law changed when you're making your opinions?

A    So from the Summary of Findings we looked

Michael Rudolph          August 23, 2023

through that time period, right?  The Summary of Findings is not looking at calls from the month of July.

So I don't think -- if SmartBiz is effective July, 2023, you know, I don't have visibility into that.

But for the time period that we analyzed, there's a section here on tracebacks and we can see a time line of tracebacks.  We can see a timeline of robocall behaviors, right?

So for the time period within the Summary of Findings, it will look like a problem that, you know, did not have an effective resolution through that time period.

Which, where I believe that is a time period where there was an obligation to be effective when you're made aware of problematic robocalls, to come up with an effective mitigation strategy for them.

Q     But you don't know what they did or didn't do.  You just know that it didn't stop, right?

A     Correct.

Q     Did you review the graph provided by the ITG that lays out SmartBiz's traceback history?

A     I did not.

Q     Do you think that would be helpful to know, how many tracebacks SmartBiz got per month, and look at

Exhibit E - YouMail Deposition

Michael Rudolph                    August 23, 2023

the trends?

A    We received the raw data, so we could have produced -- I assume a similar graph, but not to the ITG's product.

Q    I mean would that be helpful, do you think, to know that?

A    Any time you're looking at data trend to draw conclusions it's helpful to have more data.

Q    Okay.  So, I wasn't planning on doing this, but we're going to go ahead and just take a quick peek at the YouMail -- we're not going to make it an exhibit, we are -- excuse me, the ITG's document, but we are going to look at it though.

And we've done this in some other depos.  And I'm surprised you haven't seen this.  I thought it would have been relevant to your analysis.

Okay.  See this?

A    Yep.

Q    Okay.  So, this is -- it says confidential and proprietary, that's why we're not making a new exhibit.

A    Yep.

Q    But this is -- I represent to you this was produced by the ITG.

A    Okay.

Michael Rudolph          August 23, 2023

Q    And it has column month, total tracebacks that month, the rank among all other providers that got tracebacks for that month, how many tracebacks they were point of entry on, and what rank they were on the point of entry, okay?  Do you see that?

A    I do.

Q    Okay.  So, do you see how here in October, November, December, a pretty high amount of tracebacks, right, 22, 26, 30?  Do you see that?

A    Yep.

Q    Point of entry rank number 2.  Number 2 and number 1 respectively here, December, 2020, right?

A    Yep.

Q    Okay.  And so you don't know when that effective mitigation requirement went into play, do you?

A    No.

Q    Okay.  But what happened after December, 2020, with the traceback numbers for SmartBiz?  Just take a look and tell me what trend you see.  You do data analytics, right?

A    Yeah.

Q    What do you see?

A    We keep joking, hey, look, they went down. Column B went down and -- around row 12.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q    Yeah.  It may go -- it goes up a little bit later, you know, full disclosure.  You can see the whole document, right?

A    Yep.

Q    Okay.  They had a little spike here, these three months.

A    Yep.

Q    Let me ask you this:  To go from the number one ranked point of entry traceback entity in December of 2020, it's six months later to have zero point of entry tracebacks.  Does that sound like effective mitigation to you?

A    So here's one of the challenges with industry, and I know this was an observation in the supplemental summary of findings.  We noticed that there were two entities of data sets, there was SmartBiz and Whisl.

And there's a point in time where they reverse roles and one was -- was at least respond to tracebacks as a point of entry and the other was responding as intermediate.

And then for the tracebacks that we were provided that role switched.  So, to a certain extent you could control where you would be on the point of entry leader boards by working with partners, and then determining

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

between yourself and a partner what your role is with a third party in transiting robocalls.

So I don't know if that happened, but to me the point of entry ranked leader boards is a little bit of a red herring because it could be -- it could be gained. Does that make sense?

**Q All right. Well, what about the total tracebacks. Are you going to gain that?**

A So total tracebacks, what's interesting about that is the amount of tracebacks that are performed in a given month are kind of relative to like just how bad certain things are in industry, and where investigative efforts are performed.

So again, I'm not -- I'm not suggesting that this is exactly what happened in the period that you have from September, 2020 to December, 2020, but a robocall operation can come up with a great idea.

Let's go -- let's go scam Americans and pretend to be the IRS. And that entire operation spins up in a month, runs over six months, and then eventually back pressure, investigative pressure, and law enforcement pressure causes that operation to cease.

And so certain material robocall operations, if you were the enabling provider for those when they were bursting their traffic, could create a lot of counting

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

matrix.

And then there could be a calm in the industry where there's not a significant high volume like multi-thread operation that's receiving investigative priority.

So, you know, it -- this also kind of has variables outside of SmartBiz on what they would see.

Q    Okay.  Well, if I were to represent to you, you tell me if you think this would be accurate, that in the six month period when SmartBiz's tracebacks went from 30 to 2, the robocall index that's published by your company, showed robocalls going up across the country, illegal robocalls.

So, does that sound consistent?  That sounds right, right?

A    Yeah, so what I was ---

Q    How does that make any sense, what you just said?

I mean your own data shows robocalls up, SmartBiz tracebacks down.  And your answer is there weren't illegal robocalls going on?

A    No, no, no.  I said robocalls that have investigative prioritization.

So, if you look over the past 12 months, the FCC made a big pressure -- a big push.  We're taking on

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

auto warranty robocalls.

That was a big 2022 push that really escalated from early 2022 to culminating, I want to say, around August/September, when the FCC effectively declared orders like these calls are too poisonous to touch, no one better touch these.  You can almost immediately block any provider that you think is carrying these.

So in that case you could infer the FCC has its focal efforts on auto warranty calls as a topic of robocalls that are just too dangerous to handle.

If you follow the FCC's efforts, they moved into student loan calls as their next area of focus, right? So, if you look at, effectively I think our robocall index effectively shows like four to five billion robocalls, it's the same, you know, for three years, let's say, plus or minus a billion, which is a big number, but not a material change in robocall volume.

But the component that's auto warranty went from 15 percent of industry to sub one percent of industry. So, if you get a communication provider and they happen to have picked to enable the calls that are the focal point of investigative pursuit, they're going to receive a lion share of tracebacks relative to the rest of industry.

So right now there's no investigative pursuit of -

Michael Rudolph          August 23, 2023

- and I'm going to pick something, I don't know, office equipment repair robocalls.  I'm not really aware of this being a matter.

But if that became an investigative focal point, and that's the robocalls you were enabling, you would expect to receive more robocalls because now it's getting more investigative resources.

**Q     I want to make sure I understood something you said.  You said the numbers are approximately four to five billion robocalls, right?  Plus or minus one billion?**

A     Uh-huh.

**Q     And you said that that's not material, yeah?**

A     I said -- my point was from -- the purpose of my point, that if it's four billion robocalls in a month or five billion calls in a month, the focal point of an investigation on a material component of those robocalls was the bigger factor in your quantity of tracebacks.

So it was more of that, you know, four to five billion is a lot, it's too much.  You're in the too much territory.  Instead of having the extra one billion to five billion, from four billion, it's just still too many out there.

**Q     So basically when SmartBiz has almost no**

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

tracebacks they're still doing wrong.

    A    No.  If you get no tracebacks then I think you're doing okay.

    Q    Okay.  What about one?

    A    I mean it depends which robocall campaign that is, and it depends how much that one traceback indicates.

    It's like if you find a termite in your attic, right?  And you looked hard enough and you found one, you kind of -- you still might want to look a little further and see what else you got.

    Q    We're going to switch back to this because of time.

    First, on page four of your report here, Snowshoeing.  It says it's a term for rotating through originating numbers to evade behavioral analytics.  Do you see that?

    A    I do.

    Q    Okay.  So, I mean if it's intended to evade analytics, how do you expect providers to monitor it?

    A    Well, it depends on the provider.  So, there is examples where in industry, as analytics engines started to protect consumers better from repeat calls from the same number, robocalling operations went to the providers and said hey, we're not getting our

Michael Rudolph          August 23, 2023

robocalls through to consumers anymore, what should we do.

And some of those providers said you know what, let me go to the North American Numbering Plan and get you a million numbers.  And then you can rotate your calls through those numbers.

If you're that provider doing that, then maybe you are pretty much enabling unlawful robocalls and shouldn't have done that.

So I can give you a very blatant example where the robocall operator went to the provider, that provider went and procured numbers in order to enable this tactic.

**Q    SmartBiz doesn't sell numbers, right?**

A    I am not aware if SmartBiz sells numbers.

**Q    Where can a voice service provider find guidance on how to effectively monitor snowshoeing?**

A    I know a lot of voice providers are members of consortiums, like the Cloud Communications Alliance, I think, does a quarterly webinar that, you know, has been covering this topic for the last few years.

CFCA is the Communications Fraud Control Association, and has, I think, a hundred plus providers who meet regularly to talk about this.

Generally, most of the provider, I don't know,

Michael Rudolph                  August 23, 2023

industry groups, working groups, this is like a big topic where they share -- they share ideas and strategies.

There's vendors in space that pitches their solutions.

Q    Okay.  Are you aware that, you know, a lot of these industry consortium groups don't allow certain providers to join?

A    That would probably make sense, yeah.

Q    So I mean that's not always an available remedy, or avenue, excuse me, for a provider, is it, to join a consortium and just find out what they need to know, right?

A    No.

Q    I'm going to turn to page six of your report. It says here -- and I'll look -- I have to find page six.

The sentence at the bottom.  Any data set where the average call duration is below 20 seconds, or the answer rate is below 30 to 40 percent, can be a fast indicator of unwanted calls, essentially, right?

A    Yep.

Q    Unwanted doesn't mean illegal, does it?

A    That's correct.

Q    Okay.  So, that's under 20 seconds, fast

Michael Rudolph          August 23, 2023

indicator.

Q  So if we go down to page eight of your report you'll note it says here note, there is a good volume of 6 to 12 second and 12 to 18 second duration calls as lawful, real originator may be dialing and reach a voicemail prompt but choose not to leave a voicemail. Do you see that?

A  I do.

Q  Okay.  So, under 20 seconds on page six is a fast indicator of robocalls.  But here, 6 to 12 second and 12 to 18 duration calls are lawful.

A  Correct.

Q  Do I understand that correctly?

A  You do.

Q  Okay.  How?

A  Like CVS is lawfully making robocalls that are short duration, telling you your prescription is ready at 123 Main Street, right?

So, you know, short duration, low answer rate, is an indication of robocalls.  And there's no referendum on if they're lawful, unlawful, wanted or unwanted in that case, right?

So, just because it was an indication of a robocall, it doesn't necessarily mean it's an indication of an unlawful or un-consented robocall.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

However you want to think about it.

**Q    How do you differentiate between the two?**

A    Generally, you would need to know what those robocalls are carrying, right?

So if you look at your network and say hey, look I made a million calls today and they were all 15 seconds long, you can go to that account.

And you look at the account that's signed up and you see oh, CVS Pharmacy.  And usually most sales teams would be celebrating if they landed CVS Pharmacy as an outbound dialer.

But let's say it's Smith Pharmacy at some regional pharmacy, and they just turned up a robocall system. Then you pretty much know that you've got, you know, I think a pretty good customer.

That said, there are examples in industry where providers have a pharmacy sign up.  And if you actually look at the registration form they fill out, and that provider, and you look at the address, and then you look at that address, it actually isn't a pharmacy.

It's an apartment or it's not even a valid address.  So, you have somebody who might sign up with a provider and pretend to be a pharmacy, and instead be, you know, pretend to be a government agency and scamming people.

Michael Rudolph          August 23, 2023

So generally you'd want to know your customer or your customer's customers that are creating the calls, or during the calls that have those robocall matrix, and then I would think white list them because you're done the research to vet that they are a legitimate business.  And not even that, but not pretending to be a legitimate business.

Q    I just -- how do you reconcile the statement that under 20 seconds is a fast indicator of unwanted calls, but 6 to 12 and 12 to 18 seconds are lawful?

Are you saying the two can be the same?  It can be unwanted and lawful, right?  Is that where you're getting at?

A    So again, short duration and low answer rates are an indication of robocalls.

Q    Your report says or.  I just want to clarify that.  It doesn't say and.  So, it's or, right?

A    Correct.

Q    Okay.  So, under 20 seconds, right?  And that's what I'm getting at.  You have one statement that says under 20 seconds is a fast indicator.  Then you have a provision on page eight that says 6 to 12 and 12 to 18 are lawful.  And then if we go to the next page, section ten, we get back to suddenly the robocalls again at 24 to 30.

Michael Rudolph          August 23, 2023

**So 6 to 12 is lawful, and 24 to 30 is robocall. And section 11 then says that over a minute, 60 to 90 seconds are robocall.  So I'm just confused because the paragraphs seem to say contradictory things in terms of what's an indicator of robocalls.  I can't make heads or tails.  So, can you clarify that for me?**

A    So there's a lot of -- so the first thing that we're talking about is it a robocall, true/false. No commentary if it's lawful, unlawful, unwanted, wanted, right?  How do you find robocalls in a network, right?  So, if you look at the way human beings call each other, there's no magic behavior in human beings where a huge section of the population calls each other and has exactly 30 second long -- 37 second long conversations.

But if I look at a billion robocalls, and I can say out of those billion robocalls a hundred million were exactly 37 seconds, I feel like there's a robot involved because a human being would have more variability in how they would generate a call duration, right?

So we're just talking about finding robocalls. So, the section that you're in right now, where we see 21 percent at 24 to 30 seconds, and 30 to 36 seconds, that's not natural, organic behavior.  Like automated

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

systems, robo dialers robots create that bulge at a certain duration.  So, we basically think hey, something artificial, nonorganic is involved in creating a high density of calls at that call duration. No referendum if they're legal or unlawful, unwanted. You don't know.  You just know that there's a high duration of robocalls.

And we know in industry if you think you've got robocalls, you bear some burden to be like well, what are those actually doing so I can verify they're not illegal robocalls.  Because those are the vein of industry.

So this is basically just like a canary in a coal mine.  It's coughing, you look in the mirror, you see your symptoms.  Hey, I got a lot of calls that are exactly the same duration.  I wonder what those are doing.  And then talking to whoever you know is giving you those calls, whether it's a direct account owner or your upstream provider, and saying hey, I don't know if you saw this, but I see this.  There's a lot of calls there exactly basically the same duration.

Now that aside, when you look at people who are doing unwanted calls, right?  Which could be legal or illegal, right?  I could be calling you and I have full consent and I'm selling you a great deal on solar

Michael Rudolph          August 23, 2023

panels.  And this is no commentary on solar panel robocalls.

I'm saying let's pretend for a moment this is legal, one to one consent, however you want to think about that.  Generally, consumers who want calls, answer those calls.  Like if I went to a Mazda dealership and I test drove a car, a decent number of people actually do answer when the Mazda sales guy calls them up and offers them a great deal.

That, or the Mazda guy, because he wants to induce you to business, leaves you a long voicemail saying hey, Sean, it was great to see you.  I think little Timmy is going to be great at baseball next year.

Human beings who want to transact leave longer voicemails, either because they're depositing as a voicemail or the call was wanted and it was answered and it results in a conversation.

So generally, wanted calls will bias way north of 20 seconds because -- and higher answer rates, because there's engagement between the two parties due to a preexisting relationship.

So low ACD's, low ASR's are indicative of there's not a very good connection between the caller and the callee.

So you're taking these different signals, right,

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

of hey there's robocalls, cool.  I got some burden now to understand more.  Wow, they're low answer rate, they're low duration.

That shows there's not a really good connection between the caller and the callee.  Now I'm getting more nervous the more I kind of dig into and uncover what might be happening here.

And eventually the idea would be, as you're seeing these behavioral concentrations of durations that are all high density in a certain band, and you're seeing low answer rates, low durations, most communication providers, especially intermediate ones, are always thinking about how can I get more money from my customer.

Like I'd like you, Mr. Solar Company, who I believe has consent, to get answered more.  I'd like you to use twice as many minutes.  I think it would be great if you left longer voicemails.  I think it would be great if we labeled your calls differently.

I think it would be -- and you would be, as a communication provider, enabling things, trying to help your communication provider use more minutes and have higher answer rates.

So you're always -- everything in your industry invites you to get to know your customers or your

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

upstream partners better to try to increase these

things because that's how you make more money.

And generally, if you're not doing those things,

it would almost suggest that you're trying to evade

those things in some way.  Does that help?

Q     That was a very long answer.  I just want to make sure I understand.  You're determining these are robocalls just based on the call duration and seizure rate?

A     Those are indications that you have a high amount of nonorganic traffic, a/k/a a robocall, yes.

Q     Okay.  And so I believe you also said, you know, that people without relationships don't leave voicemails, right?  And that people with relationships do leave voicemails, did you just testify to that?

A     That is -- that is yes.

Q     All right.  I'd like to show you this j peg. I took a screenshot of LinkedIn from your CEO, his LinkedIn feed here, Alex.

A     Yeah.

Q     He left this article about let's all start leaving voicemails again.

A     Okay.

Q     And he linked to it.  And so I mean doesn't that seem to say that we don't actually leave

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

voicemails?

I mean it linked the Wall Street Journal article, let's all start leaving voicemails again. So, I'm not sure, is that really a fair analytic measurement?

A    Believe it or not, I have not -- I did not know he posted this. I have not read this article. I know the timeline, it looks like, I'm guessing was in the last 60 days?

Q    Yeah.

A    Okay. So, I know -- I know IOS -- IOS 17 has a feature called live voicemail. And IOS 17's live voicemail, if you called me, Sean, and you weren't a contact, it would say something along the lines of hi, Mike, Rudolf is not available at the moment, but tell me why you're calling, and I'll try to connect you.

And then you would interact with Apple's live voicemail and say hey, I'm calling Mike about the test drive at the Mazda dealership. And I'm hoping you're going to come by Mazda because we got a great rebate that ends in three days, right?

So there's a trend in industry that Apple and Google are launching these interactive voice agents that will talk to a remote party calling you. I'll ask my CEO ---

Q    I appreciate that. I'm sorry to cut you off.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

I just don't have the time, and I don't need to know about live voicemail.

A    All right.  No worries.

Q    What I'm trying to get at here is, I mean clearly people aren't leaving voicemails right now, right?

That's what this article seems to indicate through its title that your CEO posted.

A    No.  This article ---

Q    Let's start leaving voicemails again.

A    No.  This article is more about my CEO's interest in voicemail being more effective and chatting with Apple's new live bott that will answer your calls.

Q    But it says let's all start leaving voicemails again.  Doesn't that imply that we're not leaving them now?

A    This is, again, if you go to this article it is talking about IOS's live voicemail, which in this case is considering it not a voicemail, but it's still a voice -- it's voice -- it's bi-directional voice about the nature of a call.

So depending upon how you want to use the term voicemail, it's all trying to get more interactive voice between caller/callee and then optionally an agent in between those two.

Michael Rudolph            August 23, 2023

Q    That's going to be Exhibit 3.  Exhibit 4 here is just one more LinkedIn post I have from a month ago, saying You Mail protective services now has the only complete solution to detect and disrupt phishing and smishing campaigns that impersonate companies.  Do you see that?

A    I do.

(Thereupon, Defendant's Exhibit 3 was marked for identification.)

BY MR. GELLIS:

Q    Is that true?

A    So this is, again, companies, when they do marketing ---

Q    Yes or no, is it true?

A    I don't know if it's true or not.

Q    Well, if only now, one month ago, the only complete solution was invented a month ago, is it really fair to hold SmartBiz accountable for 2020 conduct when even you guys now, just now came up with a solution?

A    So this particular solution is for campaigns that impersonate companies.

So this is for a bank to come to a vendor and say hey, vendor, I have phishing, which is voice calls, impersonating my bank, or I have SMS calls -- SMS

Michael Rudolph          August 23, 2023

messages impersonating my bank.

And so this is a social media marketing post that's projecting that for banks, or enterprises like banks who see SMS and voice imposters, YouMail has the only complete solution then. I'm making air quotes here on camera.

And so lots of times marketing companies will define what they mean by complete, which is seven bullet points, and suggest we're got the only complete solution because we have the seven bullet points that we defined.

Someone else in market might have the only complete phishing and smishing defense solution for banks, and use a different seven bullet points, or five bullet points, that are mutually exclusive to ours.

So this is marketing for a enterprise phishing/smishing solution, and it has nothing to do with whatever solution SmartBiz would potentially procure.

Q    **This is going to be number four. So, I'll just make that 4.**

(Thereupon, Defendant's Exhibit 4 was marked for identification.)

BY MR. GELLIS:

Q    **Earlier today I believe there was testimony**

Exhibit E - YouMail Deposition

Michael Rudolph                August 23, 2023

from you that the terminating providers have all implemented some kind of analytic solution to try to stop this problem.

A    When you say all, lots have.  I do not know if all have.

Q    Fair, okay.  Lots.  The fact that these calls are still reaching end users and evading the terminating providers' analytics, doesn't that suggest that maybe these callers are using tactics that might not be apparent to SmartBiz?

A    I mean generally the big terminating providers, AT&T, Verizon, T-Mobile, etcetera, are still using analytics based upon reuse of a number for multiple calls, or a number that calls to a thousand distinct individuals.

So those particular ones are hard for those providers to block -- sorry.

It's hard for those providers to block.  Or when, and unfortunately this is the case in the SmartBiz data, there's like a billion numbers used, and some of the numbers made one and only one call in a 6 or 12 month time period.

Because analytics can't develop a reputation for an individual number because it hasn't made enough phone calls.

Michael Rudolph          August 23, 2023

Q    I want to take you -- direct you to page 22, paragraph 41.

You said that the above analysis leveraged the persistent utilization of just a few origination numbers by a campaign.  Do you see that?

A    Uh-huh.

Q    Okay.  That's contradictory to your snowshoeing section that says that providers use -- cycle through numerous numbers, right?

A    I mean yes, multiple tactics were deployed in the data analyzed here.

So this is a set of calls that exhibit one tactic.  And what we just talked about was snowshoeing, which is hard for the big providers to stop, utilizes that snowshoeing tactic.

Q    Okay.  We discussed the CDR's that YouMail sells, sometimes with recordings.

Does YouMail sell any other data or any other information to other people besides the CDR's?

A    I mean selling CDR'S is not a large business.  There's not a lot of customers that procure that.  What we sell the most is number scoring.

So if you provided a phone number to YouMail, we would give you a score -- I'm just going to generalize, between 1 and a 100 percent, if we think that number is

Michael Rudolph          August 23, 2023

carrying fraudulent calls or unwanted calls at present. That's the predominant thing that we would sell to a provider.

Q    **YouMail and SIPNAV had a contract; is that correct?**

A    We did, yes.

Q    **All right.  Tell me about that relationship.**

A    SIPNAV is like a -- is a host at Softswitch, I guess is the layman's terms of how I would describe them.

And SIPNAV did procure that product that I just mentioned, where you have a list of numbers and each number has a score, 20 percent, 50 percent, 80 percent. It's a little more nuance.  We have like 80 percent to point 8, 50 percent to point 5.

So for each phone number SIPNAV had a -- we think point 8, 80 percent confident that number is carrying problematic calls today, let's say.

So for a period of the contract, which I don't know the exact date range, but it's probably over a year expired now, YouMail provided that data to SIPNAV.

Q    **Okay.  Why did the relationship terminate?**

A    The relationship terminated because, generally speaking, SIPNAV's customers exhibited more behavior of generating more robocalls than less

Michael Rudolph               August 23, 2023

robocalls, which led the company to believe that they might have been procuring the data to learn to avoid calling YouMail rather than to stop bad accounts that were on SIPNAV's customer base.

**Q    It wasn't because YouMail went to the individual customers who use SIPNAV and try to sell it directly to them?**

A    I mean at some point if we were not providing services through SIPNAV, if SIPNAV's customers still wanted to use our data to actually try to get a handle of their robocall problems, that would lead them to have to work with us directly.

**Q    So it wasn't because you -- YouMail felt that only having a contract with SIPNAV wasn't profitable enough, and so YouMail went through a strategy to instead put all the SIPNAV users under contract for more money, yes, no?**

A    As far as I can tell we've lost more money than we could have possibly ever gained by terminating the relationship with SIPNAV.

I do not think -- and I might be wrong, that we have a single one of SIPNAV's customers currently paying us.

**Q    So after you guys terminated the SIPNAV contract do you know how many people signed up with**

Michael Rudolph          August 23, 2023

YouMail?

A     As far as I'm aware, none.  But it's possible one escaped my awareness.

Q     **Do you know how many calls were blocked by your software when it was employed on SIPNAV?**

A     That's one of the reasons why we ended up terminating relations with SIPNAV, because SIPNAV wouldn't tell us that.

We would have loved to known that.  We wanted it -- we wanted it to be an effective partnership to stop robocalls.  Instead it was an obfuscated use of the data.

Q     **Why do you say it was an obfuscated use of the data, what leads you to say that?**

A     So a lot of times when a provider go to a customer they're excited about our data.  They're like hey, YouMail, because of your data we found these numbers.  We found these upstream customers, we terminated them.

Hey, YouMail, because of your data we found this media IP in Germany and now we're blocking that, and now those calls aren't getting through.  Hey, YouMail, we got your data.  We haven't seen a traceback in six months.

SIPNAV generally was not engaged with us in the

Michael Rudolph          August 23, 2023

consumption of our data.  Their customers were not engaged with us.  There was really no understanding of the matrix and it was very -- very private, closed off from understanding of how successful it would be in the field.

Q    Do you have any knowledge about whether SmartBiz was utilizing the YouMail technology when it was on the SIPNAV platform?

A    Only because of this engagement with Florida has that been a suggested thing, until this -- until the last 90/120 days, no idea.

Q    Okay.  And so in regards to your opinion earlier that SmartBiz did not mitigate because it kept getting tracebacks, what more should it have done, aside from implementing your software, assuming they did, I understand you don't know that, but just for this question please assume they did, what more should they have done?

I mean what do they have to do for you to say they did enough?

A    So my assumption is that at some point SmartBiz had a business that predated the receipt of tracebacks.  I think I went through this analogy before.

And again, I apologize.  They have three

Exhibit E - YouMail Deposition

Michael Rudolph        August 23, 2023

customers, three upstreams are -- if they're only intermediate, they had three upstreams.  And those upstreams, you know, hadn't caused any tracebacks.

At some point they perhaps took on an upstream partnership that, you know, brought problematic traffic through their network.  And, you know, maybe that's not a partnership that's worth the -- the risk.

So I know a lot of providers who have had similar problems as SmartBiz, when they're trying to solve it, you know, the very binary fashion without data, you know, they terminate relationships.

There's a lot of intermediate VOIPS out there who have gone from ten million dollars of wholesale intermediate revenue to two, and it's because they've terminated all these questionable relationships that don't have a handle on the robocall problem.

**Q   Were you provided any information about what security features SmartBiz had enabled on the SmartBiz platform?**

A    No.

**Q    Do you think that would have been useful in forming your opinion about whether they did not mitigate sufficiently?**

A    Again, I never -- again, I don't remember saying mitigate -- mitigate continued tracebacks.  Like

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

it would be great to -- yeah, I wouldn't mind seeing what they did.

Q    Do you think that would be relevant to your opinion?

A    If I was asked an opinion did -- did what SmartBiz do, was it -- were they good ideas, were they effective ideas, knowing what those were would be helpful in forming that opinion.

The opinion I'm rendering isn't what did SmartBiz do is good.  My opinion is the results weren't achieved.

Q    Okay.  I mean but when you said these were requirements to effectively mitigate, you brought that up earlier.

So, I mean to you it doesn't matter what you did, the only thing that matters is the end results, is that a fair statement?

A    To me, personally, it matters what you did, right?  The steps that you took and how systematic you were about that.  I think in the eyes of the law, you know, effectiveness is ultimately what matters, right?

Like you're not going to get a traceback if you don't have a problematic call that gets -- that gets traced.  I mean it's a binary thing, it's true/false.

Q    If I told you that YouMail ---

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A    My opinion doesn't matter in that case.

Q    **If I told you that YouMail service only blocked 400 calls in a year for SmartBiz, would that sound right to you?**

A    It would depend if they were trying to actually block calls or not.

Q    **Okay.  And how -- what would you look at to determine if they had done that?**

A    So generally, the way that that data is intended to be used is if you get a phone call, and they're like hey, that phone call -- that phone number is 90 percent certain to be fraud.

You'd want to open a ticket to understand how did that come to happen, like that's, you know, without extrapolating too much, like a crime happened.  Like let's figure out what happened.  Where did that call come from.  What country did that come from.  What provider did that come from.  You would make a big deal over the fact that that incident occurred.

Or you can trim the setting really low and say, you know, we're not going to block very many calls with YouMail because we're going to -- we're gonna, you know, look for a very short --

Q    **Can you assume that they used a 95 percent filter, okay?  And I want you to assume that.**

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

A    If they used a 95 percent filter then they were not trying to block very many calls, so that would not surprise me.

**Q    Okay.  I guess it's your service though, I mean so you offer options for carriers to be able to select features that don't work or -- I don't -- I guess I don't follow that.**

A    So again, if you recall, the percentage is -- percentage confident of the call is fraud.  And in data science, when you get to 80 percent confidence, you're getting really confident at 80 percent.

I'm 80 percent certain, Sean, that you committed a crime, I'm taking a pretty big risk by saying 80.  When I'm at 95 percent, that basically means I've reached a confidence level where I think you're going to be going to jail next week, right?

So 95 percent confidence is not reached lightly when we're talking about, you know, some unlawful behaviors.

So if one of our partners or our vendors was setting the threshold so high as 95, that's showing that they really weren't trying to block very much.

And, you know, that's probably what led to, you know, the various signals that we had, that they weren't in good faith trying to use our product to stop

Michael Rudolph          August 23, 2023

robocalls, or their customers weren't.

Q    What percentage should they have applied? Because I mean to me 50 percent, that's like a crap shoot.  Hey, do we bock my mom's call or not.

A    Remember, it's not necessarily for blocking. It's for this merits investigation.  So, you're basically saying I only want to investigate a call if the person was about to go to jail next week.

You're not saying if the call's a 50/50 chance of being a crime I want to know about it.  It's pretty egregious.

Q    I mean but you do block though, right?  I mean that's why they set the feature at 95 percent. That will block some calls, won't it?

A    The feature wasn't meant for blocking.  It was meant for creating an investigative ticket.  You should set the investigative ticket signal much, much lower.

Q    Okay.  And where was the guidance that you gave on this?

Is there somewhere you publish and tell providers, you know, hey, we're going to testify against you as an expert if you don't use this percentage of our service? Do you have that somewhere?

A    No.  I mean we have a best practices document

Michael Rudolph          August 23, 2023

that goes to vendors with this product, the API

documentation.  The developers engaging with it, saying

hey, you know, this value in this data format, we

recommend this value for this use case.

I think even the contract, you know, has some --

some short language about, you know, what the intended

use case is for each product and each value and the

fields.

**Q    What percentage does a carrier have to set it at for you to be satisfied that they're sufficiently trying to investigate robocalls?**

A    I mean I'd want a -- it's kind of like --

this is just us, you know, kind of talking very

conversationally, is you would put it in and you would

turn it to -- let's just say that you start at 95.  And

you don't get a lot.  And you say okay, we're looking

for anything that's 95 percent likely committing fraud.

Let's turn it to 80 percent.

Now you get some more traffic.  You said there was

only 200, 400 calls that came up at 95 percent.  You

set it to 80 percent, now you get 5,000.  So, these

should all be tickets to investigate.

And if all 5,000 come from one account, then you

could engage us and say well, what's that account

doing.  We're like well, it's impersonating the SSA.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

You're like you're only 80 percent certain that it's committing fraud.  We're like yeah, we haven't got the SSA to tell us unequivocally in printed statement that that's fraud.  But when we do that, that's when it gets dialed up to 95.

But we're pretty confident that's why it's at 80 percent.  So, ideally you would dial that setting, you'd see what you get.  And when you start to get false positives, that's when you would back off that setting.

So generally speaking, I don't think we really have false positives very often at all in the fraud setting above point five.

So you'd want to, you know, most of our vendors get all the way down to point five and they're remediating what's coming out of that.

**Q   So 90 percent is not your recommended threshold that you put out there to people, companies?**

A   No.

**Q   You sure?**

A   I'm pretty sure.

**Q   Okay.  Might want to look into that.**

A   Okay.

**Q   I'm just telling you.  Okay.  I want to go back to the tracebacks, the calls that resulted in**

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

tracebacks for SmartBiz.

Do you know, were those calls placed to honey pots?

A    I don't think so, no.  That would be very rare.

Q    Okay.  So, who was the called party on those calls?

A    To the calls that were traceback, I mean they would be various individuals.  If there were 200 calls traceback, there were probably 300 individual.  That's very unusual, that the same person is used twice.

Q    Okay.  But those individuals don't actually get the call, do they?  It's forwarded away from their voicemail inbox to YouMail's service, right?

A    The perception of that end user is they use YouMail like you would use Gmail to get your email.

So they would have gotten the call and, you know, decide if they wanted to delete it, listen to it, forward it to a friend, whatever.

Q    But it's your number receiving the call, not the person's number.  It's your number.  It's YouMail's number and company's number, right?

A    No.  It's the person's.  It's -- it would be your cell phone, Sean, that forwarded that call to us and we would put it in a mailbox for your cell phone

Michael Rudolph         August 23, 2023

number.

Q    That's my point though.  The call is forwarded away from the end user to your phone number, right?

A    So it's forwarded away from AT&T's network, right?  And you had a brief moment when it flashed on your device to answer it, but it didn't go from your device to our network.

It retreated back into AT&T's network, and then AT&T sent the call to us.

Q    Exactly.  The end user is not getting the call is my point.  The call is going to your number that you've purchased and setup an inbox for, right, a voice mailbox?

A    So your cell phone number that you have with Verizon, let's just say right now, if I called you your phone would flash.  And you would have a chance to answer the call.

You got the call live to answer.  When you didn't answer it, just like Verizon would pull it back and send it to a Verizon mailbox, Verizon now pulls it back and sends it to a YouMail box.

It's all for your Verizon number.  Everything is anchored under your personal cell phone number.

Q    I get that.  But again, I mean the call ends

Exhibit E - YouMail Deposition

Michael Rudolph                 August 23, 2023

up at a phone number owned by YouMail, right?

A    We don't own the number.  That's your phone number on your Verizon cell phone bill.

Q    **You told me earlier you buy numbers from intermediate providers and that the calls are forwarded to those numbers for the voicemail service box you provide.**

A    Okay.  So, when you're using your Verizon voicemail, Verizon has a phone number out there which you probably aren't aware of.  But if you went into your phone you would find a phone number.

So there's ten million people on Verizon, who when they don't answer their phone, Verizon pulls it back to their network and forwards that call to that one number, and then process for each individual who is the terminator.

So that number doesn't really matter.  That's just a number for call routing.  That's not the number that was the terminating number of the call.

Q    **But that doesn't happen when your software blocks the number, right?**

**Because let's say it's a bad, you know, it's identified as a high fingerprinted value or whatever, and the call doesn't make it, right?  That doesn't happen.**

Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

A    So again, remember blocking has a bunch of different terms.  There's like ring suppression, there's wasn't allowed to leave a voicemail.  There's went to voicemail, went to a spam folder.

So generally speaking, it depends, right?  If a call is just spammy, it can go to a spam folder and the only difference to an individual human being interacting with the service is it's in my spam folder instead of my inbox, but it rang.

I had a chance to answer it, and it said something spammy.  It went to a spam folder.

Q    Okay.  I guess what I'm just trying to get at here is, you know, who is answering these calls?  Who is getting them?

I mean you say the end user is getting them.  But you're telling me it's going to a number owned by YouMail corporate, which is not a person, right?

The entity YouMail, the entity -- the corporation owns that number, right?

A    So again, I'm going to generalize.

Q    I understand what you're saying.  I understand it goes to my cell.  It doesn't make it there because I didn't pick it up, meaning I never received it.  Hello, I never heard a single robocaller in my ear.  It went to you, right?

Exhibit E - YouMail Deposition

Michael Rudolph                 August 23, 2023

A    Okay.

Q    Right?

A    Okay.

Q    And it went to -- yes or no?

A    Yeah, you're saying you did not answer it, so then Verizon would have pulled it back. And they would have forwarded it to an entry point in YouMail's network.

And we would have answered it. It would have said hey, this is Seth, I can't get to the phone right now. Leave me a message. The remote probably would have left a message. We would have pushed that message to you.

Q    And no human being owns that number that YouMail owns.

A    The number that YouMail owns, which -- the purpose for that is to connect Verizon as a whole into YouMail for traffic. That number is kind of inconsequential because all the voicemail and call management is for your personal number.

Q    I understand that part. I'm just asking who actually answers the call.

It sounds like YouMail does when the end user does not answer the phone, it sounds like YouMail answers the call, yeah?

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A     Yep, just like your Verizon voicemail pops up and answers the call, YouMail pops up and answers the call.

**Q     Excellent.  So, would you say YouMail is the called party in that situation?**

A     No.  And I know, like -- again, I'm not the lawyer, but I know in most cases it's you as the consumer.  It's not whoever happens to be operating the voicemail software.

**Q     Okay.  Didn't you say in that YouTube interview that if every U.S. point of entry was using a solution like YouMail, the bad actors would have nowhere to go; do you recall saying that?**

A     Yeah, that sounds great.

**Q     Haven't we gone over that you could use a YouMail solution and it doesn't stop anything, or it may still let calls through in the example of ---**

**Q     You have to want it to stop things for it to be effective.  If you dial it up to like don't find fraud, then you're not really effectively using the solution.**

But if you dial it to help me find the fraud and get rid of it, then yeah, I think it's effective and it would be great if every point of entry used it.

**Q     Why do you sell a fraud detection tool with**

Michael Rudolph                    August 23, 2023

an option to not detect fraud?

A    Generally speaking, we don't control -- we want to -- the company wants to trust a provider is going to do what they say they're going to do, right?

So when we score a number, if it's committing fraud or not, we don't usually sell it to somebody who is going to say well, we're actually going to turn it to a setting where it's not going to do anything.

If they told us that we wouldn't engage in a commercial relationship with them.  So, most -- I want to say -- except for the case that you're mentioning, I feel like everybody has presented, and I don't have any contrary evidence, has genuinely taken our data and tried to stop bad things with it and investigate problematic calls.

Q    In that same interview you said there's a lot of legitimate robocalls that call people on the DNC list, such as pharmacy prescription alerts, etcetera, isn't that right?

A    Correct.

Q    Okay.  So, you know, just the fact somebody is on a DNC list doesn't mean that they can't get a call.

A    Correct.

Q    And there's some analysis about the DNC list

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

in your report, right?

     A     Correct.

     Q     Okay.  And so how do you know whether or not those people who were called on the DNC list, whether there was actually a violation occurring or not?

     A     I mean for the specific calls where we have the recorded audio on the calling party, you can look at those and suggest, if you pretend to be the Social Security Administration, you probably didn't have consent as a scammer from a consumer to call and pretend to be the SSA.

     So that one is like a very direct, you know, non-interpretive DNC violation, right?  I think most of our DNC analysis is effectively an aggregate.

     And so when you've got the aggregate counting matrix, I mean you don't have necessarily if they were true or not.

     But what you would want to look for, if you were operating this kind of as an independent, is if you see a lot of calls, and I know a lot of voice providers do this, they see a lot of calls landing at DNC numbers, don't go ask that customer hey, we noticed a lot of your calls are landing in DNC numbers, we just want to make sure that you know that they need to have consent.

     And they'll go oh, it's CVS Pharmacy.  We can

Michael Rudolph          August 23, 2023

quickly go probably CVS Pharmacy has consent.  So, again, it's just a signal you use to look one level deeper and know what the intent of the call is, and feel what your comfort zone is about the content of those calls.

Q    But YouMail gets the benefit of the recordings, don't they, and SmartBiz can't, right? Because SmartBiz can't record calls as they traverse their network, can they?

A    No.  I mean that's -- no.

Q    So they don't actually have real time monitoring abilities, do they?

A    No.  I mean that's why vendors and solutions and Google exist, to try to figure those things out, yeah.

Q    So you guys have more information available to you than SmartBiz.

A    Correct.

Q    It's pretty easy when you have 20/20 vision to, you know, pick on the guy who doesn't, right?  You can see a little further than somebody without 20/20 vision perhaps?

A    Sure, whenever you're doing data analysis, having more data helps you make better decisions.

Q    And YouMail has found a way though to record

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

information and be able to take recordings, right?  And sell them, in fact?

A    Yep.

Q    Including, and I want to get back to this, I don't think I got a clear answer.

When you do the analytics, the fingerprinting and all that stuff, are you telling me you never actually capture audio files of peoples' personal recorded calls, like their personal voicemails to their spouses and stuff?

A    I mean we're a voicemail service.  We have all of -- all of our customers, all of their voicemails.

Q    So the answer is yes?

A    Yes.

Q    You do capture all that.  And your AI touches all of that.

A    It touches the folks who have opted in for that AI assistance to process their incoming calls.

Q    Through, presumably, Click Wrap or something.

A    Click Wrap, yeah.  I mean, I guess ---

Q    Hits the okay button and sell your sole, that thing?

A    Yeah, I like to think we do a pretty good job of disclosing it.  You know, Apple is -- into it to be

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

very -- very transparent there, and you have to -- when you see the permission bounce, you have to tap.

I mean it's -- it's not as deceptive as -- it's not deceptive like a lot of stuff that ---

Q    I just went back to -- I could be wrong.  I'm going to have to go watch the video again.

But I'm pretty sure that there was like a personal call played on that podcast, where you all just took somebody's personal stuff and gave an example of how that's not a robocall.

A    If that's true, which I don't think I would ever do that ---

Q    I could be mistaken.  I'm not -- I watched it like two days ago.

A    It was probably a call from my own wife or something, that's like the only way I would do something like that.

Q    Well, no.  It was the other guy who had it, the company that you were doing the podcast with.  I don't remember the name of the company.

A    Definitely send it 'cause, you know, that -- it like hurts my sole to think somebody interpreted it that way.

Q    Well, they also talked about the stay home, stay safe campaign.  Right, you put some of that.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

A     Okay.

Q     Remember talking about how that one used a different number for every call?

A     Uh-huh, yep.

Q     Yeah, and they didn't snowshoe at all there, right?  Or no, they did.  That is snowshoeing.

A     That would be snowshoeing.

Q     It is snowshoeing, all right.  I'm trying to get this right.  Okay.

And so what should SmartBiz have done to like stop that?  How do they ---

A     You're saying if they were the -- an enabler of the stay safe/stay home, or they're trying to stop stay ---

Q     I'm saying they were -- it transited their network, did a report, right?  You know, and the AG's office has made a big deal about these, and election interference and all this stuff.

So I'm asking you what should SmartBiz have done in real time on Election Day to know that this was happening and to stop it in real time?

A     So I know the stay safe/stay home campaign is one that was subjected to tracebacks pretty aggressively as it was happening.

So if you were enabling it, presumably you would

Michael Rudolph          August 23, 2023

have seen a traceback letting you know hey, here's a recording, here's a call time, here's the source, here's the destination, Stay safe/stay home.  I know sometimes there's extra context there about, you know, why it's perceived to be problematic or illegal.

And then with that a lot of times providers will go look at their signups or their new accounts that they've closed in the last week or the last month, and there will be a pattern, right?

There will be hey, Acne Industries, like I got three tracebacks and they all go to something called Acne Industries.  Let's look at anything called Acne Industries in the last month and, you know, shut those accounts down.

Or they'll see hey, all three tracebacks, if they're like a POE, all have the same media IP, they're all coming from an IP in Pakistan.  And they'll try to block Pakistan IP's.

I mean it's a cat and mouse game.  Maybe the IP moves to India, and they block that IP.  So, I mean you're -- you're, you know, trying to defend against, you know, a cyber security breach or incursion.

I mean there's a lot of terms here, but you're trying to shut down the accounts that are -- you've created a relationship with that are causing the

Michael Rudolph          August 23, 2023

problem.

Q    Exactly.  And so if you're doing that, and it is this cat and mouse game, like you just said, then isn't it reasonable to expect that you may still get tracebacks?

A    Yeah, I mean for a lot of providers who, I guess, kind of clean themselves though, they get to a point where they don't have a monthly bad account that keeps finding a foothold in their network.

So I think that's one of the things that we've observed is there are some providers out there who, you know, you shut down one bad account, but it comes right back in again.

And there is something about how they have yet to evolve their business practices to find a way to keep inviting that, you know, those same types of accounts or same business relationships to keep creating new relationships.

Q    Well, when the people who are making the illegal robocalls are trying to get their calls through, do you think they go around and tell all the other companies hey, man, I got a ton of illegal traffic for you, let's do a deal?

Do you think they do that or do you think they lie about what traffic that they're sending?

Michael Rudolph          August 23, 2023

A    So that's a very interesting observation. So, when you see the FCC take action on a certain topic robocall, you'll see a lot of providers industry all start to see new signups, like I want to create an account with you.  I got -- I got 20 million calls to get through.

So I think, you know, usually if you're getting tracebacks, you're getting plugged into what's going on in industry around robocalls.  And you're getting these signals that there's a lot of bad actors trying to find purchase in your accounts.

And that's creating a sense of heightened vigilance and reticence to take on a new customer.  And I think your tracebacks, if you can't get a break or you don't have any for six months, that's showing that you haven't yet achieved that reticence of new customers in light of the fact that there's a lot of bad actors trying to find new places to go.

**Q    So when SmartBiz goes from 30 tracebacks to two in a six month period, I believe earlier you said that that was just because the analytics weren't right or the campaigns, that has nothing to do with what they do?**

A    I said I don't know.  I can't comment on, you know, what that represented from like an enablement

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

because the quantity of tracebacks is as much -- there's two functions.

There's what you do to stop them, and there's how many are sent into the traceback process. So, if the ITG goes from tracing a 100 per month, that would indicate you're the problem to two, that you're the problem, you've got kind of a false signal.

Like I'm down to two, and if you're down to two, you still have an account that needs to be cleaned up and remediated, but you don't know if it's because the ITG has decided to do two instead of a 100 this month, or you've 98 percent solved the problem.

You would need to have that conversation with them, I would think, in order to know.

Q   Isn't it possible that there's a lot of situations where SmartBiz's numerous -- a lot of chains, I'll call them, down the hops. There are numerous hops down the line, okay. Let's say five or six hops from where it originated.

SmartBiz is only in contractual privity, meaning they only have a contract with their upstream provider, right?

That upstream then has a contract, who has a contract, potentially, who has a contract, etcetera, based on how many hops there are. Are we on the same

Michael Rudolph          August 23, 2023

page?

A    Yep.

Q    Okay.  So, if SmartBiz goes to the only person it's in contract with and is assured that hey, we fixed it, everything is good.  We identified the problem, we apologize.

And SmartBiz says okay, I'm going to trust this guy, and then gets more tracebacks.  I mean it seems to me you're saying it's like a zero tolerance.  One traceback, you have to cut the customer off forever.

Is that what you're trying to say?  Or is there some reasonable steps that can be taken by a provider where they still get tracebacks?  And you know what, they did everything they could.

A    Again, you've got to make good decisions with the data signal.  So, I'll give you an example of a provider who got some tracebacks.

And you can operate kind of whack-a-mole.  Oh, Smith Industries, oh, Acme, Inc.  And I warned the customer, Acme, Inc., and you get another traceback.  I warned Smith Industries, you get another traceback on the next one.

I warned Johnson, Co, right.  Then you're like oh, man, I keep having this problem, what am I going to do.  And you go look at those three accounts and you see

Michael Rudolph          August 23, 2023

well, all three of those are using Nord VPN some VPN tunnel in order to interact with my network.

Now you've got another signal because you wanted to really -- you had the conviction to solve this problem, and you've looked for another signal in your data, which is exclusively yours, and said oh, Nord VPN, we probably should not let people send calls through a VPN tunnel.  Those are probably somewhat sketchy calls.

So, you would try to keep improving yourself in the pursuit of effectiveness if your keeping given evidence that you're being ineffective.  Whatever steps you've done no longer are effective.  You've got to find something new.  So, whatever you're doing month one, you have to find something completely different to do month 12.

Q    Isn't there a difference between industry self regulation and governmental official codified regulation?

A    I would think so, yeah.

Q    Okay.  So, a lot of what you're talking about is industry self regulation, right?

A    Correct.

Q    Okay.  So, it's not necessarily codified in law anywhere yet.  I believe you said the FCC is

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

working on some of these issues, right?

A    Generally communication providers want to self regulate.  That's how they always respond to any discussion here.

Q    Sure, and I agree that's a good desire.  But I'm asking you about what the law says.

A    Okay.

Q    So there's self regulation.

A    Uh-huh.

Q    But you've also said that the FCC is catching up to some of these things; is that a fair statement?

A    They're definitely soliciting input on these things.  So, I don't know if catching up is the right way to portray it.

Q    Well, if they're soliciting input then they obviously haven't, you know, put their final stamp on something yet, have they?

A    Yep.

Q    No.  Have they put their final stamp on the process to do this, or anything like that?

A    I mean I think it's evolving.  Like they're always collecting and then publishing, right?

Q    Yeah, I know it's constantly evolving, right?

A    Uh-huh.

Q    Okay.  It must be kind of hard for carriers

Michael Rudolph          August 23, 2023

to like keep up with all the requirements, I would imagine.

A    I would say yes.  I mean it's -- when you say it's hard, it's more work than it was five years ago, for sure.

Q    Oh, absolutely.  Do you guys like put substantial resources into keeping up with regulatory happenings?  I'm sure you have like a team, right?  Like that monitors this stuff?

A    There's a -- team, yeah.

Q    And you have outside counsel that, I'm assuming, I don't need to know what you said to him, I'm assuming you have legal help as well?

A    Yeah, we can -- we have lawyers.  I mean there's no fulltime general counsel at YouMail, unfortunately.  But it would be nice to have it.

Q    Of course, of course.  We're getting close to the end here.  I know we only have a little bit of time.  Let me make sure I didn't miss anything.

What should providers do to stay on top of all like the regulatory like updates and stuff?

Let's say SmartBiz decided, you know, hey, YouMail's got it right.  You know, we want to do everything possible, and we think YouMail is the shining light in this industry of how to do it right.

Michael Rudolph          August 23, 2023

**You know, what do they have to do?  Like where do they go to learn what YouMail says you should do?**

A    I mean I know one thing I've seen that's good for communication providers actually is their counsel at the law firms they engage to help them, right?

So I know a lot of providers, you know, get a couple of tracebacks and they've gone from, you know, not spending any hours with their legal counsel to now it's a regular part of the process.

And you know, they've got a retainer and that legal counsel is kind of watching out for them because the landscape is shifting, and seeing the risks.

So I mean I think it's a great time to be a communications lawyer.

**Q    Excellent.  Because, you know, look, I'm just ---**

A    You wanted me to say that.

**Q    No.  I mean I'm not really a comms lawyer. I'm going to talk to Patrick about that later.  I'm more of a litigator that -- for this case got thrown into comms.**

A    I hear there's a lot of opportunity for communications lawyers coming up.

**Q    Yeah, my co-counsel, Ed Maldonado, he's a -- yeah.  Okay.**

Michael Rudolph          August 23, 2023

**So what does YouMail charge to like a provider? Is it like fifty thousand a month, ten thousand a month; what is it?**

A    Yeah, usually our economics are based upon like the volume of the provider.  So, if you're a provider that makes a thousand calls a month, right, you don't really need -- so we have different solutions, right?

There's solutions that would protect the people that you service from receiving the phone calls.  So, think about it as shielding real human beings.

And there's data which helps you investigate calls you originate or transit to try to find and investigate the accounts.

So they're all based upon scale.  So, if a provider came to us and said hey, YouMail, we're originating from a billion numbers, first we'd probably turn them away because that shouldn't be humanly possible or physically possible in the Telecom industry.

But a provider who, you know, is at the scale of that they're operating ten to fifteen percent of the industry at whole, is, you know, probably a hundred thousand dollars.

But we're talking about there's ten providers who

Michael Rudolph                    August 23, 2023

have that scale, that's per month.  And we've got ---

Q    Let's do this then.  What about five million minutes a month?

A    Five million minutes per month.

Q    Per day, a day.  A day.

A    Five million minutes per day, that's a decent amount of minutes.  So, I mean the challenge with that is the cost -- model here is trying to -- if we're doing the risk product, which I assume is what you're asking for, because for our shielding product we just care about end points and how much it cost to protect an end point.

And then in that case we're talking like a penny per month to protect your law firm phone number from getting rung.

So if you have a hundred thousand customers, we charge a penny per month for those hundred thousand customers to have additional protections of their phone ringing.

From a compliance perspective, the minutes aren't any input that we use or do in cost estimates.  What we want to know is the quantity of numbers that you're accountable for, so you're originating or transiting from, and then roughly how many parties are behind those.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

So if you came to me and said I have a million numbers and there are a million distinct individuals, there's a lot going on.

But if you come to me and you say I've got a million numbers, one is Bank of America and one is Chase Bank, it doesn't mean very much.

You've got two accounts that we need to watch, and we're kind of looking for a breach.  So, the economics can vary wildly, where somebody with a million numbers has one one hundredth of the contract of somebody that's got a million numbers.  Because there's a million chaotic, you know, independent things moving that can cause risk.

**Q     Do you know what you quoted SmartBiz for YouMail service?**

A     I don't think we got a quote to SmartBiz beyond an audit.  But I don't know, actually.

**Q     But there were discussions between YouMail and SmartBiz, right?**

A     I know one of our sales people received an inbound, yeah.

**Q     Yeah, I mean because they were trying to solve the problem of robocalls, perhaps, right?**

A     Yep.

**Q     Okay.  I mean ---**

Michael Rudolph          August 23, 2023

A    I don't know what we quoted them.  I'm sorry, I don't.

Q    And so it might have been Whisl.  What about Whisl, did you ever quote Whisl?

A    I might be confusing SmartBiz and Whisl.  But I know one or both of them came in as an inbound lead to our sales team.

Q    Yeah, okay.  And so that's like -- do you know if it was ten thousand or fifty thousand?  That's like within the range of possibility, right?  I mean based on what we're talking about here.

A    Yeah, if it was Whisl that came in, I know Whisl has, you know, had a number of, you know, complaints, I guess, issued against it.

So the perception was that Whisl had a lot of moving parts in their network, and I think they were -- they were proposed in audit, which is the Summary of Findings Report that you -- that you referenced earlier, that would be our work product.

Like our team would roll up our sleeve and say okay, let's go find where all the bad stuff is coming from and make sure that, you know, it's stopped or the person that's giving it to you knows where it is and they can stop it.

And, you know, it's a big project if it's somebody

Michael Rudolph         August 23, 2023

that's got kind of that much diversified traffic and causes of their problems.

Q    That's kind of a lot of money for a small company potentially, right?  Ten grand a month or fifty grand.

A    I mean generally it's proportional to the quantity of calls they're sending, so I think Whisl is sending a substantial amount of calls.

Q    Sure, didn't you testify earlier though that there's really thin margins, intermediate to intermediate?

A    Yeah, I mean that's what I'm told, yes.

Q    And so you're potentially asking a company with razor thin margins to shell out tens of thousands of dollars a month for software that may not even stop the calls, still may result in tracebacks, and they're in the same place they're in, right?

A    So what's interesting is, you know, we talked about razor thin margins, but even razor thin margins on a billion daily calls get to be pretty substantial revenue.

So think about -- think about what the cost is of a lawyer.  So, you know, if somebody's transacting in billions of monthly calls and our quote for them was hey, it's ten thousand dollars a month to help you

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

police those calls, that's significantly less than the lawyers' fees, I think, by an order of magnitude.

Q    I mean maybe perhaps if it was a hundred percent effectiveness.  But I think you agree that having the YouMail service doesn't mean you're not going to get a traceback, right?

A    It depends what you do with the YouMail data. Like I said, if you -- if you set the knob to like don't tell me anything, then you're -- that's not an effective use.

When you engage our team that's going to audit and go through your CDR's, like you saw in the Summary of Findings, then we really are finding specific calls and then working backwards with them.

Like we're -- we're effectively bringing traceback in house to that provider to try to really, you know, go up to the attic and get rid of all the termites.

Q    Didn't you say earlier that you had a problem with some people trying to use YouMail for the wrong reasons, so to speak, or I guess ---

A    Uh-huh.

Q    -- I'm paraphrasing, yes?

A    Yep.

Q    Okay.  By offering like a zero setting in your services, I mean aren't you kind of encouraging

Michael Rudolph          August 23, 2023

companies to potentially use you to say they're using you and then set the filter to zero?

A    So interesting enough, we don't have a zero setting.  SmartBiz implemented the zero setting.  We just have a number and our percentage score, if it's fraud.

And we say you probably should try to like investigate anything that's 50/50 or 60/40 fraud.

SmartBiz put in their console oh, you can do it at only 95.  So, we -- I agree completely that a setting that basically does nothing is not a good choice.

Q    Well, yeah.  That's my point though.  Why do you offer it though?

A    We knew that that was an option in SmartBiz.  That's part of what led to the discontinuation of that relationship.

Q    I thought you said you weren't familiar if SmartBiz -- I thought you discontinued the relationship with SIPNAV because they weren't ---

A    SIPNAV, I meant SIPNAV.  I'm sorry.  The last four mentions of SmartBiz, I meant SIPNAV.  I'm sorry.

Q    Okay, okay.  That was a little confusing to me.  Okay, I get it.  I get it.

So, but I'm talking about SmartBiz.

A    Uh-huh.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q   Okay.  So, do you want to clarify?

A   There is no setting.  Our product doesn't come with a knob that you turn.  Our product comes with numbers and scores, right?

And the recommendation that if something is 50/50 fraud, you might want to look at it.

Q   Well, I guess my point is you have a software that can be enabled to pretty much not work, right?

If it's a setting that you -- I could set the setting to make YouMail ineffective, correct?

A   This is -- so it's number scoring.  It's phone numbers and a score of how likely they are to commit fraud.  There is no setting involved here.

This is you get like an Excel file, and then if you're going to put a setting about your threshold about how you want to filter and look at less rows, that's what you're doing on your end once you've got the data.

Q   Are you familiar with a platform known as Denovo?

A   Denovo --?  Yeah.

Q   Okay.  Do they use YouMail?

A   They buy YouMail data.

Q   Okay.  So, would you suggest that SmartBiz move from SIPNAV to Denovo if they want to give the

Michael Rudolph          August 23, 2023

appearance of cutting down on robocalls?

A    They want to give the appearance of hunting down robocalls?

**Q    Well, I mean I would say actually cut down on robocalls, but we've already been over the fact that there's instances where the software doesn't stop anything.  So, I'm not going to say that.**

A    SIPNAV no longer -- I mean it hasn't gotten any data from YouMail in a long time.

So I would suggest that if a company is getting data from YouMail, and a company is not getting data from YouMail, I would probably want to advocate that they go to somebody that's at least got that data to have a more complete picture.

But I don't have any understanding or acute knowledge of what else Denovo might do that SIPNAV doesn't or vice versa.

So it would be hard for me to, as a completely neutral, unbiased party, tell you which one is going to be more effective without knowing all of the ingredients and what they're doing, and what they would allow SmartBiz as a customer to -- if they've got dials, what they would allow them to set them to.  And more importantly, I think as just a human being, how they would coach them to solve the problem or not.

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

Q    Okay.  And so you would recommend a -- what setting do you recommend?  What percentage should somebody set it at to make YouMail happy?

A    If you're an originator and you're trying not to originate fraud, like I said, that setting you would keep -- say show me more until you're getting false positives.  And I want to say people have gotten down to, we think it's 40 percent likely it's fraud, and there was still a good reason to investigate that account.

Q    That's originators though.  What about intermediates like SmartBiz?

A    Same thing, originator and intermediate, same use case.

Q    All right.  I'm going to take just a short break.  I still intend to end by 5:32.  I think that's when we got started, so that will be four hours.  So we'll take a five minute break.  Let's reconvene in about five minutes.

THE COURT REPORTER:  Okay.  The time is 5:17 p.m.  We're off the record.

(Thereupon, a break was held 5:17 p.m., afterwards the following was heard at 5:21 p.m.)

BY MR. GELLIS:

Q    All right.  Yes or no, YouMail has consent to

Michael Rudolph          August 23, 2023

sell the data that it records from its customers?

A     Yes.

Q     Okay.  And that's in the privacy policy and other documents that you get when you signup?

A     Terms of service privacy policy, yes.

Q     Okay.  And you believe that ten grand a month over a year period is a minor expense to an intermediate provider.

A     I believe if they've got a good SIS admin or IT or fraud ops or a part time lawyer, that that's probably equivalent to that virtualized employee, yes

Q     I wish I could do part time law and make 120. I see Patrick agreeing over there.

A     I know what our lawyers charge us, it's not ---

Q     California, right?

A     Maybe.  I mean you really can't get a good IT guy for under a hundred thousand dollars.  I mean you're finding a guy green from college at 90 these days.

California, I think our minimum wage for somebody that's got a tech background is like 90 or 100 a year now.

Q     Tell me about Jasper, what's his credentials? The guy you work with on the team, we didn't talk about

Michael Rudolph          August 23, 2023

his credentials.

A    Yeah, I mean Jasper is like 20 years of telecommunications background, fraud hunting.  He runs our SecOps team, which is security operations.

I mean I'm happy to just give that to you outside the call.

Q    I'm just trying to get -- I mean what's his degree?  What's his degree in?

A    Computer science.

Q    Same as you, bachelors'?

A    He might have an advance degree, actually.

Q    Okay.  Well, we can find that out later.  I was just trying to -- like I said, I have very limited time.

A    I think he has an advanced degree, so I don't want to sell him short.

Q    I just want to hit again on that statement you made in that podcast that if every point of entry was using YouMail, the bad actors would have nowhere to go.

A    Uh-huh.

Q    In light of what we've discussed today, and that many calls still passed through YouMail's software, you still stand by that?

A    I guess I would add and they use the YouMail

Michael Rudolph          August 23, 2023

data to affirmatively try to take action against the calls.  Unfortunately, I need to apparently add that.

Q    Okay.  I guess you said that providers can do all the analytics themselves very easily, according to you.

A    Uh-huh.

Q    So what is YouMail giving them that they don't have on their own?

A    So the -- I think that podcast, I don't know which one it is still, but the thesis there is if a human being, a person with a phone, gets an unlawful call that's impersonating the IRS, if we can take that call within a few minutes of it concluding and give that to every point of entry, and all those point of entries can say oh, that was me, I was the one who enabled that call, and they can open a case with wherever they got that call from.  You know, we could quickly defuse a lot of the threats before they can scale their operations unchecked.

So that's the thesis where if the point of entries could get a little bit better at getting direct feedback from the consumer, who is about to be a victim or was a victim, of the call that just transited, they can accelerate their investigative process to stop those vectors of those calls.

Michael Rudolph            August 23, 2023

When I say it's an easy lift, it's an easy lift to go look at your log files and say hey, 30 percent of the calls we sent to Inteliquent got denied a day, we might have something we've got to check into because you're just counting the zip code responses of calls in --, or how many calls did we send that were, you know, less than ten seconds.

Those counting matrix are an easy one for anybody to go to their log files and type a couple of lines in a prompt and get the answers, or use their -- their switch has that baked in a lot of the time.

**Q     Does YouMail lobby?**

A     Does YouMail lobby?  I don't think so.  I don't know ---

**Q     Okay.  So, you don't -- you don't advocate any ---**

A     We responded to the MPRM, so I guess that's a form of lobbying.  But like I think of lobbying as something completely different than what we do, so I would say no.

**Q     Are you engaged in a conscious effort to get a law or regulation passed that would require implementation of YouMail by some sector of communications providers?**

A     No.

Michael Rudolph          August 23, 2023

Q    Are you trying to get any sort of regulations where companies are required to use some kind of analytics similar to YouMail?

A    I mean I know the FCC is asking that, and I want to say that I even replied like it should always be an option.  Like I do believe in that choice.

Q    I mean is it really a choice though when users don't use YouMail, and then you come and be expert witnesses against them for not using YouMail?

A    No.  I mean I think you could have -- so like there's other companies out here, like Nomorobo is another company that makes an app on your phone to find robocalls.  They've got a robocall leader board, you can go to their website and find a number.  The number said this today.  So, I know, you know, there's communication providers out there who want to take an active present investigative effort into their customers and their communications, and they can use Google.

They can use our public directory, they can use Nomorobo's public directory.  They can use Robokillers public directory, and gather these bits and say oh, that account, we don't want that account in our network.

So, I mean you can do it organically with your own

Exhibit E - YouMail Deposition

Michael Rudolph         August 23, 2023

people. So, when you're going direct to us or you're going direct to Nomorobo or Hiya, you're basically paying a vendor to, you know, automate those steps so you don't have to have your people do that work. So, it's not ---

Q But you guys are the ones who get to sell your data to the ITG, the official FCC appointed entity, right?

A As far as I know, and the ITG just, I think, posted this yesterday or in the last week, they were talking -- they were proud about that they were getting data from YouMail, Verizon, RRAPTOR, Nomorobo, so they cited a bunch of sources of data.

Q Okay.

A I don't know what the economics are of those.

Q What's your relation with RRAPTOR, any?

A I'm aware of it. I guess it's a competitor.

Q Any relationship with David Frankel?

A I've seen David Frankel at conferences and he has talked to me. I do not really have much of a relationship with David Frankel.

Q Is there anything else that I need to know we haven't talked about, with four minutes left?

Do you know if your CEO has any relationship with David Frankel?

Laws Reporting, Inc.   305.358.2700
schedule@lawsreporting.com   www.lawsreporting.com
Exhibit E - YouMail Deposition

Michael Rudolph            August 23, 2023

A    I believe he's talked to David Frankel at industry events more times than I have in the last decade. And I think they exchanged some emails once upon a time. At one point David Frankel was competing with the traceback group for the designation, and so there would have been communications about the state of traceback. I guess that's another example though of somebody  -- a provider can go to and they hold up a mirror of what their traffic looks like.

Q    Do you know if David Frankel was associated with the ITG at one point?

A    Yeah, I think as a contractor or something.

Q    Yeah, he was going around telling SmartBiz what to do. Did you know that?

A    I mean I did not know he was telling Smartbiz what to do, but that does not surprise me.

Q    Do you agree the ITG does not have enforcement authority?

A    I mean I'm not the lawyer, so I don't know what enforcement theory entails, but I know ---

Q    That's fine, that's fine. Why does it not surprise you about what David Frankel was doing?

A    It was just industry conjecture.

Q    Conjecture, like -- tell me the conjecture.

A    I just, you know, I guess, you know, there's

Exhibit E - YouMail Deposition

Michael Rudolph          August 23, 2023

trade shows or whatnot, so I think CFCA is one that Zip DX presents that, and, you know, I think -- I'd go back and watch those videos and get that from those recorded -- I think publicly recorded sessions.

MR. GELLIS:  We're all done here.  No further questions.  Patrick, I'm assuming you're not going to ask any, but I'll stay if you want to.

MR. CROTTY:  No, no cross.  Mike, you have the opportunity to -- so if somebody orders the transcript you have the opportunity to read it and correct anything that strikes you as a transcription error.

THE WITNESS:  Okay.

MR. CROTTY:  You can't actually modify the transcript, but it will be added as a errata.

THE WITNESS:  Okay.

MR. CROTTY:  I can't tell you to do it.  If you've got the time and the inclination, it's always great if you want to go through and note anything that you think is a transcription error.

THE WITNESS:  Okay.

MR. CROTTY:  Would you like to read that transcript, or will you waive that right?

THE WITNESS:  I guess I wouldn't mind seeing it.  I know SQL was probably mis-transcribed at

Michael Rudolph          August 23, 2023

one point, but maybe there was -- I know I said SmartBiz, and I meant SIPNAV at one point, and we corrected that, so.

THE COURT REPORTER:  Okay.  What is your email address?

THE WITNESS:  You could just do mike@youmail.com

THE COURT REPORTER:  Okay.  And Mr. Gellis, would you like to order the transcript at this time?

MR. GELLIS:  Yeah.  Could we get an invoice for it?  The answer is --  I think we're going to order.  But I just want to see the invoice first.

THE COURT REPORTER:  Okay.

MR. GELLIS:  -- approximate.

THE COURT REPORTER:  You want an estimate sent to you?

MR. GELLIS:  Yeah, I think it'd be standard because we have a month until Summary Judgment.

THE COURT REPORTER:  Okay.  The time is 5:32 p.m.  We're off the record.

(Thereupon, the deposition was concluded at 5:32 p.m. with reading and signing having not been waived.)

Exhibit E - YouMail Deposition

Michael Rudolph                    August 23, 2023

CERTIFICATE OF OATH

THE STATE OF FLORIDA

COUNTY OF MIAMI-DADE:

    I, the undersigned authority, hereby certify that Michael Rudolph appeared before me via Zoom on August 23, 2023 and was duly sworn.

    WITNESS my hand and official seal on this 6th day of September, 2023.

*Miriam Meneely*

_____

Miriam Meneely,

Notary Public-State of Florida

My commission # HH387107

Expires: August 14, 2023

Michael Rudolph          August 23, 2023

REPORTER'S CERTIFICATE

THE STATE OF FLORIDA

COUNTY OF MIAMI-DADE:

I, Cynthia Dorobiala, Court Reporter and Notary Public, certify that I was authorized to and did report the deposition of Michael Rudolph; the transcript is a true and complete record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel with the action, nor am I financially in the action.

DATED on this 7th day of September 2023.

*Miriam Meneely*

Miriam Meneely,

Notary Public-State of Florida

My commission # HH387107

Expires:  August 14, 2027

Laws Reporting, Inc.    305.358.2700
schedule@lawsreporting.com    www.lawsreporting.com
Exhibit E - YouMail Deposition