**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

    Plaintiff,

    v.                        CASE NO.: 1:22-cv-23945-JEM

SMARTBIZ TELECOM LLC,
A Florida limited liability company,

    Defendant.

                                     /

## <u>RESPONSE TO DAUBERT MOTION TO EXCLUDE TESTIMONY AND REPORT OF MIKE RUDOLPH</u>

    Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs (the "Attorney General"), hereby responds in opposition to Defendant, Smartbiz Telecom LLC's ("Defendant"), Daubert Motion to Exclude Testimony and Report of Mike Rudolph, [ECF No. 59] (the "Motion").

### INTRODUCTION

    Mike Rudolph ("Rudolph") is the Chief Technology Officer with YouMail, Inc. ("YouMail"), a company which provides, in relevant part, consumer voicemail service for over 10 million registered subscribers, as well as analytics and data related to robocalls. [ECF No. 59-2, pg. 1]. The Attorney General retained Rudolph as an expert witness to analyze several relevant datasets, specifically: Defendant's

1

Call Detail Records ("CDRs"),[1] consumer voicemail recordings provided by YouMail, traceback[2] data provided by the Industry Traceback Group ("ITG"),[3] and consumer complaint data provided by the Attorney General. [ECF No. 59-1, ¶ 1].

Rudolph prepared an Expert Report which describes several types of analysis using different methodologies and generating different conclusions. These were set forth in Rudolph's "Summary of Findings," [ECF No. 59-2], which was expressly incorporated into Rudolph's Expert Report, [ECF No. 59-1, ¶ 11]. The first type analysis Rudolph described is "behavioral call analysis," which identified indicia of fraudulent or otherwise unwanted calls in Defendant's CDRs. [ECF No. 59-2, pg. 3]. Rudolph's behavioral call analysis consists of five sections of his Summary of Findings: 1) Analysis of "Snowshoeing" Calling Tactics (pg. 4), 2) Analysis of Low Answer Rates and Short Duration Calls (pg. 7), 3) Analysis of Phone Number Spoofing (pg. 14), 4) Analysis of Recipient Geographic Location (pg. 16), and 5) Analysis of Telemarketing Hours and Do-Not-Call-Registry (DNC) Data (pg. 17).

---

[1] CDRs are records that Defendant's softswitch creates about calls transiting Defendants network. The creation and uses of CDRs are more fully described in the Attorney General's Motion for Summary Judgment, [ECF No. 51, pgs. 2-3].

[2] Traceback refers to a process in which the Industry Traceback Group attempts to identify the source of a suspected illegal call by sequentially contacting each communications service provider who was involved in connecting the call, starting with the recipient's voice service provider, to uncover the origin of the suspected illegal call. The traceback process and traceback information are more fully described in the Attorney General's Motion for Summary Judgment, [ECF No. 51, pgs. 2-3].

[3] The ITG is a neutral consortium of telecommunications companies appointed by the FCC pursuant to 47 C.F.R. 64.1203 who attempt to trace suspected illegal calls to their source. [ECF no. 50, ¶ 16].

Next, Rudolph analyzed Defendant's CDRs in conjunction with "YouMail Consumer Voice Call Evidence," which consists of call records for calls to YouMail subscribers, recordings of voicemails left by those calls, and transcriptions of those voicemails. [ECF No. 59-2, pg. 18]. This type of analysis identified examples of calls that Defendant transmitted to YouMail subscribers. *Id.* Third, Rudolph performed an analysis of traceback information to identify patterns in Defendant's traceback responses to the ITG. [ECF No. 59-2, pg. 36]. Finally, Rudolph analyzed Defendant's CDRs and YouMail data in conjunction with consumer complaint data supplied by the Attorney General to identify individuals who complained about the types of calls Defendant transmitted, [ECF No. 59-2, pg. 43]. Defendant's Motion is difficult to parse but appears to challenge each type of analysis Rudolph performed.

The Motion contains approximately five pages of "Background" which almost exclusively consists of quotations from deposition transcripts without context or explanation. The Motion also has one page of "Legal Standard" with citations to cases relevant to scientific expert testimony but with no mention of expert testimony based on technical or other specialized knowledge. Lastly, the Motion includes approximately half a page of "Analysis" where Defendant argues Rudolph's testimony and Expert Report should be excluded because it is unreliable. Motion at 6. The Motion also makes a conclusory allegation that Rudolph's expert testimony and Report will confuse the trier of fact. Motion at 1. However, Defendant appears

to abandon this argument as it is not mentioned after the introductory paragraph of the Motion. *King v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 248 F. App'x 123, 125 (11th Cir. 2007) (Merely mentioning argument is not sufficient to raise a claim, either on the merits or on due process grounds). Taken together, the Motion appears to question Rudolph's qualifications, the reliability of Rudolph's methods, and whether Rudolph's Report and testimony would assist the trier of fact. The Attorney General will address each of these topics in turn.

## LEGAL STANDARD

The admission of expert evidence is governed by Fed. R. Evid. 702.[4] *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). When expert evidence is introduced, the Court has a "gatekeeping" obligation to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 580 (1993). This gatekeeping obligation requires the Court to "engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is

---

[4] Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case."

4

sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink*, 400 F.3d at 1291–92 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir.1998)).

Ascertaining reliability of expert evidence is not rigidly defined by whether the evidence is based on scientific, technical, or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999) ("We do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match."). Rather, a trial court has latitude in both how to determine an expert's reliability as well as whether the expert's relevant testimony is reliable. *Id.* at 152. As to how to determine reliability, the Eleventh Circuit has "identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink*, 400 F.3d at 1292. However, the list of factors does not "exhaust the universe of considerations that may bear on reliability." *Id.* (internal quotation and modification omitted).

**ARGUMENT**

A. Rudolph is Qualified

The first prong of the *Daubert* analysis is whether Rudolph is qualified to testify competently regarding the matters he intends to address. *Rink*, 400 F.3d at 1291. Each subject of Rudolph's Expert Report addresses whether large datasets show that fraudulent or unwanted communications were present in Defendant's network and the degree to which Defendant did or could have identified the presence of these communications. [ECF No. 59-2, pgs. 4-17 (describing indicia of fraudulent or otherwise unwanted calls in Defendant's CDRs), 18-35 (identifying fraudulent or otherwise unlawful calls Defendant transmitted to YouMail subscribers), 36-42 (identifying patterns in Defendant's responses to ITG tracebacks of suspected illegal calls), 43-45 (identifying consumers who complained about campaigns of fraudulent or unwanted calls that Defendant also transmitted to YouMail subscribers). Rudolph describes himself as an expert in "[u]nlawful and unwanted communications in communication networks." [ECF No. 59-3, 11:15-16]. Thus, Rudolph's claimed expertise aligns with the subjects he intends to address.

Rudolph developed expertise through experience in the field, which is a permitted basis for qualifying as an expert. *United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004) ("While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert

status.") Rudolph's experience arises from his work with YouMail where he has been "analyzing lawful and unlawful communications since 2007 by providing call answering, labeling, and protection services." [ECF No. 59-1, ¶ 3]. In his deposition, Rudolph described his work with YouMail:

> YouMail is a consumer answering service that started about 15 years ago, in 2007. So, we distribute software and services for consumers to process incoming voice calls and SMS messages. About ten years ago the consumers, as they were getting hit by unwanted calls and SMS, began to ask us to enhance the features that would protect them against those unwanted communications. So, for the past decade or so, as the Chief Technology Officer for the company, we've been innovating new ways, using technology, to receive those incoming calls on behalf of our end users and understand which ones are unlawful, unwanted.

[ECF No. 59-3, 10:12-24]. In the course of his work, Rudolph was the primary author to several patents on relevant topics, including patents titled: "System and Method for Identifying Unwanted Communications Using Communication Fingerprinting," "System and Method for Determining Unwanted Call Origination in Communication Networks," and "Identifying, Screening and Blocking of Calls From Problematic Telecommunications Carriers and Number Blocks." [ECF No. 59-2, pg. 2-3]. In Rudolph's deposition he described the subjects of his patents as "processing signals in data to determine if the signals would allow us to draw a conclusion if the communications were either unlawful or unwanted." [ECF No. 59-3, 11:1-4]. The work experience Rudolph describes is more than sufficient to qualify him as an expert to opine on the presence of fraudulent or unwanted communications

7

in the datasets he analyzed. *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) ("the standard for determining an expert's qualifications to testify on a given topic is not stringent. So long as the witness is minimally qualified, objections to 'the level of the expert's expertise [go] to credibility and weight, not admissibility.'") (quoting *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 809 (3d Cir.1997)).

The Motion does not challenge Rudolph's qualifications directly but does lodge several oblique criticisms. For instance, Defendant notes that Rudolph did not produce a resume. Motion at pg. 1, ¶ 2. Although this is true, Rudolph does note that he has been the Chief Technology Officer at YouMail and engaged in analyzing lawful and unlawful communications since 2007. [ECF No. 59-1, ¶ 3]. Given that Rudolph has been with one company performing the same type of work for the last sixteen years, a resume is not an essential distillation of Rudolph's qualifications. Further, the production of a resume is not a requirement for an expert witness and Defendant had ample opportunity to either request a resume through the discovery process or question Mr. Rudolph during his deposition.

Similarly, Defendant criticizes Rudolph because he "holds no advanced degrees or certifications. While he took statistics classes for his undergraduate degree, he has no statistical education outside of his [bachelor's] degree." Motion at pg. 2 (citation omitted). As previously stated, education is not a requirement for

expert witnesses and Rudolph developed his expertise through experience, which is expressly permitted under Fed. R. Evid. 702. ("A witness who is qualified as an expert by knowledge, skill, *experience*, training, or education may testify in the form of an opinion. . .") (emphasis added). Furthermore, Defendant's reference to statistical education is particularly misplaced, as nowhere in Rudolph's Expert Report does he draw any statistical inferences or use any statistical method beyond describing certain qualities of calls as percentages, e.g., "The [Average Call Duration] across the full dataset was 21.8 seconds, where 29.6% of calls lasted more than 20 seconds, 4.0% remained connected for more than 60 seconds, and 1.0% remained connected for over 2 minutes." [ECF No. 59-2, pg. 9, Finding No. 6]. Defendant has not raised any evidence or issue to rebut the Attorney General's showing that Rudolph is qualified to testify as an expert witness.

    B. Rudolph's Methodology is Reliable

Defendant explicitly challenges Rudolph on the second prong of the *Daubert* inquiry, whether Rudolph's methodology is sufficiently reliable, arguing that Rudolph's testimony and Report are unreliable because they are based on a confidential and proprietary processes, use algorithms, have not been peer reviewed, have an error rate that is "suspect," and cite the average length of Defendant's calls as a metric. Motion at pg. 6. Although not expressly argued, Defendant also suggests that additional factors detract from reliability, specifically, that Rudolph had

9

assistance and that he did not review sufficient evidence. Motion at ¶¶ 11, 24. Defendant's arguments, whether raised expressly or through innuendo, are meritless.

Rudolph describes performing a "behavioral call analysis" on 3.4 billion deduplicated CDRs provided by Defendant. [ECF No. 59-2, pg. 3]. Although a lay juror without the specialized skills needed to analyze a dataset with 3.4 billion entries would not be able to replicate this analysis, Rudolph opines that "[a] voice service provider can execute simple commands against their log files to determine counts or averages of the data for a given time period to determine if the calls within those logs exhibit any behavior that would be considered abnormal or problematic." *Id.* In other words, Defendant could replicate Rudolph's behavioral call analysis and identify any errors in his methodology or findings, which demonstrates the reliability of Rudolph's analysis. *Rink*, 400 F.3d at 1292 ("whether the expert's methodology can be tested" is factor bearing on reliability); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1123 (D. Colo. 2006) (finding expert methodology reliable where opposing expert was able to "test and evaluate" work).

In fact, one aspect of Rudolph's behavioral call analysis, specifically the analysis of low answer rates and short duration calls, [ECF No. 59-2, pgs. 7-8], Defendant claimed to perform itself. Rudolph calculated the Average Call Duration ("ACD") and Answer Seizure Ratio ("ASR") for Defendant's call records. He opined that while there is no obvious value for ACD and ASR that indicates lawful

or unlawful robocalls are present in call traffic, "any data set where the average call duration is below 20 seconds, or the answer rate is below 30-40% can be a fast indicator of calls generally unwanted by their recipients or delivery issues where providers would take an active role in working with their customers to understand their use cases and try to improve their answer rates and call deliverability." *Id.*

Notably, Defendant purported to implement a policy where it would monitor its customers' call traffic and commence an investigation if, *inter alia*, the percentage of calls with a duration of less than six seconds exceeded forty-five percent of the total number of calls for three consecutive days or the ASR fell below twenty-five percent. [ECF No. 50, ¶ 36]. Defendant's purported traffic monitoring policy uses essentially the same methodology as Rudolph's behavioral call analysis, namely calculating the percentage of short duration calls, which is materially similar to ACD, and calculating the ASR, and using these metrics as a fast indicator that illegal traffic may be present.[5] Defendant now claims that using average call duration as a metric to identify robocalls is faulty methodology. Motion at pg. 6. However, looking at the percentage of calls under six seconds differs from the ACD only in degree. Defendant may take issue with Rudolph's observation that an average call duration of under twenty seconds is suspicious, but it is disingenuous for Defendant

---

[5] Defendant did not follow its stated policy of investigating its customers call traffic when these metrics were present. [ECF No. 50, ¶ 37]. However, the fact that Defendant represented that it would follow this policy indicates that it views this type of traffic analysis as reliable.

to say that it is inherently unreliable given that Defendant views a high percentage of calls under six seconds as a possible indicator of illegal calls.

Similarly, Rudolph's analysis using traceback data and consumer complaint data is entirely testable and replicable. Defendant has all of the underlying data sources and could have verified the accuracy of Rudolph's observations itself or through a rebuttal expert who has the requisite expertise in data analysis.

Rudolph also performed an analysis using "YouMail Consumer Voice Call Evidence." [ECF No. 59-2, pg. 18]. This analysis relies on a method that starts with cross-referencing Defendant's CDRs with YouMail's records to identify calls Defendant transmitted to YouMail's subscribers. *Id.* Rudolph then matched the identified calls to transcriptions of voicemails left for subscribers to YouMail's call answering services. [ECF No. 59-2, pg. 19]. YouMail reviews the transcribed calls and classifies them based on content. [ECF No. 59-2, pg. 47]. YouMail also groups calls with similar content into "Campaigns," for instance, calls to YouMail subscribers en masse which state they are from the seemingly fictious "centro de cobertura médica" [Medical Coverage Center] were grouped into the "Centro De Cobertura" campaign. [ECF No. 59-2, pgs. 24-25]. Rudolph analyzed both the number of calls captured that were facially fraudulent, deceptive, or violative of telemarketing restrictions, as well as the dynamics of Campaigns. [ECF No. 59-2, pgs. 18-35].

12

Defendant criticizes Rudolph's methodology using YouMail Consumer Voice Call Evidence because some aspects of the way that YouMail transcribes and categorizes recorded voicemails are proprietary and not disclosed in full, technical detail in Rudolph's Report. Motion at 6. This criticism is misplaced because Defendants were provided with the actual voicemail recordings and transcriptions underpinning Rudolph's analysis. [ECF No. 59-2, pg. 52].[6] Verifying that YouMail's proprietary transcription and content review methodology produced reliable data is as simple as listening to the recorded audio and comparing it to the transcribed content. Rudolph's analysis using consumer voice call evidence is fully testable and replicable. The fact that Defendant did not undertake the effort to do so is not a reason to exclude Rudolph's Expert Report and testimony.

Moreover, the reliability of YouMail's process is constantly being tested because "the vast majority of tracebacks [the ITG] run[s] are based on data [the ITG's] team sources from YouMail." [ECF No. 53-3, 53:23-25]. The results of these tracebacks do not reflect consistent misidentification or erroneous transcription of calls. *See* [ECF No. 50-13]. YouMail is listed as the source of the traced call for 179 out of 261 traceback notifications to which Defendant responded. [ECF No. 50-14,

---

[6] The Attorney General conventionally filed the spreadsheet Rudolph compiled and references in his Summary of Findings as Exhibit 33 to the Attorney General's Statement of Material Facts, [ECF No. 50-33], pursuant to this Court's Order, [ECF No. 46]. The spreadsheet contains transcriptions and links to recordings. The Clerk docketed receipt of the USB containing the file, "Ex 33 - Youmail Recorded Evidence Count.xlsx" at [ECF No. 60-1].

column Q]. In only one instance was Defendant unable to identify a completed call in its records for a traceback initiated based on data sourced from YouMail. [ECF No. 50, ¶ 27]. When reviewing the ultimate results of each traceback done on calls which traversed Defendant's network, the Attorney General was unable to find a single instance where a company that originated the traced call challenged the accuracy of YouMail's call recording or transcription. [ECF No. 50-13]. If voice service providers were being falsely accused of transmitting suspected illegal calls because of misidentification attributable to YouMail, there would be some evidence of this in the hundreds of traceback responses the ITG provided to the Attorney General. Instead, these traceback responses show that there is no appreciable error rate to YouMail's process for identifying suspected illegal calls.

Defendant also attacks the reliability of YouMail's methodology because it claims it is confidential, but this assertion is contradicted because Rudolph invited Defendant to witness the process. [ECF No. 59-3, 77:18-20 and 78:7-8] (Defendant's counsel stated: "My problem is, you know, the way you sound and talk about it, I think your methodology would be fine if everyone got to stand in the room and watch it." Rudolph responded: "And I'd say, you know, we're happy to invite, you know, the observation of the process."). Defendant could have observed YouMail's work but chose not to do so.

14

Defendant did not attempt to learn any of the proprietary details about YouMail's process, although no one has ever attempted to prevent Defendant from doing so. In fact, Defendant issued a subpoena to YouMail dated April 2, 2023, and the company responded and produced documents. Exhibit 1, YouMail Subpoena and Response. Defendant is clearly aware of how to take discovery from YouMail, and YouMail has demonstrated it is responsive. Although it is true that YouMail's processes are proprietary in some respects – they are not secret or otherwise immune from discovery. Defendant could have obtained technical details as to how YouMail generated the consumer voice call evidence underpinning Rudolph's analysis if it had sought that information.

Defendant's contentions that Rudolph's methods are unreliable because they use algorithms and have not been peer reviewed are not relevant to the type of expert opinion Rudolph has produced. Defendant relies primarily on factors relevant to scientific testimony to attack the reliability of Rudolph's methodology; however, Rule 702 does not bar non-scientific expert evidence, and expressly admits expert opinions based on technical or other specialized knowledge. *Kumho Tire Co.*, 526 U.S. at 147 (1999) (Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony.") The use of algorithms is essential to data analysis because the number of records involved is too

15

large for manual review. Here Rudolph parsed 3.4 billion unique call detail records. [ECF No. 59-2, pg. 3]. Defendant does not suggest there is a method that does not use algorithms which would be a more reliable way to analyze these records.

Similarly, peer review in the academic sense involving publication in scientific journals is inapplicable in this case because Rudolph is not an academic who is interested in identifying and publishing in peer reviewed academic journals. As previously stated, Rudolph's expertise arises from his experience in industry, and the review by others in the telecommunications industry is the more relevant consideration. On that point, Rudolph testified that his methods and opinions regarding the identification of fraudulent and unwanted communications had been reviewed by numerous other industry members with favorable results. [ECF No. 59-3, 66:25-67:24]. Peer review in a published journal is not the *sine qua non* of reliability as Defendant suggests.

Finally, Defendant's suggestions that Rudolph's report is unreliable because it was drafted with assistance from an analyst named Jasper Von Beusekom and because Rudolph did not review Defendant's internal documents and procedures are entirely meritless. Motion at ¶ 11. Rudolph oversaw or carried out all of the analysis described in his Expert Report. [ECF No. 59-1, ¶1]. The fact that Rudolph had assistance from Mr. Von Beusekom in producing the Expert Report does not change the fact that the document contains Rudolph's opinions. Likewise, the fact that

Rudolph didn't review Defendant's communications with its customers or the "security features" enabled on its trunks is immaterial. Motion at ¶¶ 24-27. Rudolph does not purport to have evaluated Defendant's call blocking or customer screening procedures, and the Attorney General has adduced significant evidence showing that Defendant did not follow its procedures. [ECF No. 50, ¶¶ 33-43]. Other evidence, not Rudolph's Expert Report, shows that Defendant's robocall mitigation procedures were pretextual and Defendant knowingly profited from transmitting illegal calls. It is not necessary for Rudolph to have reviewed those procedures.

C. Rudolph's Testimony Will Assist the Trier of Fact

Defendant suggests without elaboration or support that Rudolph's testimony will confuse the trier of fact. Motion at pg. 1. In fact, the opposite is true. Rule 702(a) permits an expert to testify to "help the trier of fact to understand the evidence," which is precisely what Rudolph's testimony will do. The Attorney General has adduced voluminous, technical datasets such as Defendant's 3.4 billion call detail records, over 166,000 recordings of voicemails left for YouMail customers by calls Defendant transmitted, over 4,000 consumer complaints about scam calls, and hundreds of traceback notices and responses. Rudolph's testimony summarizes and reveals patterns in these voluminous records that are essential for the trier of fact to understand. Defendant has not articulated any reason why Rudolph's testimony would be confusing, and it is clearly helpful on its face.

17

## CONCLUSION

WHEREFORE, the Attorney General respectfully requests that this Court deny Defendant's Daubert Motion to Exclude Testimony and Report of Mike Rudolph.

Dated: November 17, 2023

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General of the State of Florida**

*/s/ Patrick Crotty*
Patrick Crotty
Florida Bar # 108541
Senior Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Patrick.Crotty@myfloridalegal.com

Miles Vaughn
Florida Bar # 1032235
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Miles.vaughn@myfloridalegal.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 17, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system and thereby served the other parties of record.

*/s/ Patrick Crotty*
Patrick Crotty
Senior Assistant Attorney General