UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 22-23945-CIV-MARTINEZ-BECERRA**

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

     Plaintiff,

v.

SMARTBIZ TELECOM LLC,

     Defendant.

_____/

**<u>DEFENDANT SMARTBIZ TELECOM LLC'S
REPLY TO PLAINTIFF'S RESPONSE TO DAUBERT MOTION TO EXCLUDE
TESTIMONY AND REPORT OF MIKE RUDOLPH</u>**

Defendant **Smartbiz Telecom LLC ("SBT")**, through counsel, hereby files its Reply to the Plaintiff's Response to SBT's Daubert Motion to Exclude Testimony and Report of Mr. Mike Rudolph, and states the following:

**<u>Introduction</u>**

The OAG admits it retained YouMail to "analyze several relevant datasets," but claims that data analytics is a matter of "experience" rather than science. Complex proprietary data analytics algorithms and conclusions derived from those algorithms may qualify as "technical or other specialized knowledge," but it is technical and specialized *scientific* knowledge. This is evidenced by information published by the United States Office of Research Integrity ("ORI"), which defines "data analysis" as "the process of systematically applying statistical and/or logical techniques to describe and illustrate, condense and recap, and evaluate data."[1] The ORI warns that improper statistical analyses distort scientific findings, mislead casual readers, and may negatively influence the public perception of research. The kind of analysis being done by YouMail is a statistical and scientific analysis that is governed by science and not experience. YouMail's Expert Report admits as much. [ECF No. 59-2 at 47 ("Thus, at a certainty of ALMOST_CERTAINLY (80%+) <u>we are</u>

---

[1] https://ori.hhs.gov/education/products/n_illinois_u/datamanagement/datopic.html

dealing within the realm of certainty sufficient for a scientific understanding of data, and any campaigns that are ALMOST_CERTAINLY fraud have approached a general human understanding of near absolute certainty that is the case.")].

The OAG also takes issue with SBT quoting its expert "without context or explanation." The OAG offers no rebuttal of these quotations or explains how they're irrelevant or misrepresent the testimony. SBT attached the entire transcript. See [ECF Nos. 50-4 and 50-6].

Finally, the OAG claims that "education is not a requirement for an expert witnesses and Rudolph developed his expertise through experience, which is permitted under Fed. R. Evid. 702." [ECF No. 68 at 8-9]. However, statistics is a science and there is a difference between an individual who took general statistics classes for a Computer Science degree and an individual who holds an advanced degree in statistics. Mr. Rudolph has expressed zero (0) specialized knowledge of human behavior, sociology, or psychology regarding the habits of human beings using telecommunications systems. Elevating a behavioral analysis to the level of admissible expert opinion requires more than basic knowledge of statistics. It requires knowledge of behavior related to the subject of the analysis. For example, a behavioral analysis of ant colonies would greatly differ from a behavioral analysis of drivers in rush hour traffic. This discrepancy is evident when Mr. Rudolph's opinions regarding average call duration are compared to guidance from the FCC and public comments made by the ITG and USTelecom that call duration is not a good indicator of illegal activity. Conclusions derived from untested proprietary algorithms do not become reliable just because a CTO and his subordinate paste them into a report. These conclusions, absent proper scientific analysis, will confuse the trier of fact. For those reasons, Mr. Rudolph's testimony and report should be excluded.

### Legal Standard

The case cited by OAG, Rink v. Cheminova, Inc., 400 F.3d 1286 (11th Cir. 2005), supports SBT's position. Each of the four factors cited by the OAG, ECF No. 68 at 5, supports the conclusion that the opinions must pass scientific muster.

### Reply Argument

#### A. Mr. Rudolph is Not Qualified to Opine on Human Behavior

The OAG cites Mr. Rudolph's patents and work as YouMail's CTO to qualify him as an expert based on experience. [ECF No. 68 at 7]. Citing his deposition, the OAG notes Mr. Rudolph described his patents as "processing signals in data to determine if the signals would allow us to

draw a conclusion if the communications were either unlawful or unwanted." [Id.]. First, Mr. Rudolph states he cannot offer any opinion that SBT violated the law - even though he claims his patents have the ability to determine if the law was broken per one set of A.I. analytics that is confidential and proprietary as to its inner programming workings and construction. Second, the issue of whether communications are unwanted necessarily involves an analysis of more than "signals" to make a determination of illegality. It would involve expertise on human psychology, or even criminology.  Mr. Rudolph has no such training or specialized experience on human behaviors. Despite this, his report makes claims such as "[c]all originators who truly seek to inform the recipient of why they are calling will traditionally at the very least leave a voicemail message about why they called (such as an appointment reminder, confirmation, etc.)." [ECF No. 59-2 at 7]. This is a purported expert opinion about the subjective thoughts processes of humans coming from a computer scientist.

After noting quite surely that originators will "at the very least leave a voicemail," he notes that originators may reach a voicemail prompt "but choose not to leave a voicemail." [ECF No. 59-2 at 10]. This contradiction is easily explained by Mr. Rudolph's lack of experience, expertise, or education in the sociological or psychological aspects of human interpersonal communications. As a persuasive comparison, SBT cites Metropolitan St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Estate Co., 130 F.Supp.2d 1074, 1091-92 (E.D. Mo. 2001), where a behavioral data analysis opinion was found to be admissible in a racial discrimination case. The expert there had the hallmarks of an individual who could conduct behavioral data analyses and render opinions based on them:

> Dr. Tiktinsky has doctorate degrees in psychology and mathematical/statistical psychology. He has been involved in behavioral sciences data analysis since 1965; working primarily in field research and statistical analysis. He has been a party to several field research projects involving matters of discrimination and has testified frequently as a data analyst in discrimination cases. He has given numerous seminars and workshops on field research protocol.
>
> \* \* \*
>
> Dr. Tiktinsky's analytical methodology has been used extensively on matched pair data, has been subjected to peer review and publication, is widely accepted in the field of social science research and non-parametric statistics, and has a clearly defined rate of error. Dr. Tiktinsky is aptly qualified as an expert to give his opinion in this case as to the testing methodology and analytical methodology present in this case. His evidence is not only reliable but relevant to the issues present and

would be of assistance to the jury in adjudging the facts. His testimony and expert report meet the criteria set down by Daubert and its progeny, and thus, is admissible under Rule 702.

Metropolitan St. Louis Equal Hous. Opportunity Council, 130 F.Supp.2d at 1091-92.

Mr. Rudolph's expert report contains conclusions that calls are "robocalls" based solely on the call's average duration. On page 11 of the report, the claim is made that "average call duration indicate a high concentration of robocalls of 24-30s and 30-36s durations." These conclusions are suspect considering YouMail purports to serve as a voicemail service for *unanswered* phone calls. If YouMail is in the business of capturing voicemails of unanswered calls, then it's puzzling how Mr. Rudolph can opine that the length of time of a *connected* call can prove the call was a robocall. For example, his opinion that there was a "high presence of robocalls prior to 2023 as evidenced by 30-36s duration robocalls (21% of traffic) and 60-90s duration robocalls (19.5% of traffic). [ECF No. 59-2 at 11]. Further, "ACDs ranging from near-zero seconds to over 1 minute can be indicative of robocalling activity – this is dependent on the consistence of the robocalls in terms of their configured behavior and their proportional representation within a set of traffic." [ECF No. 59-2 at 7]. There is not a sufficient nexus between Mr. Rudolph's experience as CTO of a technology company and his opinion that the length of time a human being chooses to have a phone call is indicative of robocalling activity. As noted by the OAG, Mr. Rudolph "parsed 3.4 billion unique call detail records," but the spreadsheet shows 166,628 alleged calls captured by YouMail. [ECF No. 50-33]. This means that Mr. Rudolph claims to have audio/transcription evidence of robocalls for .0049% of the dataset. The remaining 99.95% of the calls were only reviewed via CDR, which contains limited information as explained by the OAG. See [ECF No. 50 at ¶¶ 13-15]. Thus, all Mr. Rudolph knows is that there was a connected call on a certain date and time and the call lasted a certain amount of seconds or minutes. Based solely on the call duration, or whether it was answered, Mr. Rudolph extrapolates that the calls are robocalls.

To conclude, Mr. Rudolph may be qualified to opine about how his company captures voicemail recordings, but it is a stretch to say he is qualified to opine on the behaviors of call recipients when his company only records *unanswered* calls. The fact that a call may last only 15 seconds does not automatically mean it is a robocall or an illegal robocall. There are many reasons why a telephonic conversation between two human beings might last less than a minute. Absent some experience in the social sciences, Mr. Rudolph should be barred from offering these opinions.

**B. <u>Rudolph's Methodology is Not Reliable Because It's Untested and Incomplete</u>**

Mr. Rudolph's methodology has not been tested. Although the OAG claims SBT could replicate Mr. Rudolph's behavioral call analysis, ECF No. 68 at 10, the expert report contains much more than purported mathematics. There are numerous opinions buried within the report purporting to tie average call length and answer seizure rate to robocall activity. The report also includes opinions about the behaviors of human beings and their subjective motivations for deciding whether to leave voicemails. Mr. Rudolph admitted in the deposition that his methods were not tested and even suggested it was unnecessary for them to be tested. His own report notes that his review of the data was incomplete, "it would be helpful to have insight into factors that may have changed the relationships with ALKA, LATA1, and RED during these times."[2] [ECF No. 59-2 at 21].

The OAG also objects to SBT's criticisms of YouMail's Consumer Voice Call Evidence, claiming the "criticism is misplaced because Defendants were provided with the actual voicemail recordings and transcriptions underpinning Rudolph's analysis." [ECF No. 68 at 13]. However, a close review of the expert report's alleged findings show that the recordings do not appear to be from the calls themselves. Specifically, on page 78, titled "Appendix VI: Audio Transcription & Media Link for Top 50 Campaigns Present in Call Traffic from Upstream Providers Other than Whisl," there is the following note:

> As voicemail deposit audio recordings may capture different fragments of the robocall audio, depending on when the robocall dialer begins playing its recording, or due to variations in the robocall script linked to a template further linked to a campaign, multiple transcripts or multiple links to recordings may be presented.
>
> This is not an indication of each distinct, individual recording for each recipient, but rather distinct transcripts and links to each variant.

[ECF No. 59-2 at 78].

The report admits that the linked recordings are not an indication of an individual recording for each recipient, but instead seem to be exemplars of different campaigns. SBT argues there is an inherent issue with relying upon the recordings because they're misleading due to lack of a causal chain. Although the OAG filed with the Court its spreadsheet with purported links to audio

---

[2] This claim undermines the OAG's argument that Mr. Rudolph's failure to review SBT's communications with its customers is immaterial. [ECF No. 68 at 17]. Communications between SBT and those customers would offer insight into the factors that changed the relationship.

recordings, ECF No. 50-33, there is an issue with the links. There are *many* duplicate links throughout the document. For example, lines 5380 through 5765, overwhelmingly contain the same link: https://media.youmail.com/mcs/glb/audio/s3diZGlyX3R0bmRmYTp0b21jYXQ0MzU0OjE2MTQyOTYwMDQyMTFSAfGq2M.gen.wav. Pasting this link into the excel search box and clicking "Find all" reveals 16,613 cells containing this exact link to this exact .wav file. It does not take a computer scientist to understand that 16,613 individual voicemail recordings from 16,613 individual calls should not result in 1 .wav file. It should result in 16,613 individual .wav files. YouMail is trying to use 1 single recording from 1 single call and say that exact recording's audio file was also present on thousands of other calls. This is highly suspect in light of YouMail's own admission that "audio recordings may capture different fragments of the robocall audio . . ." [ECF No. 59-2 at 78].

According to YouMail, there should be some variation across the recordings, but the spreadsheet contains numerous examples of duplicate .wav files. It's true that each individual or unique .wav file link was likely generated at some point from a single call to a single subscriber. However, it's not true that the exact same .wav file, generated from subscriber A on a certain date and time, was also generated from the voicemail box of thousands of other users on other dates and times.

Further, the notion that SBT would have been given access to YouMail's proprietary algorithms should be rejected. It is true that SBT attempted to subpoena YouMail for documents. However, SBT's efforts were rebuked. YouMail's counsel responded with fifteen (15) separate objections. See Exhibit 1. These objections included the following:

> 3. The Responding Entity, a non-party to the Action, objects to the Subpoena to the extent that it calls for the production of documents, memoranda, or reports, that constitute **proprietary information, trade secrets, or other confidential, research, development, and/or commercial, information**. Such materials (and the information contained therein) have been developed at great expense and effort. **Their disclosure would be competitively harmful, and no confidentiality stipulation provides adequate protection for their production**.

See [Exhibit 1 at ¶ 3].

The claim that "[d]efendant could have obtained technical details as to how YouMail generated the consumer voice call evidence underpinning Rudolph's analysis if it had sought this information" should be disregarded. [ECF No. 68 at 15]. SBT did attempt to obtain information

and was told by YouMail's counsel that it could not have access to such information because it was so proprietary that no confidentiality stipulation could possibly provide adequate protection.

For these reasons, Mr. Rudolph's opinions, based on untested proprietary secret algorithms, should be rejected. Further, any opinions regarding human behavior should likewise be disregarded as unreliable because Mr. Rudolph is not qualified to speak to them, resulting in a flawed methodology. Mr. Rudolph's company captures voicemail recordings from *unanswered* calls and has no insight into the subjective intentions of two persons engaged in a phone call after it connects. Finally, the purported "actual voicemail recordings," ECF No. 68 at 13, seem to be a handful of unique .wav audio files relinked thousands of times and presented as if they were unique recordings pulled individually from each user's voicemail box on the spreadsheet. If that were so, each cell in column H would link to a unique .wav file. Instead, a few unique .wav files are being broadly applied to thousands of calls based on nothing but the *ipse dixit* of the expert.

### C.  **Rudolph's Testimony Will Confuse the Trier of Fact**

Many of Mr. Rudolph's opinions are framed as "can" or "could" statements that hold no real weight and will confuse the trier of fact. For example, the bulk of Mr. Rudolph's conclusions about Average Call Duration and Answer Seizure Rates are not definite. This is concerning considering the amount of weight placed onto these metrics by OAG and Mr. Rudolph, and the number of opinions rendered that SBT transmitted illegal robocalls based solely on the call duration and seizure rate:

> Average Call Duration (ACD) provides an indication of engagement between originating and receiving parties. Call originators who truly seek to inform the recipient of why they are calling **will traditionally** at the very least leave a voicemail message about why they called (such as an appointment reminder, confirmation, etc). Call originators who are seeking to only find a live recipient while balancing the cost of making calls **will typically** result in extremely short duration calls. While some people engage with an unrecognized call, unwanted calls face challenges in keeping a significant number of consumers on for longer duration and many calls upon being answered are immediately hung up as the consumer hears an automated voice on the line.

> Answer Seizure Rate (ASR) describes the proportion of calls that are answered by a human or their voicemail system. ASR naturally varies between callers and their content. A low ASR **could be indicative** of the caller not being recognized by the recipient, such as is the case with highly variable origination numbers, or the call being unwanted. It **could also indicate** call blocking in the phone network or on the recipient's device.

> ACDs ranging from near-zero seconds to over 1 minute **can be indicative** of robocalling activity – this is dependent on the consistency of the robocalls in terms of their configured behavior and their proportional representation within a set of traffic. If a robocaller configures their behavior to generate millions of calls at 30s in duration, such a bias towards those durations can be observed within CDR data. A robocall **could also configure** their robocalls to be 65 seconds long in order to move the average call duration up over 1 minute. Further, robocall operators **can optimize** their answer rates (ASRs) by configuring how often they leave a voicemail message for the recipient. As such, **there is no obvious value that indicates robocalls – lawful or unlawful**, as these values can be pre-determined by robocall operators and a deeper analysis of specific traffic is necessary to correlate ACD and ASR values to robocalling/dialer behavior different than conversational behavior. Nonetheless, any data set where the average call duration is below 20 seconds, or the answer rate is below 30-40% **can be a fast indicator** of calls generally unwanted by their recipients or delivery issues where providers would take an active role in working with their customers to understand their use cases and try to improve their answer rates and call deliverability.

See [ECF No. 59-2 at 7] (emphasis supplied).

As argued in response to the OAG's Motion to Dismiss/Strike the Counterclaim, the FCC rejected the idea that all calls of short duration are inherently suspect. [ECF No. 47 at 8 (quoting the FCC)]. Yet, Mr. Rudolph intends to offer opinions that billions of calls were all robocalls because of the duration of the call. Likewise, despite offering no opinions that SBT violated the law, ECF No. 53 at ¶ 21 (undisputed by OAG), the expert report contains the word "scam" 26 times and notes Mr. Rudolph was hired to analyze CDRs and "identify indicia of fraudulent or otherwise illegal calls transmitted by the Defendant." [ECF No. 59-2 at 3].

Mr. Rudolph's conclusions are also contradictory on top of being indefinite. For example, on page 10 of the Report he notes "Note there is a good volume of 6-12s and 12-18s duration calls as a lawful, real originator may be dialing and reach a voicemail prompt **but choose to not leave a voicemail.**" However, on page 7 of the Report he noted with certainty that call originators will "at the very least leave a voicemail message." Further, the opinion that there was "good volume of 6-12s and 12-18s duration calls as a lawful, real originator may be dialing . . ." is confusing in light of the language cited above that "any data set where average call duration is below 20 seconds, or the answer rate is below 30-40%, can be a fast indicator of calls generally unwanted by their recipients . . ."

## Conclusion

In conclusion, Mr. Rudolph's testimony goes beyond his qualifications as CTO of YouMail. Mr. Rudolph is intending to offer opinions about the behavior of human beings engaging in telephone conversations based on his experience as a computer scientist. His methodologies are suspect because his company only records voicemails and does not have visibility into the content of connected phone calls. All analyses were conducted by proprietary and secret algorithms. Mr. Rudolph purports to have evidence of over 166,000 calls that transited SBT's network, but the spreadsheet reveals that only a few unique .wav files have been reproduced thousands of times and presented as individual unique recordings taken from specific inboxes. There are not in fact unique voicemail recordings for each of the calls on the spreadsheet. Even if there were 166,000 unique recordings, it would represent less than .05% of the entire dataset. Mr. Rudolph does not have any purported transcription or audio evidence for the other 99.95% of the dataset, yet he confidently proclaims they're robocalls based on nothing more than knowing the calling number, the called number, whether the call connected, and how long the connection was active. Finally, his opinions are not definite in that they are simply "may" or "could" statements. This will confuse the trier of fact especially where the report contradicts itself on what call duration results in a call being labeled a robocall. The opinions are not reliable and should be rejected.

**WHEREFORE**, SBT respectfully requests that OAG's Expert Witness Report be excluded for the reasons stated herein.

Respectfully submitted,

SMARTBIZ TELECOM LLC

/s/ Sean W. Gellis
SEAN W. GELLIS, B.C.S.*
Florida Bar No. 105924
Gellis Law, PLLC
300 W. Pensacola St.
Tallahassee, Florida 32301
Telephone: (561) 371-2848
sean@gellislaw.com
*Board Certified in State and
Federal Government and
Administrative Practice*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed electronically through the Court's CM/ECF portal and served via the same on all parties of record on this November 27, 2023.

/s/ Sean W. Gellis
SEAN W. GELLIS