UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 22-23945-CIV-MARTINEZ

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

    Plaintiff,

vs.

SMARTBIZ TELECOM LLC,

    Defendant,
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**THIS MATTER** came before this Court on Plaintiff Office of the Attorney General, State of Florida, Department of Legal Affairs' Motion for Summary Judgment ("Pl.'s Mot."), (ECF No. 51), and Defendant Smartbiz Telecom LLC's Motion for Summary Judgment ("Def.'s Mot."), (ECF No. 54). After considering the relevant briefing, the record, and being otherwise advised in the premises, the Court rules as follows.

### FACTUAL BACKGROUND[1]

This action concerns Defendant's alleged transmission of illegal robocalls. Defendant, Smartbiz Telecom LLC ("Defendant" or "Smartbiz"), is a Florida limited liability company and is registered in the Federal Communications Commission's ("FCC") Form 499 Filer and Robocall Mitigation databases. (Plaintiff's Statement of Facts ("Pl.'s SOF") ¶¶ 1–3, ECF No. 50.) Smartbiz

---

[1] The following pertinent facts are undisputed unless otherwise noted. When the facts are in dispute, they are taken in the light most favorable to the nonmovant. *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).

is a provider of Voice over Internet Protocol ("VoIP") communication services, "meaning that it receives telephone calls from its customers in the form of packets of information sent over the internet, and routes those telephone calls through its suppliers to be connected to recipients in the United States." (*Id.* ¶ 6; Joint Statement of Undisputed Facts ("JSOF") ¶ 3, ECF No. 57.) Defendant provides its customers with trunks, which are digital pathways for transmitting VoIP phone calls. (JSOF ¶ 5; Pl.'s SOF ¶ 9.) Customers send calls through trunks to Defendant's softswitch, which is an online platform owned by the company SIPNav LLC, that routes the calls to Defendant's suppliers. (JSOF ¶ 4; Pl.'s SOF ¶ 8.) The softswitch captures information about each call it routes including the date and time on the call, the calling phone number, the called phone number, and the billed duration of the call. (JSOF ¶ 7; Pl.'s SOF ¶ 13.) Records that Defendant's softswitch creates about calls transiting Defendant's network are referred to as Call Detail Records ("CDRs"). (JSOF ¶ 7; Pl.'s SOF ¶ 13.) Defendant's softswitch also records a three-digit integer code denoting the call result, called a "SIP code," for each call. (JSOF ¶ 8; Pl.'s SOF ¶ 14.)

The Industry Traceback Group ("ITG") is a consortium of telecommunications companies appointed by the Federal Communications Commission ("FCC") to manage private-led efforts to trace back the origin of suspected unlawful robocalls. (Pl.'s SOF ¶ 16.) The ITG conducts tracebacks, a process that attempts to identify the source of a suspected illegal call by contacting each communications service provider who carried the call sequentially starting with the call recipient's provider. (JSOF ¶ 9; Pl.'s SOF ¶ 17.) The ITG conducts tracebacks by sending an email notification to a communications provider, starting with the call recipient's provider, asking it to sign into the ITG's online portal to respond to the traceback request. (JSOF ¶ 10; Pl.'s SOF ¶ 18.)

ITG records indicate that Smartbiz has received at least 256 traceback notifications between June 26, 2020, and January 30, 2023. (Pl.'s SOF ¶ 21.) Traceback notices inform Smartbiz

that a suspected fraudulent call traversed its network and provide a description of the call and why it is suspected to be illegal, the phone number information, and the call time and date. (*Id.* ¶ 22.) Defendant has responded to 261 traceback notifications and would frequently leave comments informing the ITG of the action it purported to take in response to the traceback. (*Id.* ¶¶ 27–28.)

Plaintiff commenced this action on December 5, 2022, alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq. (Counts I and II); the Truth in Caller ID Act, 47 U.S.C. § 227(e) (Count III); the Telemarketing Sales Rule, 16 C.F.R. § 310 (Count IV); and Florida's Deceptive and Unfair Trade Practice Act, Chapter 501, Part II, Florida Statutes ("FDUTPA") (Count V). (*See generally* Compl., ECF No. 1.) Plaintiff seeks statutory damages and to enjoin Defendant from transmitting fraudulent robocalls to consumers in Florida and elsewhere in the United States. (*Id.* at 31.)

On January 20, 2023, Defendant moved to dismiss the Complaint, arguing that (1) Plaintiff does not have Article III standing; (2) the TRACED Act preempts Plaintiff's theories of liability; (3) Defendant did not "make" or "initiate" calls; (4) Plaintiff has not joined the required parties; (5) Count III contains a pleading defect; (6) Defendant did not provide substantial assistance under the Telemarketing Sales Rule; and (7) Count V cannot survive absent the others. (Mot. to Dismiss, ECF No. 12.) This Court dismissed the Motion to Dismiss in its entirety. (ECF No. 32.) Plaintiff now moves for summary judgment on the five counts pled in the Complaint while Defendant moves for summary judgment because it (1) did not "make" or "initiate" calls; (2) was exempted from the Truth in Caller ID claims; (3) is not subject to the Do Not Call list restrictions; (4) did not provide substantial assistance or support; (5) and it did not violate FDUTPA. (*See generally* Pl.'s Mot. and Def.'s Mot.)

3

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may show that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). Rule 56 requires granting summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant is entitled to a judgment as a matter of law when the "nonmoving party has failed to make a sufficient showing on an essential element of [their] case." *Id*.

"The moving party bears the initial burden to show, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *accord Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Cont. No. B0621MASRSWV15BND*, 766 F. App'x 795, 798 (11th Cir. 2019). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

When the moving party has carried its burden, the party opposing summary judgment must do more than show that there is "metaphysical doubt" as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, Rule 56 "requires the nonmoving party to go beyond the pleadings and, by her own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate *specific facts showing that there is a genuine issue for trial*." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (emphasis added) (cleaned up). "[C]onclusory allegations without specific supporting facts have no probative value." *Myers v. Bowman*, 713 F.3d 1319, 1327 (11th Cir. 2013) (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).

At summary judgment, this Court must view the evidence and draw inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus.*, 475 U.S. at 586; *Chapman*, 861 F.2d at 1518. "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant." *Chapman*, 861 F.2d at 1518. "However, an inference based on speculation and conjecture is not reasonable." *Id.* (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 270 (1968).

## DISCUSSION

I. **PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO COUNTS I AND II.**

The Telephone Consumer Protection Act ("TCPA") prohibits "any person with the United States, or any person outside the United States if the recipient is within the Unities States [from making] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice to any telephone number assigned to a . . . cellular telephone service," and "[from initiating] any telephone call to any

5

residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." (47 U.S.C. §§ 227(b)(1)(A)(iii), (b)(1)(B); Compl. ¶¶ 83, 91.) To state a claim for a TCPA violation, the plaintiff must prove the following elements: 1) Defendant or the recipients of Defendant's calls are within the United States; 2) Defendant made or initiated the calls at issue; 3) Defendant was involved in placing the calls; and 4) Defendant's calls went to cellular or residential lines and played prerecorded or artificially voiced messages. (*Id*.)

        A.        **Defendant and the recipients of Defendant's calls are within the United States.**

To satisfy the first element of a TCPA violation claim, the plaintiff must show that the defendant and/or the recipients of the defendant's calls are within the United States. Here, Defendant is within the United States because Defendant is incorporated in Florida and has maintained at least a nominal address in Florida since 2016. (JSOF ¶ 1; Pl.'s SOF ¶¶ 1, 4–5.) Additionally, Defendant's CFO and CEO reside in the United States. (Pl.'s SOF ¶ 12.) These connections to the United States establish Defendant's presence. *See Int's Shoe Co. v. State of Wash., Off. Of Unemployment Comp. & Placement*, 326 U.S. 310, 316-17 (1945). Furthermore, the calls at issue in this case were all transmitted to phone numbers with United States area codes. (*Id.* ¶ 15). Therefore, Defendant was within the United Sates at the time the relevant calls were made or initiated, and the calls themselves were directed to recipients of the United States.

        B.        **Defendant had actual notice of an illegal use, however, cannot be deemed to have failed to take steps to prevent such transmissions.**

The second element of Plaintiff's TCPA claim concerns whether Defendant made or initiated the calls at issue. In a 1992 order, enacted shortly after the enactment of the TCPA, the FCC concluded that liability exists if Defendant demonstrates "a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions." *In the Matter*

*of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, ¶ 54 (1992). In its Motion for Summary Judgment, Defendant renews its claim (previously raised in its Motion to Dismiss) that because it is an intermediate provider it cannot make or initiate a call and therefore cannot be held liable under the TCPA. (Def.'s Motion at 3; see also ECF No. 12.) This Court has already rejected this argument in its Order Denying Motion to Dismiss, holding that "the role Defendant plays in transmitting telephone calls falls within the scope of the FCC's 1992 Order." (ECF No. 32 at 6–8.)

The threshold for what constitutes actual knowledge is rather low. In *FTC v. Fleetcor Techs., Inc.*, the court found that an individual had actual knowledge of a corporation's unlawful practices based on the volume of email communications and customer complaints. *FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 1268, 1343 (N.D. Ga. 2022); *see also FTC v. Partners in Health Care Ass'n, Inc.*, 189 F. Supp. 1356, 1368 (S.D. Fla. 2016) (holding that knowledge based in part on numerous complaints constituted actual knowledge).

Here, Defendant had actual notice of an illegal use. The Industry Traceback Group (ITG) conducts tracebacks, a process that attempts to identify the source of a suspected illegal call by contacting each communications service provider who carried the call sequentially starting with the call recipient's provider to uncover the provider who originated the call being traced and who the caller is. (Pl.'s SOF ¶ 17). The ITG then sends an email notification to the communications provider asking them to respond to the traceback request. (*Id.* ¶ 18). ITG records indicate that Defendant received over 250 traceback notifications between June 2020 and January 2023, all providing notice of suspected illegal calls that have traversed Defendant's network. (*Id.* ¶ 21–22). ITG records also indicate that Defendant responded to 261 traceback notifications. (*Id.* ¶ 27). Additionally, besides actual notice of suspected illegal activity from the ITG, Defendant's

7

upstream providers' complaints provided Defendant with actual notice that illegal calls were transiting its network. Directo, a supplier of VoIP services used by Defendant, sent at least fifteen complaints to Defendant regarding illegal activity, such as spoofed ANIs, calls that were associated with fraud, calls characterized as scams and robocalls, and imposter scam calls. (*Id.* ¶ 30). Other suppliers used by Defendant issued complaints with similar reasoning, clearly notifying Defendant that illegal activity was transiting its network. Therefore, Defendant had actual notice of the illegal use of its network through the traceback notifications and numerous complaints from suppliers. These notifications provided specific information about the illegal nature of the calls and required Defendant to locate and respond to the tracebacks, demonstrating that Defendant had actual knowledge of the illegal use of its network.

The language of 47 CFR § 64.6305(b)(2) sets forth the robocall mitigation program requirements, stating that, "Any robocall mitigation program . . . shall include reasonable steps to avoid carrying or processing illegal robocall traffic and shall include a commitment to respond fully and within 24 hours to all traceback requests from the Commission, law enforcement, and the industry traceback consortium, and to cooperate with such entities in investigating and stopping any illegal robocallers that use its service to carry or process calls." 47 CFR § 64.6305(b)(2). This broad language sets the standard for what would be considered adequate robocall mitigation efforts and should be applied to Defendant to determine whether their efforts meet this requisite level.

While Defendant did have notice that that illegal calls were transiting its network, it cannot, as a matter of law, be concluded that it failed to take steps to prevent such transmissions. (*See* Pl.'s Mot. at 10-15.) Defendant claims to have implemented various procedures to prevent illegal traffic, and Plaintiff argues that these measures were either ineffective or not properly implemented. *Id.*

The effectiveness of Defendant's KYC program, Acceptable Use Policy, STIR/SHAKEN implementation, Proactive Network Monitoring, and cooperation with tracebacks is a question for a jury to decide. Plaintiff alleges that that "Defendant ignored warnings that its practices allowed illegal traffic to flow through its network, failed to follow the nominal procedures it did put in place, and actively blended suspicious, short duration traffic with longer duration traffic to circumvent downstream providers' robocall mitigation programs," and that Defendant's five-part mitigation procedure was ineffective. (Pl.'s Mot. at 10–11.) However, while Plaintiff has presented strong evidence regarding the Defendant's actual notice of illegal use and the ineffectiveness of its purported preventative measures, the effectiveness of such procedures is a question for a jury to decide.

      **C.**      **Defendant was involved in the placing of the telephone calls.**

The scope of liability under the TCPA was addressed extensively in the 2015 FCC Order. *See Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7890 (2015). The FCC found that "one can violate the TCPA either by taking the steps necessary to physically place a telephone call, or by being so involved in the placing of a specific telephone call as to be deemed to have initiated it." *Mey v. All Access Telecom, Inc.*, No. 5:19-CV-00237-JPB, 2021 WL 8892199, at *4 (N.D.W. Va. Apr. 23, 2021). In making this determination, the adjudicator must 'look to the totality of the facts and circumstances surrounding the placing of a particular call.'" *Id.* Factors relevant to this analysis include: 1) the extent to which the defendant controls the call's message; 2) the extent to which the defendant controls the timing or initiation of the call; 3) the extent to which the defendant controls who receives the call; 4) whether the service is "reactive in nature," meaning that it places calls in a manner that is arranged by the customer rather than the defendant; 5) the extent to which the defendant "willfully enables

9

fraudulent spoofing of telephone numbers" by offering that functionality to clients; 6) the extent to which the defendant "assists telemarketers in blocking Caller ID" by offering that functionality to clients; and 7) whether a defendant "who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes." *Cunningham v. Montes*, 378 F. Supp. 3d 741, 747-48 (W.D. Wis. 2019). Two principles emerge from the 2015 FCC Order: TCPA liability attached to those who control or are deeply involved in making specific calls, and to those who knowingly allow an auto-dialing system to be used to make prohibited robocalls. *Id.*

In *Cunningham*, the court found that TCPA liability extended to those who "knowingly allow an auto-dialing system to be used to make prohibited robocalls." *Id.*; *see also Hurley v. Messer*, No. 3:16-cv-9949, 2018 WL 4854082, at *9 (S.D.W. Va. Oct. 4, 2018) ("With respect to the second prong for those that offer calling platform services for others to use, the FCC stated that it also will consider as a factor whether they 'knowingly allowed [their] client(s) to use that platform for unlawful purposes.)'"

Defendant was involved in the placing of the telephone calls because it knowingly allowed fraudulent calls to transit its network. Plaintiff argues that Defendant is "is deeply involved in the calls that transit its network because it plays a vital role in connecting the calls." (Pl.'s Mot. at 16.) Here, TCPA liability would extend to Defendant because it has already been established that Defendant had actual knowledge that illegal, fraudulent calls were transiting its network. Like in *Cunningham*, where the court said that a party was liable under the TCPA when it knowingly allowed an auto-dialing system to be used to make illegal robocalls, Defendant knowingly allowed fraudulent scam calls to transmit its network. *See Cunningham*, 378 F. Supp. 3d at 747-48. While Defendant argues that Plaintiff omitted the term "auto-dialing" in its application of *Cunningham*,

10

this omission does not affect the scope of TCPA liability. *See id.* Likewise, Defendant argues that *Hurley* was misapplied because, here, Defendant does not utilize a "calling platform." *See Hurley*, 2018 WL 4854082, at *9. Similarly, this slight variance in the precedent case law would not exempt Defendant from being liable under the TCPA. The crux of the findings in both *Cunningham* and *Hurley* was that under the 2015 Order, TCPA liability can extend to parties who knowingly allow illegal, fraudulent calls to transit its network. *See id; see Cunningham*, 378 F. Supp. 3d at 747-48. It is undisputed that Defendant knowingly did exactly that, and therefore, it is liable under the TCPA.

   **D.** **Calls transmitted by Defendant went to cellular or residential lines and played prerecorded or artificially voiced messages.**

The fourth and final element of Plaintiff's TCPA claim is that calls went to cellular or residential lines and played prerecorded or artificially voiced messages. At least 166,628 calls transited Defendant's network and connected to cellular or residential phone lines and left prerecorded or artificially voiced messages. (Pl.'s SOF ¶ 48.) Therefore, the fourth element of Plaintiff's TCPA claims is satisfied because the calls were transmitted to cellular or residential lines and played prerecorded or artificially voiced messages.

On balance, because a reasonable jury could differ on the question as to whether Defendant took adequate steps to prevent the fraudulent transmissions after having actual knowledge that there was illegal activity transiting its network, Plaintiff is not entitled to summary judgment as to Counts I and II.

**II.** **PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNT III OF THE COMPLAINT.**

Plaintiff's third Count alleges that Defendant violated 47 U.S.C. § 227(e), the Truth in Caller ID Act. Under U.S.C. § 227(e)(1), "it is unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States, in connection

with any voice service or text messaging service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value, unless such transmission is exempted pursuant to FCC regulations." (Compl. ¶ 99). To state a claim for violation of the Truth in Caller ID Act, the moving party must prove the following elements: 1) Defendant is in the United States; 2) Defendant acted "in connection with any Voice Service;" and 3) Defendant knowingly caused a caller identification service to transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value.

It has already been established that Defendant is in the United States, so the first element has been satisfied. The second element of Plaintiff's Truth in Caller ID Act violation claim is that Defendant acted in connection with any Voice Service. Voice Service is defined as "any service that is interconnected with the public switched telephone network and that furnishes voice communications to an end user using resources from the North American Numbering Plan." 47 U.S.C. § 227(e)(8)(E)(i). This element is clearly satisfied because Defendant routes voice telephone calls using United States' phone numbers conforming to the North American Numbering Plan which are subsequently answered by the end users. Therefore, Defendant is acting in connection with a Voice Service because Defendant is directly providing Voice Service.

The third element of Plaintiff's Truth in Caller ID Act claim is that Defendant knowingly caused a caller identification service to transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value. In *United States v. Rhodes*, the United States alleged that the defendant made thousands of robocalls playing a prerecorded voice message and did so using a dialing platform's service to display caller ID numbers that were not assigned to him. *United States v. Rhodes*, No. CV 21-110-M-DLC, 2022

WL 2466796, at *7 (D. Mont. Apr. 1, 2022), *report and recommendation adopted*, 2022 WL 17484847 (D. Mont. Dec. 7, 2022). The United States further claimed that the defendant selected caller IDs that matched the area code of the call's recipient rather than his own. *Id.* The court found that the United States had "alleged sufficient facts demonstrating the defendant knowingly caused a caller identification service to transmit misleading or inaccurate caller ID information in connection with a voice service." *Id.*

Like in *Rhodes*, Plaintiff has asserted factual allegations that Defendant "knowingly caused" fraudulent transmissions and thus has satisfied the final element of the Truth in Caller ID Act claim. *See id.* Here, Defendant was alerted upwards of 200 times to the fact that its network was being used to transmit calls with misleading or inaccurate, spoofed phone numbers. *See Rhodes*, 2022 WL 2466796, at *7. Defendant was notified of the transmission of misleading or inaccurate information through various means, including traceback notifications and complaints from downstream providers. These notifications informed Defendant of specific instances where its network was transmitting calls where the caller was impersonating law enforcement or a well-known brand. Therefore, it is undisputed that Defendant had actual knowledge that calls including misleading or inaccurate caller ID information were transiting their network.

Additionally, consumers who reportedly answered spoofed calls transmitted by Defendant confirm that the intent of the calls was to steal things of value, including money or personal information. (Pl.'s Mot. at 20-21.) Calls impersonating the "department of tax debt and financial settlement" offering to help an individual with nonexistent tax problems, or Amazon imposters who have scammed individuals out of thousands of dollars confirm that fraudulent caller ID information were tactics used in calls that transited Defendant's network and the callers' intent in making these spoofed calls was to steal something of value, whether that be someone's money or

personal information. (*Id*. at 21.) Therefore, Defendant knowingly transmitted call traffic that caused consumers' caller identification services to display inaccurate or misleading information in furtherance of attempts to steal from the call recipients.

Lastly, Defendant argues it is exempt from the Truth in Caller ID Act (Def.'s Mot. at 13–15), but the prohibition under 47 U.S.C. § 227(e) is subject to two exceptions: "(1) Lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States; or (2) Activity engaged in pursuant to a court order that specifically authorizes the use of caller identification manipulation." 47 C.F.R. § 64.1604(b). Smartbiz does not fall into either exception. Plaintiff is entitled to summary judgment as to Count III because there is no genuine issue of material fact regarding whether the Defendant has violated the Truth in Caller ID Act.

### III.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNTS IV AND V OF THE COMPLAINT.

The Telemarketing Sales Rule ("TSR") prohibits abusive and deceptive acts or practices by sellers or telemarketers and further prohibits other persons from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR. *See* § 501.203(3), Florida Statutes. To prove that the Defendant was liable for Count IV and Count V, Plaintiff must prove the following elements: 1) Defendant transmitted calls that violated 16 C.F.R. §§ 310.3(a) or 310.4; 2) by transmitting the calls Defendant provided substantial assistance or support to the sellers or telemarketers associated with the calls; and 3) Defendant had actual knowledge or deliberate ignorance that the sellers or telemarketers were violating the TSR. *See FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008); *see also Statement of basis and purpose and final rule*, Telemarketing Sales Rule, 60 FR 43842, 43851-52.

### A. Defendant Transmitted Calls that Violated the TSR.

A violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce. *FTC v. Life Mgmt. Servs. Of Orange Cnty.*, 350 F. Supp. 3d 1246, 1264 (M.D. Fla. 2018). In *FTC v. Life Mgmt. Servs. Of Orange Cnty*, it was undisputed that "employees of Loyal and LMS violated this provision when selling the LI program by misrepresenting, both directly and by implication, that they were representatives of or otherwise affiliated with customers' banks, credit card issuers, and credit card associations such as MasterCard and Visa." *Id.* Additionally, in *FTC v. Lalonde*, the defendant's actions were deemed to violate the TSR where the defendant had the ability to control the telemarketing program and knew or should have known of its clients' violations including inducing the purchase of credit repair services by way of multiple telephone calls. 545 F. App'x 825, 840 (11th Cir. 2013). Likewise, here, the caller pretended to be from the "Medical Coverage Center" in over 16,000 calls and of those calls, over 10,000 call-receivers were on the National Do Not Call Registry. (Pl.'s Mot. at 24.) These calls that transited Defendant's network are in violation of the TSR. And for these same reasons and the ones discussed above, Defendant's argument that it is not subject to the Do Not Call List restrictions "because it has no knowledge about the contents of a call transiting its network" fail. (Def.'s Mot. at 15.)

Additionally, Government imposter scams constitute violations of the TSR. *See Telemarketing Sales Rule, 2015 Statement of Basis and Purpose*, 80 FR 77520-01, 77529. Defendant's practices violated the TSR by transmitting large numbers of calls that misrepresented material aspects of the performance, efficacy, nature, or central characteristics of goods or services to be sold to induce payment for goods or services. Notably, Defendant received numerous traceback notifications about calls transiting their network where the caller was impersonating the

Social Security Administration. (*Id*. at 25.) Since the calls transmitted by Defendant were Government imposter scams, these calls also constitute violations of the TSR.

Therefore, Defendant transmitted calls that were in violation of the TSR, and the first element of these counts is satisfied.

### B. Defendant Provided Substantial Assistance by Knowingly Transmitting Scam Calls.

To show that a party has provided substantial assistance to telemarketers in violation of the TSR, there must be "something more than causal or incidental help to the telemarketer but does not have to show a direct connection between the assistance and the misrepresentation for an entity to be liable under § 310.3(b)." *FTC v. Partners in Health Care Ass'n, Inc.*, F. Supp. 3d 1356, 1369 (S.D. Fla. 2016). "The threshold for what constitutes substantial assistance is low." *FTC v. Lake*, 181 F. Supp. 3d 692, 699 (C.D. Cal. 2016). In *United States v. Dish Network, L.L.C.*, the court found that there was substantial assistance where the defendant paid dealers to engage in telemarketing that violated TSR and allegedly knew or consciously avoided knowing of the violations. 667 F. Supp. 952, 961(C.D. Ill. 2009). *See also FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-Orl-22, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014) (finding that substantial assistance was present, as a matter of law, where the defendant provided just two merchant accounts that were essential for processing credit card payments).

With a rather low threshold, Defendant's essential role in the transmission of these scam calls surpasses this threshold. *See FTC v. Lake*, 181 F. Supp. 3d at 699. Defendant had the power to stop every call that transited its network. (*See* Pl.'s SOF ¶ 9.) While it has already been established that Defendant had knowledge of suspected illegal calls through its customer's complaints and ITG traceback notifications, by continuously playing a role in connecting these calls, Defendant has provided substantial assistance. (*See id.*)

16

    **C.**    **Defendant had Actual Knowledge that the Telemarketers were Violating the TSR.**

As previously discussed, Defendant had actual knowledge that the telemarketers were violating the TSR. The hundreds of traceback notifications received, to which Defendant replied, and the numerous complaints by its own downstream providers demonstrate that Defendant knew or should have known that there was illegal activity transiting its network. (*See* Pl.'s SOF ¶¶ 21, 30–32, 36–38.) Therefore, Defendant had actual knowledge that the telemarketers placing calls through its network were violating the TSR. Plaintiff is therefore entitled to summary judgment as to Counts IV and V.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Plaintiff's Motion for Summary Judgment, (ECF No. 51), is **GRANTED in part and DENIED in part**.

2. Defendant's Motion for Summary Judgment, (ECF No. 54), is **DENIED**.

3. This case shall proceed to trial as to Counts I and II, specifically in regard to Defendant's mitigation efforts.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of September 2024.

                                                      JOSE E. MARTINEZ
                                                     UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record