UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

    Plaintiff,

    v.                                          CASE NO.: 1:22-cv-23945-JEM

SMARTBIZ TELECOM LLC,
A Florida limited liability company,

    Defendant.
_____/

**MOTION FOR ENTRY OF INJUNCTION**

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General") respectfully requests entry of a Permanent Injunction against Smartbiz Telecom LLC ("Defendant") pursuant to Fed. R. Civ. P. 65 and this Court's September 19, 2024, Order on Motions for Summary Judgment ("MSJ Order"), [ECF No. 110], and further states as follows.

**INTRODUCTION**

Defendant is actively transmitting high volumes of fraudulent and otherwise illegal robocalls into the United States, which lends urgency to the need for this Court to enter permanent injunctive relief. Entry of a permanent injunction as soon as possible and prior to the final disposition of this action will prevent avoidable fraud losses caused by the scam calls Defendant continues to transmit to consumers. Defendants are liable under three separate Counts in the Complaint each of which authorizes injunctive relief. [ECF No. 110]. Entry of a permanent injunction is appropriate regardless of whether the Attorney General is successful at trial on the two remaining Counts not resolved by this Court on Summary Judgment. In short, Defendant's

1

repeated and ongoing illegal conduct warrants entry of a permanent injunction separate from, and prior to, resolution of the Attorney General's monetary claims.

This Court determined that Defendant had actual knowledge of the illegal use of its network to transmit fraudulent robocalls, in part, based on over 250 traceback notifications between June 2020 and January 2023, and Defendant's responses to those notifications. [ECF No. 110, pgs. 7-8]. The Industry Traceback Group ("ITG"), a consortium of telecommunications companies appointed by the Federal Communications Commission ("FCC") to manage private-led efforts to trace back the origin of suspected unlawful robocalls, has sent Defendant an additional twenty-seven (27) traceback notifications between April 27, 2023, and September 24, 2024. Exhibit 1, Traceback Notifications 4-27-2023 to 9-24-2024. These tracebacks and Defendant's responses show that Defendant has no intention of following either its own policies for eliminating illegal robocalls from its network or obeying laws mandating that Defendant refuse to transmit such illegal traffic.

Faced with Defendant's intentional, repeated illegal conduct and dishonesty, it is appropriate for this Court to cut Defendant off from the United States telephone network. Prohibiting Defendant from transmitting any telephone call on behalf of any other entity to any telephone number with an area code assigned to the United States, its districts, or its territories, is the least restrictive measure that will still end Defendant's dangerous and illegal conduct.

## LEGAL STANDARD

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). This test requires that the movant demonstrate: (1) that the members of the public on whose behalf this action was brought have suffered

irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *See Id.*; *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 985 (11th Cir. 2016). Courts are required to follow this framework absent an unequivocal command by the legislature dispensing with traditional equitable requirements. *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 526 (11th Cir. 2006) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). However, a district court may appropriately exercise its equitable discretion when presuming elements of the four-factor test are satisfied based on historical traditions where the circumstances of the instant case bear substantial parallels to previous cases. *Hoop Culture,* 648 F. App'x at 985 (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008)).

Regarding the appropriate scope, "injunctive relief must be tailored to fit the nature and extent of the established violation[s]." *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984). "In other words, the injunction must be no broader than necessary to remedy the [precipitating] violation[s]." *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1351 (11th Cir. 2024), *cert. denied sub nom. Young Israel of Tampa, Inc. v. Hillsborough Reg'l Transit*, No. 23-1276, 2024 WL 4426635 (U.S. Oct. 7, 2024) (internal quotation omitted). *See also, Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010) ("we must also ensure that the scope of the awarded relief does not exceed the identified harm.").

## ARGUMENT

This Court has determined that Defendant is liable under three statutes which authorize injunctive relief. [ECF No. 110, pgs. 14, 17]. Specifically, this Court's summary judgment decision on Count III of the Complaint, which alleges violations of 47 U.S.C. 227(e), the Truth in Caller ID

Act, authorizes injunctive relief because 47 U.S.C. § 227(g) provides for an injunction against calls which violate "this section or the regulations prescribed under this section." This Court determined Defendants are liable for calls which violated 47 U.S.C. § 227(e) – a subsection of 47 U.S.C. § 227. [ECF No. 110, pg. 14]. The Court's conclusions also make it clear that Defendant violated the regulations promulgated under 47 U.S.C. § 227(e)(3) of the Truth in Caller ID Act, specifically 47 C.F.R. § 64.1604, which parallel the statutory text. Therefore, the Court has authority to enter an injunction under 47 U.S.C. § 227(g).

Similarly, 15 U.S.C. § 6103 authorizes the Attorney General to seek an injunction for violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.1, *et seq.*,[1] and the Court found Defendant liable for violating the TSR. [ECF No. 110, pg. 17]. Lastly, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), at Section 501.207(1)(b), authorizes the Attorney General to bring an action "to enjoin any person who has violated, is violating, or is otherwise likely to violate, [FDUTPA]." This Court found that Defendant violated FDUTPA, [ECF No. 110, pg. 17].

Traceback evidence shows Defendant continues to transmit illegal calls. *See* Exhibit 1. The ITG has sent Defendant notifications consistently about suspected illegal traffic traversing Defendants' network during the pendency of this action, continuing even after the Court's Order on Motions for Summary Judgment, [ECF No. 110], found Defendant liable for materially identical transmissions. See Exhibit 1 at pgs. 23-27 (traceback notifications dated September 23rd and 24th, 2024, which are after the Court's September 19th Order). These post-summary judgment tracebacks were for "Prerecorded calls impersonating a store regarding an order or purchase that

---

[1] The Attorney General alleged this violation as Count IV of the Complaint. [ECF No. 1, pgs. 26-28].

was made" and "Prerecorded calls to recipients impersonating a financial institution for fraudulent means." Exhibit 1 at pgs. 24-27.

The ITG sent traceback notices to Defendant about its illegal traffic in April, June, August, September, and November of 2023, as well as January, February, March, April, May, and September of 2024 – all during the pendency of this lawsuit. Defendant responded to the traceback notifications in Exhibit 1 and confirmed that it transmitted the calls at issue. *See* Exhibit 2, Traceback Responses.[2] Furthermore, Defendant's responses show that it continued to accept traffic from the same providers even after repeated warnings that the traffic was illegal. Defendant identified its customer Raza Global Inc. as the source of traced calls in April 2023 and again in May 2024. Exhibit 2 at rows 11, 169, 178, 186, and 196. Defendant's customer Red Telecom LLC was the source of suspected illegal calls in August 2023, as well as January and March 2024. Exhibit 2 at rows 62 and 161. Defendant's customer Whisl, who the Attorney General previously noted was the source of at least eighty-three tracebacks, [ECF No. 50, ¶25], again sent Defendant illegal traffic in June and November 2023, as well as January, March and May 2024. Exhibit 2 at rows 19, 26, 34, 42, 50, 63, 71, 100, 122, 133, 140, 151, and 194. Defendant's Robocall Mitigation Program, filed in the FCC's Robocall Mitigation Database ("RMD") on or about February 2024, states: "Starting from February 26th, Smartbiz will require the execution of an Addendum to its Interconnection Agreements, containing terms and conditions that obligate customers not to use Smartbiz services for unlawful purposes. Additionally, this addendum will preserve Smartbiz's

---

[2] Exhibit 2 consists of a spreadsheet cataloging Defendant's and other providers' responses to the twenty-seven traceback notifications included in Exhibit 1. As this spreadsheet is not formatted such that it is legible when converted into a .pdf document suitable for submission through the Court's Electronic Case Filing ("ECF") system, the Attorney General has filed a Motion to Conventionally File Exhibit, seeking leave to submit Exhibit 2 to the Court on a USB drive, in conjunction with the instant Motion.

right to terminate customers for violations of the law, applicable to all its U.S. commercial clients." Exhibit 3, Smartbiz Telecom Robocall Mitigation Program, at pg. 8, § 5. Evidently, Defendant has elected not to execute its right to terminate customers who habitually send it illegal traffic despite repeated traceback notifications.

This Court found that the broad language of 47 CFR § 64.6305(b)(2), which sets forth robocall mitigation program requirements including a requirement to cooperate "in investigating and stopping any illegal robocallers that use [Defendant's] service to carry or process calls" should be applied to Defendant to determine whether their robocall mitigation efforts are adequate. By not terminating customers who repeatedly send illegal traffic that results in tracebacks, Defendants are not cooperating in stopping illegal robocallers that use its service. Thus, not only are Defendant's robocall mitigation efforts inadequate, Defendant is also being dishonest by indicating that it can and will terminate clients who send it illegal calls, but then continuing to accept additional traffic from these clients after repeated notifications of illegal calls. This willful non-compliance and deceit demonstrates why injunctive relief is necessary sooner rather than later.

Moreover, many of the tracebacks in Exhibit 1 show that Defendant continues to disregard its own Robocall Mitigation Program in other ways. For instance, Defendant states: "In accordance with 47 C.F.R § 64.6305(e)(1), Smartbiz only accepts calls from Providers listed in the RMD." Exhibit 3 at pg. 7, § 4.[3] However, Zenit Telecommunication LLC, whom Defendant identified as

---

[3] Although Defendant's Robocall Mitigation Program cites 47 C.F.R § 64.6305(e)(1), the regulation prohibiting Defendant from accepting call traffic from foreign providers who have not filed in the RMD is found at 47 C.F.R. § 64.6305(g)(2), which states: "intermediate providers and voice service providers shall accept calls directly from a foreign voice service provider or foreign intermediate provider that uses North American Numbering Plan resources that pertain to the United States in the caller ID field to send voice traffic to residential or business subscribers in the United States, only if that foreign provider's filing appears in the Robocall Mitigation Database."

6

its customer for four tracebacks from September 23-24, 2024,[4] is not listed in the RMD. Defendant acknowledges it completed four fraudulent calls for Zenit Telecommunication LLC, despite the fact that its own robocall mitigation procedures and federal regulations required it to turn away all traffic from this company. The calls Defendant received from Zenit appear to be attempts to steal money or personal information by impersonating a financial institution. Call recordings for two of the calls, which were supplied to Defendant by the ITG through its online portal for traceback responses, state: "Su cuenta cooperative se encuentra temporalmente suspendida por actividades inusuales para reactivar la marque uno para suspender la cuenta marque dos"[5] and "motivo de esta llamada es que han intentado acceder a su cuenta si desconoce la transacción marque uno para comunicarse con un representante del departamento de seguridad."[6]

Similarly, Defendant's Robocall Mitigation Program states: "If a call comes from a 'Neighboring' number, meaning the NPA-NXX is the same on both the ANI and DNIS, such call will be blocked."[7] NPA-NXX refers to the area code and next three digits of a ten-digit phone number, and spoofing the calling number such that the area code and next three digits match the called number is often referred to as "neighborhood" spoofing as it gives the appearance of calling from a local number. See [ECF No. 50-10, at AG MSJ 019]. Defendant did not follow its stated policy of blocking calls that exhibit neighborhood spoofing. For instance, Defendant received a

---

[4] Exhibit 2 at rows 213, 223, 233, and 243.
[5] Informally translated to English, the message reads: "Your cooperative account is temporarily suspended due to unusual activities. To reactivate it, press one. To suspend the account, press two."
[6] Only a partial recording of the prerecorded message Defendants transmitted was supplied, but informally translated to English, it reads: "The reason for this call is that they have tried to access your account. If you do not know the transaction, press one to communicate with a representative of the security department."
[7] ANI is a common acronym for Automatic Number Identification, which is materially synonymous with the calling phone number. DNIS is a common acronym for Dialed Number Identification Service and is materially synonymous with the called phone number.

traceback for a call fraudulently impersonating Amazon where the called number was 1-551-298-1516 and the calling number was 1-551-298-8523. This is exactly the pattern Defendant claimed to block, but evidently does not.

Pursuant to the statutory authority authorizing the Court to enjoin Defendant on the basis of its past conduct, and given Defendant's ongoing, willful, illegal acts, the Attorney General requests that this Court enter an injunction prohibiting Defendant from transmitting further calls on behalf of any other entity[8] to any phone number with an area code assigned to the United States, its districts, or territories. The record in this action as well as evidence of Defendant's continuing transmission of illegal calls amply demonstrates that the four-factor test for equitable relief is satisfied and the scope of the proposed injunction is proper.

### A. The Four-Factor Test for Equitable Relief

#### 1. *Irreparable Injury Absent an Injunction*

"A showing of irreparable harm is the *sine qua non* of injunctive relief." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal quotation omitted). "An injury is irreparable only if it cannot be undone through monetary remedies." *JetSmarter Inc. v. Benson*, No. 17-62541-CIV, 2018 WL 2709864, at *7 (S.D. Fla. Apr. 6, 2018), *report and recommendation adopted,* No. 17-62541-CIV, 2018 WL 2688774 (S.D. Fla. Apr. 26, 2018) (internal quotation omitted). Here, Defendant's ongoing transmission of fraudulent or otherwise illegal calls invades consumers' privacy and creates a material risk of financial loss that is not susceptible to redress through monetary remedies.

---

[8] The Attorney General does not request that the Court restrain the Defendant from placing telephone calls into the United States on its own behalf in furtherance of lawful portions of its business. Merely, that the Court restrain Defendant from transmitting calls into the United States on others' behalf in exchange for payment. Defendant has shown it has no intention of performing this aspect of its business in a lawful manner.

This Court has found that Defendant transmitted calls which violate recipients' privacy, including where "the caller pretended to be from the "Medical Coverage Center" in over 16,000 calls and of those calls, over 10,000 call-receivers were on the National Do Not Call Registry." [ECF No. 110, pg. 15]. Statutes regulating telemarketing, and the National Do Not Call Registry in particular, protect consumers' privacy. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019); *Pariseau v. Built USA, LLC*, 619 F. Supp. 3d 1203, 1211 (M.D. Fla. 2022); *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1341 (S.D. Fla. 2022). Historically, privacy violations constitute irreparable injuries. *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) ("we have said that an on-going violation may be presumed to cause irreparable injury involv[ing] the right of privacy"). Defendants continue to transmit unwanted robocalls that, at a minimum, pester consumers and waste their time. Monetary remedies cannot restore consumers' wasted time or adequately compensate them for the frustration caused by Defendants' ongoing transmission of illegal robocalls. Even if it were possible to calculate a monetary amount that correlates to these harms, the calls at issue impact vast numbers of consumers and it would be infeasible to identify each consumer and distribute compensation.

Additionally, the Court determined that Defendant transmitted calls that attempt "to steal things of value, including money or personal information" from consumers. [ECF No. 110, pg. 13]. Recent traceback information shows that Defendant continues to transmit such calls. See generally, Exhibit 1. Courts have found irreparable injury where, as here, Defendant's illegal conduct is likely to continue. *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1360 (11th Cir. 2019) (The "government will likely suffer irreparable injury absent an injunction. Among other things, the district court noted that [defendants] had 'a proclivity for unlawful

9

conduct,' had 'diverted and misappropriated' the employment taxes it had withheld from its employees' wages, and was 'likely to continue ignoring' its employment tax obligations.").

Although the Attorney General could theoretically bring suit for damages on behalf of each fraud victim arising from calls Defendant transmits, it is not feasible for the Attorney General to continuously monitor Defendant's call traffic and investigate each instance of attempted fraud to identify victims and then initiate litigation on their behalf. Such victims are also unlikely to initiate litigation on their own behalf as they lack investigative resources to identify the entities responsible for fraudulent calls, and the dollar value of consumers' losses to phone scams is often not sufficient to make an individual suit financially practical. Reports submitted to the Federal Trade Commission's Consumer Sentinel Network indicate that in 2023 the median amount lost by consumers who reported losing money to a fraudulent phone call was $1,480.[9] While this amount is significant to the average consumer, it is generally not sufficient to justify the expense of filing suit and retaining counsel to prosecute an action on an hourly fee basis, or enough to attract an attorney on a contingency basis – assuming consumers even had information sufficient to identify those responsible for the fraudulent call that precipitated the loss. In practice, consumer victims of Defendant's illegal calls are unlikely to receive any recompense, and prevention of the calls at issue is the only meaningful way of addressing consumer injury.

    *2.    <u>Inadequate Remedies at Law</u>*

"Often times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable . . . the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks

---

[9] Consumer Sentinel Network Databook 2023 at pg. 12. Available at:
https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Annual-Data-Book-2023.pdf

to the possibilities of alternative modes of relief, however serious the initial injury." *Lewis v. S. S. Baune*, 534 F.2d 1115, 1124 (5th Cir. 1976) (internal quotation and citation omitted).[10] As discussed above, the invasion of consumer privacy and continuing risk of financial loss caused by Defendant's conduct cannot be adequately redressed through legal remedies such as money damages. Individual consumer impacts, such as the frustration caused by repeated telephonic harassment from Defendants' illegal calls, are difficult to quantify absent intensive fact finding. The Defendant is also a recidivist that continues to transmit illegal calls in violation of its own internal policies as well as FCC regulations. *See generally*, Exhibit 2. Legal remedies would require continually filing suits against the Defendant. In such circumstances courts have found legal remedies are inadequate. *Askins & Miller Orthopaedics,* 924 F.3d at 1358 ("the IRS's ability to sit on its hands until the defendants fail to pay their taxes (again) and only then bring an action for money damages does not qualify as an 'adequate' legal remedy.")

    3.    <u>*Balance of Hardships*</u>

Balancing the hardship imposed by the requested injunction on the Defendant against the ongoing hardship experienced by the public strongly favors entry of the requested relief. Prohibiting Defendant from transmitting calls to United States' area codes would eliminate approximately 10% of Defendant's revenues. [ECF No. 50-34, pg. 5, Interrogatory No. 8]. This modest decrease in revenue is far outweighed by the benefit to the public from imposing the requested injunction. The vast majority of the call traffic Defendant delivers to the United States appears to be unwanted, illegal, or both. The Attorney General's expert witness analyzed 3.4 billion de-duplicated records of calls Defendant transmitted into the United States between 2020 and

---

[10] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

2023.[11] [ECF No. 50-10, AG MSJ 008]. The average length of Defendant's calls was only 21.8 seconds, and only 29.6% of calls lasted for more than twenty seconds, 4% remained connected for more than a minute, and only 1% remained connected for over 2 minutes. [ECF No. 50-10, AG MSJ 014]. This high proportion of short duration calls is indicative that Defendant's call traffic is largely unwanted because "unwanted calls face challenges in keeping a significant number of consumers on for longer duration and many calls upon being answered are immediately hung up as the consumer hears an automated voice on the line." [ECF No. 50-10, AG MSJ 012]. Defendant also transmitted 86.6 million calls from invalid phone numbers, where it is virtually certain that the call does not reflect communication by someone known to the recipient or who has a legitimate reason to place the call. [ECF No. 50-10, AG MSJ 019]. Similarly, over 508 million phone numbers were used to place only a single call and it is "highly likely that most or all 508 million numbers that were only used for a single call are not assigned to the entity initiating the call or are only temporarily assigned to the caller allowing it to rotate through a pool of phone numbers to avoid associating the phone number with the fraudulent or otherwise illegal content of the calls." [ECF No. 50-10, AG MSJ 009].

Enjoining Defendant from transmitting further calls to the United States modestly reduces Defendant's revenue but protects the public from a high volume of calls that are at best a waste of consumers' time, and frequently are dangerous attempts to steal money or personal information. [ECF No. 110, pg. 13-14] ("Defendant knowingly transmitted call traffic that caused consumers' caller identification services to display inaccurate or misleading information in furtherance of attempts to steal from the call recipients.").

---

[11] The majority of the call records analyzed were from 2022. [ECF No. 50-10, AG MSJ 010-12].

*4.     Public Interest*

The balance of hardships and the public interest generally merge when the government is a party to the action. *See Scott v. City of Daytona Beach Fla.*, 689 F. Supp. 3d 1160, 1170 (M.D. Fla. 2023). Here, the Attorney General has brought the instant suit as *parens patriae* and respectfully asserts that the requested injunction is in the public interest for the reasons articulated above.

### B.     The Scope of The Proposed Injunction is Proper

Preventing further statutory violations requires an injunction prohibiting Defendant from transmitting calls to phone numbers with area codes associated with the United States, its districts, and its territories. Narrower injunctive relief which merely requires Defendant follow existing statutes and regulations would be ineffective. *See Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) ("It is well-established in this circuit that an injunction demanding that a party do nothing more specific than 'obey the law' is impermissible."). The record in this action and recent evidence of Defendant's continued transmission of illegal calls show that Defendant will not obey existing regulations or even its own internal policies. Injunctions can cabin Defendant's conduct but cannot force Defendant to care that its conduct fuels harassment and theft. A clear-cut prohibition on transmitting domestic call traffic is the least restrictive measure that will address Defendant's callous, repeated illegal acts.

### CONCLUSION

WHEREFORE, The Attorney General respectfully requests that this Court enter a permanent injunction prohibiting the Defendant from transmitting any telephone call on behalf of any other entity to any telephone number with an area code assigned to the United States, its districts, or its territories. The text of the proposed injunction is attached hereto as Exhibit 4.

Dated: October 30, 2024.

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General of the State of Florida**

*/s/ Patrick Crotty*
Patrick Crotty
Florida Bar # 108541
Special Counsel, Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Patrick.Crotty@myfloridalegal.com

Miles Vaughn
Florida Bar # 1032235
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515
Miles.vaughn@myfloridalegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 30, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system and thereby served the other parties of record.

*/s/ Patrick Crotty*
Patrick Crotty
Senior Assistant Attorney General