UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 22-23945-CIV-MARTINEZ**

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

     Plaintiff,

vs.

SMARTBIZ TELECOM LLC,

     Defendant.

_____/

## <u>CONSENT FINAL JUDGMENT AND STIPULATED INJUNCTION</u>

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs (hereinafter referred to as "Plaintiff" or "Attorney General") and Defendant, Smartbiz Telecom LLC ("Defendant"), stipulate to entry of this Consent Final Judgment and Stipulated Injunction ("Order") to resolve all matters in dispute in this action.

**THEREFORE, IT IS ORDERED** as follows:

### <u>FINDINGS</u>

1.    This Court has jurisdiction over this matter.

2.    The Attorney General's Complaint, [ECF No. 1], alleges that Defendant violated the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101 et seq., the Telemarketing Sales Rule, 16 C.F.R. § 310; the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., and Florida's Deceptive and Unfair Trade Practice Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"), by knowingly transmitting fraudulent or otherwise illegal call traffic to consumers in the United States.

1

3. Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

4. Plaintiff and Defendant waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## STIPULATED DEFINITIONS

5. "Automatic Number Identification" or "ANI" means the telephone number that is asserted to be originating a call and for purposes of this Order is synonymous with the telephone number which would be displayed on a call recipient's phone.

6. "Customer" means any domestic or foreign individual and/or entity with which Defendant has (or would have, in the case of a prospective customer) a direct business relationship for the provision of Voice Service.

7. "Call Originator" means a Customer, or potential Customer, that provides Voice Service to any entity which initiates outbound calls using automated systems, such as predictive dialers, or using prerecorded or artificially voiced messages. Examples include Voice Service providers whose Customers are retail end users, enterprise users, and contact centers.

8. "Dialer Traffic" means VoIP calls that are placed to U.S. telephone numbers and within a 24-hour period thirty five percent (35%) or more of non-zero duration calls had a duration of less than six seconds.

9. "FCC" means the Federal Communications Commission.

10. "Industry Traceback Group" or "ITG" means the then current FCC delegated single consortium or contractor that conducts private-led efforts to trace back the origin of suspected fraudulent, abusive, or unlawful telecommunications traffic which is currently registered in

accordance with the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105, 133 Stat. 3274 (2019) (TRACED Act).

11.     "Intermediate Provider" means U.S. voice service providers who transmit or processes traffic that traverses or will traverse the U.S. public switched telephone network at any point but does not originate or terminates that traffic.

12.     "International Provider" means international Voice Service providers who transmit or processes traffic that traverses or will traverse the U.S. public switched telephone network at any point but does not originate or terminate that traffic.

13.     "International Tier 1 or In-Country Operator" means dominant foreign Tier 1 wireline and wireless operators operating outside the U.S on an in-country or international basis.

14.     "Prior Express Written Consent" is a term to be governed consistent with the interpretation of the FCC and means an agreement, in writing, bearing the signature of the person called (electronic signature being sufficient) that clearly authorizes the calling party seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

15.     "Session Initiation Protocol Trunk" or "SIP Trunk" means a virtual phone line or set of phone lines provided to a Customer for the transmission of Voice Service, specifically calls to a U.S. telephone number.

16.     "STIR/SHAKEN Authentication Framework" means the secure telephone identity revisited and signature-based handling of asserted information using tokens standards in compliance with current rules prescribed by the FCC.

17. "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones.

18. "Telemarketer" means any person who, in connection with Telemarketing, initiates or receives telephone calls to or from a customer or donor.

19. "Voice Service" means (1) Means any service that is interconnected with the public switched telephone network and that furnishes voice communications to an end user using resources from the North American Numbering Plan or any successor to the North American Numbering Plan adopted by the Commission under section 251(e)(1) of the Communications Act of 1934, as amended; and (2) Includes transmissions from a telephone facsimile machine, computer, or other device to a telephone facsimile machine.

## STIPULATED INJUNCTION

### Reasonable Customer Screening Practices

20. Defendant shall request from each Customer, in writing, information sufficient to determine that the Customer is engaged in, or intends to engage in, the provision of lawful Voice Service. This information shall include, but is not limited to:

a. The physical address and contact information for an individual associated with the Customer who has authority to make business decisions on behalf of the Customer, including the authority to terminate the Customer's Voice Service clients;

b. A description of the Customer's business, including whether the Customer is a Call Originator, an Intermediate provider, or an International Tier 1 or In-Country Operator for purposes of analyzing business and traffic, if it intends to transmit Dialer Traffic, and whether the Customer is engaged in Telemarketing or provides Voice Service directly to Telemarketers;

c. The address of any website the Customer maintains to advertise or otherwise describe its services;

d. Whether the Customer has been determined by the FCC via its ITG to be a "Non-Cooperative Voice Service Provider," or blocked from another voice service provider's network after being determined to be "Bad-Actor Upstream Voice Service Provider";

e. Whether the Customer is implementing, or has implemented, the STIR/SHAKEN Authentication Framework (to the extent legally required), pursuant to then-applicable rules or legislation, or is implementing, or has implemented a successor authentication framework if subsequently mandated by applicable federal law or regulation;

21. If a Customer indicates that it is a Telemarketer or a Call Originator to one or more Telemarketers, then Defendant shall further request that the Customer provide evidence that the Customer's Telemarketer Customer(s) are compliant with regulations prohibiting calls to consumers who have registered their phone numbers on the National Do-Not-Call Registry, such as the Telemarketer's Subscription Account Number and the name of the Telemarketer's Authorized Representative. Defendant shall refrain from entering into a business relationship with, or shall terminate, any Customer who provides Telemarketing services that refuses to provide evidence that such Telemarketer is compliant with regulations prohibiting calls to Consumers who have registered their phone numbers on the National Do-Not-Call Registry.

22. Defendant shall review and assess the accuracy of the information provided pursuant to Defendant's customer screening practices, including but not limited to:

a. Reviewing the Customer's internet website(s), and/or online presence;

b.  Reviewing public databases hosted by relevant state and/or federal/national governments that contain information about the registration or licensing of business entities in order to verify the Customer is appropriately licensed;

c.  Performing reasonable internet searches about the Customer, including public searches to determine if the Customer or its owner(s) have been found guilty from civil or criminal proceedings for violation of federal or state laws regarding the transport of illegal calls;

d.  Performing any additional reasonable investigation, at Defendant's discretion, to resolve any concerns or suspicions Defendant becomes aware of at any point during the Customer business relationship.

Customer Termination Practices

23.  Defendant shall immediately terminate, or refrain from entering into, any business relationship with a Customer or potential Customer if a review of information provided by the Customer, or information subsequently obtained, reveals that the Customer:

a.  Has refused to provide any material information or documentation requested;

b.  Has reported and not corrected false, inaccurate, or misleading material information;

c.  Provided inactive or false contact information, including email addresses, phone numbers, and mailing addresses;

d.  Is not incorporated, registered or licensed as a business, or is otherwise inactive, with the state or country of its principal place of business

e.  Does not have a website or online presence, or in Defendant's reasonable assessment maintains or proffers a dubious website or operation that presents obvious indicia of fraud or other illegal conduct;

6

f.  Has not implemented the STIR/SHAKEN Authentication Framework to the extent required by law, or a successor authentication framework if subsequently mandated by applicable federal law or regulation.

24.  Defendant shall immediately block and reject U.S. call traffic access of any Customer that does not respond to an ITG traceback involving calls sent to Defendant or otherwise cooperate with the ITG concerning that traceback, within 24 hours as required by law and regulation.  Defendant will block U.S. Call Traffic for that Customer to force the provider to respond, cooperate and comply with the ITG traceback, and, if after 2-weeks from the initial traceback request the Customer is still non-responsive or non-cooperative with the ITG, or Defendant, or has not credibly demonstrated the suspected call source has been eliminated or resolved, Defendant shall permanently block all U.S. call traffic for that Customer on its network.

25.  Defendant shall immediately block and permanently reject U.S. call traffic access of any Call Originator Customer that dialed or originated calls to the Defendant that have been the subject of – a total of (3) or more ITG traceback requests concerning calls suspected of consumer telephone scams, fraud, or impersonation campaigns, during any sixty (60) day period. Tracebacks regarding the same call or same call campaign on the same day shall not be treated as separate tracebacks for purposes of this paragraph.

26.  Defendant shall immediately block and permanently reject U.S. call traffic access of any Customer that has been the subject of – or calls dialed or originated by the Customer have been the subject of – a total of (5) or more ITG traceback requests sent to Defendant during any thirty (30) day period;  unless the Customer involved in the traceback request is an Intermediate Provider, International Provider, International Tier 1 or In-Country Operator or a dominant national/regional U.S. operator and, within two (2) business days, the provider produces to

Defendant credible documentation that it eliminated the offending call source or Customer on their network, has cooperated not only with the Defendant but the ITG to identify the source of each call subject to a traceback, is STIR/SHAKEN compliant to the extent required by law, has added all suspected robocall calling numbers to their Do Not Originate (DNO) Lists as applicable by law, and undertakes other reasonable actions in compliance with U.S. law and regulation to identify "bad actors" who are the source of the tracebacks and calls. It is understood in interpretation of this paragraph that:

a. Tracebacks regarding the same call or same call campaign on the same day shall not be treated as separate tracebacks for purposes of this paragraph.

b. The ITG may have timing delays in sending a traceback request to Defendant from the time of the occurrence of the suspected robocall(s) and this delay shall not be held against the Defendant in such instances to allow for proper investigation of the source of the traceback as contemplated by U.S. law and regulations.

c. International Tier 1 and In-Country Operator provide valuable and necessary information and cooperation in robocall mitigation, yet they operate cross border in different time zones wherein two (2) business days are not practicable for them to respond, act, or provide credible documentation, and that Defendant may afford reasonable accommodation of five (5) business days or more based upon circumstances to this type of provider in the determination of this paragraph.

**Screening and Constraining Dialer Traffic**

27.     Defendant shall monitor all call traffic in a manner sufficient to detect Dialer Traffic. If a Customer indicates to Defendant, or Defendant at any point determines, that the

Customer is transmitting Dialer Traffic, then Defendant shall request information sufficient to determine that the Dialer Traffic is legal, including but not limited to:

    a.  A description, sample recording, or sample transcript of the types of calls comprising the traffic;

    b.  If the traffic contains pre-recorded or artificially voiced messages, then evidence that the callers have obtained Prior Express Written Consent from the recipients of the calls, or a description as to why the traffic is legal;

    c.  If the traffic contains spoofed phone numbers, then a description of why the spoofing is legal.

28.     Defendant will refrain from accepting Dialer Traffic from a Customer if:

    a.  The Customer or potential Customer refuses to provide any information requested;

    b.  Information provided by the Customer or potential Customer, or information otherwise obtained by the Defendant, indicates that the Customer's Dialer Traffic is illegal.

29.     If any Customer represents to Defendant that its Dialer Traffic does not contain spoofed calling numbers, but Defendant detects that twenty-five percent (25%) or more of a Customer's Dialer Traffic is comprised of calls where the area code of the ANI matches the area code and exchange code (NPA-NXX) of the called number, or Defendant detects the presence of invalid or unassigned calling numbers in the Customer's Dialer Traffic, then Defendant shall first block all Customer's U.S. terminating SIP trucks for forty-eight (48) hours and then terminate the Customer; unless, within forty-eight (48) hours, the Customer can demonstrate to Defendant that the traffic is legal, such as through documentation showing that the ANIs used in the Customer's traffic have been validly assigned to the caller, then termination is not required.

Reasonable Traffic Monitoring

30. When the source of traffic is a Call Originator the defendant shall segregate all Customer traffic such that any SIP Trunk used for Dialer Traffic shall exclusively carry Dialer Traffic.

31. Defendant shall monitor all Customer call traffic in a manner sufficient to identify any Dialer Traffic any Customer routes through any SIP Trunk provided to the Customer by Defendant.

32. Defendant shall monitor all SIP Trunks that carry Dialer Traffic in a manner sufficient to identify whether twenty-five percent (25%) of calls have an area code and exchange code which matches the area code and exchange code (NPA-NXX) of the called number.

## MONETARY RELIEF

33. Defendant has agreed to pay the Attorney General the full sum of Sixty-Five Thousand Dollars ($65,000.00) in exchange for the entry of this Judgment ("Judgment Amount"), which is not and shall not be an admission of wrongdoing or liability of any kind on the part of Defendant. This amount shall be paid in scheduled installments with $5,000.00 USD due within seven (7) days of the Effective Date and $5,000 USD due on the final business day of each month starting the month after the initial payment and continuing for twelve (12) months. Payments shall be made by wire transfer, certified funds or cashier's checks, payable to the Department of Legal Affairs, c/o Patrick Crotty, Office of the Attorney General, Consumer Protection Division, 3507 E. Frontage Road, Suite 325, Tampa, FL 33607. To the extent any monthly installment is not paid upon its due date, the Attorney General is entitled to a late fee of an additional 1.5% of the monthly payment amount if payment is made by Defendant within three (3) business days after the due date, and if monthly payment amount is not paid in that time the Attorney General may enforce

10

the Judgment Amount against the Defendant, plus interest as prescribed under section 55.03, Florida Statutes, for which sum execution shall issue forthwith, and such amount may be used for purposes that may include, but are not limited to, attorneys' fees, and other costs of investigation and litigation, or be placed in, or applied to, any consumer protection enforcement or revolving fund, future consumer protection or privacy enforcement or litigation, consumer education, or for other uses permitted by state law, at the sole discretion of the Attorney General.

34.     If Defendant files bankruptcy within 91 days after making any payment pursuant to this Judgment, Defendant shall remain liable for the full balance of the Judgment Amount.  The Judgment Amount may be asserted by the Attorney General in any subsequent proceeding to enforce this Judgment, whether through execution, garnishment, or other legal proceedings, or through a proof of claim in any bankruptcy proceeding filed by any Defendant.

## FUTURE VIOLATIONS

35.     IT IS FURTHER ORDERED, upon the express agreement of the Parties, that any material failure to comply with the terms and conditions of this Judgment shall be addressed through enforcement with the prevailing party in any such proceeding(s) being entitled to recover all penalties and sanctions authorized by law, including attorney's fees and costs incurred in relation to such enforcement, from the non-prevailing party.  Any sanction or payment provided by this Judgment does not preclude the Attorney General from pursuing any other action, relief, or sanction available to the Attorney General for any act which, independent of this Judgment, would constitute a violation of the laws of Florida.

## COMPLIANCE MONITORING AND REPORTING REQUIREMENTS

36.     Defendant shall notify the Attorney General of the filing of a bankruptcy petition within fifteen (15) days of filing.

11

37.     Upon any reasonable written request by the Attorney General, the Defendant shall:

a.  Designate at least one telephone number and email, physical, and postal address as points of contact, which the Attorney General may use to communicate with Defendant;

b.  Identify all businesses related to Telecommunications or Telemarketing that the Defendant owns, or directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

c.  Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales;

d.  Identify any Customer and provide call detail records for any Voice Service Defendant provided to the Customer.

38.     Defendant shall not effect any change in the form of doing business or the organizational identity of any of the existing business entities or create any new business entities for the purpose of avoiding the obligations and terms and conditions set forth in this Judgment.

39.     Unless otherwise directed by a representative of the Attorney General in writing, all submissions to the Attorney General pursuant to this Order must be emailed to patrick.crotty@myfloridalegal.com or sent to:

Florida Office of the Attorney General
Consumer Protection Division
Attention: Patrick Crotty
3507 E. Frontage Rd., Ste. 325
Tampa, FL 33607

**GENERAL AND ADMINISTRATIVE PROVISIONS**

40.     The "Effective Date" of this Judgment is the date upon which the Judgment is entered by the Court.

41.     Acceptance by the Attorney General shall be established by the signature of the Division Director or her designee.

42.     The receipt by the Attorney General of any monies pursuant to the Judgment does not constitute acceptance by the Attorney General, and any monies received shall be returned to Defendant if this Judgment is not accepted and fully executed by the Attorney General.

43.     It is further agreed that facsimile copies of signatures may be accepted as original for the purposes of establishing the existence of this Order, and this Order may be executed in counterparts the compilation of which shall constitute the full and final agreement.

44.     Nothing herein constitutes approval by the Attorney General of any person or corporation's past or future business practices. The Defendant shall not make any representation contrary to this paragraph.

45.     Nothing herein shall be construed as a waiver of any private rights, causes of action, or remedies of any private person, business, corporation, government or legal entity against the Defendant. Similarly, nothing contained herein shall waive the right of the Defendant to assert any lawful defenses in response to a claim of a consumer.  Any and all findings contained herein are solely for the purposes of this Order and shall not be binding against Defendant for the purpose of establishing liability in any action asserted by any private person, business, corporation, government or legal entity against Defendant, except in any bankruptcy proceeding relating to the discharge or discharge ability of any monetary award in this Order as set forth above.

46.     Notwithstanding any other provision of this Order, nothing herein shall be construed to impair, compromise, or affect any right of any government agency other than the Attorney General except as expressly limited herein.

47. Defendant shall release and forever discharge the Office of the Attorney General (including any of its past, present or future administrators, employees, officers, attorneys, agents, representatives, officials acting in their official capacities, agencies, departments, commissions, and divisions) from any and all manner of civil claims, demands, actions, suits and causes of action, damages whenever incurred, liabilities of any nature whatsoever, whether known or unknown, accrued or unaccrued, legal, equitable or statutory, arising out of or in any way related to, in whole or in part, the subject matter of the litigation of this lawsuit.

48. Nothing herein relieves Defendant of its continuing duty to comply with applicable laws of the State of Florida nor constitutes authorization by the Attorney General for Defendant to engage in acts and practices prohibited by such laws.

49. Defendant expressly acknowledges that it has obtained or had the opportunity to obtain the advice and counsel of an independent attorney of its choosing to assist in the negotiation and preparation of this Order. Defendant agrees that it has read this Order, is aware of its terms and has voluntarily agreed to and signed this Order. Further, Defendant acknowledges that to the extent it has waived any rights or defenses by entry into this Order, such waiver was made voluntarily and with full knowledge of the ramifications of such waiver.

50. Further, the Parties acknowledge that this Order constitutes the final, complete, and exclusive statement of the Parties' agreement on the matters contained in this Order, and it supersedes all previous negotiations and agreements. Other than any representation expressly stated in this Order, the Parties have not made any promises, representations or warranties to each other, and neither Party's decision to enter into this Order is based upon any statements by the other party outside of those reflected in this Order.

51.     Defendant states that no promises of any kind or nature whatsoever, other than the written terms of this Order, were made to induce Defendant into entering into this Order.

52.     If any term of this Order is to any extent unenforceable, invalid, or illegal, such term shall be excluded to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

53.     This Order shall be governed by the laws of the State of Florida.

54.     This document is signed in anticipation of this Order being submitted to the Court for approval, without necessity of hearing, which is hereby WAIVED by all Parties. The signatures below indicate the Parties' consent and agreement to this Order.

55.     IT IS FURTHER ORDERED that this Court retains jurisdiction of this case to enforce the terms of this Order and enter any further orders as may be necessary to ensure compliance with this Order, including by issuing additional injunctive relief. Accordingly, this Court shall enter any further orders as may be necessary to ensure compliance with this Order, including civil and/or criminal contempt proceedings.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 18 day of February, 2025.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record

15